# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WHALECO INC., | Case No. **1:23-cv-3706** |
| 31 St. James Avenue, Suite 355<br>Boston, MA 02116, | |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SHEIN TECHNOLOGY LLC, | |
| 250 Massachusetts Avenue NW<br>6th Floor, Suite 660<br>Washington, DC 20001, | |
| ROADGET BUSINESS PTE. LTD., | |
| 7 Temasek Boulevard,<br>#12-07 Suntec Tower One,<br>Singapore 038987, | |
| Defendants. | |

i

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 6

THE PARTIES ...................................................................................................................... 8

FACTUAL ALLEGATIONS ............................................................................................... 8

I.    Shein's Multifaceted Scheme to Abuse the U.S. Copyright Office's Intellectual Property Protection Regime and Subvert the Purposes of the DMCA to Interfere with Temu's Growth ......................................................................................................... 9

    A.    Shein's Unlawful, Anticompetitive Exclusive-Dealing Agreements with Coercive IP Transfers from Suppliers to Shein ....................................................... 9

    B.    Shein Uses Illegal IP Seizures for Pretextual IP Enforcement and a Mass-Scale Bad Faith Campaign of Sending Tens of Thousands of Sham DMCA Notices to Disrupt Temu's Operations ............................................... 10

    C.    Shein Has Defrauded the U.S. Copyright Office and Obtained Improper Copyright Registrations that It Has Asserted Against Temu ........... 15

    D.    Shein's Bad-Faith DMCA Campaign to Cripple Temu and Tie Up Suppliers ............................................................................................................... 19

        1.    Shein's Submission of Thousands of False DMCA Notices Where Shein Neither Owns the Asserted Works nor Has the Required Authorization from the Copyright Owner ........................... 19

        2.    Shein's Accusations Against Products Unrelated to Its Asserted Copyrighted Images to Interfere with Temu's Business ..................... 21

        3.    Shein's DMCA Notices Against Non-Infringing Images ................... 24

        4.    Shein Intentionally Has Misused the DMCA Process to Interfere with Temu's Business ...................................................................... 25

        5.    Shein Relied on Its Mass-Scale DMCA Fraud to Launch Bogus Legal Actions Against Temu (Directly and by Proxy) ....................... 29

II.    Shein's Abuse of the Copyright System Is Part of a Pattern of Defrauding and Abusing the U.S. Legal System ...................................................................................... 30

    A.    The U.S. Copyright Office and Its Fundamental Reliance on the Candor of Applicants ............................................................................................. 30

    B.    Shein Is a Potemkin Village ............................................................................... 31

    C.    Shein's Scheme Relies on Information Asymmetry Between U.S. Courts and Other Countries ................................................................................. 33

    D.    Shein's Corporate Camouflage and Shape-Shifting Corporate Entities ......... 35

III.    Shein's Scheme to Foreclose Temu from Supply Through False Imprisonment, Exclusive-Dealing Agreements, Loyalty Attestations, Phone Seizures, and Unauthorized Searches of Merchants' Phones ........................... 38

    A.    Shein's Abuse of Its Monopoly Position through Improper Seizures of IP Rights and Exclusive-Dealing Agreements ................................................. 39

B.   Shein's Coercion of Suppliers to Enforce Its Exclusivity Requirements and IP Seizures—False Imprisonment of Vendors Who Deal with Temu, Loyalty Attestations, Public Shaming, and Mafia-Style Intimidation ............ 44

    1.   Shein Demands that Manufacturers Execute False and Misleading Loyalty Attestations Against Temu ................................. 45

    2.   Shein Has Threatened Suppliers that It Would "Go After" Anyone That Supplied Temu or Any Other Third Party .................... 46

    3.   Shein Has Used Public Penalty Notices to Publicly Shame Suppliers Who Did Business with Temu and to Intimidate Other Suppliers ...................................................................... 46

    4.   Shein Has Falsely Imprisoned Suppliers' Representatives, Searched Their Phones for Temu's Proprietary Information Without Permission, and Made Additional Threats............................ 48

C.   Shein's Anticompetitive Pricing Floor Requirements ..................................... 50

IV.  Shein Has Copied Temu's Copyrighted Games and Arcade-Style Trade Dress to Steal Temu's Customers .................................................................... 51

A.   Shein Has Copied Temu's Copyrighted Games to Increase Customer Acquisition ................................................................................. 52

    1.   Shein's Infringement of Temu's Registered Copyrights .................... 52

    2.   Temu's Copyrighted Games Are Particularly Valuable as They Are Designed to Acquire New Customers and Deepen Engagement with Current Users ...................................................... 56

    3.   Shein Has Hired Temu's Key Marketing and Advertising Personnel Who Had Access to Highly-Confidential Information and Know-How Including for Temu's Trade Dress that Shein Copied ........................................................................... 59

B.   Shein Has Copied Temu's Arcade-Style Trade Dress .................................... 60

    1.   Temu's Arcade Trade Dress Is Distinctive and Valuable.................. 62

    2.   Shein's Improper Acts ...................................................... 65

V.  Shein's Misappropriation of Temu's Trade Secrets ................................... 67

VI.  Injury to Temu, Consumers, and Competition.............................................. 69

CLAIMS ...................................................................................... 73

Count I
False DMCA Takedown Notice (17 U.S.C. § 512(f))........................................ 73

Count II
Copyright Infringement (17 U.S.C. § 101, *et seq.*) ..................................... 74

Count III
Inaccurate Copyright Registrations (17 U.S.C. § 411)..................................... 74

Count IV
Trade Dress Infringement (15 U.S.C. § 1125(a)) .......................................... 75

Count V
Misappropriation of Trade Secrets (18 U.S.C. § 1831, *et seq.*) ........................................... 76

Count VI
Misappropriation of Trade Secrets (D.C. Code § 36-401, *et seq.*) ..................................... 78

Count VII
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) ................................................ 80

Count VIII
Monopolization in Violation of Section 2 of the Sherman Act  (15 U.S.C. § 2) ............... 81

Count IX
Attempted Monopolization in Violation of Section 2 of the Sherman Act
(15 U.S.C. § 2).......................................................................................................................... 82

Count X
Violation of Section 3 of the Clayton Act (15 U.S.C. § 14) ................................................ 83

Count XI
Restraints of Trade (D.C. Code § 28-4502) ....................................................................... 83

Count XII
Monopolization (D.C. Code § 28-4503) ........................................................................... 84

Count XIII
Attempted Monopolization (D.C. Code § 28-4503)............................................................ 85

Count XIV
Unfair Competition (D.C. Common Law) ........................................................................ 86

Count XV
Tortious Interference with Contract (D.C. Common Law) .................................................. 87

Count XVI
Tortious Interference with Business Relations (D.C. Common Law) ............................... 88

Count XVII
Tortious Interference with Prospective Business (D.C. Common Law).......................... 89

Count XVIII
Abuse of Process (D.C. Common Law) .............................................................................. 89

PRAYER FOR RELIEF ............................................................................................................ 90

JURY TRIAL DEMANDED..................................................................................................... 95

Plaintiff WhaleCo Inc. ("Temu" or "Plaintiff"), by its attorneys White & Case LLP, brings this Complaint and requests a Jury Trial against Defendants Shein Technology LLC and Roadget Business Pte. Ltd. (together, "Shein" or "Defendants").  Temu alleges, upon personal knowledge as to events or actions taking place in its presence, and upon information and belief as to all other events or actions, as follows:

## NATURE OF THE ACTION

1.      Temu is a growing e-commerce marketplace offering U.S. consumers an extensive range of products supported by an innovative, enhanced user experience.  Though Temu's business model is very different from the fashion-focused, resale approach relied on by Shein (an incumbent online retailer that has been straining to reinvent itself as an online marketplace), ever since Temu's U.S. launch in September 2022, the company has been seen by Shein as its greatest threat—and therefore the target of malicious and unlawful conduct intended to thwart Temu's success.

2.      Shein's efforts to illegally interfere with Temu's business, abuse the U.S. legal process, and infringe Temu's intellectual property ("IP") rights have escalated recently and warrant immediate action by this Court.  Shein recently has gone so far as to *falsely imprison* merchants doing business with Temu, including detaining merchant representatives in Shein's offices for many hours while Shein confiscates the merchants' electronic devices, obtains access to proprietary Temu information through the merchants' seller accounts, and threatens the merchants with penalties for doing business with Temu.

3.      Following its pandemic-related boost, Shein reportedly was valued at over $100 billion as of early 2022 and announced its intention to become a public company traded on a United States exchange.  Following the U.S. entry of Temu, however, Shein's valuation reportedly fell by over $30 billion, so Shein hatched a desperate plan to eliminate the competitive threat posed by Temu.  Shein's plan entailed the manipulation of the U.S. Copyright Office, misuse of the Digital

1

Millennium Copyright Act ("DMCA") procedures designed to protect legitimate rights holders (which Shein is not), the subversion of the U.S. legal process to disrupt Temu's operations and damage Temu's valuable brand, and the unlawful copying of Temu's IP.  At the same time, Shein carried out a campaign to shore up its public image and deceive U.S. regulators and intellectual property agencies located here in the Nation's Capital.

4.     Temu brings this action to respectfully ask this Court to put a stop to Shein's deceptive misuse of the U.S. legal system and anticompetitive conduct.

5.     Shein has carried out a multi-faceted scheme to slow Temu's growth in the United States, including through at least the following actions (the "Scheme"):

(a)     Coercing thousands of suppliers to sign adhesion contracts allowing Shein to ***seize the suppliers' worldwide IP rights***, through invalid assignments and often without the suppliers' knowledge;

(b)     Relying on the illegally seized IP rights and/or relying on knowingly false information to obtain ***improper copyright registrations*** in the United States Copyright Office, located in this District;

(c)     Issuing voluminous, ***bad-faith DMCA takedown notices*** to Temu, often alleging that a product sold on Temu's marketplace has infringed the very rights obtained as a result of Shein's supplier IP seizures—even where Shein has no basis to establish that it owns the IP it is purporting to enforce;

(d)     Further abusing the U.S. legal system by ***instigating and supporting dubious copyright infringement lawsuits*** against Temu, even though the named plaintiffs suffered no commercial injury, and even though Shein's entire business model is based on stealing others' IP (with approximately

100 IP infringement lawsuits filed against Shein and its affiliates in the U.S. alone); and

(e)     Leveraging its dominance in ultra-fast fashion (the product market on which Shein built its earlier success in the United States) to foreclose Temu from access to suppliers, through ***Exclusive-Dealing Agreements***, ***mafia-style intimidation of suppliers***, and ***anticompetitive pricing floor requirements***.

6.     In the months leading up to Temu's major upcoming advertising campaign for Super Bowl LVIII in February 2024 (bound to increase traffic to Temu's app and website, just as a similar Temu campaign did in 2023), Shein has resorted to even more desperate and coercive measures, including physical detention of merchants who dare to work with Temu, personal threats, and illegal seizures of merchants' personal devices to obtain access to the merchants' Temu accounts and Temu's confidential information and trade secrets.

7.     Shein's illegal Scheme to disrupt Temu's business cannot be separated from its public campaign to manufacture the false image of itself as a law-abiding corporate citizen.  In numerous public statements, Shein has gone to great lengths to convince the public that Shein respects intellectual property rights and champions the rights of the merchants who supply products for resale on Shein's websites.  For example, in a 2022 "Sustainability and Social Impact Report," Shein represented to the public that:

> "***Protecting intellectual property*** is one of SHEIN's key priorities and a critical part of empowering independent designer talent," and

> "A core pillar of our business model is ***empowering entrepreneurs***." (emphasis added)

8.     But Shein's behind-the-scenes campaign to prevent competition and thwart Temu's success exposes its public campaign as a fraud and a farce.  The truth is that Shein's interpretation of "protecting intellectual property" is illegally seizing, fabricating, and weaponizing intellectual

3

property rights to block competition.  And if Shein claims to "empower entrepreneurs," then someone should ask the "entrepreneurs" that Shein has bullied, intimidated, and even detained in its offices until they swore allegiance to Shein—and Shein alone.

9.      Shein's conduct targeted at Temu is part of a larger pattern of behavior by Shein to subvert and abuse the U.S. legal system.  Shein's recent and ongoing manipulation of DMCA notice procedures to disrupt Temu's marketplace is founded on Shein's improper seizures of the suppliers' IP and Shein's false submissions to the U.S. Copyright Office.  Shein has asserted and continues to assert against Temu copyrights Shein unlawfully seized from suppliers or fraudulently registered with the U.S. Copyright Office, not for the purpose of protecting legitimate IP rights but instead to shut down listings of competing fashion products on Temu's marketplace.  But most of Shein's asserted copyrights are invalid, and any corresponding copyright registrations should be cancelled, because they are based on (1) coercive, unlawful IP transfers; (2) works where Shein otherwise lacks IP ownership; and (3) a massive pattern of misrepresentations to the U.S. Copyright Office (including knowingly false claims regarding ownership, publication, and backdated transfers).

10.     Had the U.S. Copyright Office known that its registration process—which depends on honesty and respect for the law by applicants—had been abused to obtain registrations based on knowing misrepresentations in order to perpetrate widespread DMCA fraud, it would have refused registrations to Shein.  Although the scale of Shein's unlawful copyright scheme is currently unknown, it likely implicates numerous copyright registrations and likely thousands of DMCA notices against Temu and the innocent suppliers who dared to offer U.S. consumers competing products.

11.     Not stopping there, Shein manipulates the U.S. judicial system by making self-

serving and inconsistent representations depending on which side of the "v." Shein is on:  when it gets sued for IP infringement (which is often), Shein claims that its suppliers are responsible for the infringements.  But when IP enforcement suits Shein, it uses the rights it seized from suppliers to attack Temu and block sales of competing products through a sham DMCA campaign, often relying on fraudulently-obtained copyright registrations.

12.    If Shein believes that its public statements, IP enforcement conduct, and litigation positions are not inconsistent—and if Shein indeed stands by its past statements—then Shein's senior executives should be willing to appear in this Court to testify under oath that they intend to comply with U.S. law and that they can attest to the truth and accuracy of their statements.

13.    Finally, and true to form, to boost its attempted pivot to a marketplace model, Shein has been infringing Temu's valuable copyrights in its popular customer acquisition mobile games and has been copying Temu's unique and distinctive trade dress, causing confusion in the marketplace and loss of goodwill for Temu.

14.    Shein's pattern of deceitful, intentional disregard for U.S. law and the laws of this District has spread and will continue to spread without intervention by this Court.

15.    While each component of Shein's conduct is unlawful in its own right, taken together they form an anticompetitive Scheme and abuse of power in violation of District of Columbia Code Sections § 28-4502 and § 28-4503, §§ 36-401 to 36-408 and District of Columbia common law relating to unfair competition, tortious interference with contract, tortious interference with business, tortious interference with prospective business, and abuse of process. Shein's conduct has also violated and continues to violate several federal statutes:  15 U.S.C. § 1, 15 U.S.C. § 2, 15 U.S.C. § 14, 15 U.S.C. § 1125(a), 17 U.S.C. § 101, et seq., 17 U.S.C. § 411, 17 U.S.C. § 512(f), and 18 U.S.C. § 1831 et seq., as set forth below.

16.     Shein's conduct has harmed and continues to irreparably harm Temu, U.S. consumers, hard-working ultra-fast fashion suppliers, and the U.S. intellectual property and judicial systems as a whole.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1337(a), and 1338(a) and (b) because the claims herein arise out of federal questions concerning the copyright laws under 17 U.S.C. § 101, et seq., antitrust laws under 15 U.S.C. § 15, trade secret laws under 18 U.S.C. § 1836, and trade dress infringement under 15 U.S.C. § 1125(a). The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

18.     The Court has personal jurisdiction over Defendants under D.C. Code § 13-423 because Shein transacts business in this District, Shein contracts to supply services or things in this District, and Defendant Shein Technology LLC has an office and employees located at 250 Massachusetts Avenue, NW, Washington, D.C., 20001.  Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal Scheme throughout the United States and in this District specifically.  The fraudulent DMCA campaign and the scheme to defraud the U.S. Copyright Office have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States.  Moreover, Shein's anticompetitive Scheme directly affects interstate commerce and has been directed at this District.

19.     Shein also offers, markets, promotes, and sells products in this District in connection with its infringing trade dress and infringing interactive games, which are the subject of this lawsuit, and Temu is being harmed in this District by Shein's infringing activities.  Shein also purposely directs its business activities and sells its products to District of Columbia residents, and the exercise of jurisdiction in this District is consistent with the United States Constitution and

laws.

20.    This Court also has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2) because Shein purposely directs its business activities and sells its products to District of Columbia residents and United States residents, and the exercise of jurisdiction in this District is consistent with the United States Constitution and laws.

21.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants are subject to personal jurisdiction in this District.  The acts complained of have and will continue to have substantial effects in this District.  Moreover, Defendants reside, transact business, are found, and have agents in this District.  Defendants have submitted hundreds of copyright registrations, which are implicated in this litigation, to the U.S. Copyright Office, located in this District.  The critical records related to Defendants' copyright applications and registrations, as well as Defendants' scheme to defraud the U.S. Copyright Office, are located in this District and may be obtained only from the U.S. Copyright Office's records and/or witnesses.  Further, Defendants use social media to target consumers in the District of Columbia to join its purported platform and purchase its products, and it ships consumer goods to and imports into this District. Customers from this District access Shein's website or mobile application.

22.    Further, Defendants knowingly have targeted Temu with their fraudulent DMCA and copyright scheme.  Shein has sent knowingly false notices of copyright infringement to Temu that are based on Shein's alleged copyrights, which were registered in this District and the records for which reside with the U.S. Copyright Office in this District.  As a result, a substantial part of the interstate trade and commerce involved in and affected by Shein's violations of the intellectual property laws, the U.S. copyright registration regime within the U.S. Library of Congress, the

copyright protection regime, and antitrust laws was and is carried out in part within this District. The acts complained of have and will continue to have substantial effects in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright lawsuits), 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision), because Defendants reside, transact business, are found, or have agents in this District.

## THE PARTIES

24.     Plaintiff WhaleCo Inc. (d/b/a Temu) is a Delaware corporation with its principal place of business in Boston, Massachusetts.  Temu has customers throughout the United States and the District of Columbia.

25.     Defendant Shein Technology LLC is an indirect, wholly-owned subsidiary of Roadget Business Pte. Ltd and is located at 250 Massachusetts Avenue, NW, in Washington, D.C.

26.     Defendant Roadget Business Pte. Ltd. ("Roadget") is a private limited company organized under the laws of Singapore.  Roadget owns the website https://us.shein.com and the corresponding mobile application.  The history of Roadget acting as Shein is detailed below.

## FACTUAL ALLEGATIONS

27.     In response to the competitive threat posed by Temu, Shein created and implemented a Scheme to interfere with Temu's U.S. growth.  While Shein's Scheme was motivated by a desire to prevent competition from Temu's superior offering, Shein's conduct struck at the very systems and institutions in place to protect intellectual property and adjudicate legal disputes in the United States.

I.    **Shein's Multifaceted Scheme to Abuse the U.S. Copyright Office's Intellectual Property Protection Regime and Subvert the Purposes of the DMCA to Interfere with Temu's Growth**

    A.    **Shein's Unlawful, Anticompetitive Exclusive-Dealing Agreements with Coercive IP Transfers from Suppliers to Shein**

28.    As described in Section III.A. below, Shein has monopoly power in the U.S. ultra-fast fashion market.  The ultra-fast fashion model relies on a highly tech-enabled supply chain that includes a limited pool of independent clothing makers that can create and deliver products on demand.  Today, approximately 10,000 of these manufacturers have the capability for small-batch, flexible production at a low cost.

29.    Temu's entry and meteoric rise to prominence have given these suppliers—who for years had no alternatives to Shein—a better channel to sell their products to U.S. consumers.  But it has also posed an existential threat to Shein.  Desperate to hold on to its grip on the ultra-fast-fashion market, Shein has devised an anticompetitive scheme that misuses and abuses the DMCA procedures and the U.S. Copyright Office registration regime to prevent ultra-fast-fashion suppliers from listing their products for sale on Temu.

30.    Shein enters into Exclusive-Dealing Agreements with ultra-fast-fashion suppliers, and through those agreements Shein improperly seizes suppliers' IP rights—without due consideration and, oftentimes, without suppliers' knowledge—to prevent suppliers from listing and selling similar products on Temu or other retail platforms.

31.    Specifically, at around the time of Temu's launch in the United States, Shein began to amend the Exclusive-Dealing Agreements to seize suppliers' IP.  An example of the Exclusive-Dealing Agreements is attached to this Complaint as **Exhibit A**.  The critical amendments made to the Exclusive-Dealing Agreements (i) force suppliers to grant a worldwide, irrevocable, and exclusive license allowing Shein to "publish, display, reproduce, improve, or otherwise use" the

suppliers' products and related styles (Ex. A, Part I, Art. II.11(1)); (ii) force suppliers to initiate a mandatory transfer to Shein of the IP rights in the images, photos, or videos of such products (*id.* at Part I, Art. II.11(2)); and (iii) prohibit suppliers from using or displaying the aforementioned styles (*id.* at Part I, Art. II.11(1)), to the effect that such suppliers would not be able to list any of the same styles on any third-party platform.

32.     As detailed below, Shein then relies on these unlawful IP seizures for thousands of DMCA notices seeking to shut down competing product listings by merchants who dare to list their products on Temu.

33.     What's more, as described below, Shein has also made scores of knowingly false claims to the U.S. Copyright Office in this District to procure copyright registrations for various ultra-fast-fashion product photographs on which it later relies to issue a barrage of bad-faith DMCA notices to Temu.

**B.     Shein Uses Illegal IP Seizures for Pretextual IP Enforcement and a Mass-Scale Bad Faith Campaign of Sending Tens of Thousands of Sham DMCA Notices to Disrupt Temu's Operations**

34.     Shein has engaged in a pretextual IP enforcement campaign to inundate Temu with ***tens of thousands of baseless and fraudulent DMCA claims*** to hinder Temu's progress and interfere with its business relationships with merchants.

35.     The United States copyright laws are clear:  DMCA takedown notices cannot be made frivolously or without investigation by the copyright complainants.  The DMCA provides safe harbor for service providers but allows copyright owners or those authorized to act on their behalf to request takedown of infringing material posted by third parties.  But takedown notices pursuant to the DMCA must be based on a "good faith belief" that the use of the material is infringing, accompanied by a statement made under the penalty of perjury that the information within the notice is accurate.  17 U.S.C. § 512(c)(3)(A)(v) and (vi).

36.     ***Bad faith notices.***  If someone asserts a DMCA takedown notice in "bad faith"—

for example, by materially misrepresenting its IP rights or making a false claim of infringement—

then Section 512(f) provides for liability for submitting a notice with a material misrepresentation.

17 U.S.C. § 512(f).  Moreover, the DMCA requires that notices of claimed infringement must

include information sufficient to evaluate the claim asserted in the notice.   17 U.S.C.

§ 512(c)(3)(A)(iii).  A party asserting a DMCA takedown notice must consider—in good faith and

*before* a takedown notice is sent—whether the accused material infringes its asserted rights.  As

described below, Shein not only has failed to comply with these requirements, but it also has

designed and perpetrated a fraudulent DMCA scheme (knowing that it lacked the required bases

for the notices) with the goal of harming Temu and shutting down tens of thousands of competing

listings on Temu.

37.     Temu is an online marketplace that serves approximately thirty million daily users

in the United States, with over three million product listings.  As of the date of this filing, the U.S.

site of the Temu platform displays more than eighty million product images, and over 100,000

new images are uploaded onto the U.S. site of the Temu platform every day.  Between January

and October 2023, Temu has received on average 170 copyright takedown requests a day across

all rights holders—which is a very small percentage of the 100,000 new product images uploaded

onto the platform on a daily basis.  Moreover, out of the roughly 170 copyright takedown notices

Temu receives each day, the majority (on average 63%) come from Shein.  This shows that,

notwithstanding Shein's abusive practices, Temu is a responsible and trusted marketplace, and it

is committed to following the law, connecting legitimate sellers with U.S. consumers, and

protecting intellectual property rights.

38.     Temu is continuously hard at work to ensure that its platform adheres to industry

standards in working with rights holders to address the inevitable instances of third-party infringements on its platforms.

39.     Shein, however, is not a legitimate rights holder nor a legitimate DMCA complainant.  Rather, it is a malicious actor seeking to take advantage of the DMCA framework to advance its anticompetitive agenda and maintain its unlawful monopolistic grip on the ultra-fast-fashion market.

40.     ***63% of Takedown Notices Come from Shein.***  Between January and October 2023 alone, approximately ***63%*** of the copyright takedown requests received by Temu (around 33,000) were from Shein.  The remaining 37% came from a total of approximately ***2,200*** other copyright rights holders combined.

41.     Out of 33,000 DMCA takedown notices sent by Shein during this time period, nearly all of them asserted copyright infringement in simple ***photographs*** of ultra-fast-fashion products and accessories.  Importantly, the asserted copyrights cover and are limited to the specific artistic elements of the photograph—***not the physical item of clothing itself***.

42.     Unsurprisingly, Temu's merchants use these photographs to promote items of clothing in their online product listings.  Ultra-fast fashion inventory moves quickly, with items going out of style or becoming irrelevant in a matter of weeks or even days.  And the margins in the ultra-fast-fashion industry are razor thin.  If a merchant on Temu is affected by a wrongful DMCA notice from Shein, and its listing is shut down (based on a false allegation that the photograph in the listing is infringing), then on most occasions, the merchant will lack the time and resources to take new photographs of the clothing items for the listings.  As such, a bogus DMCA notice over a listing photograph effectively prevents these third-party merchants from selling the ***underlying physical clothing products*** on Temu.  And this is precisely the result Shein

wants.

43.     ***Temu's Prices Are Lower than Shein's on the Products for Which DMCA Notices Are Sent by Shein.***  Temu sampled a selection of DMCA notices sent by Shein and found that for around 90% of the affected listings, the prices for these products on Temu were lower than those on Shein.  Shein selectively targets photographs of ultra-fast fashion merchant listings on Temu that compete with—and offer a lower price than—the corresponding listings on Shein.

44.     Shein buries Temu with thousands upon thousands of DMCA notices, nearly all of which fail to include the requisite proof that Shein owns the asserted copyrights and/or that Shein is indeed authorized to act on behalf of the bona fide copyright owner.  Shein's DMCA notices include boilerplate language claiming that Shein is the "owner," "licensee," or authorized to act on behalf of the owner of the asserted copyrights in the photographs.  Notably, Shein fails to attach any documentation supporting its claims (e.g., copyright registrations or original photographs).

45.     Ironically, Shein takes a very different approach with respect to its own purported platform when dealing with DMCA takedown notices submitted by others ***to Shein***.  Shein asks DMCA requestors to provide detailed information to support the DMCA notices before Shein acts on the notices (including "copies of IP certificates and deposits," "the first date of public listings if no registrations (mandatory)," and "assignment agreements or work for hire agreements").

46.     ***Shein's Sham DMCA Takedown Notices Sent to Temu.***  Shein does not hold itself to this rigorous standard when sending the DMCA notices to Temu.  Conspicuously absent from its avalanche of DMCA notices to Temu is any proof that Shein has the required authority to request the takedowns.  This is because Shein knows that it is falsely claiming that Shein is the owner or licensee of many of the asserted works (it is not) and that Temu merchants' listings are infringing (they are not).

47.     Upon information and belief, nearly all of the works in the DMCA notices sent by Shein to Temu are not photographs that Shein took and/or commissioned others to take for it. Rather, upon information and belief, for the vast majority of its DMCA notices, Shein relies on IP rights that it illegally seized from its suppliers through its Exclusive-Dealing Agreements.

48.     First, Shein chokes the ultra-fast-fashion suppliers with exclusivity requirements and mafia-style intimidation and detention scare tactics against suppliers who dare to sell to Temu, including false imprisonment and seizure of cell phones during meetings Shein calls on false pretenses.  Second, Shein, as described above, coerces suppliers into blanket transfers of their IP rights to Shein as part of the Exclusive-Dealing Agreements.

49.     Next, for any suppliers who dare to list their products on Temu (in competition with Shein), Shein then sends DMCA takedown notices to shut down the listings.

50.     ***Shein's Sham DMCA Notices:  Copyrights Not Owned by the Suppliers, Not to Mention Shein.***  Moreover, even if the Exclusive-Dealing Agreements with IP transfer clauses were valid (they are not), the suppliers on many occasions do not own the rights in the photographs to transfer to Shein.  Upon information and belief, oftentimes the photographs asserted in Shein's DMCA takedown notices actually were taken by independent, third-party photographers hired and paid by the suppliers (who then wish to sell their products on Shein, Temu, or other platforms or websites).  The copyrights in the photographs thus rest with the independent photographers (not suppliers).  But suppliers receive permissions to use the photographs they commissioned and paid for to advertise their product listings.

51.     In sum, upon information and belief, the bulk of Shein's DMCA notices are false and invalid for two main reasons.  First, they are based on sham, coercive IP transfers that are invalid.  Second, even if the sham coercive transfers from merchants to Shein were valid (they are

14

not), the merchants had **no rights** in the photographs to transfer to Shein in the first place.  Shein is neither the owner of the asserted works nor is acting on behalf of the copyright owner, as it must be for the DMCA notices to be valid.

52.     Not stopping there, Shein found other ways to intentionally abuse the DMCA process and sabotage Temu.  As described below, Shein intentionally has sent DMCA takedown notices to Temu in large batches, demanded removal of product listings unrelated to the asserted copyrights, deliberately failed to provide clickable links and/or submitted incorrect links, mismatched images and links, and otherwise concocted ways to make DMCA compliance difficult, if not impossible.

53.     Shein's multi-stage and multi-faceted Scheme is aimed at stifling competition, hurting Temu's business, and foreclosing the public's access to alternative, often less costly, shopping choices.

54.     Shein has subjective knowledge of designing a large-scale DMCA scheme and submitting scores of false and baseless DMCA notices with the purpose of harming Temu and its third-party sellers.

### C.      Shein Has Defrauded the U.S. Copyright Office and Obtained Improper Copyright Registrations that It Has Asserted Against Temu

55.     Shein has abused and misused the U.S. copyright registration system for purposes of its fraudulent DMCA campaign against Temu.

56.     A review of the U.S. Copyright Office records shows that Roadget is the claimant for around 300 copyright registrations (with its affiliate Guangzhou Shein International Import & Export Co. Ltd. listed as the purported author on the "work for hire" bases) for visual works.  Many of these copyright registrations obtained by Shein cover multiple photographs as part of the registered visual work.

57. Upon information and belief, many of those registrations are based on (1) knowing misrepresentations by Shein to the U.S. Copyright Office; (2) works where Shein does not own the copyrights; and/or (3) coercive, invalid IP transfers. As such, as detailed further below, these registrations are invalid and should be canceled.

58. First, certain of Shein's copyright registrations are replete with material misrepresentations about key facts (e.g., including publication dates, publication status, and ownership) and/or rely on backdated assignment agreements (where the listed claimant Roadget did not own the purported copyrights at the time it filed for registration with the U.S. Copyright Office).

59. In a prior court action Shein brought against Temu (and which Shein has since voluntarily dropped), Shein had asserted thirty-five copyrights filed from September 2022 to May 2023. Of these thirty-five copyrights, every one contained at least one error in the registration made at the U.S. Copyright Office in Washington, D.C. Most significantly, in twenty-one of the thirty-five copyright registrations, Shein listed Roadget as the claimant, but later admitted in the relevant supplemental registrations for those copyrights that "the written agreement identified in the original application had not been executed at the time the original application was filed." *See, e.g.*, Shein Copyright Registration (Reg. No. VAu 1-494-985) (attached as **Exhibit B**). Roadget thus falsely asserted to be the claimant and, only after it got caught as part of a court proceeding, did it seek to correct the claimant to another related entity, Guangzhou Shein International Import & Export Co., Ltd., through supplemental registrations.

60. In addition, Shein attempted to clean up numerous other misrepresentations in the thirty-five copyright registrations through supplemental registrations once its false statements were revealed in court. For instance, seven of the thirty-five copyrights identified the work as

"published," but Shein later filed supplemental registrations to attempt to correct the copyrights to unpublished works. Similarly, seven of the copyrights were corrected from "unpublished" works to published works. In five of the thirty-five copyrights, Shein sought to correct the wrong year of completion, and in three of the copyrights Shein corrected a publication date. Finally, Shein sought and obtained removal of certain images from five of the thirty-five copyrights, including removing images in two copyright registrations because the images were not created by the same author as other images in the group collection (contrary to what Shein originally represented to the U.S. Copyright Office). All of this demonstrates not only a pervasive pattern of obtaining dozens of registrations by relying on knowing misrepresentations but also confirms that Shein is not aware of the basic facts underlying the works it seeks to register.

61.     Notably, of the thirty-five works, over one third may be found in listings on third-party platforms including Amazon, eBay, Walmart, and Poshmark, among others. This shows selective IP enforcement by Shein (targeting Temu and Temu only), that these purported works were not designed and/or owned by Shein (despite representations to the U.S. Copyright Office to the contrary), and/or that these works were obtained through improper IP transfers. Indeed, Temu's research has revealed that some of the designs subject to these Shein copyright registrations were published by ***third parties*** before Shein's claimed publication dates in its registrations.

62.     For example, Reg. No. VA 341-311 claimed a January 26, 2023 publication date. But at least two stores on Temu had used this same design in their product listings on Temu on December 25, 2022 and December 30, 2022—before Shein's alleged first publication date.

63.     Another design, titled "Heart and Hand" on Shein's website (subject to Shein's Registration No. VAu 1-497-129), looks nearly identical to a design that, upon information and

belief, was created by a third-party artist who made it available on a third-party website Pixel at least as early as July 2020.

64.     Further, for Shein's copyright Registration Nos. VA 2-340-978 and VA 2-340-990, the font design, prominently featured in the alleged works, was, upon information and belief created years ago by another third party.

65.     All of the above suggests that Shein has filed for and obtained copyright registrations for third-party works Shein had neither authored nor owns.

66.     The above conduct further shows Shein's pattern of making misrepresentations to government organizations and not respecting or following the rules.

67.     Moreover, upon information and belief, some of the copyright registrations are works created by or for the sellers by third parties.  But Shein claws those works for itself as part of its coercive IP transfer provisions in the Exclusive-Dealing Agreements.  Because the IP transfer provisions are buried within lengthy Exclusive-Dealing Agreements with suppliers (all small, unsophisticated entities), the suppliers are either unaware that they are signing away their IP and/or have no bargaining power to refuse these contracts of adhesion.  Shein thus does not own the copyrights it ultimately registered with the U.S. Copyright Office because the claim of ownership is based on invalid transfers and coercive Exclusive-Dealing Agreements.

68.     Further, for some of the works, even if the IP transfer agreements are valid (they are not), Shein's resulting registrations are still a nullity.  This is because, as detailed above, the copyrights in the asserted photographs actually are owned by third-party photographers, not the sellers.  As such, the sellers have no copyrights to transfer to Shein.

69.     Had the U.S. Copyright Office known that Shein obtained registrations based on coercive IP transfer agreements and/or a massive pattern of misrepresentations and inaccuracies

as to the key aspects of the registrations, it would not have issued the registrations.

70.     The full scope and magnitude of Shein's scheme to take advantage of the U.S. copyright registration system and defraud the U.S. Copyright Office is unknown.  Shein goes to great lengths—including through its corporate shell game, intentionally convoluted copyright transfer and assignment schemes, and intimidation tactics aimed at silencing suppliers and other third parties—to conceal the true scope of its scheme.  Moreover, critical documents regarding these copyright registrations—including copies of the visual works deposited with the copyright applications—are available only from the U.S. Copyright Office located in this District.

**D.     Shein's Bad-Faith DMCA Campaign to Cripple Temu and Tie Up Suppliers**

71.     As detailed below, Shein's violations of the DMCA are knowing, continuous, pervasive, crippling to Temu's and its sellers' business, and will continue to cause irreparable harm unless immediately enjoined.

72.     Moreover, Shein's illegal scheme intentionally abuses the DMCA process created by the U.S. Congress to protect legitimate rights holders and service providers, while avoiding abuse of the copyright system as conducted here by Shein.

**1.     Shein's Submission of Thousands of False DMCA Notices Where Shein Neither Owns the Asserted Works nor Has the Required Authorization from the Copyright Owner**

73.     Upon information and belief, Shein has submitted and continues to submit scores of sham DMCA notices to Temu where Shein falsely claims to be the "owner" or "exclusive licensee" (or similar wording) of the works asserted in the notice and/or purports to act on behalf of the copyright owner.

74.     For example, Temu investigated around 1,041 URLs from Shein's prior takedowns for listings on the Temu website.  Notably, Shein was able to show that Shein employees took the photographs asserted in only thirty-two URLs (or around 3% of the URLs).  Upon information and

belief, the above percentages are representative of Shein's other DMCA notices to Temu.

75.    Upon information and belief, Shein is neither the owner nor does it have the required authorization from the bona fide copyright owner for a very large portion of its DMCA takedown notices.  Nor does Shein investigate, as it must before sending the DMCA notices, whether it is the owner, licensee, and/or otherwise authorized by the copyright owner to submit the notices on the owner's behalf.

76.    Upon information and belief, Shein has sent and continues to send scores of DMCA takedown notices based on the images uploaded to Shein's website(s) by Shein's suppliers and third-party merchants—with no reliable verification regarding the suppliers' or merchants' ownership rights in those images.  Upon information and belief, Shein knows that many of these suppliers do not own the copyrights in the images.

77.    And even if the suppliers do own any rights, Shein knows that its coercive Exclusive-Dealing Agreements with the suppliers cannot lawfully and do not validly transfer any intellectual property rights to Shein.

78.    By way of example, in a recent instance, upon information and belief, Shein submitted a DMCA notice to a Temu seller where Shein was not the owner of the copyrighted images in the notice.  Rather, Shein based the notice on Shein's purported authority to act on behalf of one of its suppliers.  In reality, the Temu seller was the rightful owner of the copyrighted images. It was only after the merchant on Temu objected to Shein's false DMCA notice and initiated a legal proceeding against Shein that Shein appeared to attempt to investigate whether it had any rights to assert in the DMCA takedown notice and/or grounds to send the DMCA notice in the first place (it did not).  This is not an isolated incident.  Many merchants have complained to Temu that they have been the target of false DMCA takedown notices by Shein where the merchants were

either authors and owners of the copyrighted images and/or had authorizations to use the images to promote their product listings (e.g., from the photographers who created the product listing images for the merchants).

79.     Similarly, Shein's recent November 30, 2023 DMCA notice demanded takedown of fifty-four listings of fashion products that third-party merchants posted on Temu.  Shein asserted, without any proof, that it was the "owner, exclusive licensee, or agent for the owner of copyright rights" of fifty-four photographs included in the notice.  Temu asked that Shein provide proof that it is either the owner of the copyrights and/or is acting on behalf of the owners.  In so doing, Temu requested documentation that Shein itself asks complainants to provide when handling DMCA takedowns on its website.  Not surprisingly, Shein failed to respond to Temu and did not provide any proof of its rights or the required authorizations to submit the requests for any of the fifty-four images in the DMCA notice.

**2.      Shein's Accusations Against Products Unrelated to Its Asserted Copyrighted Images to Interfere with Temu's Business**

80.     Shein has also utterly and willfully failed to comply with the DMCA requirements by bombarding Temu with scores of non-compliant DMCA takedown notices for product images unrelated to the asserted copyrighted works.  Shein has done that to delay Temu's response times, disrupt its business, and harm its sellers.

81.     For example, on or around September 28, 2022, Shein sent Temu two DMCA notices accusing approximately 700 product listings on Temu's site of allegedly infringing Shein's copyrighted photographs.  Out of the 700, 448 accused product links were for a shoulder bag posted by third-party Temu sellers.  But the links on Shein's website, provided to prove Shein's purported rights, were for products *entirely unrelated* to the shoulder bag.  Examples of the incorrect Shein URLs include a three-piece hairclip set (https://us.shein.com/x-p-9711278.html),

a   tropical   print   jumpsuit   (https://us.shein.com/x-p-3040285.html),   a   mesh   dress (https://us.shein.com/x-p-6955657.html),   and   a   fake   nail   kit   (https://us.shein.com/x-p-10788795.html).  Shein thus harried Temu in an avalanche of alleged infringement of an image of a shoulder bag but provided hundreds of links to *different* images of products.  Temu had to spend countless hours combing through hundreds of links to try to, in good faith, interpret and address this notice.  Shein's malintent is apparent from a visual comparison of the allegedly infringing products on Temu, and photos from the URLs provided by Shein to prove its purported rights:

**Table 1:  Unrelated Images Used in Shein's DMCA Notices**

| The Accused Images on Temu | Examples of Images from the Shein URLs Included in Shein's Purported DMCA Notice to Prove "Infringement" of the Handbag Image |
|---|---|
|  | |

| The Accused Images on Temu | Examples of Images from the Shein URLs Included in Shein's Purported DMCA Notice to Prove "Infringement" of the Handbag Image |
|---|---|
| |  |

82.     The inescapable conclusion from such conduct—for example, asserting infringement of a *shoulder bag* photograph by a *hairclip or a nail kit* photograph—is that Shein's DMCA claims were asserted with subjective bad faith, and that no meaningful review occurred

before the claim was sent to Temu.  Rather, Shein intended to bury Temu with a hodgepodge of hundreds of notices with links that included unrelated products to overwhelm Temu and try to manufacture a scenario where Temu allegedly delayed or did not process the takedowns promptly.  Moreover, on information and belief, Shein, after sending this flawed DMCA takedown notice, then disabled many of the 448 links to unrelated products, destroying evidence and frustrating Temu's ability to confront Shein for its baseless accusations.

### 3.      Shein's DMCA Notices Against Non-Infringing Images

83.     Shein's improper DMCA takedown requests have also included a campaign based on subterfuge and deliberate confusion as to exactly what is the subject of its purported copyrights. It is important to note that Shein's asserted copyrights (to the extent it owns any)—indeed, any copyright—can cover only a picture, depiction, or description of a product.  *The product itself is not protected by copyright laws*.  As is well-established, a copyright covers only the *expression* of an idea, not the idea itself.  Shein's asserted "expression" of the alleged products are photographs, not the physical garments in the photographs.  Shein itself, when obtaining copyrights from the U.S. Copyright Office, has reiterated this basic point, stating that the registration did not extend to the depicted article of clothing.

84.     Despite Shein's disclaimer, Shein has repeatedly sought to impermissibly extend its copyrights by claiming infringement on a copyrighted photograph by a seller photograph posted on Temu that is completely different.  For example, Shein has claimed a copyright on an image of a girl in a tie-dye dress, wherein the image presented on Temu's site is to an utterly different picture with simply a tie-dye dress on a hanger (and a different dress, too).  Shein's DMCA notices are replete with these types of "infringements," where the only similarity is that the *products* themselves look similar, as opposed to a comparison of Shein's copyrighted image and the image on the Temu seller's site.

85.     Because these types of blatant "mismatches" cannot in good faith be considered an infringement of Shein's copyrighted image, Shein's assertion of DMCA violations in these instances is unsupportable and, on information and belief, made in bad faith and with a subjective intent to stop sales of competing products on Temu.

86.     The improper assertions of infringement and attempts to extend Shein's rights beyond those conferred by the copyright laws by accusing images of infringement based on entirely different products or images of the underlying product are further evidence of Shein's failure to undertake a good faith analysis as required by law.

87.     These Shein takedown notices fail to comply with the DMCA requirements and have caused real harm to Temu, as it has been forced to expend an enormous amount of time, resources, and effort chasing Shein's fraudulent notices, and Temu and its sellers have lost sales as a result of these fraudulent notices.

88.     ***Shein Knows that Temu Is Forced to Deal with Shein's Sham DMCA Notices.***  In addition, in order to protect its internet service provider status under the DMCA safe harbor provision, Temu has no choice but to investigate and address Shein's voluminous yet improper DMCA notices.  This causes harm not only to Temu, but to innocent third-party sellers who are forced to forego profits because of baseless copyright infringement allegations.  Shein knows that most of these third-party merchants are small and medium-sized enterprises; they are not sophisticated in intellectual property laws, do not understand the counter-notice procedures to contest bad-faith notices, and are terrified of Shein's retaliation were they to submit an objection to a baseless takedown.

### 4.     Shein Intentionally Has Misused the DMCA Process to Interfere with Temu's Business

89.     Shein is selectively using DMCA takedown notices *specifically to target Temu* and

interfere with its business.  But many of the images in the takedown notices also appear on third-party ecommerce platforms (e.g., Amazon), seemingly with no objection from Shein at all.  Nearly all of these listings on other platforms feature images identical to those used in Shein's listings for the same products, and on some platforms, there is more than one listing using the same image.  A recent sampling of 245 Shein URLs submitted by Shein with its DMCA notices has shown that (1) for 148 (or around 60%) of the URLs, at least one photo from each URL was also found on other third-party platforms; and (2) around 850 different URLs were found on third-party platforms displaying the exact same images as those in the 148 Shein URLs.  In light of the fact that these listings remain accessible, Shein appears not to have issued takedown notices for these products to platforms other than Temu.  Shein's targeted and selective attempts at enforcement show that Shein's true motivation is not protection of its alleged copyrights, but, rather, interfering with Temu's business operations.

90.    To further frustrate Temu's business, Shein sent DMCA takedown notices containing broken or incorrect links such that Temu was forced to expend substantial time and resources reviewing and processing the takedown requests.

91.    On or around May 15, 2023, Shein sent a DMCA takedown request containing 1,490 accused product listings on the Temu website.

92.    The accused Temu listings were to a variety of products on the Temu website (dresses, pants, women's blouses, etc.).  To support its DMCA notice, Shein provided a "Shein Photo" (an image of its asserted copyrighted photograph) for each alleged infringement—supported by a "Shein Photo URL" (a link to Shein's website purportedly showing use of the "Shein Photo").  Shein used the same single "Shein Photo URL" to support takedown notices for over 560 of the Temu website product listings contained in its May 15, 2023, notice.  The recycled

URL was linked to a children's dinosaur-themed swimsuit listing:  https://us.shein.com/Toddler-Girls-Heart-Print-Guipure-Lace-Trim-Cami-Dress-With-Bag-p-2771955-cat-2065.html?src_identifier=st%3D2%60sc%3Dsk2211148991985892%60sr%3D0%60ps%3D1&src_module=search&src_tab_page_id=page_home1683277063749&mallCode=29.

93.    The table below shows the images.  The "Shein Photo" (the image of the alleged Shein copyrighted image in the DMCA notice) did not match the "Shein Photo URL."  By way of example, some of the Shein Photos depicted two different women's robes and men's denim shorts, but the sole supporting URL—where Shein was supposed to link to the source information for the infringed product in 560 instances—took users to a page for a children's swimsuit with dinosaurs.

**Table 2:  "Shein Photos" that Do Not Match the Image in the Accused Product Listing**

| Examples of "Shein Photos" Provided with the DMCA Notice to Support Takedown of the Children's Swimsuit | Image of a Children's Swimsuit from over 560 "Shein Photo URLs" |
| --- | --- |
|  | |

94.    The  above  examples  further  confirm  that  Shein  sends  DMCA  notices  with

subjective bad faith intent to bury Temu with hundreds or even thousands of unusable, incorrect, and/or outright invalid takedown demands to slow down Temu's business, interfere with its operations, raise Temu's costs, and harm Temu's relationships with its sellers.

95.     Shein also sends Temu DMCA takedown notices in a non-searchable PDF format or with broken and unusable Internet links that make it difficult or impossible for Temu to locate the accused material—requiring even more tedious manual steps to unmask the offending sham Shein notices.  From 2022 to early 2023, Shein would provide clickable links as part of its DMCA takedown requests, making it easier for Temu to review and process the takedown requests.  But between February 2023 and June 2023, Shein sent DMCA takedown requests affecting approximately 19,850 product listings in an unclickable PDF format.  For each request, Temu employees had to manually type out each character of each URL of the image on Shein's site and of the product listing on Temu's site in order to properly review and address the Shein takedown request.  The significant volume of takedown notices in unclickable format that Temu has received from Shein requires Temu to expend a substantial amount of time and resources to identify the accused content and remove it—precisely the result Shein intends to artificially manufacture a narrative that Temu has failed to expeditiously comply with takedown requirements.

96.     Further, Shein issues its takedown notices to Temu in large packets, so that a significant volume of takedown notices are provided in spikes over a small period of time, making it difficult for Temu to quickly address them.  This behavior underscores that Shein's true intention is not to have Temu take down allegedly infringing products, but to cause disruption to Temu's business by making it difficult for Temu to identify and remove allegedly infringing content.

97.     On information and belief, Shein has bombarded Temu with thousands of non-compliant and/or unusable DMCA takedown notices with the subjective knowledge of wrongdoing

and intent to delay Temu's response times and disrupt its business.

     **5.**     **Shein Relied on Its Mass-Scale DMCA Fraud to Launch Bogus Legal Actions Against Temu (Directly and by Proxy)**

98.    Shein did not stop with its barrage of false and unusable DMCA notices aimed at hindering Temu's growth. While Temu was off-guard and scrambling to deal with thousands of Shein's notices, Shein took its assault to the next level: it relied on its fraudulent and pretextual DMCA campaign and invalid copyright registrations to launch malicious prosecutions against Temu in the U.S. courts—both directly and by proxy.

99.    Having carefully crafted its DMCA trap, Shein sued Temu accusing Temu of infringing its copyrights and being too slow in addressing its DMCA notices. With manufactured outrage, Shein proclaimed that it was being irreparably harmed. But when, during preliminary injunction discovery, it was exposed that *all* thirty-five copyright registrations Shein asserted contained falsities and misrepresentations to the U.S. Copyright Office (and after Temu diligently addressed all the DMCA notices, despite their falsities, scores of unclickable links, and other deliberate misconduct detailed above), Shein dropped the case in October 2023.

100.    Additionally, Shein is behind five proxy copyright litigations against Temu.[1] All five cases were brought by persons alleged to have licensed their works to Shein. In all but one, Shein registered copyrights on the plaintiffs' behalf. In all but one, the alleged copyrights were registered by Shein on the same day. And in all cases, Shein submitted the DMCA notices to Temu for the plaintiffs with the exact same content as Shein's other DMCA notices claiming itself as "owner or licensee." Notably, in one of the cases it is now clear that Shein was not the licensee

---

[1] *Ilustrata Servicos Design, Ltda. v. PDD Holdings, Inc. et al*, No. 1:23-cv-04824 (N.D. Ill. Jul 25, 2023); *Lord v. PDD Holdings, Inc. et al*, No. 1:23-cv-04729 (N.D. Ill. Jul 21, 2023); *Milburn v. PDD Holdings, Inc. et al*, No. 1:23-cv-04785 (N.D. Ill. Jul 24, 2023); *Trinidad v. PDD Holdings, Inc. et al*, No. 1:23-cv-04786 (N.D. Ill. Jul 24, 2023); *Wang v. PDD Holdings Inc. et al*, No. 1:23-cv-04760 (N.D. Ill. Jul 24, 2023).

of the work (despite its false claim in the notice) at the time it sent the DMCA notice to Temu. Another common denominator between the five cases is the lack of any commercial injury or reason to pursue the case: it is undisputed that Temu addressed the isolated instances of third-party infringement by expeditiously removing the listings.

101.    The true motivation behind these proxy cases is inescapable—a competing platform orchestrating damage to Temu's business and reputation by seeking to portray Temu as a non-compliant marketplace and harm Temu's relationships with sellers and rights owners.

## II.    Shein's Abuse of the Copyright System Is Part of a Pattern of Defrauding and Abusing the U.S. Legal System

102.    The U.S. legal system depends on the honesty and candor of litigants. As the U.S. Supreme Court has made clear: "The very integrity of the judicial system and public confidence in the system depend on *full disclosure of all the facts*, within the framework of the rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Indeed, in this District, submitting a false written statement to an office of the District of Columbia can subject the individual to *criminal penalties*. *See* D.C. Code. § 22-2405.

103.    Shein, however, has taken advantage of the U.S. legal system's presumption of honesty and good faith. Shein has used the copyright registration process, DMCA procedures, and U.S. District Courts to punish and interfere with its competitors. All the while, just as a mafia organization might support local charities to conceal its illegal behavior, Shein hides behind a deceptive public image in the United States.

### A.    The U.S. Copyright Office and Its Fundamental Reliance on the Candor of Applicants

104.    The U.S. Copyright Office was officially established in Washington, D.C. in 1897 within the Library of Congress, although its roots trace back to the first U.S. copyright law in 1790. The Copyright Office's primary purpose is to provide a public record of the intellectual property

of authors, artists, and other creators and to provide legal protection for their works as authorized by the U.S. Constitution (art. 1, sec. 8).

105.    To carry out its Constitutional mandate, the Copyright Office relies on the accuracy of copyright applicants:  "Applicants are encouraged to complete applications accurately and completely" because "[e]stablishing a full, accurate record . . . serves the public interest by creating a more useful public record, it provides potential licensees with more accurate information, and it decreases the cost of copyright litigation by minimizing potential disputes about the work(s) that the registration covers."  COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES 3rd Ed. at § 602.1.

106.    Due to its limited resources, the U.S. Copyright Office necessarily is forced to operate largely on a system of trust that depends on the honesty and candor of applicants.  Indeed, "[a]s a general rule, the U.S. Copyright Office accepts the facts stated in the registration materials" and typically "does not conduct investigations or make findings of fact to confirm the truth of any statement made in an application."  COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES 3rd Ed. at § 602.4(c).  This reliance on the candor of applicants is necessary because the Office does not have the capacity to independently verify the originality or ownership of every submission it receives.

107.    False, untruthful statements in an applicant's registration undermine the effectiveness of the U.S. Copyright Office.  False or misleading information not only burdens the system with illegitimate claims, but it also jeopardizes the integrity of the public record, potentially leading to legal disputes and infringement of legitimate copyrights.  This dishonesty can strain the Office's limited resources, as it diverts attention and effort away from genuine copyright protection, ultimately eroding trust in the system as a whole.

**B.    Shein Is a Potemkin Village**

108.    Shein's IP seizures, DMCA-related misrepresentations, and knowingly inaccurate

claims to the Copyright Office are not aberrations or outliers; they are fundamental to Shein's business model.  Shein is a shiny façade concealing a corrupt organization.

109.    In its public statements, Shein describes itself as a fashion brand, seeking the prestige and value premium that leading brand owners invest heavily to earn.  *See, e.g., Exclusive Interview with Shein,* Retail in Asia (Sept. 9, 2021), https://retailinasia.com/in-people/interviews/exclusive-interview-with-shein/ ("SHEIN's huge social media presence with over 80 million users allows the brand to form close connections with their consumers."); Jordyn Holman, *Shein, Fast Fashion Hit With Gen Z, Tries Charm to Counter Scrutiny*, N.Y. Times, May 2, 2023, at B1 ("We're an emerging brand.").  But Shein's business model is based on copying trendy designs, using its network of thousands of captive suppliers to manufacture copies of those designs, and reselling the copy with a Shein label attached.  Shein is not a brand; it is a glorified label maker.

110.    Similarly, Shein has invited numerous social media influencers to visit its factories in China, showcasing what Shein described as its in-house designs and advanced production technology.  However, this was merely stagecraft, as the realities on the ground reveal Shein's reliance on primarily small- to medium-sized factories.  These factories rely on highly manual production processes, and tens of thousands of experienced workers, to handle the small batch sizes of Shein's large volume of orders.  Shein's business model depends on controlling these factories (through the various means alleged herein), rather than relying on Shein's own in-house designs and production technology.  The stark contrast between this reality and the image Shein presents for media coverage has led to backlash, with many influencers deleting their previous posts about Shein.  *See, e.g.*, *Influencers face backlash for promoting Shein factory during PR trip in China*, The Independent (June 27, 2023), https://www.independent.co.uk/life-

style/fashion/shein-factory-tour-influencers-trip-b2364739.html.

111.    As described in Section C below, even Shein's IP litigation conduct reflects this strategy.  In litigation in which Shein has accused an online seller of copyright infringement, Shein regularly has made accusations of widespread infringement while relying on cherry-picked, non-representative examples intended to over-burden Shein's opponent and mislead the court.  But when faced with allegations of infringement against it, Shein blames suppliers.  In twenty-five of approximately fifty cases filed against Shein in the last two years alone, Shein has blamed suppliers or other unnamed third parties for creating infringing works.

**C.**    **Shein's Scheme Relies on Information Asymmetry Between U.S. Courts and Other Countries**

112.    Shein and its affiliates have been accused of IP infringement in approximately 100 lawsuits in the United States alone.  Shein's poor record of protecting the IP of others is engrained in its business model; upon information and belief, Shein relies in part on algorithms and machine learning to identify trends and order its captive suppliers to manufacture copies to keep up with demand in the ultra-fast fashion market.  Shein's serial IP infringements also highlight one of the many inconsistencies between Shein's public image and its real identity.  "Protecting intellectual property" is not, as Shein claims, one of its "key priorities."  *Shein 2022 Sustainability and Social Impact Report*.  Instead, its key priorities are to seize its suppliers' IP (*see* Section III.A) and copy and infringe Temu's IP (*see* Section IV), while shifting the blame to Shein's captive suppliers whenever Shein is accused of copyright infringement.

113.    In multiple U.S. litigations in which Shein was accused of copyright infringement, Shein resorts to finger-pointing; Shein has responded in these lawsuits that it was not responsible because its suppliers independently had created the products.  *See, e.g., Tianhai Lace Co. LTD et al v. Zeotop Business Co. Limited et al.*, No. 2:22-cv-06106, ECF No. 69 (C.D. Cal. Mar. 24,

2023); *Minx International, Inc. v. Shein Distribution Corp.*, No. 2:22-cv-02699; ECF No. 21 (C.D. Cal. Aug. 30, 2022); *Infinity Printex, Inc. v. Shein Distribution Corp.*, No. 2:22-cv-03189, ECF No. 15 (C.D. Cal. Aug. 12, 2022); *Universal Dyeing and Printing, Inc. v. Zoetop Business Co.*, Ltd., No. 2:22-cv-03741, ECF No. 13 (C.D. Cal. Aug. 1, 2022).   Similarly, in a recent IP proceeding, *H&M Hennes & Mauritz GBC AB v. Zoetop Business Co., Ltd., Shein Group Limited and Pinjun Express Co.*, *Ltd.* in the High Court of Hong Kong SAR, Shein also claimed that all infringing products and infringing images were provided by suppliers.

114.   However, when seeking to defend itself against an earlier antitrust challenge to its Exclusive-Dealing Agreements containing widespread seizures of its suppliers' IP rights, Shein claimed that it was entitled to those IP rights because its suppliers' products were designed by or made specifically for Shein.   While it is true that Shein uses its coercive Exclusive-Dealing Agreements to grant itself the right to adapt its suppliers' works and thereby claim the IP to such works, this is just another example of Shein's two-faced approach.   Shein cannot fairly blame its suppliers to avoid copyright infringement claims while at the same time claiming to have created those suppliers' designs to avoid antitrust claims.

115.   Shein's courtroom position that it is hands-off and should not be held responsible for infringements also cannot be squared with Shein's hands-on approach to its captive suppliers in China.   For example, earlier this year, Shein committed to invest "US$70 mil over the next 5-years" in its "ecosystem of third-party manufacturing suppliers."   Shein Press Release (Apr. 25, 2023),       https://sheingroup.com/corporate-news/press-releases/shein-increases-supply-chain-empowerment-investments-to-us70mil-in-5-year-plan/.

116.   Shein brags about its close involvement in production in public relations and government relations campaigns intended to address criticisms of Shein's supply chain, yet in U.S.

federal courtrooms Shein consistently disavows any involvement or responsibility for the production of the products it sells.[2]

### D.   Shein's Corporate Camouflage and Shape-Shifting Corporate Entities

117.   Shein aggressively has sought to sanitize its image through corporate restructurings and similar maneuvers.

118.   Upon information and belief, Shein was founded in Nanjing, China, in or around 2008.

119.   After expanding in China for a number of years and creating various subsidiary and affiliate companies based in mainland China, Shein abruptly created a new company based in Hong Kong, Zoetop Business Co., Ltd. ("Zoetop"), to serve as its supposed headquarters.  The creation of Zoetop in or around 2019 coincided with Shein's expanded presence in the United States.

120.   However, within just a couple of years of its creation, Zoetop had been named as a defendant in so many IP infringement cases that, upon information and belief, Shein sought to clean up its image by discontinuing Zoetop and creating a new parent company, Roadget Business Pte. Ltd. ("Roadget").  Specifically, as of mid-2022, Zoetop had been named in dozens of IP infringement cases in the United States alone—being sued at a rate that, according to The Wall

---

[2] *See also*, *e.g.*, Defs.' Answer at 3, *Caribbean Blues, Inc. v. Shein Distrib. Corp. et al.*, No. 2:23-cv-04225-MRW (C.D. Cal. Aug. 23, 2023), ECF No. 13; Def.'s Answer at 4-7, *Taylor Shaye Designs LLC v. Shein Distrib. Corp.*, No. 1:23-cv-00624-SEB-TAB (S.D. Ind. May 30, 2023), ECF No. 15; Defs.' Answer at 3-5, *G&S Prints PTE. Ltd. v. Zoetop Bus. Co., Ltd. et al.*, No. 1:23-cv-20471-BB (S.D. Fla. Mar. 2, 2023), ECF No. 8; Defs.' Answer at 2-4, *Minoza et al. v. Zoetop Bus. Co., Ltd. et al.*, No. 1:23-cv-20434-CMA (S.D. Fla. Mar. 22, 2023), ECF No. 17; Def.'s Answer at 6-10, *Heffernan v. Shein Distrib. Corp.*, No. 1:23-cv-01271-JGK (S.D.N.Y. Apr. 4, 2023), ECF No. 14; Defs.' Answer at 3-4, *Flynn v. Zoetop Bus. Co., Ltd. et al.*, No. 1:22-cv-23604-KMM (S.D. Fla. Jan. 23, 2023), ECF No. 17; Def.'s Answer at 2, 4, *Alison Lou LLC v. Shein Distrib. Corp.*, No. 1:23-cv-01268-JHR (S.D.N.Y. Apr. 4, 2023), ECF No. 17; Def.'s Answer at 2, *Bishop v. Shein Distrib. Corp.*, No. 1:23-cv-01277-MKV (S.D.N.Y. Jul. 24, 2023), ECF No. 41; Defs.' Answer at 3-4, *Golebiowski v. Zoetop Bus. Co., Ltd. et al.*, No. 1:23-cv-20433-RAR (S.D. Fla. Mar. 2, 2023), ECF No. 8; Defs.' Answer at 2-4, *Fichera v. Zoetop Bus. Co., Ltd. et al.*, No. 1:23-cv-20417-RAR (S.D. Fla. Mar. 2, 2023), ECF No. 7.

Street Journal, far exceeded other companies in the industry.

121.   Upon information and belief, starting in or around late 2021, Singapore-based Roadget, rather than Hong Kong-based Zoetop, thus began operating Shein's websites and gained ownership of Shein's trademarks and other assets.

122.   While the closing, liquidating, and de-registration of companies in China is a complex and extensive process, Shein undertook the unusual measure of de-registering the majority of its corporate affiliates.  Shein de-registered at least seven different corporate affiliates, all of which had been organized under Chinese law and all of which had Shein's CEO and founder, Xu Yangtian, listed as the legal representative, managing partner, majority shareholder, or general manager.  Moreover, several core members of the Shein Group also have been engaged in activities similar to those of Xu Yangtian.  For instance, Gu Xiaoqing and Ren Xiaoqing, co-founders of Shein, respectively de-registered several trading companies in Guangzhou between 2017 and 2022. According to Reuters, these mass de-registrations included the de-registration of Shein's main business, Nanjing Top Plus Information Technology Co. Ltd., in 2021.  Around the same time, Shein registered new, replacement entities.

123.   Relying upon Roadget's place of incorporation in Singapore and the de-registrations of a number of Shein's prior operating entities, Shein now attempts to present itself as a Singaporean company rather than a Chinese company.  But, upon and information and belief, a significant majority of Shein's employees and the bulk of its business operations have remained in China.  And even though the companies they work for may have changed, upon information and belief, much of the same management team that has run Shein's business for the past several years continues to do so today.

124.   Moreover, despite Shein's attempt to repair its reputation as an IP infringer that

regularly copies others' work, Roadget, Zoetop, and their affiliates have now been sued in approximately 100 IP infringement lawsuits in the U.S. alone—most of which challenge multiple infringing products.  Indeed, some plaintiffs have even been forced to sue Shein multiple times for infringing the same works on multiple occasions—even after settling a prior lawsuit over the first discovered infringement.  And such infringement lawsuits are merely the tip of the iceberg.  Upon information and belief, Shein has stolen the work of countless additional independent artists and designers who never filed suit.

125.    Upon information and belief, Shein also has used its confusing and shifting corporate structure—and its non-U.S. entities—to make it more difficult for plaintiffs to successfully enforce U.S. IP laws against Shein, despite clearly wrongful conduct.

126.    In a further attempt to whitewash its stained reputation, Shein recently purchased its way into alliances with established fashion brands, seeking to borrow their respectability.

127.    For example, in August 2023, Shein acquired approximately one-third of Forever 21's parent company, Sparc Group, allowing Shein, according to CNBC, to form a "relationship with a former U.S. rival as it aims to sanitize its reputation."  As CNBC notes, this arrangement affords Shein "a powerful ally on its side, which could help legitimize the company in the eyes of U.S. regulators and work to assuage concerns from lawmakers."

128.    Similarly, in October 2023, Shein acquired UK fashion brand Missguided.  As a prominent commentator noted, "[U]nlike Shein whose products are often generated by AI and data scientists, Missguided has a unique brand identity and design taste."  And in November 2023, Shein announced a collaboration with Alice McCall, an established Australian designer.

129.    Indeed, it appears Shein is trying, through these arrangements, to pass itself off as a fashion company that actually designs clothing rather than what it truly is:  a middleman company

that designs nothing and merely attaches its label to others' products for resale.

**III.    Shein's Scheme to Foreclose Temu from Supply Through False Imprisonment, Exclusive-Dealing Agreements, Loyalty Attestations, Phone Seizures, and Unauthorized Searches of Merchants' Phones**

130.    Shein has sought to protect its monopoly in ultra-fast fashion by orchestrating and executing an anticompetitive scheme to block Temu's access to the specialized suppliers necessary to compete in the market.

131.    This is not the first time Temu has raised concerns about Shein's anticompetitive conduct.  In July of 2023, Temu filed a lawsuit challenging Shein's Exclusive-Dealing Agreements with suppliers and coercive efforts to enforce those agreements under state and federal antitrust and unfair competition laws (Amended Complaint & Demand for Jury Trial, *Whaleco Inc. v. Shein US Servs., LLC et al.*, No. 1:23-cv-11596-DJC (D. Mass. Oct. 2, 2023), ECF No. 44).  As was publicly reported, in late October 2023, Temu and Shein voluntarily dismissed their respective litigation against one another without prejudice.  Since that dismissal, however, Temu has discovered that Shein's anticompetitive behavior has not only persisted but intensified.

132.    Most notably, upon information and belief, Shein has now resorted to more aggressive methods of targeting suppliers believed to be selling products on Temu, including an ongoing program of summoning Temu's suppliers on false pretenses to Shein's offices, detaining those suppliers' representatives in Shein's office for up to ten hours, seizing these Temu sellers' phones, searching their phones for Temu sales, commercial, and other financial information without permission, demanding the sellers' chat histories and log-in credentials for their Temu account, compelling them to sign documents against their will, and threatening them with extensive penalties and termination of their Shein contracts for selling on Temu.  Shein's persistent and increasingly aggressive use of anticompetitive conduct, coercion, and threatening behavior necessitates this lawsuit.

A.     **Shein's Abuse of Its Monopoly Position through Improper Seizures of IP Rights and Exclusive-Dealing Agreements**

133.    *The U.S. Ultra-Fast Fashion Market Is a Relevant Antitrust Market.*    Since the late 20th century, the increasing speed of communications and fast pace of change in fashion has led to strong consumer demand for retailers that can quickly and inexpensively manufacture and distribute the latest trends.    The first generation of such companies were known as "fast fashion" companies, which created and replaced styles and stock keeping units ("SKUs"), offered with new and different products, more frequently than high-end fashion brands.    The typical inventory turnover times for fast fashion companies such as H&M and Zara have been roughly 100 days, substantially lower than the inventory turnover time for a traditional fashion player.

134.    In recent years, new technology and supply-chain innovations combined to create consumer demand for a new industry and business model.    From this milieu, the industry has recognized a distinct new retail approach beyond fast fashion developed—called "ultra-fast fashion," or fashion "on demand."    The defining characteristics of ultra-fast fashion or "on demand" fashion, as compared to traditional fashion and fast fashion include:    (1) expedited design-to-production time, with production completed in just days; (2) significantly smaller minimum order requirements, with minimum order requirements as small as 100 pieces per order; (3) significantly faster release of styles, with 10,000 styles released in a week or even in a day; (4) sales are internet-based rather than based on the brick-and-mortar model; (5) a direct-to-consumer model is used, which utilizes efficient fulfillment centers and air freight shipment that dispatches parcels to worldwide consumers; and (6) materially lower, distinct price points with significantly diversified styles for consumers.

135.    Ultra-fast fashion dramatically breaks from the fast fashion model by relying on a highly tech-enabled supply chain that includes a limited pool of independent clothing

manufacturers that can create and deliver products on demand.  Ultra-fast fashion manufacturers are specialized, unique manufacturers which require:  (1) a pool of skilled, technical workers with years of experience and practice in sewing, cutting, pressing, seaming, trimming, tailoring, and other skills; (2) in-house designers who can both design independently (as opposed to relying on designs shared by, for example, Zara) and construct apparel in compressed timeframes in response to designs provided by fashion houses; and (3) deep know-how and effective working procedures to support large numbers of ultra-fast fashion orders.  At the same time, to ensure efficient access to the necessary raw materials, ultra-fast fashion suppliers require:  (4) close proximity to their upstream suppliers (of fabric, fiber, buttons, and other raw materials); and (5) strong local transportation infrastructure.  As a result, the pool of actual and potential ultra-fast fashion suppliers is significantly smaller than manufacturers capable of producing apparel for export.

136.    The limited pool of experienced, quick-turnaround independent manufacturers, together with the limited numbers of specialized technical workers, creates a critical barrier to entry in ultra-fast fashion, including for fast fashion and other fashion retailers who could not reasonably compete for ultra-fast fashion sales.  Only a fraction of garment manufacturers currently have the capabilities of meeting the extremely challenging demands of supplying the high-speed, ultra-fast fashion vendors.

137.    Other garment retailers, including fast fashion retailers, are not reasonable substitutes for the ultra-fast fashion experience in part because ultra-fast fashion platforms offer significantly more new styles, and these styles change effectively on a daily basis.  For ultra-fast fashion consumers, other options are not viable substitutes in part because of the staleness of the styles and the limited style options available.  Ultra-fast fashion offers a distinct service and unique experience that allows consumers to shop for a significant variety of styles and caters to customers

who have decided that significant variety and quick refreshes of styles are important.

138.    The relevant geographic market is the United States.

139.    ***Shein Has Monopoly or Market Power in the U.S. Ultra-Fast Fashion Market.***
Among the ultra-fast fashion retailers, Shein is by far the largest competitor with more than 75%
of U.S. market share by sales volume in 2022.  It sells men's, women's, and children's apparel,
along with other products, in the United States through its website, https://us.shein.com, and its
corresponding mobile app.

140.    Shein uses algorithms and machine learning/artificial intelligence to crawl through
a vast number of webpages and select potentially trendy styles.  It then instructs and/or induces
suppliers to create copycat styles, without regard to others' IP rights or compensation to the IP
owners.

141.    Shein's customer base and sales have exploded since early 2020.  Its global annual
revenue is estimated to have grown from around $3 billion in 2019 to around $30 billion in 2022,
with approximately $9.6 billion in the United States in 2022.  In the first half of 2022, Shein's app
was the most downloaded shopping app in the United States, eclipsing Amazon, with
approximately 22.4 million downloads during those six months.  Shein has a network of
approximately 8,338 suppliers in its ultra-fast fashion line of business.

142.    ***Shein Has Coerced Suppliers into Assignments of Their Global IP Rights
Through Anticompetitive Exclusive-Dealing Agreements.***  When Shein first began contracting
with both small and large suppliers, its agreements with suppliers did not prohibit the suppliers
from offering their styles to third parties.  Those agreements, entered into well before news began
to spread regarding Temu's pending 2022 entry into the U.S. market, were clear:  the IP rights to
the styles provided by Shein would belong to Shein, and the IP rights to the styles provided by the

supplier would be retained by the supplier.

143.    Shein, however, gradually revised those supplier agreements to add provisions allowing it to seize IP rights from its suppliers.  The IP clause in Shein's supplier agreements evolved into a stricter form that required the suppliers to grant free, twelve-month exclusive licenses to Shein for all product styles, images, and videos provided by the supplier to Shein.  At the twelve-month mark, this exclusive license became a permanent, but not exclusive, license to Shein for the same rights.

144.    By late August 2022, Shein further expanded the exclusivity requirements in its supplier agreements.  As noted above (see **Exhibit A**), the amendments made to the Exclusive-Dealing Agreement (i) force suppliers to grant a worldwide, irrevocable, and ***exclusive*** license allowing Shein to "publish, display, reproduce, improve, or otherwise use" the suppliers' products and related styles (Ex. A, Part I, Art. II.11(1)); (ii) force suppliers to initiate a mandatory transfer to Shein of the IP rights in the images, photos, or videos of such products (*id.* at Part I, Art. II.11(2)); and (iii) prohibit suppliers from using or displaying the aforementioned styles (*id.* at Part I, Art. II.11(1)), to the effect that such suppliers would not be able to list any of the same styles on any third-party platform.  For example, if a manufacturer independently designs and develops a dress that was provided to Shein for purchase, then that manufacturer is permanently prohibited from even displaying that dress through the Temu platform or through any other competitor of Shein's.

145.    Critically, in the previous versions of Shein's supplier agreements, the suppliers were able to maintain ownership of the rights to the products and styles they provided to Shein. After this update to the Agreement, suppliers lost all of their IP rights in the styles of products they provided to Shein (including but not limited to any photographs, pictures, and/or videos of such

products).

146.     These provisions seek to prevent manufacturers from engaging in any design, development, manufacture, sale, or distribution of any "style" of product that Shein purchased from the manufacturer for any retailer other than Shein.  Shein thereby sought to foreclose Temu or any other party from competing with Shein on any of the products—or any related products— that Shein sold.  The effect of these agreements is to deprive American consumers of lower-priced products through competition.

147.     ***Shein's Seizure of Suppliers' Global IP Rights Through Invalid Assignments Without Supplier Knowledge Is Improper.***  Shein did not provide consideration to its suppliers in exchange for the assignment of the suppliers' global IP rights.  Nothing in Shein's Exclusive-Dealing Agreements requires Shein to pay any meaningful license fees or transfer fees in order to take possession of those rights.  Nor has Shein executed separate assignments with the suppliers for the transfer of the suppliers' IP rights.  What is more, upon information and belief, many suppliers signed Shein's Exclusive-Dealing Agreement without any knowledge that the agreement contained such an assignment, and all of Shein's captive suppliers lacked the bargaining power necessary to push back against Shein on those terms.

148.     In short, Shein improperly has seized suppliers' global IP rights, by means of unenforceable adhesion contracts, and then used those very IP rights to block its suppliers from doing business with Temu.

149.     ***Shein's   Exclusive-Dealing   Agreement   Also   Includes   Anticompetitive Enforcement Provisions.***  Shein's recent Exclusive-Dealing Agreements also increased the penalties for a supplier's attempt to escape Shein's exclusionary tactics, including, for example, increasing the RMB 3,000 (Renminbi/Chinese Yuan) penalty per violation of its exclusivity terms

by a factor of 10 (to RMB 30,000).  These penalties serve no legitimate purpose except to punish manufacturers for doing business with Temu and create an additional form of *de facto* exclusivity in light of the razor-thin profit margins in ultra-fast fashion.

150.    Further, the Exclusive-Dealing Agreement expressly established unreasonable enforcement provisions against manufacturers that might work with Shein's competitors to sell, improve upon, develop, or "otherwise use" the styles ***the manufacturer had developed*** and presented to Shein for selection.  Specifically, Shein's Exclusive-Dealing Agreement:  (i) imposes a penalty of RMB 3,000 (approximately $450) per style, picture, or video for any third-party "use" authorized by a manufacturer, or Shein's alleged actual financial loss (whichever is higher), in addition to what Shein falsely calls "reasonable income lost" by Shein if the manufacturer generates any income from its own use or such third party use (Ex. A, Part I, Art. II.11(7)); and (ii) allows Shein to unilaterally terminate the Exclusive-Dealing Agreement and thereafter require a manufacturer to compensate it "for the relevant losses" if the manufacturer does not timely rectify what Shein deems to be a violation (*id.* at Part II, Art. J).

151.    These terms make it uneconomical and, as a practical matter, impossible for suppliers—which operate on thin margins—to sell their apparel on the Temu platform.  Indeed, many suppliers have systematically removed from Temu all of the products that they used to sell on both platforms and refused to offer new products on Temu as a result of Shein's conduct.

### B.    Shein's Coercion of Suppliers to Enforce Its Exclusivity Requirements and IP Seizures—False Imprisonment of Vendors Who Deal with Temu, Loyalty Attestations, Public Shaming, and Mafia-Style Intimidation

152.    Shein employs coercive, mafia-style tactics to magnify the effects of its anticompetitive Exclusive-Dealing Agreements and scare suppliers away from partnering with Temu.

### 1.    Shein Demands that Manufacturers Execute False and Misleading Loyalty Attestations Against Temu

153.    A version of the Loyalty Attestation that Shein previously filed in litigation is attached hereto as **Exhibit C**.  The Shein supplier Loyalty Attestation recites a lengthy loyalty oath in which the manufacturer must affirm to Shein, among other things, that:  (1) it has "never cooperated with Temu on the production and sales of the infringing products"; (2) "[t]he infringing products or their images displayed and sold on the Temu website are not provided to Temu by Supplier"; (3) "the infringing products and images on the Temu website violate the legitimate rights and interests" of Shein; and (4) the manufacturer will inform on any other actor or provide "any other information" that could help Shein police its illegal Exclusive-Dealing Agreements. *See* Ex. C, Loyalty Attestation, at "Supplier Attestation" (1)-(4).  These Loyalty Attestations, with repeated references to Temu, make it clear that Shein's objectives are anticompetitive—and designed to block these suppliers from working with Temu and to preserve Shein's monopoly power.

154.    Shein's Loyalty Attestations also misleadingly use the defined term "infringing products," which is defined—contrary to both reason and law—to mean any product sold on Temu that is the same or "highly similar" to products that Shein is reselling from the manufacturer.  While Shein includes throwaway references to intellectual property in the Attestation, the definition of "infringing products" is in no way tied to IP rights but extends to any products that fall under the Exclusive-Dealing Agreements and that appeared on Temu's platform.  Thus, like the Exclusive-Dealing Agreements, the Loyalty Attestations go beyond the scope of Shein's falsely claimed IP rights by purporting to prohibit manufacturers from working with Temu and selling competing products.

**2.    Shein Has Threatened Suppliers that It Would "Go After" Anyone That Supplied Temu or Any Other Third Party**

155.    With suppliers' IP rights signed away, Shein claims that any use of the products that the suppliers had listed on Shein's site, or the use of "related styles" on platforms other than Shein, is an "infringement" of Shein's newly-obtained IP rights.  Shein also communicated to suppliers that it intended to enforce the Exclusive-Dealing Agreements if suppliers decided to work with a third party.  According to several manufacturers who decided to not work with Temu, or who removed products from Temu's platform, Shein's firm statement that it would enforce its coercive agreements was enough to intimidate suppliers from working with any third-party platform and to keep the suppliers' products exclusive to Shein.  Therefore, in practice, Shein's Agreements were Exclusive-Dealing Agreements covering all of the respective suppliers' business, and not simply the products and styles currently being offered on Shein's website.

156.    Suppliers also cited the embarrassment their businesses would suffer if they faced a lawsuit by a company like Shein.  The newly amended Exclusive-Dealing Agreements contain clauses that impose extraordinary penalties on suppliers if they worked with a third party such as Temu.  For the suppliers, the possibility of prolonged litigation with Shein was not a risk they could bear.

**3.    Shein Has Used Public Penalty Notices to Publicly Shame Suppliers Who Did Business with Temu and to Intimidate Other Suppliers**

157.    While Shein's threats to suppliers often occur quietly, through backdoor channels, one intimidation tactic Shein has taken against suppliers is very public.  On the website "geiwohuo.com," which serves the global supplier system, Shein has used the site's bulletin board to intimidate suppliers into staying in an exclusive relationship with Shein.

158.    For example, on February 24, 2023, Shein posted a notice titled, "[Important] Notice to all supplier partners:  Regarding the Management of Suppliers Who Violate Contract

Agreements and Undermine Cooperation Trust."  In this notice, Shein promised to take "strict measures against any violations or breaches" of the Exclusive-Dealing Agreements that suppliers entered into with Shein.  The punishment Shein would inflict on suppliers would be three-fold, according to this notice:  "(1) According to the agreement, a specific amount of liquidated damages shall be demanded in case of breach; (2) The system will mark the supplier as dishonest and reduce future cooperation input for dishonest suppliers; (3) Conduct price verification for all its products on sale and upcoming releases."  Shein also made clear its measures were "not limited" to the ones enumerated in this post.

159.   More insidious, however, are the notices that Shein posts regarding specific suppliers on geiwohuo.com.  When suppliers "infringe" Shein's "legal rights and interests" by selling their products on other platforms, such as Temu, Shein posts notices naming the specific suppliers that "infringed," as well as the monetary penalties Shein intended to impose on those suppliers.  For example:

(a)     In September 2022, Shein posted a penalty notice naming supplier Zunqian, and Shein's intention to impose a penalty of RMB 200,000 (approximately $27,500).

(b)     In September 2022, Shein posted a penalty notice naming supplier Heying, and Shein's intention to impose a penalty of RMB 69,000 (approximately $9,400).

(c)     On February 7, 2023, Shein posted a penalty notice naming suppliers ODM Garment 3, Xinlianda, and ODM Menswear Xianyang, and Shein's intention to impose a penalty of RMB 50,000 (approximately $6,800) on each supplier.

47

160.    On November 13, 2023, Shein posted an announcement directed to all manufacturers who supplied products to Shein, on the Shein supplier portal.  In this announcement, Shein notified its suppliers that it had identified "suppliers selling SHEIN products with the same designs or images on other platforms" and that Shein intended to take punitive measures against those suppliers in response.  These measures included reducing the frequency of new releases for such suppliers, "claim[ing] damages and liabilities from and ceas[ing] cooperation with suppliers involved in infringement or breaches," and taking other measures available to Shein.

161.    Any one of Shein's intimidation tactics against its suppliers would be sufficient to maintain a coerced, exclusive relationship between Shein and the supplier.  When these intimidation measures are all taken together, many suppliers (large and small) have no choice but to work with one monopoly distributor, Shein.

### 4.    Shein Has Falsely Imprisoned Suppliers' Representatives, Searched Their Phones for Temu's Proprietary Information Without Permission, and Made Additional Threats

162.    Shein's coercive conduct has become more severe in recent weeks and continues today.  Upon information and belief, several suppliers who previously listed products on both Temu's and Shein's platforms have reported that their representatives were called into the "inspection room" in Shein's offices in Guangzhou, China.   In recent weeks supplier representatives were lured to the offices on false pretenses—to discuss "potential collaborations" between Shein and the supplier, to assist Shein in investigating corruption among Shein staff, or to discuss any difficulties the merchants were facing with their business and presumably any assistance that Shein could offer them.  However, once there, the representatives were held at Shein's offices in a small room for up to ten hours and threatened by Shein employees until they acquiesced to Shein's demands.  These representatives often arrived at Shein's offices alone, and Shein employees physically overwhelmed the supplier representatives, stationing multiple Shein

employees around the merchant in a small space during the ensuing interrogation.

163. ***Phone Seizures During False Imprisonment.*** Not only were the supplier representatives threatened, Shein employees during these false imprisonment sessions seized the Temu suppliers' phones, at times grabbing the phones from the merchants. Once the phones were in Shein's physical possession, Shein employees demanded that the supplier representatives provide account information and passwords for all of the supplier's business operations on Temu's platform and export all of the suppliers' WeChat and Alipay transaction records related to Temu. When some suppliers to Temu refused Shein's intimidation threats to provide their account information for Temu's platform, Shein employees took the opportunity to take the information covertly through the suppliers' seized phones. The Temu suppliers only found out afterward that Shein accessed their Temu accounts when they saw new verification codes on their phones for those accounts after leaving Shein's offices. Seizing this information from suppliers has given Shein access to Temu's sensitive and proprietary commercial and financial trade secrets.

164. ***Coerced Signature on Papers As a Condition of Leaving Shein's Offices.*** On information and belief, the Temu suppliers falsely imprisoned at Shein's offices also were coerced to sign a number of documents before they were allowed by Shein to leave. The Shein documents were lengthy, constituting dozens of pages, and suppliers were not given an opportunity to review their terms closely. If the suppliers refused to sign, Shein threatened them with punitive measures, including refusing to allow the suppliers to leave Shein's "inspection room," closing the supplier's storefronts on Shein, and threatening more generally that the supplier would face consequences for failing to cooperate. Suppliers were coerced to "agree" to adverse statements and false statements, including terms falsely claiming that products sold on Temu were owned by Shein, even when they were independently developed, as well as documents misrepresenting certain

49

copyrights belonged to Shein when they did not.

165.   Confiscating the Temu suppliers' personal mobile phones made it effectively impossible for the merchants to leave Shein's offices.  The Temu suppliers feared for their physical safety when they were being held in Shein's offices.  Such practices are unheard-of in the developed world today, and the practices are punishable as "false imprisonment" in common law jurisdictions such as the District of Columbia.

166.   Shein's message to merchants and suppliers is unmistakable:  if you choose to deal with Temu, then you are subject to intimidation, unauthorized access to your personal devices, and other threats.

167.   Upon information and belief, other major suppliers that supply both Temu's and Shein's platforms, or that are suspected by Shein to supply both platforms, have been subjected to similar treatment by Shein in recent months.

168.   Upon information and belief, multiple suppliers have ceased doing business with Temu as a result of Shein's intimidation tactics, and multiple suppliers who otherwise would have done business with Temu have declined to do so as a result of Shein's intimidation tactics.  The effect of Shein's campaign is to reduce competition by depriving U.S. consumers of the choice of two websites for these products.

## C.     Shein's Anticompetitive Pricing Floor Requirements

169.   Shein's agreements with suppliers also contain an anticompetitive "Price Commitment" restriction that stymies the ability of suppliers to do business with other marketplaces such as Temu.  As alleged above, Shein enforces its Exclusive-Dealing Agreements in a way that prevents suppliers from offering on a competing marketplace any products or related styles offered on Shein's website.  However, in the event a supplier somehow offers the same product on both the Shein website and a competing marketplace, then—in addition to facing

punitive and retaliatory penalties for violating the exclusivity requirements of the Agreement—Shein's pricing floor term would prevent the supplier and marketplace from competing to sell the product through lower prices.

170.    Upon information and belief, Shein enforces its "Price Commitment" term in a manner that prevents suppliers from offering products sold on Shein's website for lower prices on competing marketplaces.  (Ex. A, Part I, Art. II.8.)  Based on this term, suppliers are further deterred from providing lower prices to Temu or other third parties by the requirement that the supplier pay Shein a penalty of "double the overpaid purchase fee" if the supplier is unable to "adjust the price and promptly notify [Shein] within 1 business day from the date it knows or should know" that its product is being offered at a lower price by a competitor to Shein.  (Ex. A, Part I, Art. II.8(2))

171.    The Exclusive-Dealing Agreement's pricing floor term works in conjunction with Shein's other anticompetitive and restrictive provisions to keep suppliers from doing business with Temu or other competitors.  Suppliers who may have the ability to offer a lower supply price to Temu may be restricted from offering those lower prices if it would be unprofitable to offer price parity to Shein.  Accordingly, these anticompetitive pricing floor clauses harm Temu's ability to compete with Shein.  Further, the retaliatory penalty that attaches to the pricing floor term deters suppliers from offering more competitive prices to Temu and other competitors.

## IV.    Shein Has Copied Temu's Copyrighted Games and Arcade-Style Trade Dress to Steal Temu's Customers

172.    To inflict further harm on Temu and give itself an unfair and unlawful advantage, Shein has also infringed Temu's valuable IP.

173.    Indeed, Temu's success story is largely attributable to its innovation and ability to acquire, engage, and retain customers through its fun, colorful, and creative promotional mobile

games and the distinctive look and feel of its shopping experience.

174.    Rather than invest in and develop its own intellectual property, Shein instead decided to take a shortcut and engaged in blatant copying of Temu's valuable intellectual property. Shein's goal, once again, was to harm Temu, lure Temu's customers to Shein, and create consumer confusion in the marketplace.

**A.    Shein Has Copied Temu's Copyrighted Games to Increase Customer Acquisition**

**1.    Shein's Infringement of Temu's Registered Copyrights**

175.    Shein copied Temu's popular promotional games, which are protected by valid and subsisting copyright registrations, including:  "Lucky Flip" (Reg No. PA 2-440-815), "Credit Giveaway" (Reg. No. PA 2-440-816), "Free Gift" (Reg. No. PA 2-440-813), and "Cash Reward" (Reg. No. PA 2-440-814).

176.    These registrations cover the artistic designs of some of Temu's popular promotional games.  Promotional games are interactive games that simultaneously serve to advertise Temu services, sales, or other offers.  Shein later developed games that are substantially similar if not identical to Temu's copyrighted promotional games.  As shown by the examples below, Shein has infringed Temu's copyrights by copying Temu's artistic elements, graphic stylization, color schemes, language, and other artistic expressions for the same types of promotions:

**Table 3:  Shein's Infringement of Temu's Copyrighted "Free Gift" Game**





**Table 4:  Shein's Infringement of Temu's Copyrighted "Cash Rewards" Game**



| Representative Stills from Temu's Copyrighted "Cash Rewards" Game | Representative Stills from Shein's Infringing Game |
|---|---|



**Table 5:  Shein's Infringement of Temu's Copyrighted "Lucky Flip" Game**

| Representative Stills from Temu's Copyrighted "Lucky Flip" Game | Representative Stills from Shein's Infringing Game |
|---|---|





| Representative Stills from Temu's Copyrighted "Lucky Flip" Game | Representative Stills from Shein's Infringing Game |
|---|---|

**Table 6:  Shein's Infringement of Temu's Copyrighted "Credit Giveaway" Game**



| Representative Stills from Temu's Copyrighted "Credit Giveaway" Game | Representative Stills from Shein's Infringing Game |
|---|---|

177.     The full videos for Temu's copyrighted games and Shein's unauthorized copies are attached as **Exhibits D–L**.

> **2.     Temu's Copyrighted Games Are Particularly Valuable as They Are Designed to Acquire New Customers and Deepen Engagement with Current Users**

178.     Like Temu, Shein's new marketplace model is encouraging customers to engage in promotional games in a manner designed to acquire new customers and sales and to keep current

customers engaged.  For example, Temu's copyrighted "Cash Reward" customer acquisition game urges users to "Invite Friends to Earn Tokens."  Shein's infringing version uses copycat artistic elements for users to "Invite [Their Friends] to Get Energy" and, similar to the Temu game, to spin a digital wheel to earn rewards.

**Table 7:  Shein's Infringement of Temu's Copyrighted "Cash Reward" Game**

| Temu's Copyrighted Work "Cash Reward" | Shein's Infringing Copy |
|---|---|
|  |  |

179.    Temu's copyrighted "Lucky Flip" customer acquisition game operates by encouraging players to "Refer New App Users" and get rewards by inviting friends to play the game ("Just share to get diamonds").  Shein's infringing copy likewise tells players to "Invite New Users to Earn Flips" and "Just Share to Get Diamonds."

**Table 8:  Shein's Infringement of Temu's Copyrighted "Lucky Flip" Game**



| Temu's Copyrighted Work "Lucky Flip" | Shein's Infringing Copy |
|---|---|

180.    Upon information and belief, Shein had access to Temu's protected works.  Temu's protected works have been widely disseminated across the United States, as evidenced by the more than 200 million worldwide downloads of the Temu shopping app as of September 2023 and the over eighty million monthly users Temu maintains in the United States, in addition to the availability of Temu's protected works on Temu's website.  Temu's app, on which these works appear, has also been the subject of widespread marketing, including the "Shop Like a Billionaire"

Super Bowl 2023 advertising campaign.  Moreover, Shein and Temu are direct competitors in the e-commerce industry in the U.S. market and globally.  On information and belief, Shein regularly monitors Temu's platform, as evidenced by Shein's bad-faith DMCA campaign against Temu.

> **3.     Shein Has Hired Temu's Key Marketing and Advertising Personnel Who Had Access to Highly-Confidential Information and Know-How Including for Temu's Trade Dress that Shein Copied**

181.    The blatant copying of Temu's trade dress did not happen by chance.  Instead, Shein engaged in a deliberate campaign to hire away several of Temu's key marketing employees in order to take advantage of their knowledge of Temu's successful marketing strategies and use that knowledge for Shein's benefit.  Earlier this year, Shein hired several senior members of Temu's Marketing Design Team.

182.    These employees were knowledgeable about Temu's games and Temu's promotional activities, including the design of the animation, sound effects, interface layout, and visual effects.  This made them uniquely situated to copy both Temu's specific, copyrighted games and displays and Temu's trade dress in its website, app, and user experience.

183.    These employees also had access to highly-confidential Temu information regarding Temu's marketing campaign strategies, Temu data derived from previous activities, Temu marketing design drafts (including design drafts that can be directly edited and used), and Temu internal design standards and specifications.  A competitor with access to this information would have an unfair leg up because it would know, for example, what promotional activities Temu had found that worked and did not work (and how Temu made changes accordingly), what new promotions Temu was planning, and how Temu had optimized its design process.  And these materials would also allow a competitor to directly and efficiently copy Temu's designs, down to the font, colors, and other design specifications.

184.    With one of the recently poached employees, Temu found out that the employee

had begun working at Shein *before* her departure from Temu.  Moreover, notwithstanding her non-compete agreement, upon information and belief, she has continued to work for Shein since her departure.  This employee thus began her employment with Shein while still retaining access to her Temu emails and all of Temu's most confidential marketing documents.

185.    These marketing hires by Shein had the additional effect of throwing Temu's marketing into disarray when Temu suddenly had to find replacements for all team members over a period of about a month.

**B.    Shein Has Copied Temu's Arcade-Style Trade Dress**

186.    Shein has also copied Temu's unique, distinctive, and protectable shopping experience trade dress.

187.    Temu has generated an ever-growing consumer following by making its brand stand out from other online shopping platforms.  Temu has done so through extensive and consistent use of its arcade-style trade dress, defined by a combination of "gamified" aesthetic elements and prominent and consistent use of the color orange across Temu's website, mobile app, and advertising, as shown by the representative examples below:





188.   Temu has invested heavily in building its brand and customer base, expending hundreds of millions of dollars in the past year on advertising and promotion.   From this investment, Temu has become a household name in American retail that stands out from other marketplace sellers, recognized by its arcade-style user experience that invites consumers to experience a new way to shop.   Through a combination of Temu's trade dress and Temu's unique marketing strategy—a rewards-based customer acquisition and engagement approach that invites consumers to play interactive "games" to accumulate rewards and discounts—Temu has expanded its customer base by encouraging users to invite *other users* to Temu's platform.   This "invite your friends" approach to generate sales is where Temu has excelled, and Shein's concerted copying of Temu's promotions is part of a deliberate strategy to mimic Temu's success.

189.   In addition to its effectiveness in helping Temu gain new customers, Temu's gamification approach has been highly effective in user engagement.

190.    Temu's marketing strategy is highly proprietary and was developed at great expense.   And Temu's games, promotions, and other forms of interactive experience feature unique and distinctive arcade-style imagery and animation elements to create a unique shopping experience.   Temu's app achieved great success, thanks to aggressive advertising, cheap pricing, and distinctive mobile games.

### 1.    Temu's Arcade Trade Dress Is Distinctive and Valuable

191.    Temu's eye-catching branding has made Temu a cultural phenomenon, evoking the playful energy and excitement that Temu generates with its "social shopping" experience.

192.    Following Temu's smash hit "Shop Like a Billionaire" 2023 Super Bowl advertisement—replete with Temu's energetic orange coloring and game-like flashing graphics—there was a "45% surge in downloads" of Temu's app.   *See, e.g.*, Michelle Toh, *New online superstore surpasses Amazon and Walmart to become most downloaded app in US*, CNN (Feb. 19, 2023), https://www.cnn.com/2023/02/16/tech/temu-shopping-app-us-popularity-intl-hnk/index.html.   Moreover, "daily active users jumped by about 20% on [game day] compared with the previous day."   Estimated to have reached between 113-200 million viewers, the advertisement proved to be "the fourth most effective [commercial] at driving [viewer] engagement during the Super Bowl," right behind The Walt Disney Company.   Screenshots from the Super Bowl advertisement include the following:

  

193.    Temu has garnered widespread customer recognition for the distinctive "look and

feel" of Temu's website and mobile app, which together create a playful customer experience reminiscent of an arcade.  Defined by an alluring combination of Temu's signature orange color palette and graphic design elements (both static and interactive) that evoke the whimsy of arcade games, the design of Temu's customer experience (the "Arcade Trade Dress") has become an integral part of Temu's branding.

194.    Temu's Arcade Trade Dress includes a combination of the following elements:

**Table 9:  Temu's Arcade Trade Dress Elements**

| Arcade Trade Dress Elements | Examples |
| --- | --- |
| Vibrant orange coloring that creates an energetic, almost "electrified" aesthetic |  |

| Arcade Trade Dress Elements | Examples |
|---|---|
| Graphics resembling arcade games, including Temu's well-known "wheel of fortune" that greets many customers as they open the Temu website or app |  |
| Shimmering white or gold signage and typeface against a contrasting background to create a glowing effect and glowing accents on graphics |  |

195.    Together, these elements create a unique arcade-like impression (shown below) that signifies a distinct and unique online shopping destination:  Temu.

196.    Temu spends millions of dollars each quarter to promote its Arcade Trade Dress across different media, including through Temu's website, Temu's mobile app, social media, and television.

197.    From Temu's substantial investment, Temu's Arcade Trade Dress has attracted significant attention and has made Temu's website, app, and promotions instantly recognizable, distinguishing Temu from other online marketplaces by creating a community-focused gaming wonderland that makes shopping as much fun as a trip to the arcade with friends.

198.    Temu's Arcade Trade Dress has delighted tens of millions of American consumers who have downloaded Temu's app and/or shopped on its website platform.

199.    The attractive qualities of the Arcade Trade Dress are evident from Temu's strong

customer engagement—not only are tens of millions of people using Temu's website and app each day, but they are spending substantial amounts of time on the app, a testament to the Arcade Trade Dress's engaging appeal.

200.    As a result of Temu's widespread customer reach and skyrocketing sales, millions of consumers have been exposed to Temu's Arcade Trade Dress and have come to associate it with Temu.

201.    Temu has developed substantial rights, goodwill, customer recognition, and brand identity in its Arcade Trade Dress following its extensive investment and widespread sales, significant promotion, and unsolicited attention and recognition.  This association has created invaluable goodwill in Temu's brand.

### 2.      Shein's Improper Acts

202.    In a grasping attempt to stifle Temu's growth, establish its market position, and cause consumer confusion, Shein began emulating the aspects that contributed to Temu's popularity, including Temu's well-known and valuable trade dress.

203.    Following Temu's meteoric rise to success, Shein began prominently using the same combination of elements that comprise Temu's Arcade Trade Dress to create a copycat look and feel for consumers' shopping experience, as shown below:

**Table 10:  Examples of Shein's Copying of Temu's Arcade Trade Dress**

| Temu's Arcade Trade Dress | Examples of Shein's Copying |
|---|---|
| Vibrant orange coloring that creates an energetic, almost "electrified" aesthetic |  |
| Graphics resembling arcade games (including Temu's well-known "wheel of fortune" that greets many customers as they open the Temu website or app) |  |
| Shimmering white and/or gold signage and typeface against a contrasting background to create a glowing effect and glowing accents on graphics |  |

204.    Shein copied Temu's trade dress knowingly and willfully as part of a campaign to trade off of Temu's rapid success.  Shein's unauthorized use of Temu's Arcade Trade Dress is likely to cause confusion, mistake, and deception as to the source or origin of Shein's products and platform, and is likely to falsely suggest a sponsorship, connection, or association between Temu and Shein.

205.    Shein's acts, as described above, have damaged and irreparably injured Temu and, if permitted to continue, will further damage and irreparably injure the public, who has an interest in being free from confusion, mistake, and deception.

## V.      Shein's Misappropriation of Temu's Trade Secrets

206.    As set forth above, Shein's conduct goes beyond engaging in anticompetitive behavior, abusing the DMCA and copyright process, and copying Temu's intellectual property. Shein has also engaged in a repeated and concerted effort to misappropriate Temu's trade secrets, particularly Temu's proprietary commercial and financial information provided in confidence to Temu's sellers.

207.    For example, Temu's sellers are provided access—protected by user identification and password credentials—to Temu's seller portal.  The seller portal allows access to a wide variety of Temu's commercial and financial information.  The sellers enter into an agreement with Temu whereby the sellers agree to keep this Temu commercial and financial information confidential.  In addition, Temu's sellers agree to keep confidential the aspects of their operations on the Temu platform that are not accessible or readily ascertainable by others.

208.    Shein knows, or should have known, that access to Temu's seller portal can only occur by authorized individuals and through a password protected account.  Upon information and belief, Shein has improperly detained Temu's sellers for many hours and subjected them to threats and other abusive behavior.  Shein improperly forced the sellers to provide their login credentials

and passwords for their access to the Temu seller portal.  Thus, by theft, fraud, misrepresentation, inducement of a breach of a duty to maintain confidentiality, and/or espionage, Shein has used or has the ability to use those credentials to access Temu's seller portal and obtain Temu's proprietary customer and financial information.  In essence, Shein has coerced and otherwise improperly obtained from Temu's sellers access to Temu's entire seller portal, which provides Temu's competitors (like Shein) a treasure trove of Temu's trade secret information.  This Temu commercial and financial information accessed through Temu's seller portal derives independent economic value to Temu from not being generally known or readily ascertainable to Temu's competitors.

209.   Temu's commercial and financial information that Shein obtained through its intimidation and predatory actions against Temu's sellers and their representatives is confidential, proprietary, and constitutes a trade secret within the meaning of both the Defend Trade Secrets Act and the District of Columbia's trade secrets law.  Moreover, given the unknown scope of Shein's improper scheme of detaining Temu's sellers, the threatened misappropriation of Temu's commercial and financial trade secrets exists.  Shein has acquired and, based on this past conduct will continue in the future to acquire, Temu's commercial and financial trade secrets through Temu's sellers, and use and disclose that commercial and financial information.  Temu takes reasonable measures to protect its trade secrets and confidential information and maintain that information in secrecy.  Among other measures, Temu requires employees and sellers to sign confidentiality agreements.  Temu's sellers also must, by agreed upon Terms of Use, maintain Temu's commercial and financial information as confidential and may not disclose it to third parties.  Temu's seller portal is protected by a unique user name and password for each seller.  In addition, certain pages involve an additional level of protection in the form of text verification.

210.    Temu has also implemented policies requiring certain documents and other materials to be designated as confidential or proprietary or other designations to reflect that they contain information which should not be disclosed to non-Temu or non-Temu designated individuals and companies.

211.    Temu subjects its information, including its commercial and financial information, to other reasonable protective measures, including physical security at Temu's facilities, as well as electronic data security measures such as requiring access credentials and passwords to access Temu's accounts.

## VI.    Injury to Temu, Consumers, and Competition

212.    Shein's anticompetitive, exclusionary practices and blatant copying of Temu's valuable intellectual property has harmed not only Temu, but also sellers, customers, and competition as a whole.

213.    Shein's exclusive agreements with suppliers, and coercive conduct related to those agreements, has foreclosed Temu from access to approximately 70–80% of ultra-fast fashion suppliers.  To compete in ultra-fast fashion, Temu must have access to suppliers that are capable of shifting production to new SKUs immediately and matching ever-evolving customer demand in real time, as opposed to relying on a high volume of a single production run or SKU.  Temu cannot compete against Shein in the U.S. with access to only 10–20% of the overall capacity of ultra-fast fashion suppliers.

214.    Temu has made significant investments, and incurred substantial costs, to enter the U.S. ultra-fast fashion market.  Shein's conduct is unfairly limiting Temu's sales volume and artificially raising its costs, reducing Temu's ability to achieve the economies of scale needed to grow and compete.  Without the ability to contract with these suppliers, Temu's growth in the ultra-fast fashion market is being unfairly constrained, while Shein continues to further entrench

its monopoly position.  But for Shein's anticompetitive conduct and unreasonable agreements, Temu could sell as much as three to four times the daily volume of ultra-fast fashion merchandise that it currently sells by competing head-to-head with Shein on price, quality, and speed—a fight Shein knows Temu can win.

215.    As a result, Temu has lost business opportunities and suffered substantial financial and reputational injury.  At the same time, manufacturers that would prefer to sell their products on both Temu's and Shein's platforms essentially are left with no choice but to sell exclusively through Shein, which unfairly restricts their revenue.

216.    Moreover, Shein is also robbing consumers of the benefits of direct competition between Shein and Temu, eliminating the ability to comparison shop for the same or similar products across Temu's and Shein's platforms.  Temu regularly beats Shein on price for identical products, and consumers benefit from lower average costs across platforms when suppliers are permitted to sell on both Temu and Shein.  Yet Shein's anticompetitive Exclusive-Dealing Agreements with suppliers stamp out that competition before it even starts, driving up prices, limiting selection, reducing product quality, and undermining the competitive process.

217.    Suppliers also bear the brunt of Shein's conduct.  Shein's permanent seizure of suppliers' IP rights—in not only the products offered on Shein's website but also the "related styles"—means that suppliers cannot use any such IP rights to develop new products.  Suppliers have alleged that Shein has even gone so far as to make false claims of IP ownership that have resulted in products improperly being removed from the Temu platform.  Indeed, several suppliers have filed suits against Shein in China, claiming that Shein infringes their IP rights and improperly forces Temu to remove products based on falsely claimed IP rights.

218.    There is constant pressure on these suppliers—many of which are small businesses

with limited resources—for lower prices, higher churn, and faster design.  With razor-thin margins, these suppliers would prefer to sell on as many platforms as possible.  Shein's restrictions and intimidation make this virtually impossible, narrowing the outlets to which these manufacturers can sell.  Shein's threats, lawsuits, and fines bring more than just embarrassment for these suppliers—Shein's conduct jeopardizes their entire business model.

219.    Without Shein's explicit and *de facto* exclusive relationships, and threats of fines and penalties, suppliers would have every reason to sell on both the Temu and Shein platforms, expanding their customer base, generating more revenue, and growing their business by leveraging the same product design and imagery used for one platform on the other.  As one supplier explained, "98% of [the] products are Shein top selling items" that it tries "to give to [Temu] at the same time."  Moreover, on information and belief, suppliers' prices are lower, and overall sales volume is higher, when suppliers sell their products on multiple platforms simultaneously.  By forcing suppliers to forego selling on the Temu platform, Shein improperly restricts supplier growth, reach, and profitability.

220.    In addition to Shein's conduct targeting suppliers, Shein has interfered with Temu's business by improperly and anticompetitively weaponizing intellectual property law.  Specifically, Shein has continuously abused the United States copyright law by using barrages of false DMCA notices as a weapon to obstruct Temu's business.  Even where Temu has complied with the false notices in good faith, Shein has not stopped burying Temu with sham notices, leaving Temu no choice but to file this lawsuit to stop Shein's unlawful activity and prevent further harm to Temu.

221.    Next, through its pervasive copying of Temu's copyrighted mobile application games, Shein has unlawfully used and continues to use Temu's copyrighted works for its own commercial gain.  Shein could develop and use its own designs for its games.  But Shein chose to

copy Temu's work and used it to attract customers to Shein's business.  Temu has been left with no choice but to file this lawsuit to stop Shein's ongoing infringement of Temu's copyrights and remedy the significant harm that Shein has caused.

222.   Shein's infringement of Temu's Arcade Trade Dress is likely to cause confusion, mistake, and deception as to the source or origin of Temu's goods and services.  Shein's conduct seeks to trade off of Temu's hard-earned goodwill, and is likely to falsely suggest a sponsorship, connection, or association between Shein's commercial activities and Temu's.  Shein's acts, described above, have damaged and irreparably injured Temu, and, if permitted to continue, will further damage and irreparably injure Temu, as well as the public, who has an interest in being free from confusion, mistake, and deception.

223.   When Shein could not lawfully compete with the number of customers driven to Temu's website by Temu's marketing materials, Shein took a different course—it improperly hired ex-Temu employees and—knowingly or with reason to know—gained access to Temu's proprietary marketing information.

224.   Finally, by threats, extortion, coercion, misrepresentations, and simply abhorrent conduct, Shein has repeatedly gained access to Temu's customer commercial and financial information.  Shein has accessed Temu's seller portal, which contains a vast amount of Temu proprietary information and trade secrets, and has established the pattern where Temu's trade secrets are under the constant threat of being misappropriated.  And the U.S. antitrust laws do not condone such tortious anticompetitive practices to prevent competition.

## CLAIMS

### COUNT I
### FALSE DMCA TAKEDOWN NOTICE (17 U.S.C. § 512(f))

225.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

226.    Section 512(f) of the Copyright Act provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred . . . by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing." 17 U.S.C. § 512(f).

227.    Shein's DMCA notifications sent pursuant to 17 U.S.C. § 512 knowingly and materially misrepresented that Temu, directly or by and through its sellers, infringed Shein's copyrights.

228.    Shein's DMCA notifications knowingly and materially mispresented the ownership of the copyrighted images asserted, Shein's status as an owner or licensee, and/or Shein's authorization to act on behalf of the copyright owner.

229.    Shein's abusive behavior has caused and continues to cause Temu irreparable reputational harm and harm to its goodwill.  Moreover, Temu has expended and must continue to expend substantial resources on its investigation of the DMCA notices, and on efforts to ensure that its merchants do not suffer adverse consequences from said notices.

230.    However, as a service provider, Temu materially relied on Shein's DMCA notice misrepresentations to remove or disable access to the material Shein claimed to be infringing.

231.    As a result of Shein's abusive behavior, Temu (and also innocent third-party sellers)

has suffered economic and irreparable reputational harm.  Accordingly, Temu seeks its attorneys'

fees and damages, under 17 U.S.C. § 512(f), in an amount to be determined at trial.

## COUNT II
## COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, *et seq.*)

232.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth

herein.

233.    Temu is the sole owner of the above-referenced registered copyrights for depictions

of Temu's customer acquisition games.  These copyright registrations are valid and enforceable.

234.    Shein had access to the copyrighted works through Temu's publicly available

mobile app and website.

235.    Shein has infringed Temu's registered copyrights by copying, reproducing,

displaying, publishing, and/or materially deriving benefits and commercial gain from the

copyrighted works for Shein's own games, website, and mobile app.

236.    Shein's conduct constitutes willful direct copyright infringement.

237.    Temu is entitled to recover from Shein the amount of actual damages incurred as a

result of the infringement under 17 U.S.C. § 504, in such amount as shown by appropriate

evidence, and the profits derived by Shein as a result of its infringing activities.

238.    Temu is also entitled to recover attorney's fees and costs of suit pursuant to 17

U.S.C. § 505.

## COUNT III
## INACCURATE COPYRIGHT REGISTRATIONS (17 U.S.C. § 411)

239.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth

herein.

240.    Shein provided inaccurate information to the Copyright Office when it applied for

applications for copyright registrations VA 2-320-444, VA 2-320-442, VA 2-320-439, VA 2-325-

368, VA 2-325-347, VA 2-325-350, VA 2-325-348, VA 2-336-726, VAu 1-490-964, VAu 1-490-963, VAu 1-490-961, VAu 1-490-958, VAu 1-491-024, VAu 1-491-021, VAu 1-491-016, VA 2-340-947, VA 2-340-948, VA 2-340-949, VA 2-340-978, VA 2-340-988, VA 2-340-990, VA 2-341-313, VA 2-341-311, VA 2-341-277, VAu 1-494-985, VAu 1-495-440, VAu 1-496-110, VAu 1-496-108, VAu 1-496-107, VAu 1-497-137, VAu 1-497-132, VAu 1-497-129, VAu 1-497-128, VAu 1-497-127, and VAu 1-497-125, as described herein..

241.    Shein knew that the information it provided to the Copyright Office contained false and/or inaccurate information.   Shein's inaccuracies, misrepresentations, and omissions to the Copyright Office were knowing, deliberate, willful and for the purpose of misleading the Copyright Office.

242.    Shein's inaccurate copyright registrations caused the U.S. Copyright Office to improperly register Shein's copyrighted works.

243.    The inaccuracy of the information, if known, would have caused the U.S. Copyright Office to refuse registration.

## COUNT IV
## TRADE DRESS INFRINGEMENT (15 U.S.C. § 1125(a))

244.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

245.    Temu's Arcade Trade Dress is and has been distinctive since before Shein's use of its infringing website, mobile app design, and promotional materials based on—among other things—its inherent distinctiveness and extensive nationwide use, promotion, recognition, and commercial success.

246.    Shein's conduct, as described above, has caused and is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Shein, its goods and services,

and/or its commercial activities by or with Temu, and thus constitutes trade dress infringement, false designation of origin, passing off, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1831, *et seq.*)

247.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

248.    Temu operates its business in interstate and foreign commerce, transacting and doing business with customers, vendors, and others throughout the United States and internationally.  Temu's commercial and financial trade secrets are used, and intended to be used, in both interstate and foreign commerce.

249.    Temu conceives, designs, develops, and owns trade secrets, as that term is defined under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), as amended (the "DTSA").

250.    Temu's trade secrets encompass confidential and proprietary intellectual property, including but not limited to Temu's commercial and financial information provided through the seller portal.

251.    Temu obtains actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means to others, including Temu's competitors.  Temu's competitors obtain economic value from the acquisition, disclosure, or use of Temu's commercial and financial information.

252.    Temu obtains economic value and a competitive advantage from its trade secrets through the value of those trade secrets, Temu's efforts in devoting substantial resources, time and investment into creating, developing, and using such information, as well as by being able to offer its sellers and vendors the ability to provide lower costs for their goods as compared to Temu's

competitors.

253.    Temu has taken reasonable measures to safeguard its trade secrets, and to limit and restrict others outside of Temu from knowing, readily ascertaining, or using its trade secrets.

254.    Shein has willfully and maliciously engaged in various acts of misappropriation regarding Temu's trade secrets, including but not limited to the improper acquisition, disclosure, and use of Temu's commercial and financial trade secrets associated with its sellers.  Shein improperly acquired Temu's trade secrets while it knew or had reason to know that its acquisition was improper.  Shein has also used and disclosed Temu's trade secrets that Shein knew or had reason to know were derived through improper means and/or in breach of a duty to maintain the confidentiality and/or secrecy of the trade secrets.

255.    In addition, Shein's actions have created a real and credible threat of misappropriation of Temu's commercial, financial, and marketing trade secrets.  Shein's strong-arm tactics used to obtain access information to Temu's seller portal, for example, provides Shein the ability to repeatedly threaten to acquire, and then eventually use or disclose, Temu's trade secrets.

256.    Shein has committed acts in furtherance of the misappropriation of Temu's commercial and financial trade secrets in the United States.  For example, and without limitation, Shein, directly or indirectly, has used the Temu information obtained by its improper activities to offer goods for sale to United States residents through Shein's website, and by actually selling products in the United States.

257.    As a result of Shein's improper misappropriation, acquisition, disclosure, and use of Temu's trade secrets, Shein has violated the DTSA.

258.    As a direct and proximate result of Shein's violations of the DTSA, Temu is entitled

to full compensatory and consequential damages, as well as attorneys' fees, costs, and expenses.

259.    Because Shein's misappropriations have been willful and malicious, Temu is entitled to exemplary damages.

260.    Shein's DTSA violations have caused and will continue to cause Temu irreparable harm that is not adequately remedied at law and that requires preliminary and permanent relief.

**COUNT VI**
**MISAPPROPRIATION OF TRADE SECRETS (D.C. CODE § 36-401, *et seq.*)**

261.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

262.    Temu operates its business in interstate and foreign commerce, transacting and doing business with customers, vendors, and others throughout the United States (including in this District) and internationally.  Temu's commercial and financial trade secrets are used, and intended to be used, in both interstate and foreign commerce.

263.    Temu conceives, designs, develops, and owns trade secrets, as that term is defined under the District of Columbia's Trade Secrets Act, D.C. Code § 36-401 *et seq.* (the "DCTSA").

264.    Temu's trade secrets encompass confidential and proprietary intellectual property, including but not limited to Temu's commercial and financial information provided through the seller portal.

265.    Temu obtains actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means to others, including Temu's competitors.  Temu's competitors obtain economic value from the acquisition, disclosure, or use of Temu's commercial and financial information.

266.    Temu obtains economic value and a competitive advantage from its trade secrets through the value of those trade secrets, Temu's efforts in devoting substantial resources, time,

and investment into creating, developing, and using such information, as well as by being able to offer its sellers and vendors the ability to provide lower costs for their goods as compared to Temu's competitors.

267.    Temu has taken reasonable measures to safeguard its trade secrets, and to limit and restrict others outside of Temu from knowing, readily ascertaining, or using its trade secrets.

268.    Shein has willfully and maliciously engaged in various acts of misappropriation regarding Temu's trade secrets, including but not limited to the improper acquisition, disclosure, and use of Temu's commercial and financial trade secrets associated with its sellers.  Shein improperly acquired Temu's trade secrets while Shein knew or had reason to know that its acquisition was improper.  Shein has also used and disclosed Temu's trade secrets that Shein knew or had reason to know were derived through improper means and/or in breach of a duty to maintain the confidentiality and/or secrecy of the trade secrets.

269.    In addition, Shein's actions have created a real and credible threat of misappropriation of Temu's commercial, financial, and marketing trade secrets.  Shein's strong-arm tactics used to obtain access information to Temu's seller portal, for example, provides Shein the ability to repeatedly threaten to acquire, and then eventually use or disclose, Temu's trade secrets.

270.    Shein, directly or indirectly, has used and disclosed the Temu information obtained by its improper activities to offer goods for sale to residents in the District of Columbia through Shein's website, and by actually selling products in the District of Columbia.

271.    As a result of Shein's improper misappropriation, acquisition, disclosure, and use of Temu's trade secrets, Shein has violated the DCTSA.

272.    As a direct and proximate result of Shein's violations of the DCTSA, Temu is

entitled to full compensatory and consequential damages, as well as attorneys' fees, costs, and expenses.

273.     Because Shein's misappropriations have been willful and malicious, Temu is entitled to exemplary damages.

274.     Shein's DCTSA violations have caused and will continue to cause Temu irreparable harm that is not adequately remedied at law and that requires preliminary and permanent relief.

### COUNT VII
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

275.     Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

276.     Shein's Exclusive-Dealing Agreements and Loyalty Attestations are coerced agreements that Shein forces on suppliers, are anticompetitive, and unreasonably restrain trade in the relevant market.  These agreements have a direct and proximate effect on U.S. interstate and foreign commerce.

277.     Shein's anticompetitive conduct, including its Exclusive-Dealing Agreements, Loyalty Attestations, and campaign of vendor intimidation—targeting the most important ultra-fast fashion vendors—has affected a substantial portion of U.S. interstate commerce and foreign commerce.

278.     Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers in the United States and in this District will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

279.     Shein's anticompetitive conduct has caused Temu actual damages.

280.     Shein's violations have deprived, and will continue to deprive, consumers and the

industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## COUNT VIII
## MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### (15 U.S.C. § 2)

281.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

282.    Shein possesses monopoly power in the relevant market.

283.    Shein has willfully maintained that power by engaging in the anticompetitive and exclusionary Scheme alleged herein, including exclusionary agreements, loyalty attestations, and a campaign of intimidation against the most important ultra-fast fashion vendors.

284.    Shein's maintenance of its monopoly power is not a consequence of a superior product, business acumen, or historical accident.

285.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

286.    Shein's Scheme, and each of the constituent acts in that Scheme, constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

287.    Shein's anticompetitive conduct has affected a substantial portion of U.S. interstate and foreign commerce.

288.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

289.    Shein's anticompetitive conduct has caused Temu actual damages.

290.    Shein's violations have deprived, and will continue to deprive, consumers and the

industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## COUNT IX
## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

291.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

292.    Shein has attempted, continues to attempt, and specifically intends to monopolize the relevant market by engaging in the anticompetitive and exclusionary Scheme alleged herein.

293.    Shein possesses sufficient power in the relevant market such that it has a dangerous probability of success of monopolizing the relevant market.

294.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

295.    Shein's Scheme, and each of the constituent acts in that Scheme, constitutes an attempt violation under Section 2 of the Sherman Act, 15 U.S.C. § 2.

296.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

297.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

298.    Shein's anticompetitive conduct has caused Temu actual damages.

299.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

**COUNT X**
**VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)**

300.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

301.    Shein possesses sufficient market power in the relevant market such that its Scheme has substantially lessened competition or tended to create a monopoly in the relevant market.

302.    Shein's Scheme and its constituent acts, including specifically its Exclusive-Dealing Agreements and Loyalty Attestations, constitute anticompetitive exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

303.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

304.    Shein's anticompetitive conduct has affected a substantial portion of interstate commerce.

305.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the antitrust laws in these circumstances.  Consumers will also suffer antitrust injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

306.    Shein's anticompetitive conduct has caused Temu actual damages.

307.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

**COUNT XI**
**RESTRAINTS OF TRADE (D.C. CODE § 28-4502)**

308.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

309.     Shein's Exclusive-Dealing Agreements and Loyalty Attestations are coerced agreements that Shein forces on suppliers, are anticompetitive, and unreasonably restrain trade in the relevant market, which constitutes a violation of D.C. Code § 28-4502.

310.     Shein's conduct, including its Exclusive-Dealing Agreements and a campaign of vendor intimidation, has had a direct and proximate effect on commerce within the District of Columbia.  Shein's website, app, and ads are widely available to consumers in the District of Columbia.

311.     Temu has suffered injury in the relevant market and is an efficient and appropriate enforcer of laws relating to the restraint of trade in these circumstances.  Consumers in the District of Columbia will also suffer from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

312.     Shein's anticompetitive conduct has caused Temu actual damages.

313.     Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## COUNT XII
## MONOPOLIZATION (D.C. CODE § 28-4503)

314.     Temu incorporates allegations in the preceding paragraphs as if fully set forth herein.

315.     Shein possesses monopoly power in the relevant market.

316.     Shein has willfully maintained that power by engaging in the anticompetitive and exclusionary Scheme alleged herein.   Shein's conduct, including its Exclusive-Dealing Agreements and campaign of vendor intimidation, has had a direct and proximate effect on commerce within the District of Columbia.

317.    Shein's maintenance of its monopoly power is not a consequence of a superior product, business acumen, or historical accident.

318.    There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

319.    Shein's Scheme, and each of the constituent acts in that Scheme, constitutes a violation of D.C. Code § 28-4503.

320.    Shein's anticompetitive conduct has affected commerce in the District of Columbia.

321.    Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of competition laws in these circumstances.  Consumers in the District of Columbia will also suffer injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

322.    Shein's anticompetitive conduct has caused Temu actual damages.

323.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

**COUNT XIII**
**ATTEMPTED MONOPOLIZATION (D.C. CODE § 28-4503)**

324.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

325.    Shein has attempted, continues to attempt, and specifically intends to monopolize the relevant market by engaging in the anticompetitive and exclusionary Scheme alleged herein.

326.    Shein possesses sufficient power in the relevant market such that it has a dangerous probability of success of monopolizing the relevant market.

327.   There are no legitimate procompetitive justifications for Shein's anticompetitive conduct.

328.   Shein's Scheme, and each of the constituent acts in that Scheme, constitutes an attempt violation under D.C. Code § 28-4503.

329.   Shein's anticompetitive conduct has affected commerce in the District of Columbia.

330.   Temu has suffered competitive injury in the relevant market and is an efficient and appropriate enforcer of the competition laws in these circumstances.  Consumers will also suffer injury from higher prices, decreased choice, and lower quality if Shein's conduct is not remedied.

331.   Shein's anticompetitive conduct has caused Temu actual damages.

332.   Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

### COUNT XIV
### UNFAIR COMPETITION (D.C. COMMON LAW)

333.   Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

334.   Temu has invested significant resources in developing, promoting, and advertising its Arcade Trade Dress, and Temu has generated substantial goodwill and commercial success through its extensive use, promotion, and advertising of the Arcade Trade Dress.

335.   As alleged in this Complaint, Shein has engaged in unfair methods of competition through its infringement of the Arcade Trade Dress.

336.   Shein's unauthorized use of Temu's distinctive trade dress in commerce and in connection with the sale, promotion, and advertisement of Shein's goods and services is likely to

cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Shein, its goods and services, and/or its commercial activities by or with Temu.

337.    As a direct and proximate result of Shein's misconduct, Temu has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to goodwill; and additional business expenses, in amounts to be determined at trial.

338.    Shein's actions were committed knowingly, willfully, and in conscious disregard of Temu's rights, and Temu has been and will continue to be irreparably injured unless Shein's unlawful actions are enjoined.

339.    Shein has also engaged in unfair methods of competition by engaging in the anticompetitive and exclusionary Scheme alleged herein.  Shein's violations include disparaging Temu's business, intimidating suppliers, threatening groundless legal action, and otherwise interfering with Temu's business and access to business.

340.    Shein's violations have impeded Temu's access to business in a tortious and wrongful way, and its conduct has caused and continues to cause Temu actual damages.

**COUNT XV**
**TORTIOUS INTERFERENCE WITH CONTRACT (D.C. COMMON LAW)**

341.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

342.    Temu has existing contracts with ultra-fast fashion manufacturers, including specifically those manufacturers who stopped doing business with Temu as alleged above.  Each of these contracts affords Temu existing or prospective legal rights.

343.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's aforementioned existing contracts through anticompetitive, wrongful, and unjustifiable means of interference in order to disrupt Temu's business and gain an unfair and

unjustified advantage over Temu.

344.   At the time of its actions, Shein had actual knowledge of the relevant contracts.

345.   Shein's conduct has caused, and will cause, actual damage to Temu.

346.   Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

**COUNT XVI**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (D.C. COMMON LAW)**

347.   Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

348.   Temu has and had existing business relations with ultra-fast fashion manufacturers, including specifically those manufacturers who stopped doing business with Temu as alleged above and those manufacturers who ceased selling certain products on Temu's platform.

349.   Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's existing contracts through the anticompetitive, wrongful, and unjustifiable means of interference alleged herein.

350.   At the time of its actions, Shein had actual knowledge of the relevant business relationships.

351.   Shein cannot justify its actions as legitimate competition.

352.   Shein's conduct has caused, and will cause, actual damage to Temu.

353.   Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## COUNT XVII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS (D.C. COMMON LAW)

354.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

355.    Temu has prospective business relations with ultra-fast fashion manufacturers, including but not limited to those manufacturers who stopped doing business with Temu as alleged above or who ceased selling certain products on Temu's platform but may reinstate business relations with Temu absent Shein's conduct.

356.    Shein wrongfully, and without justification or privilege, intentionally interfered with Temu's existing contracts and prospective business through the anticompetitive, wrongful, and unjustifiable means of interference alleged herein.

357.    At the time of its actions, Shein had actual knowledge of the relevant prospective business relationships.

358.    Shein cannot justify its actions as legitimate competition.

359.    Shein's conduct has caused, and will cause, actual damage to Temu.

360.    Shein's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Shein's unlawful conduct will continue unless enjoined.

## COUNT XVIII
## ABUSE OF PROCESS (D.C. COMMON LAW)

361.    Temu incorporates the allegations in the preceding paragraphs as if fully set forth herein.

362.    Shein has used the legal process to interfere with Temu's business by filing copyright infringement litigations against Temu.

363.    Shein brought copyright infringement litigations against Temu with the ulterior motive of disrupting Temu's ability to market and sell products in competition with Shein.

364.    Shein used the legal process against Temu for the improper purpose of maintaining Shein's monopoly power in the relevant market by seeking to cause reputational, financial, and other injury to its competitor.

365.    Shein's abuse of process has caused actual damage to Temu.

## PRAYER FOR RELIEF

WHEREFORE, Temu respectfully requests the following relief from this Court:

**Improper DMCA Notices:**

A.    An Order that any Shein DMCA notices that rely on works obtained through Exclusive-Dealing Agreements, coercive IP transfers, or fraudulently obtained copyright registrations are invalid;

B.    An Order directing Shein to provide evidence of authority for all IP takedown notices issued to Temu.  For instances in which incorrect, false, or unsupported takedown notices have been issued, Shein should be ordered to provide compensation to all the affected parties and be held liable for any damages to Temu merchants;

C.    An Order prohibiting Shein from submitting any further false, malicious, and/or ungrounded DMCA notices.  As part of Shein's compliance with this paragraph, Shein shall be required to immediately comply with the following procedure for each DMCA notice to Temu and provide the following documentation for each asserted work in each notice:

(1)    A copyright registration showing Shein is the owner of the work (and deposit materials and documentation proving ownership).  If the work is not registered, an under-oath statement under penalty of perjury that Shein is the owner of the asserted work with documentation proving ownership

(including the original photographs of the works with metadata, the work for hire agreement, or assignment or transfer with valid consideration predating transfer); and

(2)     If Shein is not the owner, an under oath statement by Shein under penalty of perjury and documentation showing Shein is authorized to act on behalf of the bona fide owner.  The documentation must show that the owner in fact owns the copyright, i.e., (1) proof of copyright registration by the entity that claims to be the owner (and deposit materials and documentation showing ownership), or, (2) if the work is not registered, an under-oath statement by the claimed owner under penalty of perjury how they came to own the work and documentation proving ownership (i.e., original photographs with metadata and all applicable transfer or other agreements relied on with valid consideration predating transfer).

(3)     Not submit any DMCA notices to Temu in batches of more than 100 images per day;

(4)     All notices must include clickable links, and the URL links must be verified by Shein to relate to correct product listings on Shein and Temu.

Shein shall be prohibited from submitting any further takedown notices to Temu in contravention of the above (or assisting, aiding, or abetting any other person or entity in violating this Order).  Unless Shein submits a valid DMCA notice in compliance with the procedure above, Temu will have no obligation to delist any products;

**Fraudulently Obtained Copyright Registrations:**

D.     An Order that Shein's conduct constitutes fraud and/or knowingly false representations to the U.S. Copyright Office;

E.     An Order cancelling Shein's copyright registrations containing false and/or inaccurate information, with knowledge that such information was false and/or inaccurate, and/or registrations based on unlawful IP transfers from suppliers and/or other third parties to Shein;

**Trade Secret Misappropriation:**

F.     An Order immediately enjoining Shein from any activities that involve actual or threatened improper acquisition, disclosure, and use of any Temu commercial and financial trade secret information, including obtaining login credentials to Temu's seller portal system from current or former Temu sellers, and from using those login credentials to acquire Temu commercial and financial trade secret information;

G.     An Order requiring Shein to provide all copies of any document that contains Temu commercial and financial trade secret information to Temu, or for Shein to destroy, with proper verification, all copies of any document that contains Temu commercial and financial trade secret information;

H.     An Order requiring Shein:

(1)     to cease immediately the false imprisonment and interrogations of sellers and/or seizure of their devices or property;

(2)     to return immediately any devices or data obtained from sellers as a result of unlawful detentions and from access to the sellers' and Temu's confidential information;

I.     An Order requiring Shein to issue, within five (5) days, a public apology from Shein to the affected Temu sellers for subjecting them to false imprisonment, humiliation, and distress;

**Copyright Infringement:**

J.      An Order declaring that Shein's conduct, as detailed above, constitutes direct copyright infringement under federal law;

**Trade Dress Infringement and Unfair Competition:**

K.      An Order declaring that Shein's conduct, as described above, constitutes trade dress infringement and unfair competition under federal and/or state laws;

L.      A permanent injunction enjoining Shein and all persons in active concert or participation with any of the aforementioned entities:

      (1)     From using, registering, or seeking to register any infringing trade dress or designs that violate Temu's rights in the Arcade Trade Dress;

      (2)     From representing by any means whatsoever, directly or indirectly, that Shein, any products or services offered by Shein, or any activities undertaken by Shein is/are associated or connected in any way with Temu or sponsored by or affiliated in any way with Temu; and

      (3)     From assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities above;

M.      An Order directing Shein to destroy all products, packaging, signage, advertisements, promotional materials, stationery, forms, and/or any other materials and things that contain or bear any trade dress or designs that violate Temu's Arcade Trade Dress;

N.      An Order directing Shein to publish a pre-approved corrective statement and send pre-approved corrective letters to all U.S. customers, merchants, suppliers, agents, partners, and/or representatives to remedy the confusion and other impact of Shein's conduct restricting merchant

freedom and making misrepresentations in court regarding Shein's ownership of intellectual property and/or having the authority to send out DMCA notices;

**Restraints of Trade and Monopolization:**

O.      An Order declaring, ordering, and adjudging that the conduct alleged herein unreasonably restrained trade, monopolized or attempted to monopolize the relevant market, or otherwise violated the Sherman and/or Clayton Antitrust Acts and, further, that it was illegal and tortious under the laws of the District of Columbia;

P.      An Order enjoining Shein from entering into exclusive-dealing agreements with suppliers;

Q.      An Order enjoining Shein from engaging in the intimidation tactics directed at restricting merchants' freedom as alleged herein;

R.      An Order directing Shein to implement a pre-approved plan to remedy and remove the financial penalties imposed on Shein's suppliers for doing business with Temu, including publishing a pre-approved corrective statement and sending pre-approved corrective letters to all of Shein's merchants, suppliers, and the agents and representatives thereof, and providing restitution, in an amount to be determined by the Court, to compensate Shein's suppliers for their past and reasonably foreseeable future damages suffered as a result of being coerced into removing their listings from Temu's marketplace;

**Damages, Attorneys' Fees, and Costs:**

S.      An Order directing Shein to account for and pay to Temu any and all profits arising from the foregoing acts, and increasing such profits in accordance with 15 U.S.C. § 1117 and other applicable laws;

T.      An Order directing Shein to pay Temu damages in an amount as yet undetermined caused by the foregoing acts, and trebling such damages in accordance with other applicable laws;

U.      An award of punitive damages to Temu for unfair competition under common law;

V.      An award of damages to Temu for willful copyright infringement including, but not limited to, an award of actual damages, Shein's profits from infringement, and prejudgment and post-judgment interest, in an amount to be determined at trial;

W.      Treble damages pursuant to 15 U.S.C. § 15 and D.C. Code § 28-4508;

X.      An Order directing Shein to provide compensation, in an amount to be determined by the Court, to all merchants affected by false DMCA notices and product de-listings, and to all merchants who submit declarations, affidavits, or other sworn statements of evidence in connection with this proceeding, in acknowledgment of the fear of retaliation from Shein;

Y.      An award to Temu of attorneys' fees and costs pursuant to 15 U.S.C. § 15, 17 U.S.C. § 505, D.C. Code § 28-4508, and other applicable laws;

Z.      Such other relief as the Court deems proper and just.

## JURY TRIAL DEMANDED

Temu hereby demands trial by jury on all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.


Date:  December 13, 2023                    Respectfully submitted,

                                            */s/    J. Mark Gidley*
                                            J. Mark Gidley (D.C. Bar No. 417280)
                                            Anna Naydonov (D.C. Bar No. 980910) (*pro hac vice* forthcoming)
                                            Michael J. Songer (D.C. Bar No. 453727)
                                            WHITE & CASE LLP
                                            701 Thirteenth Street, NW
                                            Washington, DC 20005

Telephone: (202) 637-6197
Fax: (202) 639-9355
mgidley@whitecase.com
anna.naydonov@whitecase.com
michael.songer@whitecase.com

Jack E. Pace III (*pro hac vice* forthcoming)
Michael Hamburger (*pro hac vice* forthcoming)
Holly Tao (*pro hac vice* forthcoming)
Rosie Norwood-Kelly (D.C. Bar No. 1780519) (*pro hac vice* forthcoming)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8520
Fax: (212) 354-8113
jpace@whitecase.com
michael.hamburger@whitecase.com
holly.tao@whitecase.com
rosie.norwood-kelly@whitecase.com

*Counsel for Plaintiff WhaleCo Inc.*