# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WHALECO INC.,

                Plaintiff,

      v.

SHEIN TECHNOLOGY LLC,
ROADGET BUSINESS PTE. LTD.,

                Defendants.

Case No. 1:23-cv-3706-TJK

**PLAINTIFF WHALECO INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ROADGET BUSINESS PTE. LTD.'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD........................................................................................................ 4

ARGUMENT ..................................................................................................................... 4

I.     Temu Sufficiently Pleaded a Claim Under Section 512(f) (Count I).................... 4

     A.    The "Plausibility" Standard Under Rule 8 Applies ............................................ 4

     B.    Temu Sufficiently Pleaded Shein's Actual Knowledge or Willful Blindness of Its Misrepresentations of Ownership and Infringement ................................ 6

II.    Temu Sufficiently Pleaded Copyright Infringement (Count II)............................ 9

III.   Properly Seeks a Declaratory Judgment of Invalidity (Count III) ....................... 12

IV.   Temu Sufficiently Pleaded Its Trade Dress Infringement Claim (Count IV) ...... 13

     A.    Temu Sufficiently Alleged that the Arcade Trade Dress Is Non-Functional... 13

     B.    Temu Sufficiently Pleaded that Its Arcade Trade Dress Is Distinctive .......... 16

     C.    Temu Sufficiently Pleaded Likelihood of Confusion ...................................... 18

V.     Temu States a Claim For Misappropriation of Trade Secrets (Counts V–VI)..... 19

     A.    Temu's Claims Are Not Barred on the Basis of Extraterritoriality ................ 19

     B.    Temu Sufficiently Pleaded the Existence and Nature of Temu's Trade Secrets ..........................................................................................................20

     C.    Temu Took Reasonable Steps to Protect Its Secret Information .................... 21

     D.    Temu Alleges Facts Showing Acquisition and Use of Trade Secrets ............ 22

VI.   Temu Sufficiently Pleaded Its Sherman and Clayton Act Claims (Counts VII-X), Which Fall Squarely Within This Court's Jurisdiction ............ 23

     A.    The Foreign Trade Antitrust Improvements Act Does Not Apply to Temu's Claims Because They Involve Import Commerce and Domestic Injury ........ 23

          1.    Shein's Illegal Scheme Involves Import Commerce .......................... 23

          2.    Shein's Scheme Had Direct, Substantial, and Foreseeable Effects on U.S. Commerce That Injured Temu in the United States .............. 24

          3.    The Supreme Court Has Already Rejected Shein's Argument that Comity Principles Weigh Against Permitting Claims for Domestic Harm Caused in Part by Foreign Conduct............................. 27

     B.    Shein Has Monopoly and Market Power in the Ultra-Fast-Fashion Relevant Antitrust Product Market ............................................................... 27

          1.    Ultra-Fast Fashion Is a Unique, Relevant Product Market That Is a "New Industry and Business Model" ............................................... 28

          2.    Both Direct and Indirect Evidence Support Temu's Allegations of Shein's Market Power and Monopoly Power in U.S. Ultra-Fast Fashion.................................................................. 31

     C.    Shein Has Engaged in Anticompetitive Conduct............................................. 33

1.  Shein Fails to Respond to Key Allegations of Anticompetitive Conduct ........................................................................................ 33

2.  Shein's Supplier Agreements Are Anticompetitive Exclusive Deals ............................................................................................... 34

3.  Shein's Extreme Coercion to Enforce Exclusivity Is Anticompetitive ............................................................................... 37

4.  Shein's Exclusive Agreements and Coercion Foreclose Competition ............................................................................................ 38

5.  *Noerr-Pennington* Does Not Immunize Shein's Sham IP Enforcement ....................................................................................... 39

D.  Shein's Conduct Has Harmed Competition ...................................... 41

E.  Temu Sufficiently Pleaded Facts to Support Its Clayton Act Section 3 Claim ................................................................................................... 41

VII.  Shein's Challenge to the D.C. Antitrust Claims (Counts XI–XIII) Fails for the Same Reasons as Its Sherman Act Challenges ......................................... 42

VIII.  Temu Sufficiently Pleaded Facts to Support Its D.C. Unfair Competition Law Claim (Count XIV) .................................................................................. 43

IX.  Temu Sufficiently Pleaded Facts Sufficient to Support Its Tortious Interference Claims (Counts XV–XVII) ........................................................... 43

X.  Shein's Arguments Concerning Temu's D.C. Abuse of Process Claim (Count XVIII) Mischaracterize the Claim and Should Be Rejected .................. 44

CONCLUSION ..................................................................................................... 45

## TABLE OF AUTHORITIES

Page(s)

## CASES

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
    342 F. Supp. 3d 126 (D.D.C. 2018) ............................................................................ 41, 44

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
    131 F. Supp. 3d 196 (S.D.N.Y. 2015) ........................................................................ 17

*Allen v. Dairy Farmers of Am., Inc.*,
    748 F. Supp. 2d 323 (D. Vt. 2010) ............................................................................ 28

*\*Alper Auto., Inc. v. Day To Day Imps.*,
    2021 WL 5893161 (S.D. Fla. Nov. 3, 2021) .............................................................. 7

*\*Am. President Lines, LLC v. Matson, Inc.*,
    633 F. Supp. 3d 209 (D.D.C. 2022) .......................................................................... passim

*\*Amaretto Ranch Breedables v. Ozimals, Inc.*,
    2010 WL 5387774 (N.D. Cal. Dec. 21, 2010) .......................................................... 39

*Anderson v. USAA Cas. Ins. Co.*,
    221 F.R.D. 250 (D.D.C. 2004) .................................................................................. 6

*Animal Sci. Prods. Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011) ...................................................................................... 24

*App Dynamic ehf v. Vignisson*,
    87 F. Supp. 3d 322 (D.D.C. 2015) ............................................................................ 13

*\*Aristotle Int'l, Inc. v. Acuant, Inc.*,
    2023 WL 1469038 (D.D.C. Feb. 2, 2023) ................................................................ 20, 21, 22

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
    581 F.3d 1138 (9th Cir. 2009) .................................................................................. 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................. 4, 5, 6

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
    672 F.2d 607 (7th Cir. 1982) .................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 4, 5

*Bell Heli. Textron Inc. v. Islamic Rep. of Iran*,
    764 F. Supp. 2d 122 (D.D.C. 2011) .......................................................................... 13

*\*Big Daddy Games, LLC v. Reel Spin Studios, LLC*,
    2013 WL 12233949 (W.D. Wis. Apr. 10, 2013) ...................................................... 10, 11

iii

*Bohnsack v. Varco, L.P.*,
    668 F.3d 262 (5th Cir. 2012) ........................................................................ 19

*Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*,
    589 F. Supp. 2d 25 (D.D.C. 2008) ............................................................... 43

*\*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...................................................................................... 29

*Brownstein v. Lindsay*,
    742 F.3d 55 (3d Cir. 2014) ........................................................................... 13

*Bueno v. Benhamou*,
    2022 WL 1592593 (C.D. Cal. Mar. 16, 2022) .............................................. 12

*Burrows-Giles Co. v. Sarony*,
    111 U.S. 53 (1884) .......................................................................................... 7

*Can. Ass'n v. P.S. Knight Co., Ltd.*,
    649 F. Supp. 3d 334 (W.D. Tex. Jan. 4, 2023) ............................................ 12

*Caribbean Broad. Sys. v. Cable & Wireless plc*,
    148 F.3d 1080 (D.C. Cir. 1998) ................................................................... 25

*\*Cartier, Inc. v. Sardell Jewelry, Inc.*,
    294 F. App'x 615 (2d Cir. 2008) ............................................................. 15, 16

*Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*,
    350 F. Supp. 2d 1 (D.D.C. 2004) ................................................................. 21

*\*Chambers v. Green-Stubbs*,
    2021 WL 107252 (N.D. Miss. Jan. 12, 2021) .............................................. 12

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ..................................................................... 40

*Conf. Archives, Inc. v. Sound Images, Inc.*,
    2010 WL 1626072 (W.D. Pa. Mar. 31, 2010) .............................................. 16

*Cooper v. NTSB*,
    660 F.3d 476 (D.C. Cir. 2011) ....................................................................... 6

*Data East USA, Inc. v. Epyx, Inc.*,
    862 F.2d 204 (9th Cir. 1988) ............................................................. 10, 11, 12

*Data Gen. Corp. v. Grumman Sys. Supp. Corp.*,
    36 F.3d 1147 (1st Cir. 1994) ........................................................................ 38

*Dean v. Cortes*,
    2018 WL 3425016 (C.D. Cal. July 12, 2018) .............................................. 17

*DeliverMed Holdings, LLC v. Schaltenbrand,*
  734 F.3d 616 (7th Cir. 2013) ................................................................. 12

*\*Design Furnishings, Inc. v. Zen Path, LLC,*
  2010 WL 5418893 (E.D. Cal. Dec. 23, 2010) ..................................... 7, 9

*Devan Designs, Inc. v. Palliser Furniture Corp.,*
  25 U.S.P.Q.2d 1991 (M.D.N.C. 1992) ................................................... 14

*Digit. Mktg. Advisors v. McCandless Grp., LLC,*
  2022 WL 18216003 (C.D. Cal. Mar. 28, 2022) ...................................... 5

*\*Disney Enters., Inc. v. Hotfile Corp.,*
  2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ................................. 7, 8, 9

*Eastman Kodak Co. v. Image Tech. Servs.,*
  504 U.S. 451 (1992) ............................................................................... 31

*Econ. Rsch. Servs. v. Resol. Econs., LLC,*
  208 F. Supp. 3d 219 (D.D.C. 2016) ....................................................... 21

*Eliya, Inc. v. Kohl's Dep't Stores,*
  2006 WL 2645196 (S.D.N.Y. Sept. 13, 2006) ....................................... 18

*Elsevier Inc. v. Doctor Evidence, LLC,*
  2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ...................................... 21, 22

*\*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,*
  315 F.3d 338 (D.C. Cir. 2003) ............................................................... 23

*ENTTech Media Grp. LLC v. Okularity, Inc.,*
  2021 WL 916307 (C.D. Cal. Mar. 3, 2021) ............................................ 5

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.,*
  872 F. Supp. 81 (S.D.N.Y. 1995) .......................................................... 24

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004) ................................................................... 23, 24, 27

*Fed. Trade Comm'n v. Facebook, Inc.,*
  560 F. Supp. 3d 1 (D.D.C. 2021) ..................................................... 32, 33

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ................................................................................. 9

*Fernandez v. Jones,*
  653 F. Supp. 2d 22 (D.D.C. 2009) ......................................................... 17

*Frame-Wilson v. Amazon.com, Inc.,*
  591 F. Supp. 3d 975 (W.D. Wash. 2022) ............................................... 34

v

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986) ................................................................................31

*FTC v. Mylan Labs., Inc.*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ...........................................................28

*FTC v. Staples*,
    970 F. Supp. 1066 (D.D.C. 1997) ..........................................................29

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ............................................................29

*\*FTC v. Whole Foods*,
    548 F.3d 1028 (D.C. Cir. 2008) ..............................................................29

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987) ..................................................................13

*Geigtech E. Bay, LLC v. Lutron Elecs. Co.*,
    352 F. Supp. 3d 265 (S.D.N.Y. 2018)......................................................17

*Gen. Universal Sys. v. HAL Inc.*,
    500 F.3d 444 (5th Cir. 2007) .............................................................19, 22

*Genetic Sys. Corp. v. Abbott Labs*,
    691 F. Supp. 407 (D.D.C. 1988) .............................................................42

*GMC v. Lanard Toys, Inc.*,
    468 F.3d 405 (6th Cir. 2006) ..................................................................15

*Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*,
    525 F. Supp. 3d 1145 (S.D. Cal. 2021) ...................................................40

*Good L Corp. v. Fasteners for Retail, Inc.*,
    2019 WL 1429252 (M.D. Tenn. Mar. 28, 2019) .............................................14

*Greaver v. Nat'l Ass'n of Corp. Dirs.*,
    1997 WL 34605245 (D.D.C. Nov. 19, 1997) ....................................................9

*Greenpeace, Inc. v. Dow Chem. Co.*,
    2013 D.C. Super. LEXIS 22 (D.C. Sup. Ct. Feb. 5, 2013) ................................21

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
    21 F. Supp. 2d 27 (D.D.C. 1998).............................................................42

*Hall v. Hollywood Credit Clothing Co.*,
    147 A.2d 866 (D.C. 1959) ......................................................................45

*Honey Bum, LLC v. Fashion Nova Inc.*,
    63 F.4th 813 (9th Cir. 2023) ..............................................................30, 31

*Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*,
   623 F. Supp. 3d 857 (N.D. Ill. 2022) ....................................................... 37

*ICC Evaluation Serv. v. Int'l Ass'n of Plumbing & Mech. Offs.*,
   2019 WL 8501430 (D.D.C. Nov. 22, 2019) ............................................. 10

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) .......................................................... 43

*In re DC Comics, Inc.*,
   689 F.2d 1042 (C.C.P.A. 1982) ............................................................. 14

*In re eBay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar., 4, 2010) ............................................ 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   587 F. Supp. 2d 27 (D.D.C. 2008) ..................................................... 4, 35

*Int'l Council of Shopping Ctrs., Inc. v. RECONCRE, LLC*,
   2021 WL 148387 (D.D.C. Jan. 14, 2021) ............................................... 18

*Jane Lyons Advert., Inc. v. Cook*,
   1998 WL 164775 (D.D.C. Mar. 31, 1998) ............................................... 44

*Jung v. Ass'n of Am. Med. Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ....................................................... 35

*K&D, LLC v. Trump Old Post Off.*,
   2018 WL 6173449 (D.D.C. Nov. 26, 2018) ............................................. 43

*Kano Labs., Inc. v. Clenair Mfg., Inc.*,
   2013 WL 5758651 (M.D. Tenn. Oct. 24, 2013) ....................................... 15

*Keene Corp. v. Paraflex Indus., Inc.*,
   653 F.2d 822 (3d Cir. 1981) .................................................................. 14

*Kruman v. Christie's Int'l plc*,
   284 F.3d 384 (2d Cir. 2002) .................................................................. 24

*Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ..................................................... 38

*Leisurecraft Prod., Ltd. v. Int'l Dictating Equip., Inc.*,
   1981 WL 40516 (D.D.C. 1981) ............................................................. 14

*Lenz v. Universal Music Corp.*,
   815 F.3d 1145 (9th Cir. 2016) ........................................................ 6, 7, 8

*Lepton Labs, LLC v. Walker*,
   55 F. Supp. 3d 1230 (C.D. Cal. 2014) ................................................... 13

*Lotes Co. v. Hon Hai Precision Industries Co.*,
   753 F.3d 395 (2d Cir. 2014)................................................................26, 27

*\*Luminati Networks Ltd. v. BIScience Inc.*,
   2019 WL 2084426 (E.D. Tex. May 13, 2019) ....................................19, 20

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016)........................................................17

*\*Maricultura Del Norte, S. de R.L. de C.V. v. Worldbusiness Capital, Inc.*,
   159 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................24, 27

*Marion HealthCare, LLC v. S. Ill. Healthcare*,
   2015 WL 3466585 (S.D. Ill. May 29, 2015)................................................42

*Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*,
   700 F. Supp. 588 (D.D.C. 1988) ................................................................42

*McGuire v. Columbia Broad. Sys., Inc.*,
   399 F.2d 902 (9th Cir. 1968) .....................................................................42

*\*Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*,
   2012 WL 12863934 (W.D. Wash. July 25, 2012) .......................................39

*Meyer Grp., Ltd. v. Rayborn*,
   2023 WL 7006791 (D.D.C. Sept. 29, 2023) ...............................................21

*Monster Energy Co. v. Beast Cookie Co., LLC*,
   2023 WL 4681632 (C.D. Cal. June 15, 2023) ............................................18

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
   2021 WL 922074 (C.D. Cal. Jan. 7, 2021) .................................................18

*\*Motorola Sols., Inc. v. Hytera Commc'ns. Corp. Ltd.*,
   436 F. Supp. 3d 1150 (N.D. Ill. 2020) .......................................................19

*Nespresso USA, Inc. v. Peet's Coffee, Inc.*,
   2023 WL 374980 (S.D.N.Y. Jan. 24, 2023) ................................................14

*Neumann v. Vidal*,
   710 F.2d 856 (D.C. Cir. 1983) ...................................................................45

*Newborne v. Yahoo!, Inc.*,
   391 F. Supp. 2d 181 (D.D.C. 2005) ...........................................................10

*Nuance Commc'ns v. Omilia Nat. Language Sols.*,
   2020 WL 2198362 (D. Mass. May 6, 2020) ...............................................40

*Oakwood Labs. LLC v. Thanoo*,
   999 F.3d 892 (3d Cir. 2021)........................................................................19

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..................................................................................... 30

Origami Owl LLC v. Mayo,
    2015 WL 4747101 (D. Ariz. Aug. 7, 2015) ..................................................... 29

Pastime LLC v. Schreiber,
    2017 WL 6033434 (S.D.N.Y. Dec. 5, 2017) ................................................... 13

Philip Morris Inc. v. Star Tobacco Corp.,
    879 F. Supp. 379 (S.D.N.Y. 1995) .................................................................. 16

Pierce v. Lifezette, Inc.,
    2021 WL 2557241 (D.D.C. June 2, 2021) .......................................................... 7

Prof. Org. of Women in Ent. Reaching Up v. Killola,
    2014 WL 12607701 (C.D. Cal. Oct. 9, 2014) ..................................................... 5

ProV Int'l, Inc. v. Lucca,
    2019 WL 5578880 (M.D. Fla. Oct. 29, 2019) ................................................. 21

Ray v. Proxmire,
    581 F.2d 998 (D.C. Cir. 1978) ........................................................................ 43

Reckitt Benckiser Inc. v. Tris Pharma, Inc.,
    2011 WL 773034 (D.N.J. Feb. 28, 2011) ........................................................ 22

RJR Nabisco, Inc. v. European Cmty.,
    579 U.S. 325 (2016) ........................................................................................ 20

Rosen vs. Hosting Servs., Inc.,
    771 F. Supp. 2d 1219 (C.D. Cal. 2010) ......................................................... 8, 9

SCS Direct, Inc. v. Insassy, Inc.,
    2016 WL 1384762 (D. Conn. Apr. 7, 2016) .................................................... 16

Smartling, Inc. v. Skawa Innovation Ltd.,
    358 F. Supp. 3d 124 (D. Mass. 2019) ............................................................. 16

Sno-Wizard Mfg., Inc. v. Eisemann Products Co.,
    791 F.2d 423 (5th Cir. 1986) .......................................................................... 14

Sparrow v. United Air Lines, Inc.,
    216 F.3d 1111 (D.C. Cir. 2000) ........................................................................ 4

Spry Fox LLC v. LOLApps Inc.,
    2012 WL 5290158 (W.D. Wash. Sept. 18, 2012) ........................................... 12

Stat Ltd. v. Beard Head, Inc.,
    60 F. Supp. 3d 634 (E.D. Va. 2014) ............................................................... 13

*Stenograph L.L.C. v. Bossard Assocs.*,
    144 F.3d 96 (D.C. Cir. 1998) ........................................................................... 10

*Sunjoy Indus. Grp., Ltd. v. Permasteel, Inc.*,
    2023 WL 406211 (S.D. Ohio Jan. 25, 2023) ..................................................... 14

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .......................................................................................... 36

*\*Tetris Holding, LLC v. Xio Interactive, Inc.*,
    863 F. Supp. 2d 394 (D.N.J. 2012) ................................................................... 11

*Thompson v. 1-800 Contacts, Inc.*,
    2018 WL 2271024 (D. Utah May 17, 2018) ...................................................... 30

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .............................................................................. 28

*Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*,
    87 F.3d 654 (4th Cir. 1996) ............................................................................... 15

*\*Traffix Devices v. Mktg. Displays*,
    532 U.S. 23 (2001) ...................................................................................... 14, 15

*\*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) .................................................................................... 13, 16

*U.S. ex rel. Heath v. AT&T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) ............................................................................ 5

*U.S. v. Jin-Woo Kim*,
    808 F. Supp. 2d 44 (D.D.C. 2011) ...................................................................... 9

*Ulico Cas. Co. v. Pro. Indem. Agency, Inc.*,
    1999 U.S. Dist. LEXIS 8591 (D.D.C. May 5, 1999) ........................................ 44

*Ultraclear Epoxy, LLC v. Epodex USA Corp.*,
    2024 WL 815504 (M.D. Tenn. Feb. 27, 2024) ................................................. 40

*\*United States v. American Tel. & Tel. Co.*,
    524 F. Supp. 1336 (D.D.C. 1981) ..................................................................... 34

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .............................................................................. 37

*United States v. Gillette Co.*,
    828 F. Supp 78 (D.D.C. 1993) .......................................................................... 29

*United States v. Hui Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ............................................................................. 23

*United States v. Microsoft,*
   253 F.3d 34 (D.C. Cir. 2001) ............................................................. 36, 38, 41

*United States v. Van Avermaet,*
   2023 WL 3768293 (D.D.C. June 2, 2023) ......................................................... 23

*US v. H&R Block, Inc.,*
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................... 30

*Vaad L'Hafotzas Sichos, Inc. v. Krinsky,*
   133 F. Supp. 3d 527 (E.D.N.Y. 2015) ........................................................... 13

*Vendavo, Inc. v. Price f(x) AG,*
   2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) .................................................... 21

*Viacom Int'l v. IJR Capital Invs., L.L.C.,*
   891 F.3d 178 (5th Cir. 2018) ................................................................... 17

*Vicom, Inc. v. Harbridge Merch. Servs.,*
   20 F.3d 771 (7th Cir. 1994) ..................................................................... 6

*Weinberg v. Dirty World, LLC,*
   2017 WL 5665022 (C.D. Cal. Apr. 24, 2017) .................................................... 5

*Whaleco Inc. v. Shein US Servs., LLC et al.,*
   No. 23-cv-11596 (D. Mass. Oct. 2, 2023), ECF No. 44 ..................................... 29, 34

*Williams v. Hy-Vee, Inc.,*
   661 F. Supp. 3d 871 (S.D. Iowa 2023) ......................................................... 12

*Woodland Drive LLC v. Courtovich,*
   2021 WL 4476767 (D.D.C. Sept. 30, 2021) ..................................................... 5

*Yates v. United States,*
   354 U.S. 298 (1957) ............................................................................ 19

*Zaccari v. Apprio, Inc.,*
   390 F. Supp. 3d 103 (D.D.C. 2019) ............................................................ 22

*ZF Meritor, LLC v. Eaton Corp.,*
   696 F.3d 254 (3d Cir. 2012) ................................................................... 37

## STATUTES AND RULES

15 U.S.C. § 6a .................................................................................. 24

15 U.S.C. § 1052(f) ............................................................................ 17

17 U.S.C. § 410(c) .............................................................................. 9

17 U.S.C. § 411 ............................................................................ 12, 13

17 U.S.C. § 512(c)(3) ..................................................................... 6, 7, 8

17 U.S.C. § 512(f) ........................................................................................... passim

18 U.S.C. § 1837(2) .............................................................................. 19, 20, 21

18 U.S.C. § 1839 .......................................................................................... 20

18 U.S.C.A. § 1839(5) .................................................................................. 19

Clayton Act ....................................................................................... 4, 23, 41

D.C. Code §§ 28-4502, 28-4503 ................................................................. 42

D.C. Code § 36-401, *et seq.* ................................................................. 20, 21

D.C. Code. §§ 36-402, 36-403 .................................................................... 20

D.C. Unfair Competition Law .................................................................... 43

DMCA ...................................................................................................... passim

Fed. R. Civ. P. 8 ........................................................................................ 4, 5

Fed. R. Civ. P. 9 ........................................................................................ 5, 6

Fed. R. Civ. P. 12(b)(6) ............................................................................... 4

Foreign Trade Antitrust Improvements Act ...................................... 1, 2, 23

Sherman Act ............................................................................................. passim

## MISCELLANEOUS

2023 Merger Guidelines, § 4.3 ................................................................... 32

"A Top Shein Exec on That Influencer Trip Fiasco," *Time* (July 16, 2023) ........................... 30

Compendium of U.S. Copyright Office Practices § 1807.4 ...................... 12

Just. & Fed. Trade Comm'n, *Antitrust Guidelines for Int'l Enforcement and Cooperation* 19 (2017) ...................................................................................................... 24

Restatement (Third) of Unfair Competition § 40 ............................... 19, 22

"Shein to Market Its Unique Supply Chain Technology to Global Brands," *Wall Street Journal* (Mar. 20, 2024) ................................................................. 30

5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1301 (4th ed., updated Apr. 2023) ................. 5

**INTRODUCTION**

Shein's Motion to Dismiss cannot overcome Temu's extensive allegations of sham copyright enforcement, infringement of Temu's intellectual property rights, theft of trade secrets, exclusive deals, and supplier coercion. So Shein moves to dismiss the complaint it wishes Temu filed, ignoring many of Temu's allegations and recharacterizing others to fit defense arguments (on pleading standards, FTAIA, *Noerr-Pennington*, etc.) that are meritless in front of the actual Complaint on file. Shein even ignores the crux of the Complaint: that each sham takedown, each infringement, each exclusionary act served Shein's overarching scheme to preserve Shein's dominance in U.S. ultra-fast fashion. The Court may deny the Motion for that reason alone.

Shein's Motion otherwise depends on misleading factual assertions to distract from its illegal behavior. It is telling that Shein does not respond to the allegations of its knowingly false DMCA notices (Compl. ¶¶ 28–101) with *any suggestion* Shein owned the copyrights it enforced. Instead, Shein asserts that Temu's claims must be a "smoke-screen" and attempts to smear Temu by citing a different e-commerce platform operated outside of the United States by different subsidiaries of WhaleCo's parent company. MTD at 1, 3–4. But Shein's "Background" section on how it "began sending Temu DMCA takedown notices" and obtained a TRO upon Temu's U.S. launch is not a response to the Complaint but an *admission*: Shein responded to competition not by competing, but with sham IP enforcement and a TRO on an incomplete record. Once the Illinois court was informed that *every copyright Shein asserted was flawed*—a trademark of Shein's U.S. strategy—the court paused the proceedings to allow months of discovery into Shein's conduct.

Similarly, Shein tries to revise the Complaint by arguing that the challenged conduct "took place in China" such that the Foreign Trade Antitrust Improvements Act ("FTAIA") immunizes Shein's scheme. MTD at 1. But Shein ignores the allegations that Shein's scheme was targeted at and timed for Temu's U.S. entry, with the purpose and effect of preserving Shein's dominance

1

in U.S. ultra-fast fashion.  Compl. ¶¶ 130–71.  Particularly in light of Roadget's prior initiation of litigation against Temu in the United States, the FTAIA explicitly authorizes suit here.

Shein also asks the Court to treat its conduct as simply protection of IP and therefore immune.  MTD at 1.  But Shein admits that "sham" IP enforcement is not protected by *Noerr-Pennington*, and Temu alleges exactly that.  Temu's detailed allegations of Shein's bad-faith copyright enforcement describe exactly the types of sham IP enforcement *Noerr-Pennington* does not protect, and which the antitrust laws were designed to prevent.  Compl. ¶¶ 28–101.

For its individual IP claims, Temu alleged sufficient facts to support each claim.  Regarding the Section 512(f) claim (**Count I**), Shein proposes a heightened pleading standard consistently rejected by courts and makes factual arguments that its false notices were mere mistakes.  But, under any standard, Temu pleaded sufficient facts to show that Shein made systematic misrepresentations regarding ownership and infringement and acted with actual knowledge and willful blindness of the falsity of its takedowns.  For the copyright infringement claims (**Count II**), Shein again ignores the Complaint and argues that Temu's valid copyrighted works are inseparable from the idea of arcade-style games, so the "identical copying" standard applies.  But as Temu's copyright registrations cover protectible and specific expressive elements, substantial similarity (not identical copying) is the proper standard to evaluate Temu's claims.  Regarding Temu's claims of knowingly false representations in Shein's copyright registrations (**Count III**), Shein is incorrect that the relevant statute cannot be the basis to challenge a registration.  It can, and in any event Temu properly alleged an affirmative, declaratory claim of invalidity.  With respect to Temu's trade dress infringement claims (**Count IV**), the Motion contorts Temu's allegations and confuses the pleading standard with the need to prove a trade dress claim on the merits following discovery.  Temu sufficiently has pleaded distinctive, non-functional trade dress and that Shein's copycat trade dress is likely to cause consumer confusion.  As to Temu's trade secret claims

**(Counts V–VI)**, Shein argues that this Court cannot reach its trade secret theft outside the United States but ignores the Complaint's explicit allegations of a nexus with Shein's illegal U.S. strategy. Temu also has met its burden to specify its trade secrets with particularity and the circumstances under which they were taken and used by Shein.

Shein's challenges to Temu's federal antitrust claims **(Counts VII-X)** should be denied for a number of reasons, including that Shein has not challenged several of Temu's antitrust causes of action. Shein neglects Temu's overarching scheme claim, its exclusive-dealing claim pursuant to Sherman Act Section 1, and its claims challenging Shein's anticompetitive price floors. On the threshold issue of market definition, Shein argues that Temu fails to properly plead an ultra-fast-fashion market based on factual arguments about whether a dress or a shirt is substitutable with another dress or shirt. But Shein fails to engage with the facts in the Complaint, which make clear that the ultra-fast-fashion market is not defined by a particular shirt or dress but rather is a new, unique business model enabled by new technology and unique supply-chain infrastructure—a definition of ultra-fast fashion Shein itself markets and has admitted in recent public statements.

Shein's challenge to Temu's exclusive-dealing claims depends on treating Shein's supplier agreements as merely IP licenses. But the language of even the single example agreement Shein has placed in issue reveals that Shein's agreements demand exclusivity by explicitly preventing suppliers from selling the underlying products and styles (not just the images) through competitors. Shein also ignores the Complaint's detailed allegations regarding the coercion Shein uses to enforce its supplier agreements as exclusive. Shein also argues that its conduct has not foreclosed Temu from competing in the U.S. market and that Temu has not alleged antitrust injury. But Temu has alleged that 70–80% of the specialized suppliers necessary to manufacture ultra-fast-fashion products are locked up by Shein's exclusive-dealing agreements—more than double the rate of foreclosure needed to state an exclusive-dealing claim—and the Complaint includes pages of

detailed allegations about the harm to consumers, sellers, Temu, and competition as a whole.

Shein's claim that its exclusive agreements with suppliers fall outside Clayton Act Section 3 because Shein is only a "buyer" of fashion products ignores the allegations and Shein's admissions that Shein is a platform that obtains products to sell to consumers, putting Shein squarely within Section 3. Finally, Shein's arguments relating to Temu's D.C. antitrust, unfair competition, tortious interference, and abuse of process claims **(Counts XI-XVIII)** largely repeat Shein's federal antitrust arguments, and those arguments should be rejected for the same reasons.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is appropriate only if the Court finds that the allegations in the Complaint, when accepted as true, do not contain sufficient factual matter to "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 31–32 (D.D.C. 2008) (holding that court "must construe the complaint liberally in the plaintiffs' favor").

## ARGUMENT

**I.    Temu Sufficiently Pleaded a Claim Under Section 512(f) (Count I)**

**A.    The "Plausibility" Standard Under Rule 8 Applies**

Shein concedes that Temu's Section 512(f) allegations may be pled under Rule 8's liberal plausibility standard: "[t]o state a violation of § 512(f), Temu must plausibly allege that '(1) [Roadget] knowingly and materially misrepresented that copyright infringement occurred;

(2) [Temu] relied on that misrepresentation; and (3) [Temu] was injured as a result.'"  MTD at 5;
*see Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  But Shein asks the Court to apply
the higher pleading standard of Rule 9(b) based on cases in which either the plaintiff alleged fraud
expressly in connection with a Section 512(f) claim,[1] *see* MTD at 5–6 (citing *Digit. Mktg. Advisors
v. McCandless Grp., LLC*, 2022 WL 18216003, at *4 (C.D. Cal. Mar. 28, 2022)),[2] or the claims
were unrelated to the DMCA or copyright.  *See* MTD at 5 (citing *Woodland Drive LLC v.
Courtovich*, 2021 WL 4476767, at *2 (D.D.C. Sept. 30, 2021)).  Temu is not aware of any courts
applying Rule 9 to Section 512(f) claims absent express allegations of fraud in connection with
**that count**.  *See, e.g.*, *ENTTech*, 2021 WL 916307, at *6 n.44 (applying Rule 8(a)); *Weinberg v.
Dirty World, LLC*, 2017 WL 5665022, at *7 (C.D. Cal. Apr. 24, 2017); *Prof. Org. of Women in
Ent. Reaching Up v. Killola*, 2014 WL 12607701 at *1, *3 (C.D. Cal. Oct. 9, 2014).

Even if Rule 9(b)'s heightened pleading standard applied (it does not), it would not apply
to allegations concerning Shein's "knowing misrepresentations:"  "Rule 9 . . . excuses a party from
pleading [knowledge] under an elevated pleading standard."  *Iqbal*, 556 U.S. at 686; *see also* Fed.
R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged
generally [under Rule 8].");  5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1301 (4th ed., updated
Apr. 2023).  In any event, Temu satisfied Rule 9(b) by pleading the "who," "what," "where," and
"when" of Shein's misrepresentations.  *See U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 124

---

[1]  To the extent Shein claims Temu refers to "fraud" outside Count I, those allegations are related
to Shein's anticompetitive behavior, distinct from the Section 512(f) claim.  *See ENTTech Media
Grp. LLC v. Okularity, Inc.*, 2021 WL 916307, at *6 n.44 (C.D. Cal. Mar. 3, 2021) (denying motion
to dismiss and distinguishing between Section 512(f) claim, reviewed under Rule 8, and RICO
claims in which "fraud" was pled, reviewed under Rule 9:  "***[N]o authority holds that claims
under § 512(f) must be pleaded with particularity***.") (emphasis added).

[2]  *Digital Marketing Advisors* is also inapposite because the pleading failed to allege materiality
under Section 512(f); Reddit posted that the takedown was due to a violation of Reddit's policy
regarding photographs of minors, not the DMCA takedown notice.  2022 WL 18216003, at *3.

(D.C. Cir. 2015).  "Rule 9(b) is largely designed to give each opponent notice of his purported role in the alleged fraud."  *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).  The "circumstances that the claimant must plead with particularity include matters such as time, place, and content of the false misrepresentation[]," *id.*, not the defendant's state of mind.  Shein cites *Anderson* to argue that pleadings under Rule 9(b) may not be based upon information and belief, but the issue upon which Shein claims Temu's Complaint is deficient[3]—knowledge of falsity—is subject only to *Iqbal's* "plausibility" standard.  *See Iqbal*, 556 U.S. at 686–87; Fed. R. Civ. P. 9(b).

### B.    Temu Sufficiently Pleaded Shein's Actual Knowledge or Willful Blindness of Its Misrepresentations of Ownership and Infringement

"[T]he willful blindness doctrine may be used to determine whether a copyright holder 'knowingly materially misrepresent[ed]' that it held a 'good faith belief'" under 17 U.S.C. § 512(c)(3)(A)(v).  *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016); *see also Cooper v. NTSB*, 660 F.3d 476, 483 (D.C. Cir. 2011) ("knowingly" can be shown through "willful blindness").  Shein cherry-picks a few paragraphs from the Complaint to argue its conduct was merely (rampantly) mistaken.  MTD at 6.  But the Complaint goes much further than these few paragraphs—the detailed allegations go to the core of Shein's entire DMCA enterprise, in which knowledge/willful blindness is a feature, not a bug; and they more than suffice to proceed.

The Complaint's factual allegations, taken as true, support an inference that the majority of Shein's DMCA notices have been based on photographs in which Shein knew, contrary to its claims in the notices, it ***did not own*** the copyrights.  Temu alleged that merchants upload photos to Shein's website, Compl. ¶ 76, and based on a recent sampling Shein has shown that its

---

[3]    Shein's Motion does not challenge Temu's allegations with respect to materiality/Temu's reliance on DMCA notices to take down listings, nor Temu's claims of harm under Count I, nor that Shein made misrepresentations in its DMCA notices.  *See, e.g.*, MTD at 5–7.

employees have taken only ~3% of images in its takedown notices (*i.e.*, Shein could not show the source of the other 97%). *Id.* ¶ 74. Temu also alleged that the copyrights in some of the photos "rest with the independent photographers (not suppliers)." *Id.* ¶ 50; *Pierce v. Lifezette, Inc.*, 2021 WL 2557241, at \*4 (D.D.C. June 2, 2021) ("Photographers are entitled to copyright protection over their photographs.") (citing *Burrows-Giles Co. v. Sarony*, 111 U.S. 53, 60 (1884)).

Further, Temu alleged that "Shein [does not] investigate . . . whether it is the owner, licensee, and/or otherwise authorized by the copyright owner to submit the notices on the owner's behalf." Compl. ¶ 75. Shein's failure to investigate is fatal to any claim of subjective good faith belief under Section 512(c)(3)(A)(v). *Lenz*, 815 F.3d at 1154 (failure to inquire means rightsholder failed to form subjective belief that content is infringing); *see also Alper Auto., Inc. v. Day To Day Imps.*, 2021 WL 5893161, at \*16 (S.D. Fla. Nov. 3, 2021), *aff'd*, 2022 WL 3418643 (11th Cir. Aug. 7, 2022) ("Defendant's decision to not pursue information" on its alleged rights and whether use was infringing "constituted willful blindness" under Section 512(f).). Shein's systematic failure to investigate, coupled with its actual knowledge of the ubiquity of third-party photographs in which Shein holds no rights, satisfies the pleading standard for Temu's Section 512(f) claim.

Moreover, Shein had actual knowledge it was sending DMCA notices to merchants who owned the rights Shein asserted because it had already been sued on those grounds. Compl. ¶ 78; *see also Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at \*48 (S.D. Fla. Sept. 20, 2013) (denying *motion for summary judgment* on Section 512(f) counterclaim due to "evidence in the record to suggest that [plaintiff] intentionally targeted files it knew it had no right to remove").

Temu also alleged that it asked Shein to furnish proof of its rights for 54 DMCA notices sent on November 30, 2023, but Shein refused. Compl. ¶ 79. The Court may deem Shein's refusal an admission of actual knowledge it did not have the rights it claimed. *See Design Furnishings, Inc. v. Zen Path, LLC*, 2010 WL 5418893, at \*5–6 (E.D. Cal. Dec. 23, 2010) (defendant's "failure

to produce [proof of ownership]" despite plaintiff's requests supports finding defendant knew it did not have rights).[4]  Temu also alleged Shein did not substantiate its rights before sending DMCA notices; as such, Shein could not have verified whether the merchants' use was authorized, a step required by Section 512(c)(3)(A)(v).  Compl. ¶¶ 73–79.  A rightsholder must evaluate whether the DMCA recipient's use was authorized.  *See Lenz*, 815 F.3d at 1153 (copyright holder "must give due consideration to other uses authorized by law"); *Disney Enters.*, 2013 WL 6336286, at *47 ("copyright holder must consider not only whether the material actually belongs to it, but whether the use of the material lacks an obviously lawful purpose like fair use").[5]

In addition, Temu pleaded that Shein sent **over 1,000 notices**[6] where the claimed image on its face was different than the accused listing, mismatches too obvious to be missed.  Compl. ¶¶ 81, 85, 92–93.  Shein argues these rampant errors do not show a knowing misrepresentation of **ownership**, MTD at 6, but ignores that these outright mismatches create an inference of knowing misrepresentations of **infringement**.  *See, e.g.*, 17 U.S.C. § 512(c)(3)(ii), (iii) (requiring alignment between copyrighted work and allegedly infringing material).  In *Rosen vs. Hosting Services, Inc.*, the court held that inconsistent information (photographs showed Daisy Fuentes when the subject was Amy Weber) in only four DMCA-noticed links could reflect a knowing, material misrepresentation sufficient to survive a **summary judgment motion**.  771 F. Supp. 2d 1219, 1220–

---

[4]  Shein argues "the DMCA does not limit the ability to submit § 512 Takedown Notifications to registered copyright owners alone."  MTD at 6.  But Temu also asked Shein to provide other forms of proof, and Shein refused to furnish **any** proof of copyright chain of title—even though Shein requires DMCA complainants to provide proof of copyright ownership.  Compl. ¶ 45; *Notice of Infringement of Your Rights*, https://m.shein.com/us/ip-complaint (last visited Apr. 4, 2024).

[5]  Temu has shown that Shein has since sent multiple additional DMCA notices and, once again, refused to provide proof of rights despite repeated demands.  ECF No. 28-05 at 15–16 (67 product listings noticed on December 11, 2023; 107 on December 23; and 52 on January 3, 2024).

[6]  Shein incorrectly references 560 such misrepresentations, but the Complaint alleges over 1,000 instances.  Compl. ¶ 81 (referencing 448 links), ¶ 92 (another 560 links).

21 (C.D. Cal. 2010). While Shein makes the factual contention that these over 1,000 mismatched notices are a small percentage of all notices Shein has sent, Temu has pleaded that Shein's false ownership and infringement claims plague its entire DMCA scheme, affecting likely tens of thousands of notices. Compl. ¶¶ 50–51, 74, 76. And even if Shein's 1,000 mismatched notices were the only false ones—they are not—that would be more than sufficient. In *Disney*, Warner sent 400,000 takedown notices, of which fewer than 1% were incorrect. 2013 WL 6336286, at *15. The Court denied Warner's motion for ***summary judgment***, finding "motive and other evidence sufficient to sustain an inference that [plaintiff] violated Section 512(f)." *Id.* at *48.

Lastly, while Shein has admitted to the U.S. Copyright Office that its registrations for photographs do not extend to the depicted clothing, Compl. ¶ 83, Shein has threatened listings depicting the same article of clothing with dissimilar photographs. *Id.* ¶ 84. The Court may infer from Shein's improper attempts to claim rights in utilitarian articles of clothing that Shein knowingly misrepresented infringement. *See Design Furn.*, 2010 WL 5418893, at *6–8 (granting preliminary injunction against DMCA notices when claimed copyright covered utilitarian articles).

Finally, none of the cases Shein cites dismissed a Section 512(f) claim based on allegations as detailed as Temu's. *See, e.g.*, *Rosen*, 771 F. Supp. 2d at 1220–21; *Disney Enters., Inc.*, 2013 WL 6336286, at *48; *see also U.S. v. Jin-Woo Kim*, 808 F. Supp. 2d 44, 55 (D.D.C. 2011) (question of knowing misrepresentations highly factual and generally improper for motion to dismiss).

## II.    Temu Sufficiently Pleaded Copyright Infringement (Count II)

Shein does not dispute Temu's ownership of registered copyrights, which are presumed valid. 17 U.S.C. § 410(c); *Greaver v. Nat'l Ass'n of Corp. Dirs.*, 1997 WL 34605245, at *3 (D.D.C. Nov. 19, 1997). Temu's valid and subsisting copyright registrations show that the U.S. Copyright Office deemed the works original and protectable (not unprotectable "ideas"). *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (work must only "possess[] at least

some minimal degree of creativity").[7]  Shein also does not challenge the sufficiency of Temu's allegation that Shein had access to, and copied, Temu's promotional game works.  Shein's challenge is based on its misguided claim that Temu's six copyrighted works collapse into the "idea" of promotional games on retail websites, and therefore the Court should apply an "identical copying" standard based on a single out-of-circuit holding in *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988).  Shein is wrong for the reasons below.[8]

Shein erroneously argues that "Temu's Games are inseparable from the idea of arcade-style games" and thus Temu must allege "identical copying."  MTD at 9.  But "identical copying" is required only when "***features***" in the works are "inseparable from [or] indispensable to" the expressed idea.  *Data East*, 862 F.2d at 209 (emphasis added).  That reasoning, inapplicable here, prevents a copyright owner from owning the ***idea*** of a type of video game, but still protects the ***creative expressions*** that are not indispensable to the idea.  *See Big Daddy Games, LLC v. Reel Spin Studios, LLC*, 2013 WL 12233949, at *15 (W.D. Wis. Apr. 10, 2013) (rejecting application of "identical copying" standard for "slot machine games" because artist "had a wide array of graphics to choose from and the games' themes did not dictate the specific graphics or arrangement

---

[7]  Shein makes a confusing argument that although the Complaint refers to "artist designs," the registrations are "are limited only to the specific 'audiovisual material' that was submitted."  MTD at 8.  As confirmed by Shein's Request for Judicial Notice, which includes Temu's correspondence with the Copyright Office, the copyrights cover "an interactive audiovisual work."  ECF No. 54-6, at 2, 4, 6, 8.  This includes artistic design elements (visual, audio, motion, and sound).

[8]  Shein incorrectly argues Temu needs to allege the specific timing of Shein's infringement. MTD at 10 n.6.  A prima facie copyright infringement showing requires "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Stenograph L.L.C. v. Bossard Assocs.*, 144 F.3d 96, 99 (D.C. Cir. 1998) (citations omitted).  But even so, Temu provided the registration numbers of each copyright at issue, including the first publication dates of the copyrights, and thus sufficiently show when Shein's infringement began, the precise timing of which will be revealed during discovery.  *See ICC Evaluation Serv. v. Int'l Ass'n of Plumbing & Mech. Offs.*, 2019 WL 8501430, at *8 (D.D.C. Nov. 22, 2019).  Shein's reliance on *Newborne v. Yahoo!, Inc*., where plaintiff failed to identify "the materials which were infringed" or "that those materials are entitled to copyright protection," 391 F. Supp. 2d 181, 189, is misplaced.

that [the artist] chose"); *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 411 (D.N.J. 2012) (holding "style, design, shape, and movement" of Tetris pieces were expressions and "not part of the ideas, rules, or functions" nor "inseparable from" ideas, rules, or functions).[9]

Here, Temu's claim is not based on the idea of promotional games. Instead, as in *Big Daddy Games* and *Tetris*, Temu's claim is based on the specific expressive elements, including graphics, styles, colors, designs, shapes, sounds, and movement that Temu chose when designing its promotional games. *See* Compl. ¶ 176 (alleging "registrations cover . . . the artistic elements, graphic stylization, color schemes, language, and other artistic expressions").

In ignoring the totality of the artistic elements pleaded and the copyright registrations (including video deposits for each game) attached to the Complaint, *see* MTD at 9, Shein overlooks its copying of highly unique and specific artistic elements of each promotional game, including as shown by the Complaint's comparison charts.[10] As in *Big Daddy Games*, while some features may be functional, "such as the spin function and the 'help' and 'collect' buttons, there are other features that are not dictated by functional considerations, such as the selection of the graphics and how they are arranged within the game." 2013 WL 12233949, at *15.

---

[9] Shein's reliance on *Data East* is also misplaced because there the **only** overlapping features in the karate games "necessarily follow[ed] from the **idea** of a martial arts karate combat game, or are inseparable from, indispensable to, or even standard treatment of the **idea** of the karate sport." 862 F.2d at 209. If, as here, a game uses a common idea expressed with unique features and someone copies the features with substantial similarity, that is actionable infringement. *See Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982) (maze, scoring table, and point system in PAC-MAN not protectable unless "virtually identical" copying occurred; but copying of "gobbler" and "ghost monster" judged by "substantial similarity"); *Tetris*, 863 F. Supp. 2d at 411.

[10] For example, with respect to Temu's "Cash Reward" game (Copyright Reg. No. PA 2-440-814), Shein copied at least the specific depictions/artistic expressions of the (1) center spinner, (2) number of selections within the spinner, (3) alternating fill colors within the spinner sections, (4) size of the spin spoke, (5) orange invite button, (6) cash prize announcement with two stacks of cartoon paper cash and gold light emanating from the cash stack, and (7) congratulatory message in light coloring. *See* ECF No. 1 at 54, 55, 57 (Tables 4 and 7).

Here, Temu sufficiently pleaded a claim for copyright infringement based on (1) valid and subsisting copyright registrations; (2) side-by-side comparisons of screenshots of Temu's and Shein's games, and (3) video deposits of its games (submitted to the U.S. Copyright Office) and videos of Shein's infringing games. ECF No. 2. Cases tackling the idea-versus-expression theory have noted that the analysis is highly fact-intensive, but at the pleading stage only "plausibly alleg[ing]" copyright infringement is required, and have specifically distinguished *Data East*. *See, e.g.*, *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158, at *8 (W.D. Wash. Sept. 18, 2012).

## III.    Properly Seeks a Declaratory Judgment of Invalidity (Count III)

Shein erroneously argues 17 U.S.C. § 411 cannot be a basis to affirmatively challenge inaccurate registrations or seek cancellation. *See* MTD at 10. Count III properly seeks a declaration of invalidity for both the underlying copyright registrations and the DMCA notices due to Shein's knowing misrepresentations under 17 U.S.C. § 411(b)(1). Courts agree that Section 411(b) is a proper basis for a claim for declaratory relief of copyright invalidity. *See, e.g.*, *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 624 (7th Cir. 2013) (describing process for obtaining declaratory judgment of invalidity based on Section 411(b)(1)); *Williams v. Hy-Vee, Inc.*, 661 F. Supp. 3d 871, 890 (S.D. Iowa 2023) (same); *Bueno v. Benhamou*, 2022 WL 1592593, at *7 (C.D. Cal. Mar. 16, 2022) (same); *Chambers v. Green-Stubbs*, 2021 WL 107252, at *4–5 (N.D. Miss. Jan. 12, 2021) (same). Indeed, based on a process approved by both district courts and the U.S. Copyright Office,[11] a declaratory judgment based on a Section 411(b) knowing

---

[11]    *See Chambers*, 2021 WL 107252, at *8 ("It is within the power of this Court to order the Defendant to request from the Copyright Office that it cancel her copyright registration.") (citing Compendium of U.S. Copyright Office Practices § 1807.4(E)); *Can. Ass'n v. P.S. Knight Co., Ltd.*, 649 F. Supp. 3d 334, 355 (W.D. Tex. Jan. 4, 2023) (granting declaratory judgment that defendants' fraudulently obtained copyright registration was invalid and directing defendants to cancel registration with Copyright Office); Compendium of U.S. Copyright Office Practices § 1807.4(F) (describing the "Court Ordered Cancellation" procedure).

misrepresentation ultimately can lead to cancellation of the registrations:  The district court first assesses whether a knowing misrepresentation occurred and then refers its findings to the Copyright Office to advise whether the accurate information, if known, would have caused the Register of Copyrights to refuse registration.  *See* 17 U.S.C. § 411(b)(2).  Based on the Copyright Office's response, the court may then decide whether the copyrights are invalid.

This process is consistent with the cases Shein cites.  There, unlike here, the parties asked the courts to directly cancel the registrations, ignoring the procedure described above.[12]

## IV. Temu Sufficiently Pleaded Its Trade Dress Infringement Claim (Count IV)

Shein's Motion should be denied because Temu sufficiently pleaded (1) it owns valid, non-functional trade dress;[13] (2) its trade dress is "inherently distinctive" or acquired "secondary meaning"; and (3) Shein's infringing trade dress is likely to confuse consumers.  *Bell Heli. Textron Inc. v. Islamic Rep. of Iran*, 764 F. Supp. 2d 122, 127 (D.D.C. 2011).  Each prong of the analysis "involves an inherently factual review rarely resolved at the motion to dismiss stage."  *Stat Ltd. v. Beard Head, Inc.*, 60 F. Supp. 3d 634, 638 (E.D. Va. 2014); *see also Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014) (trade dress merits cannot be tested at pleading stage).

### A. Temu Sufficiently Alleged that the Arcade Trade Dress Is Non-Functional

Whether trade dress is functional is an intensely factual issue that cannot be resolved on a motion to dismiss.  *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987) ("Functionality is a question of fact.").  Courts have denied motions to dismiss on claims of

---

[12]  *See, e.g.*, *App Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 332 (D.D.C. 2015); *Brownstein v. Lindsay*, 742 F.3d 55, 75, 77 (3d Cir. 2014)); *Pastime LLC v. Schreiber*, 2017 WL 6033434, at *3 n.2 (S.D.N.Y. Dec. 5, 2017*); *Vaad L'Hafotzas Sichos, Inc. v. Krinsky*, 133 F. Supp. 3d 527, 537 (E.D.N.Y. 2015).

[13]  Contrary to Shein's argument, a registration is not required as Section 43(a) of the Lanham Act extends to protection of common law, unregistered trade dress.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("§ 43(a) protects qualifying unregistered trademarks").

functionality where images indicate the trade dress is "arguably non-functional" or where, like here, the allegations suggest that the trade dress does not impact the product's quality or cost and is not required to use the product.[14] *See Good L Corp. v. Fasteners for Retail, Inc.*, 2019 WL 1429252, at *3 (M.D. Tenn. Mar. 28, 2019) ("[T]he plain appearance of the product from the photos in the Amended Complaint shows the trade dress is at least arguably non-functional."); *Nespresso USA, Inc. v. Peet's Coffee, Inc.*, 2023 WL 374980, at *11 (S.D.N.Y. Jan. 24, 2023) (allegations that "suggest" design does not impact cost or quality sufficient). Indeed, most of the cases Shein cites were decided at different procedural postures than this one. For example, *Traffix Devices v. Mktg. Displays* involved an appeal of the Sixth Circuit's reversal of a summary judgment decision. 532 U.S. 23, 26–27 (2001); MTD at 11–12. Moreover, the asserted trade dress there was covered by an expired **utility patent**, which showed the design was functional. *Traffix Devices*, 532 U.S. at 30. No such circumstances are present here.

Shein incorrectly argues the functionality test described in *Leisurecraft Prod., Ltd. v. Int'l Dictating Equip., Inc*. requires the design of a product to be separable from the product's function to be classified as "non-functional." 1981 WL 40516, at *2 (D.D.C. 1981); MTD at 11. That test was replaced long ago.[15] As confirmed by the Supreme Court, trade dress is "functional" if it (1) is essential to the use or purpose of the product, or (2) affects the cost or quality of the product.

_____

[14]  It is not necessary for a complaint to explicitly use the term "non-functional." *Sunjoy Indus. Grp., Ltd. v. Permasteel, Inc.*, 2023 WL 406211, at *3 (S.D. Ohio Jan. 25, 2023).

[15]  Several Circuits explicitly have rejected the theory that a feature is functional merely because it makes the product more attractive to consumers. *See Keene Corp. v. Paraflex Indus., Inc*., 653 F.2d 822, 825 (3d Cir. 1981); *Devan Designs, Inc. v. Palliser Furniture Corp.*, 25 U.S.P.Q.2d 1991, 2002 (M.D.N.C. 1992), *aff'd*, 27 U.S.P.Q.2d 1399 (4th Cir. 1993); *Sno-Wizard Mfg., Inc. v. Eisemann Products Co*., 791 F.2d 423, 426 n.3 (5th Cir. 1986); *In re DC Comics, Inc*., 689 F.2d 1042, 1045 (C.C.P.A. 1982). The D.C. Circuit has not addressed the issue, but Temu respectfully submits this Court should follow the holdings of these sister Circuits.

*Traffix Devices*, 532 U.S. at 25.[16]  "[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress *as a whole* is functional."  *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 658 (4th Cir. 1996).  Shein ignores the allegations of the Arcade Trade Dress (backed up with representative visual examples), which comprises a distinctive combination of the following elements:  (1) the vibrant orange coloring that creates an energetic, almost "electrified" aesthetic; (2) graphics resembling arcade games; and (3) shimmering white or gold signage and typeface against a contrasting background that creates a glowing effect and accent on graphics.  *See* Compl. ¶ 194.  These elements neither are essential to the use of the Temu platform, website, or app, nor do they impact the platform services, cost, or quality.

The Second Circuit's decision in *Cartier, Inc. v. Sardell Jewelry, Inc.*, a case cited by Shein, is instructive.  294 F. App'x 615 (2d Cir. 2008).  The defendants argued that the elements of Cartier's watch design trade dress, *i.e.*, the Roman numerals and square shape, were functional, rendering the trade dress as a whole functional.  *Id.* at 620.  The Second Circuit disagreed and affirmed summary judgment in Cartier's favor.  First, it was "improper for defendants to break the trade dress down into specific elements and call them functional."  *Id.* at 620–21.  Second, while the design of the watch performs a function, the trade dress is not "functional" because there are many alternative designs that could perform the same function.  *Id.* at 621.

Here too, the Arcade Trade Dress is comprised of multiple distinct elements and must be considered as a whole in assessing functionality.  *See* Compl. ¶ 194.  While the Arcade Trade

---

[16]  Shein cites *Traffix* for the proposition that "[t]here is a 'statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection.'"  MTD at 11.  But Temu need not overcome this presumption at this stage of the case.  *See, e.g., GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 417 (6th Cir. 2006); *Kano Labs., Inc. v. Clenair Mfg., Inc.*, 2013 WL 5758651, at *3 (M.D. Tenn. Oct. 24, 2013).

Dress may be effective in attracting and engaging consumers, that feature does not render it functional. *See Cartier*, 294 F. App'x at 621. An infinite number of distinctive, non-functional options exist to "engage individuals shopping on the websites." MTD at 12.

### B. Temu Sufficiently Pleaded that Its Arcade Trade Dress Is Distinctive

Trade dress is distinctive if it "***either*** (1) is inherently distinctive ***or*** (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769. Temu's Arcade Trade Dress relates to website/app aesthetics that visually enhance the shopping experience and is thus akin to "product packaging" or shop/restaurant décor, not "product design" as Shein argues. The Supreme Court has recognized that product packaging, or some *tertium quid* akin to packaging, can be inherently distinctive. *Id.* at 767 (restaurant décor inherently distinctive). Temu is thus required to plead only that its asserted Arcade Trade Dress is inherently distinctive and need not plead secondary meaning. *See Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 3d 124, 148 (D. Mass. 2019) (trade dress in appearance of website "entitled to trade dress protection if it is inherently distinctive"); *Conf. Archives, Inc. v. Sound Images, Inc.*, 2010 WL 1626072, at *21 (W.D. Pa. Mar. 31, 2010) (website's design as protectable trade dress akin to product packaging).

Temu sufficiently pleaded inherent distinctiveness, *i.e.*, a unique, distinctive combination of the elements of its Trade Dress, including "its energetic orange coloring," glowing signage and type face, and unique, distinctive arcade game-like graphics. Compl. ¶¶ 190–95. Such detailed descriptions are sufficient to plead inherent distinctiveness. *See SCS Direct, Inc. v. Insassy, Inc.*, 2016 WL 1384762, at *4 (D. Conn. Apr. 7, 2016) (trade dress "'inherently distinctive'" where product packaging described "in terms of font, color, and image[s]"). Inherently distinctive trade dress is immediately protectable, with no need to plead or prove consumer recognition. *See, e.g., Philip Morris Inc. v. Star Tobacco Corp.*, 879 F. Supp. 379, 383 (S.D.N.Y. 1995).

Although not required, Temu also provided sufficient facts to show that its Arcade Trade

Dress has acquired distinctiveness (or secondary meaning).  The secondary meaning standard is "primarily an empirical inquiry," *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd sub nom.* 720 F. App'x 24 (2d Cir. 2017), which raises factual questions that ordinarily may not be decided on a motion to dismiss.  *See A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 212 (S.D.N.Y. 2015) (collecting cases).

Shein argues that Temu has not proven "the degree to which consumers recognize Temu's Games."  MTD at 13.  Shein relies on a case decided at summary judgment, incorrectly implying that Temu must produce consumer surveys and customer testimonials and submit full discovery regarding the nature and extent of advertising to plead secondary meaning.  *See id.* (citing *Fernandez v. Jones*, 653 F. Supp. 2d. 22, 29 (D.D.C. 2009)).  Not only is there no such requirement on a motion to dismiss, direct evidence of secondary meaning is not even required at the summary judgment stage.[17]  *See Viacom Int'l v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 191 (5th Cir. 2018).

Here, Temu alleged that it spent "hundreds of millions of dollars in the past year on advertising and promotion" including on its 2023 Super Bowl commercial that incorporated the Arcade Trade Dress and resulted in a "45% surge in downloads of the Temu app" and exposure of the Arcade Trade Dress to millions of consumers.  Compl. ¶¶ 188–93.  This is more than sufficient to show secondary meaning at this stage of the case.  *See Geigtech E. Bay, LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 284 (S.D.N.Y. 2018) (determination of secondary meaning will require discovery; plaintiff sufficiently pled secondary meaning where it pled advertising spending and sales success); *see also Dean v. Cortes*, 2018 WL 3425016, at *6 (C.D. Cal. July 12, 2018).

---

[17]  No requirement exists that a trade dress be in use for five years to acquire secondary meaning.  Under 15 U.S.C. § 1052(f), an applicant seeking registration of a mark can provide prima facie evidence of secondary meaning through a showing of "substantially exclusive and continuous use" of a mark in commerce "for the five years before the date on which the claim of distinctiveness is made."  *See also Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009).

### C.   Temu Sufficiently Pleaded Likelihood of Confusion

The ultimate question of likelihood of confusion is improper for a motion to dismiss.  *See Eliya, Inc. v. Kohl's Dep't Stores*, 2006 WL 2645196, at *3 n.2 (S.D.N.Y. Sept. 13, 2006) (application of *Polaroid* factors "on this motion to dismiss would be inappropriate because it would involve premature factfinding."); *Int'l Council of Shopping Ctrs., Inc. v. RECONCRE, LLC*, 2021 WL 148387, at *3 (D.D.C. Jan. 14, 2021) (fact-intensive nature of likelihood-of-confusion inquiry "does not lend itself to a motion to dismiss").

Temu's allegations are more than sufficient to withstand Shein's motion to dismiss. Temu's Complaint (1) provides details of Temu's extensive and consistent use of the Arcade Trade Dress (*see* Compl. ¶ 187); (2) includes photo comparisons of the parties' trade dresses used for their online marketplaces (¶¶ 194, 203); (3) details how millions of U.S. consumers have been exposed to the Arcade Trade Dress and instantly recognize it through Temu's extensive investments, widespread advertising and promotional efforts, and unsolicited media coverage (¶¶ 192, 196–201, 203); and (4) alleges that Shein's copying is likely to cause confusion (¶ 204). Courts have denied motions to dismiss on fewer and less detailed allegations.  *See Monster Energy Co. v. Beast Cookie Co., LLC*, 2023 WL 4681632, at *5 (C.D. Cal. June 15, 2023) (photographs of similar trade dresses and explanation of prominent color schemes on both parties' packaging and materials sufficient); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 2021 WL 922074, at *5 (C.D. Cal. Jan. 7, 2021) (photo comparisons of products at issue and allegation of likelihood of confusion sufficient).  Shein improperly asks the Court to summarily find, with no discovery, that Temu's Arcade Trade Dress is "weak," the parties' trade dresses are dissimilar, and the presence of the parties' respective house marks avoids any likelihood of confusion.  *See* MTD at 14.  None of these fact-intensive arguments are proper at this stage or warrant dismissal.

**V.     Temu States a Claim For Misappropriation of Trade Secrets (Counts V–VI)**

    **A.     Temu's Claims Are Not Barred on the Basis of Extraterritoriality**

As Shein recognizes (MTD at 15), the Defend Trade Secrets Act ("DTSA") applies extraterritorially where, as here, "an act in furtherance of the offense was committed in the United States."  18 U.S.C. § 1837(2).  Courts have treated the phrase "act in furtherance of" to require that the defendant take actions that "manifest that [misappropriation] is at work."  *Motorola Sols., Inc. v. Hytera Commc'ns. Corp. Ltd.*, 436 F. Supp. 3d 1150, 1165 (N.D. Ill. 2020); *see also Luminati Networks Ltd. v. BIScience Inc.*, 2019 WL 2084426, at *10 (E.D. Tex. May 13, 2019) ("act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense") (quoting *Yates v. United States*, 354 U.S. 298, 334 (1957)).

Here, Shein committed an "act in furtherance" of its misappropriation by "using" and threatening to "use" the trade secrets within the United States through the marketing of goods incorporating Temu's confidential commercial and financial information.  Compl. ¶¶ 214, 224; 18 U.S.C.A. § 1839(5) (misappropriation may be accomplished through "acquisition," "disclosure," or "use."); *see, e.g., Gen. Universal Sys. v. HAL Inc.*, 500 F.3d 444, 451 (5th Cir. 2007); *Motorola*, 436 F. Supp. 3d at 1165 (advertising products embodying trade secret at domestic trade shows constituted "act in furtherance").  Additionally, by compromising the value of Temu's commercial and financial information, and thereby reducing the value of this information to Temu, Shein exploited the trade secrets in a manner "likely to result in injury to the trade secret owner" within the United States, which constitutes "use."   Compl. ¶¶ 208, 251–52, 255, 265–66, 269; Restatement (Third) of Unfair Competition § 40; *see Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012); *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 914 (3d Cir. 2021).

Shein argues that Temu has not alleged a U.S. nexus of Shein's misappropriation with sufficient specificity.  MTD at 15–16.  This is incorrect; the clear and reasonable inference from

Temu's allegations is that Shein is using the commercial and financial data it accessed to understand Temu's economic positions and gain an advantage in the U.S. market. Compl. ¶¶ 208, 251–52, 255, 265–66, 269; *see Aristotle Int'l, Inc. v. Acuant, Inc.*, 2023 WL 1469038, at *9 (D.D.C. Feb. 2, 2023); *Luminati*, 2019 WL 2084426, at *11 (denying motion to dismiss based on extraterritoriality defense where plaintiff alleged that by "using . . . [Plaintiff's] trade secrets, [Defendant] has committed acts in the State of Texas and the United States").

For similar reasons, because Temu sufficiently alleged Shein's domestic "use" of Temu's trade secrets—including by offering and selling goods incorporating the trade secrets within the District of Columbia (Compl. ¶ 270)—Temu's claim under the D.C. Code § 36-401, *et seq.* (the "DCUTSA") is not barred on the basis of extraterritoriality. A U.S. court may reach extraterritorial conduct, even if a statute does not mention extraterritoriality, for "a domestic application of the statute" if "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016). Here, the DCUTSA's focus is the act of misappropriation, granting injunctive relief or damages "for misappropriation." D.C. Code. §§ 36-402, 36-403. Indeed, the DTSA and DCUTSA define "misappropriation" identically to encompass "acquisition," "disclosure," or "use" of a trade secret. *Compare* § 36-401 *with* 18 U.S.C. § 1839.

### B.    Temu Sufficiently Pleaded the Existence and Nature of Temu's Trade Secrets

Shein argues that Temu failed to describe its trade secrets with enough detail. But Temu alleges Shein coerced Temu sellers to divulge log-in credentials and passwords to obtain access to Temu's seller portal which contains "Temu's commercial and financial information" that allow Temu "to offer its sellers and vendors the ability to provide lower costs for their goods as compared to Temu's competitors." Compl. ¶¶ 163, 208, 252, 264, 266. In other words, Temu alleged not just any commercial and financial information, but information **situated behind Temu's seller portal** that provides a unique competitive edge, is not generally known, and provides independent

economic value in running a successful seller platform and offering cheaper products.  These allegations satisfy the pleading standard, and a plaintiff need not publicly divulge its trade secret in a Complaint.  *See Aristotle Int'l, Inc.*, 2023 WL 1469038, at *8 (trade secret allegations "need be identified only with enough specificity to place a defendant on notice of the bases for the claim being made against it");[18] *see also Greenpeace, Inc. v. Dow Chem. Co.*, 2013 D.C. Super. LEXIS 22, at *33–34 (D.C. Sup. Ct. Feb. 5, 2013) ("'whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side'").

### C.    Temu Took Reasonable Steps to Protect Its Secret Information

Temu made reasonable efforts to maintain the secrecy of its information.  Temu's seller portal is protected by a unique username and password for each seller, and certain pages within the seller portal require an additional level of protection through text verification.  Compl. ¶ 209.  Temu's seller agreements also require sellers to maintain Temu's commercial and financial information as confidential.  *Id.* ¶¶ 207, 209.  Shein's argument that a trade secret claim can never be brought based on login passwords and confidentiality agreements is simply unsupported.  Both the DTSA and the DCUTSA require only "reasonable" efforts of security, which can include the use of confidentiality agreements.  *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 10–11 (D.D.C. 2004), *aff'd sub nom.* 173 F. App'x 825 (Fed. Cir. 2006); *see also Meyer Grp., Ltd. v. Rayborn*, 2023 WL 7006791, at *17 (D.D.C. Sept. 29, 2023).[19]

---

[18]  Shein relies (MTD at 17–18) upon *Econ. Rsch. Servs. v. Resol. Econs., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016), but that case involved the failure to plead that the information derived value from its secrecy and that plaintiff took any steps to protect the information.  In the other cases Shein cites, the plaintiff provided insufficient detail to provide notice of the trade secrets at issue.  *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018); *ProV Int'l, Inc. v. Lucca*, 2019 WL 5578800, at *3 (M.D. Fla. Oct. 29, 2019).  Here, Shein has more than sufficient notice based on the Complaint.

[19]  Shein misreads *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018).  There, the court stated that alleging the existence of a confidentiality agreement alone

**D.      Temu Alleges Facts Showing Acquisition and Use of Trade Secrets**

Shein claims that Temu failed to allege acquisition, disclosure, or use of its trade secrets by Shein.  MTD at 17–18.  This argument ignores the allegations presented throughout Temu's Complaint.  Contrary to Shein's assertion (MTD at 20) that Temu alleges only an "effort to misappropriate," Temu alleged that Shein marketed goods incorporating Temu's confidential commercial and financial information.  Specifically, Temu alleged that Shein used the misappropriated information from Temu's seller portal to offer for sale and actually sell goods. Compl. ¶ 256.  The marketing of goods incorporating confidential information is "use" of a trade secret.  *See, e.g., Gen. Universal Sys.* 500 F.3d at 451 ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'") (quoting Restatement Third of Unfair Competition, § 40).  This is sufficient to allege trade secret misappropriation at this stage, where "information concerning Defendants' alleged use of the trade secret may, at this juncture, be solely within the Defendants' knowledge."  *Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, 2011 WL 773034, at *5 (D.N.J. Feb. 28, 2011).  Moreover, Temu properly alleged that suppliers who list products on both Temu's and Shein's platforms were threatened to provide login credentials and passwords for Temu's seller portal and that Shein representatives accessed the seller portal.  Compl. ¶¶ 162, 163, 208.  These facts are more than sufficient to allege trade secret misappropriation.  *See Aristotle Int'l*, 2023 WL 1469038, at *9 (court must take "all reasonable inferences" in the Plaintiff's favor, and denying motion to dismiss because plaintiffs must often rely on circumstantial evidence of suspected misappropriation in complaints).[20]

---

does not suffice to show ***all*** elements of a trade secret, not that a confidentiality agreement is inadequate to show reasonable security measures.  *Id.*

[20]    Shein relies upon *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 113 (D.D.C. 2019), to argue that Temu has not alleged misappropriation (MTD at 20), but the issue in *Zaccari* was identity: the plaintiff made misappropriation allegations not against the defendant but other parties entirely.

**VI.    Temu Sufficiently Pleaded Its Sherman and Clayton Act Claims (Counts VII-X), Which Fall Squarely Within This Court's Jurisdiction**

**A.    The Foreign Trade Antitrust Improvements Act Does Not Apply to Temu's Claims Because They Involve Import Commerce and Domestic Injury**

Shein argues that FTAIA bars Temu's claims by attempting to reduce its conduct—a broad scheme to substantially foreclose Temu from the U.S. ultra-fast-fashion market—to Shein's "commercial relationships with its Chinese suppliers" and arguing that those relationships are not import commerce.  MTD at 22.  But this Court must evaluate Shein's unlawful scheme "as a whole" when assessing Shein's FTAIA challenge, including that the scheme was directed at and had the effect of reducing Temu's imports into the United States, harming Temu's growth in the U.S. ultra-fast-fashion market, and depriving U.S. consumers of lower-priced goods that would have been available on Temu's platform.  Compl. ¶¶ 5, 27, 29, 34, 80, 98, 130, 138, 152, 168, 172, 202, 212–24; *see United States v. Van Avermaet*, 2023 WL 3768293, at *3 (D.D.C. June 2, 2023), *R. & R. adopted as modified*, 2024 WL 278088 (D.D.C. Jan. 25, 2024) (rejecting efforts to evaluate anticompetitive conduct "contract-by-contract" when considering FTAIA challenge).  Indeed, the D.C. Circuit has "squarely considered" and rejected the approach Shein takes here:  raising an FTAIA challenge to only part of the unlawful conduct rather than considering the entire scheme. *Van Avermaet*, 2024 WL 278088, at *4 (discussing *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 341 (D.C. Cir. 2003), *vacated on other grounds sub nom. F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)).

**1.    Shein's Illegal Scheme Involves Import Commerce**

Where, as here, relevant conduct involves import trade or commerce, the FTAIA does not apply and the conduct "falls within the Sherman Act without further . . . pleading." *Hsiung*, 778 F.3d at 754; *see also Empagran*, 542 U.S. at 163.

Shein's scheme is intended to preserve, and has preserved, Shein's monopoly by

preventing Temu and others from offering more ultra-fast-fashion products to U.S. consumers. *Infra* § VI.B.  As Shein's authorities confirm, the import-commerce exclusion to FTAIA is satisfied here—and Temu's claims are not barred—because Shein's conduct "was directed at an import market."  *Kruman v. Christie's Int'l plc*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by Empagran*, 542 U.S. 155 (2004); *Maricultura Del Norte, S. de R.L. de C.V. v. Worldbusiness Capital, Inc.*, 159 F. Supp. 3d 368, 374–75, 383–84 (S.D.N.Y. 2015) (collecting cases supporting its holding that allegations that defendant "impaired ***Plaintiffs' exports of Bluefin Tuna into the United States*** thereby impacting United States import trade and commerce" satisfied import-commerce test); *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 85 (S.D.N.Y. 1995) (import-commerce exclusion applies to defendants' actions precluding plaintiff "from exporting goods into the United States"); *see also Animal Sci. Prods. Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011) ("Functioning as a physical importer may satisfy the import trade or commerce exception, but it is not a necessary prerequisite."); U.S. Dept. of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for Int'l Enforcement and Cooperation* 19 (2017) (exclusion may apply "even if the participants themselves do not act as importers").

### 2. Shein's Scheme Had Direct, Substantial, and Foreseeable Effects on U.S. Commerce That Injured Temu in the United States

The FTAIA permits Temu's claims to proceed under the "domestic-injury exception" because Shein's conduct had a "'direct, substantial, and reasonably foreseeable effect' on domestic [or import] commerce" that "gives rise to" Temu's antitrust claims.  *Empagran*, 542 U.S. at 159 (quoting 15 U.S.C. § 6a).  Shein does not contest that its scheme had direct and reasonably foreseeable effects on domestic or import commerce.  *See, e.g.*, Compl. ¶¶ 212–24.  Shein argues only that those effects are not substantial (MTD at 23) and did not proximately cause Temu's injuries (MTD at 23–25).  Shein is incorrect on both grounds.

a.    **Shein's Illegal Scheme Had Substantial Effects on Domestic and Import Commerce**

Shein argues that Temu's allegations do not establish substantial domestic harm because margins in the relevant market are "razor thin" and Temu therefore would not offer lower prices absent Shein's conduct.  MTD at 23 (citing Compl. ¶¶ 42, 149, 218).  Shein then cites *Minn-Chem* to argue that only harm on the order of six-fold price increases would qualify.  *Id.*  But Shein misconstrues the law and the alleged facts.  On the law, the D.C. Circuit has held that a plaintiff satisfies the domestic-injury exception by pleading allegations similar to Temu's here, without requiring plaintiffs to plead a particular magnitude of harm to establish the harm is "substantial." *Caribbean Broad. Sys. v. Cable & Wireless plc*, 148 F.3d 1080, 1086–87 (D.C. Cir. 1998).  As in *Caribbean Broadcasting*, Temu sufficiently pleaded substantial domestic harm by alleging that Temu and Shein compete for U.S. customers, yet Shein has "locked up" a portion of the relevant market to maintain its monopoly power.  *Id.*

On the facts, Temu alleges **manufacturers** have razor thin margins and Shein's penalties on those suppliers were meant to prevent them from doing business with Temu (and others). Compl. ¶ 149.  Otherwise, Shein does not contest that Temu's alleged facts show substantial effects on U.S. commerce because (1) Temu regularly beats Shein's prices for similar products (*id.* ¶ 216), (2) Temu would sell three to four times more ultra-fast-fashion products in the United States but-for Shein's unlawful conduct (*id.* ¶ 214), and (3) "Shein continues to further entrench its monopoly position" in the U.S. ultra-fast-fashion market by "unfairly limiting" sales on Temu's platform through Shein's anticompetitive scheme.  *Id.* ¶¶ 212–24.  Whether Temu's marketplace would offer U.S. consumers **even lower prices** but-for Shein's conduct is beside the point; Shein already forces Temu to delist lower-priced products through its sham DMCA notices and limits sales of lower-priced products on Temu's U.S. marketplace through its efforts to lock up supply.  Shein

thus continues to cause substantial harm to domestic and import commerce by reducing the volume of ultra-fast-fashion products offered on Temu's U.S. marketplace, reducing suppliers' ability to offer products on more U.S. platforms, and forcing U.S. consumers to pay monopoly rents to Shein while depriving Temu of revenue it would have earned on sales of those products here.

<b>b.    The Effects of Shein's Illegal Scheme on Domestic and Import Commerce Proximately Caused Temu's Domestic Injury</b>

Shein contends that this case is like *Lotes Co. v. Hon Hai Precision Industries Co.*, 753 F.3d 395 (2d Cir. 2014), by misrepresenting the harm Temu alleges as "reduced access to suppliers" occurring before U.S. consumers were injured "downstream"—and arguing Temu would suffer the same "harm" even if Shein sold no products here.  MTD at 24–25.  But Temu's injury is not "reduced access to suppliers."  *Id.*  Rather, as shown above, the substantial foreclosure of access to suppliers is one result of Shein's unlawful ***conduct***.  Moreover, if Shein locked up ultra-fast-fashion suppliers (as alleged) yet sold no products in the United States—an unreasonable hypothetical, as the point of Shein's scheme was to preserve its monopoly power in the U.S. market—then Temu would still be injured here by the effects Shein's conduct had on U.S. domestic and import commerce.  Absent Shein's unlawful conduct, Temu would have earned substantially more revenue and profits from sales of ultra-fast-fashion products on Temu's U.S. marketplace, both because more products would have been offered to U.S. customers and because Temu would not have been forced to remove successful products due to Shein's sham DMCA notices.  *See, e.g.*, Compl. ¶¶ 3, 5, 9, 16, 27–29, 70, 72, 139–41, 168.

While Shein's conduct has injured Temu and U.S. consumers, here (unlike in *Lotes*) the consumers were not harmed after Temu suffered some foreign injury.  Rather, Shein's conduct injured consumers and Temu in the United States at the same time:  consumers were forced to pay Shein higher prices for products they would have purchased on Temu's platform for less, third-

26

party sellers on Temu's U.S. marketplace lost sales, and Temu lost revenue it would have earned on those U.S. sales. By contrast, in *Lotes* the plaintiff "did not import USB products into the United States, but instead sold them to other foreign entities that incorporated them into motherboards, which were then incorporated into finished products that were eventually shipped to the United States." *Maricultura*, 159 F. Supp. 3d at 383 (discussing *Lotes*). There the plaintiff's injury was lost sales abroad, which did not occur (and preceded any effects) in the United States. Here, Temu seeks damages for the lost revenue and profits it would have earned ***in the United States*** had Shein never implemented its illegal scheme.

### 3. The Supreme Court Has Already Rejected Shein's Argument that Comity Principles Weigh Against Permitting Claims for Domestic Harm Caused in Part by Foreign Conduct

Shein relies on the syllabus of *Empagran* in arguing that comity supports dismissing Temu's claims. MTD at 25 (quoting *Empagran*, 542 U.S. at 156). Shein omits the actual holdings of *Empagran*, including that (1) courts should not weigh "comity considerations case by case," and (2) comity requires dismissing foreign injury claims only where "foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects." 542 U.S. at 168–69. Here, Temu is not seeking relief for foreign injury, and thus the language Shein cites would be irrelevant even if it appeared in the opinion. Instead, Temu seeks damages for ***domestic injury*** caused by Shein's scheme. Applying "our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress ***domestic*** antitrust injury that foreign anticompetitive conduct has caused." *Empagran*, 542 U.S. at 165.

### B. Shein Has Monopoly and Market Power in the Ultra-Fast-Fashion Relevant Antitrust Product Market

Shein attempts to ignore its monopoly power by raising factual disputes about how to draw

a relevant antitrust product market.  But courts consistently hold that dismissing antitrust claims on market definition grounds at the pleading stage is inappropriate.  Temu alleges extensive facts supporting its allegations that Shein, with control over 70–80% of suppliers and an over 75% market share, has market power and monopoly power in the U.S. ultra-fast-fashion market.

### 1.    Ultra-Fast Fashion Is a Unique, Relevant Product Market That Is a "New Industry and Business Model"

Shein asserts that two of Temu's market definition allegations, out of dozens pled, are "conclusory" and contests certain facts about the relevant market.  MTD at 33–34.  None of Shein's criticisms support dismissal because "market definition is predominantly a factual rather than a legal inquiry," and courts dismiss claims on market definition grounds only if "they are 'glaringly deficient.'"  *Am. President Lines*, *LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 222 (D.D.C. 2022); *see also Todd v. Exxon Corp.*, 275 F.3d. 191, 200 (2d Cir. 2001) (market-definition-based dismissals generally limited to "(1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way"); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 54 (D.D.C. 1999) (notice pleading "requires only that the allegations in the complaint give notice as to what markets are being brought into issue"); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 337 (D. Vt. 2010) (collecting cases).

Moreover, Shein never contends with, and cannot dispute, Temu's factual allegations that no viable substitutes exist for the tech-enabled, on-demand, ultra-fast-fashion consumer experience due to the "significantly faster release of styles, with 10,000 styles released in a week or even in a day" and "styles chang[ing] effectively on a daily basis," an experience traditional fashion or fast-fashion retailers cannot offer.  *See* Compl. ¶¶ 133–34 (compared with 100-day turnaround for fast-fashion inventory); *id.* ¶ 137.  Courts hold that customer preferences for

breadth of inventory and other "uniquely attractive" characteristics can be determinative of reasonable substitutability. *See, e.g.*, *FTC v. Whole Foods*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (crediting evidence of "much larger selection of natural and organic products" in organic supermarkets than conventional supermarkets, with "more than 45,000 natural and organic SKUs"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27–31 (D.D.C. 2015) ("product breadth and diversity," with thousands of SKUs across food categories, the "most distinguishing feature" of market); *FTC v. Staples*, 970 F. Supp. 1066, 1078–79 (D.D.C. 1997) (identifying "breadth of inventory" as distinct characteristic of office superstores with over 5,000 SKUs of office supplies, in contrast to stores with only 150–400 SKUs); *see also United States v. Gillette Co.*, 828 F. Supp 78, 82 (D.D.C. 1993) (due to purchaser preferences, "fountain pens in the $50 to $400 range effectively do not compete with fountain pens either below or above that range"); *Origami Owl LLC v. Mayo*, 2015 WL 4747101, at *2–3 (D. Ariz. Aug. 7, 2015) ("online market for customized, ornamental, and low-priced jewelry" a relevant market).  And while Shein argues that ultra-fast-fashion customers may cross-shop, it cites no authority that this fact makes the ultra-fast-fashion market implausible.  *See* MTD at 34; *cf. Whole Foods*, 548 F.3d at 1040 ("Of course customers cross-shop . . . .  The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."); *Sysco*, 113 F. Supp. 3d at 26.  In addition, Shein does not contest that Temu's other allegations, such as, *inter alia*, industry recognition of the new market (Compl. ¶ 134), the use of unique production facilities and specialized vendors (¶¶ 135–36), and distinct prices (¶ 134), also support defining an ultra-fast-fashion relevant market.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).[21]

---

[21]  Shein requests judicial notice of an earlier complaint Temu filed in the District of Massachusetts (RJN at 2, ECF No. 54), yet fails to mention the amended complaint containing additional details describing the relevant market.  Compl. ¶ 131; Exhibit 1, First Am. Compl. 7–17, *Whaleco Inc. v. Shein US Servs., LLC et al.*, No. 23-cv-11596 (D. Mass. Oct. 2, 2023), ECF No. 44.

Shein also makes a factual argument about the interchangeability of "a shirt or dress" offered on multiple platforms that ignores the product market alleged here. *See* MTD at 34. As Temu alleges, the relevant market here offers "a new industry and business model" and "distinct new retail approach" with "defining characteristics" such as expedited production time, internet-based sales, and a "direct-to-consumer model" that "dramatically breaks from the fast fashion model by relying on a highly tech-enabled supply chain that includes a limited pool of independent clothing manufacturers." Compl. ¶¶ 134–35; *see also id.* ¶ 112 ("Shein relies in part on algorithms and machine learning to identify trends"); MTD at 3 ("Roadget has proprietary algorithms that permit it to quickly identify consumer trends, and a supply chain permitting Roadget to nimbly scale production in response to those trends"). *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018) (recognizing distinct "transaction platform" market bringing cardholders and merchants together); *US v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 55 (D.D.C. 2011); *In re eBay Seller Antitrust Litig.*, 2010 WL 760433, at *26, 30 (N.D. Cal. Mar., 4, 2010); *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *7–9 (D. Utah May 17, 2018). In fact, Shein's Executive Chairman, Donald Tang, described the ultra-fast-fashion or "on-demand fashion" business model in terms of its unique features—not shirts or dresses—confirming that Shein operates differently than fast-fashion retailers. Exhibit 2, "A Top Shein Exec on That Influencer Trip Fiasco," *Time* (July 16, 2023). Shein further admitted the distinctive value of the ultra-fast-fashion supply-chain technology and infrastructure when it announced its new program to market that technology and infrastructure to outside brands and designers. Exhibit 3, "Shein to Market Its Unique Supply Chain Technology to Global Brands," *Wall Street Journal* (Mar. 20, 2024).

Shein's only remaining market-definition argument relates to its misplaced reliance on a Ninth Circuit summary judgment decision. MTD at 34 (citing *Honey Bum, LLC v. Fashion Nova Inc.*, 63 F.4th 813 (9th Cir. 2023)). While the words "fast fashion" appear in *Honey Bum*, neither

the court nor the parties addressed the qualitative or quantitative characteristics of fast-fashion in a way that would be relevant here. *See Honey Bum, LLC*, No. 20-cv-11233, ECF Nos. 16, 18, 21 (motion to dismiss briefing). *Honey Bum* addressed only whether the plaintiff "myopically excluded interchangeable products" sourced from New York by defining the market as "Los Angeles-sourced fast fashion online clothing." *Honey Bum*, 63 F.4th at 819. Here, Shein does not contest the relevant geographic market, which is the United States. *See* Compl. ¶¶ 1, 188.

2.    **Both Direct and Indirect Evidence Support Temu's Allegations of Shein's Market Power and Monopoly Power in U.S. Ultra-Fast Fashion**

a.    **Temu Alleges Direct Evidence of Shein's Ability to Control and Exclude Competition from the Ultra-Fast-Fashion Market**

Shein's flagrant conduct to exclude competition provides direct proof of Shein's monopoly power that is often unavailable in other cases. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 477 & n.25 (1992) (finding it reasonable to infer power to "drive out competition" when direct evidence is offered and defendant's "goals were in fact achieved"). Temu alleges that Shein takes extreme measures to exclude competitors from accessing suppliers necessary to support the ultra-fast-fashion market, such as seizure of suppliers' IP rights (Compl. ¶ 147), false imprisonment (¶¶ 162–68), and other coercive tactics intended to enforce Shein's exclusivity (¶¶ 152–61). And, as alleged, Shein continues to control ultra-fast-fashion suppliers, despite its intolerable business practices. *See, e.g.*, *id.* ¶¶ 151, 155, 161, 168, 213. Temu alleges actual detrimental effects to competition due to Shein's conduct that are sufficient to find market and monopoly power. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 461 (1986) ("actual, sustained adverse effects on competition" sufficient to support finding of unreasonable restraint even in absence of market analysis).

b.    **Temu Pleads Facts to Support Its Allegations of Shein's 75% Market Share and Significant Barriers to Entry**

In addition to direct evidence, Temu alleges circumstantial evidence of Shein's market and monopoly power based on Shein's market share of over 75% of the U.S. ultra-fast-fashion market and the significant barriers to entry. Shein contests those allegations by asking the Court to apply a burden of proof, pre-discovery, that does not exist.

Shein cites no authority supporting its contention that the "onus is on Temu" to plead "the number of suppliers in the market" and "the number that supply Temu" with specificity—or to continuously amend the Complaint with updated sales data—or be subject to dismissal. *See* MTD at 36; *see Am. President Lines*, 633 F. Supp. 3d at 224–25 (requiring plaintiff to assert "some facts" on "market power that suggest those assertions are plausible"); *see also* 2023 Merger Guidelines, § 4.3 ("Relevant markets need not have precise metes and bounds"). Shein also ignores that Temu alleged facts that are more than sufficient to show Shein's market and monopoly power. MTD at 36. Temu pleaded in detail facts showing Shein's control of supply and dominance in the ultra-fast-fashion market. *See, e.g.*, Compl. ¶ 28 (alleging approximately 10,000 suppliers), ¶¶ 133–37 (discussing why suppliers belong in ultra-fast-fashion market specifically), ¶ 141 (approximately 8,338 suppliers locked into Shein), ¶ 213 (Temu has access to only 10–20% of suppliers). In addition to pleading Shein's over 75% market share in 2022, Temu also pleaded Shein's U.S. revenue that year at approximately $9.6 billion USD. *See id.* ¶¶ 139, 141.

Shein's reliance on *FTC v. Facebook, Inc.* is unavailing. MTD at 35. There, the court held the FTC failed to plausibly allege market power, because "the FTC alleges <u>only</u> that Facebook has 'maintained a dominant share of the U.S. personal social networking market (in excess of 60%)' since 2011, and that 'no other social network of comparable scale exists in the United States.' That is it." *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (citations

omitted). Several factors compounded the defects in the FTC's allegations, like the "unusual" nature of the personal social networking market, whose services "are not sold for a price," and the ***FTC's refusal*** to disclose what its alleged market share "is even referring to." *Id.* Was it revenue, active users, share of time spent by users, or something else? The FTC refused to say. *Id.* at 19.

The FTC's failure in *Facebook* tells us nothing about how to allege market power here. Temu's market share allegations rely on conventional metrics (sales), disclose explicitly the metric used to calculate Shein's over-75% market share (2022 sales volume), and are supported by pages of factual allegations. *See supra* § VI.B; *see, e.g.*, *Am. President Lines*, 633 F. Supp. 3d at 225 (distinguishing plaintiff's market from the "unusual" market in *Facebook*).

Finally, Shein argues that Temu's success in app downloads contradicts Temu's market-power allegations and that Temu does not plead sufficient entry barriers. *See* MTD at 36. But there is no contradiction: Temu's app download numbers (a different metric than sales volume, the basis for Temu's market share allegations) refer to Temu's overall shopping app and not its ultra-fast-fashion business. Temu's success with its shopping app not only supports Temu's allegations about the competitive threat Temu posed to Shein but also highlights the anomaly of Temu's low market share in ultra-fast fashion. Shein makes no other arguments contesting the entry barriers alleged in the Complaint, which include a "limited pool of experienced, quick-turnaround independent manufacturers," "efficient access to the necessary raw materials," and "strong local transportation infrastructure." *See, e.g.*, Compl. ¶¶ 135–37, 141.

### C. Shein Has Engaged in Anticompetitive Conduct

#### 1. Shein Fails to Respond to Key Allegations of Anticompetitive Conduct

Temu alleges a multifaceted monopolization scheme made up of several independently anticompetitive acts. *See* Compl. ¶¶ 5, 15, 18, 27, 53, 70, 130, 209. Yet Shein never meaningfully addresses, let alone proves implausible, Temu's overall scheme claim. Rather, Shein isolates and

responds to only certain components, sidestepping many of the most challenging allegations in the Complaint.  *See, e.g.*, MTD at 27–33.  Courts routinely deny motions to dismiss overarching scheme claims when defendants, as here, challenge components of the scheme and do not address the overall course of conduct.  *See, e.g.*, *Am. President Lines.*, 633 F. Supp. 3d at 228 n.8 (noting courts will "consider a series of separate acts that independently have anticompetitive effect"); *United States v. American Tel. & Tel. Co.*, 524 F. Supp. 1336, 1344 (D.D.C. 1981) (Sherman Act claim "may not be segmented for dismissal purposes").  This Court should do the same.

Shein also leaves large swaths of Temu's other allegations unanswered.  Shein does not meaningfully respond to Temu's Section 1 claim (Count VII) or its attempted monopolization claim under Section 2 (Count IX).  *See* MTD at 26–29.  Nor does Shein address the claims challenging its anticompetitive price floors (Compl. ¶¶ 169–71, 275–80, 281–99 (Counts VII, VIII, and IX)); *see Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 991 (W.D. Wash. 2022).  Shein cannot seek dismissal of claims it failed to address in its Motion.

### 2.    Shein's Supplier Agreements Are Anticompetitive Exclusive Deals

Shein is incorrect that Temu mistakes a non-exclusive IP license for an exclusive-dealing agreement and that Shein's suppliers are free to sell products through other marketplaces.  MTD at 28.  Exclusivity, beyond IP licensing, is explicitly required by the Supplier Agreement attached to the Complaint.  Shein refrains from quoting this Agreement to support its arguments.  *See id.*

As an initial matter, Shein argues as if a debate over the language of the Agreement attached to the Complaint would be dispositive of Temu's exclusive-dealing claims.  *See* MTD at 27–28.  But Temu attached the version of the Agreement made available *by Shein*—specifically, the Agreement that Shein selected to disclose publicly to support a motion to dismiss in earlier antitrust litigation.  *See Whaleco Inc. v. Shein US Servs., LLC, et al.*, No. 23-cv-11596 (D. Mass. Aug. 28, 2023), ECF No. 24 at 6.  As Temu alleges (and Shein does not dispute), however, Shein

uses multiple versions of supplier agreements, and those agreements' terms became increasingly draconian as competition (namely, Temu) entered the U.S. market and threatened Shein's ultra-fast-fashion monopoly.  *See* Compl. ¶¶ 142–46.  Shein makes no attempt to address Temu's allegations regarding the other supplier agreements at issue, not to mention Temu's allegations regarding Shein's enforcement of ***all*** its supplier agreements as *de facto* exclusive in the real world, regardless of the contract language.  *See id.* ¶¶ 152–68; *see also In re Rail Freight Fuel*, 587 F. Supp. 2d at 33 & n.4 (finding "ample support for a plausible inference" of anticompetitive conduct when "taking the allegations in the complaint as a whole and accepting them as true, as the Court must") (quoting *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 155 (D.D.C. 2004)).

In any case, the version of the agreement that Shein placed at issue is a *de jure* exclusive-dealing agreement.  *First*, Shein attempts to justify the exclusivity term by arguing that it protects against "infringe[ment] of Roadget's intellectual property rights."  MTD at 28.  But the Agreement itself makes clear that the term is far broader than an exclusive IP license.  Rather, the agreement mandates exclusivity outside of licensable IP, so that Shein has exclusive access to use the supplier's broader set of "products" and "styles":

> With regard to the style of products provided by Party B [the supplier], Party B hereby irrevocably grants Party A [Shein] a perpetual, sole, and ***exclusive*** license to publish, display, reproduce, improve, or otherwise use ***Party B's products and related styles*** worldwide.

Compl. Ex. A, Part I. II.11(1) (emphasis added).  Shein's mandatory contract requires that only Shein can use the products and styles—not third parties nor the suppliers themselves:

> Party B shall not publish, display, reproduce, improve, or otherwise use the aforementioned styles ***on its own or on any third party's behalf*** (except for the performance of obligations under this Agreement).

*Id.* (emphasis added).  Courts look to the "practical effect" of an agreement to determine whether "it comes within the condition of the section as to exclusivity," even when "a contract does not

contain specific agreements not to use the goods of a competitor." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961).  Temu alleged both the "practical effect" of exclusivity and specific terms requiring that the supplier not compete with Shein via a third party or on its own.

*Second*, Shein's attempt to hide behind "intellectual property" proves Temu's point:  the exclusivity term refers to the ***supplier's*** IP, including its photos, videos, and copyrightable styles, and Shein's anticompetitive attempt to own that IP exclusively:

> Party B [the supplier] shall provide Party A [Shein] with pictures and videos of the products that Party B independently shoots or has the right to authorize Party A to use.  (Compl. Ex. A, Part I. II.11(1))

> With regard to the photographs, pictures, and/or videos of the products provided by Party B [the supplier], Party B hereby agrees to transfer to Party A all the rights, powers, and interest[s] related to the photographs, pictures, and/or videos of the said products that it enjoys . . . .  (Part I. II.11(2))

The exclusivity term never addresses any IP created by "Roadget"; instead, it reflects only Shein's anticompetitive tactics to seize the suppliers' IP for itself.  *See United States v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001) ("Microsoft's only explanation for its exclusive dealing is that it wants to keep developers focused upon its APIs—which is to say it wants to preserve its power in the operating system market"—which was not "a procompetitive justification for . . . exclusive dealing contracts"); *see also, e.g.*, Compl. ¶¶ 147, 155, 159; MTD at 4 (suggesting suppliers selling products on Temu infringe ***Shein's*** "trademarks or copyrights" when suppliers sell their "'identical' or 'highly similar'" products on both platforms).

*Third*, Shein cites ***one term*** in the Agreement—the (redacted) pricing floor provision—to contend that suppliers can do business with third parties.  MTD at 27.  But the pricing floor provision, yet another anticompetitive term that ***further restricts*** the ability and incentives of suppliers to do business with competitors, only supports Temu's allegations that the exclusivity term governs and forecloses suppliers from doing business with Shein's competitors.

*Finally*, while Shein argues the "Supplier Agreements are of relatively short duration and terminable at will by either party on 30-days' notice" (MTD at 29), this is a question of fact since the Agreement attached to the Complaint contains dueling termination provisions with mutually exclusive conditions, even putting aside the agreements Shein has not produced. *Compare* Compl. Ex. A, Part I.II.2 (automatic one-year extension unless notification provided "at least 30 natural days before the expiration") *with* Compl. Ex. A, Part 2.J (automatic one-year extension unless notification provided "within 1 month prior to the expiration").  In any case, Temu also alleged that Shein threatens, intimidates, penalizes, and harasses suppliers that attempt to cease doing business with Shein.  *See, e.g.*, Compl. ¶¶ 155–68; *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("[W]e look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (there was "a strong economic incentive to continue carrying" the at-issue product, irrespective of party's formal legal right to termination).

### 3.    Shein's Extreme Coercion to Enforce Exclusivity Is Anticompetitive

Temu alleges a coordinated combination of anticompetitive and coercive tactics by Shein to enforce exclusivity.  Compl. ¶¶ 152–71.  Shein ignores most of the coercion alleged, including Shein's threats and intimidation tactics (*id.* ¶¶ 155–56, 160–61), public shaming and crippling penalties (¶¶ 157–61), forced detention (¶¶ 162, 164–66), confiscation and unauthorized access of private property (¶ 163), coerced signatures (¶ 164), and anticompetitive price-floor terms that prevent suppliers from selling on other platforms at a lower price (¶¶ 169–71).  Shein does not and cannot argue that any of this conduct involves the legitimate enforcement of IP rights.  Courts routinely find the use of coercion to enforce exclusive arrangements—including conduct far less severe than what Temu has alleged—can support a Section 2 claim.  *See, e.g., Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 871–80 (N.D. Ill. 2022) (denying motion

to dismiss based on anticompetitive scheme that included threats to enforce exclusivity, false rumors and misinformation, and sham FCC petitioning); *Am. President Lines*, 633 F. Supp. 3d at 226; *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1167–69 (D. Nev. 2016).

Further, the three coercive tactics Shein does address go well beyond IP protection.  MTD at 29–30.  For example, Shein argues its Loyalty Attestations require only that suppliers certify they are not cooperating with Temu on "Infringing Products."  But Temu alleges the definition of "infringing products" in the Attestation is not tied to IP rights but extends to any products falling under the exclusive agreement.  Compl. ¶ 154.  Similarly, Temu's allegations about penalties and fines go well beyond "remind[ing] manufacturers not to support Temu's infringing conduct."  MTD at 30.  Rather, Shein levies outsized fines and penalties (Compl. ¶¶ 149–50), posts notices naming and shaming offending suppliers (¶ 159), lists penalties to dissuade suppliers from selling elsewhere (*id.*), and posts threats to suppliers, including punitive measures (*e.g.*, reducing new releases or cutting off access), on its internal supplier portal (¶ 160).  Shein's conduct crosses the line from IP protection to anticompetitive conduct.  *Microsoft Corp.*, 253 F.3d at 63 (finding Microsoft's claim to an "absolute and unfettered right to use its intellectual property as it wishes" to "border upon the frivolous" because "***[i]ntellectual property rights do not confer a privilege to violate the antitrust laws***") (emphasis added) (internal quotations omitted); *Data Gen. Corp. v. Grumman Sys. Supp. Corp.*, 36 F.3d 1147, 1185 n.63 (1st Cir. 1994).

### 4.    Shein's Exclusive Agreements and Coercion Foreclose Competition

Shein's exclusive agreements and coercive tactics to enforce exclusivity have foreclosed Temu's access to approximately 70–80% of ultra-fast-fashion suppliers needed to supply the U.S. market.  Compl. ¶ 213.  This degree of foreclosure far exceeds the "about 40%" foreclosure required to state a claim under the Sherman Act.  *See, e.g.*, *Am. President Lines*, 633 F. Supp. 3d at 228 (quoting *Microsoft Corp.*, 253 F.3d at 70–71).

Shein does not articulate how 70–80% foreclosure is insubstantial.  Temu alleges that "approximately 10,000 of these suppliers have the capability for small-batch, flexible production at a low cost."  Compl. ¶ 28.  The supply Shein has foreclosed (over 8,000 suppliers) represents those "capable of shifting production to new SKUs immediately and matching ever-evolving customer demand in real time."  *Id.* ¶ 213.  Despite Shein's efforts to suggest otherwise (MTD at 4, 28), Temu made the same allegations in the D. Mass. litigation.  *See* RJN Ex. 4 ¶ 70, ECF No. 54 ("The approximately 8,338 manufacturers that supply Shein represent 70–80% of the total number of merchants capable of supplying ultra-fast fashion."); *see also* Ex. 1, First Am. Compl.

Shein also argues that Temu's allegation that "many," "multiple," and "several" suppliers "stopped supplying Temu" is "far" from thousands of suppliers.  MTD at 28–29.  But Shein confuses suppliers forced to "stop[] supplying" Temu with the thousands of suppliers that ***cannot contract with Temu or other platforms in the first place*** due to their agreements with Shein.  *See* Compl. ¶ 146.  Shein also makes the factual argument that Temu's U.S. success "undermin[es] the plausibility" of foreclosure.  MTD at 29.  But Temu is an e-commerce platform offering a variety of products, not just ultra-fast fashion.  Compl. ¶ 1.  Temu's initial e-commerce success in other product categories does not change its foreclosure from the ultra-fast-fashion market.

### 5.    *Noerr-Pennington* Does Not Immunize Shein's Sham IP Enforcement

Shein asks the Court to disregard its baseless DMCA notices and copyright litigation because that conduct should be deemed immune under *Noerr-Pennington*.  MTD at 30–33.  First, Shein's anticompetitive DMCA notices are not "pre-litigation activity" immunized by *Noerr-Pennington*.  MTD at 32.  *See Amaretto Ranch Breedables v. Ozimals, Inc.*, 2010 WL 5387774, at *2 (N.D. Cal. Dec. 21, 2010) ("The filing of a DMCA Takedown Notification is not an offer of settlement or necessarily a pre-suit step to the bringing of an infringement action.").  Nor are DMCA takedown notices government petitioning under *Noerr-Pennington*.  *See Mercer Publ'g,*

*Inc. v. Smart Cookie Ink, LLC*, 2012 WL 12863934, at *5 (W.D. Wash. July 25, 2012) (holding *Noerr-Pennington* does not immunize sending copyright takedown notices in bad faith); *see also Ultraclear Epoxy, LLC v. Epodex USA Corp.*, 2024 WL 815504, at *9–10 (M.D. Tenn. Feb. 27, 2024), *superseded*, 2024 WL 966876 (M.D. Tenn. Mar. 6, 2024); *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1241 (S.D. Cal. 2021).

Shein's *Noerr-Pennington* defense also fails because Temu alleged Shein's notices were sham. Temu alleged that the onslaught of baseless DMCA notices sent to Temu were both objectively baseless and intended in bad faith to interfere with Temu's business. *See, e.g.*, Compl. ¶¶ 34, 37–54, 73–79, 89–97; *see also* MTD at 30–31 (admitting sham exception to *Noerr*). Temu also alleged in detail how Shein's scheme involved filing baseless copyright lawsuits, on its own and by proxy, suffocating Temu with false and deficient DMCA notices, and knowingly making false statements to the U.S. Copyright Office. *See, e.g.*, Compl. ¶¶ 5(d), 29, 33, 70, 98.

Shein ignores these allegations and instead relies on a TRO issued in a single case in Illinois to argue that Shein's alleged IP enforcement nationwide should be immunized. MTD at 32; *see also id.* at 4. But while the Illinois copyright litigation was meritless—Shein's DMCA notices were defective—Temu's claim does not depend on that case being a sham. Temu alleges that Shein's scheme included abusive IP litigation *along with* sham DMCA notices, exclusive-dealing, loyalty attestations, price floors, intimidation, and other exclusionary conduct. *See, e.g.*, Compl. ¶ 5. Courts routinely deny motions to dismiss based on *Noerr-Pennington* where, as here, the supposed petitioning, even if not sham on its own, is part of an anticompetitive scheme. *See, e.g.*, *Nuance Commc'ns v. Omilia Nat. Language Sols.*, 2020 WL 2198362, at *4–5 (D. Mass. May 6, 2020) (rejecting *Noerr-Pennington* argument where plaintiffs alleged sham litigation was part of scheme); *see also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982), *rev'd on other grounds*, *Mayle v. Felix*, 545 U.S. 644 (2005) ("no overall

immunity" when "petitioning activity is but a part of a larger overall scheme to restrain trade").

### D.      Shein's Conduct Has Harmed Competition

Shein argues that Temu has not pled antitrust injury because Temu alleges only harm to Temu as a competitor.  MTD at 37.  But Shein ignores paragraph after paragraph of the Complaint detailing the widespread impact and consequences of Shein's conduct on competition.  Indeed, in the section of Temu's Complaint titled "Injury to Temu, ***Consumers, and Competition***," Temu alleges specifically that "Shein's anticompetitive, exclusionary practices and blatant copying of Temu's valuable intellectual property ***has harmed not only Temu, but also sellers, customers, and competition as a whole***."  Compl. ¶ 212 (emphasis added).  Nor are Temu's allegations "conclusory."  MTD at 37.  Temu's detailed allegations of foreclosure of competition, higher prices, reduced choice, diminished product quality, and harm to the competitive process (Compl. ¶¶ 5, 16, 53–54, 71, 80, 87–88, 94, 171, 174, 215–19) are "quintessential antitrust injuries."  *See, e.g., Am. President Lines,* 633 F. Supp. 3d at 220–22 ("reduced output (i.e., fewer shipping choices), increased prices, and diminished quality of service"); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 137 (D.D.C. 2018).

Shein also argues that "Temu's alleged injury does not flow from conduct the antitrust laws are intended to prevent."  MTD at 38.  But, as discussed above, Shein's conduct goes well beyond protecting IP.  *See Microsoft Corp.*, 253 F.3d at 63.  And, to the extent IP plays a role in Temu's allegations, that is because Temu challenges Shein's sham IP enforcement efforts as part of Shein's anticompetitive scheme.  *See, e.g.*, Compl. ¶¶ 5, 11, 46–54, 88, 220.  Shein's anticompetitive conduct is exactly what the antitrust laws are designed to prevent.

### E.      Temu Sufficiently Pleaded Facts to Support Its Clayton Act Section 3 Claim

Shein argues that it cannot be liable under Section 3 because it is merely a "buyer of products" and "not a seller."  MTD at 38–39 (citing Compl. ¶¶ 69, 118–19).  But the paragraphs

Shein cites do not show that Shein operates in this market only as a buyer. Rather, Shein ignores myriad allegations about how Shein contracts with suppliers to identify trends and "resells products" to U.S. consumers, demonstrating a different role in the distribution chain than that of merely a buyer. *See, e.g.*, Compl. ¶¶ 19–20, 116, 139; *see also* Exhibit 3 (Shein implementing a marketplace model); MTD at 3 (Shein's "marketplace model"). Moreover, two of the three cases Shein cites are summary judgment decisions on a full record (*Genetic Sys. Corp. v. Abbott Labs*, 691 F. Supp. 407 (D.D.C. 1988), and *McGuire v. Columbia Broad. Sys., Inc.*, 399 F.2d 902 (9th Cir. 1968)), and the third involved a defendant that merely promoted the exclusive agreement (*Marion HealthCare, LLC v. S. Ill. Healthcare*, 2015 WL 3466585 (S.D. Ill. May 29, 2015))—far from the role Shein plays here.

## VII.   Shein's Challenge to the D.C. Antitrust Claims (Counts XI–XIII) Fails for the Same Reasons as Its Sherman Act Challenges

Shein concedes (MTD at 26–27) that the requirements under D.C.'s antitrust statutes to bring claims for restraints of trade, monopolization, and attempted monopolization are effectively the same as those of Sections 1 and 2 of the Sherman Act. *See Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 n.9 (D.D.C. 1988)). In this District, a finding of liability under the Sherman Act mandates a finding of liability under D.C. antitrust law where "any part" of the alleged conduct occurred in the District. *See, e.g.*, *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998) (denying motion to dismiss both Sherman Act and D.C. antitrust claims for exclusive dealing conduct); D.C. Code §§ 28-4502, 28-4503. And because the Complaint alleges the national impact of Shein's ultra-fast-fashion platform—including in the District—there is no doubt the Complaint satisfies the intra-district impact requirement of Sections 28-4502 and 28-4503. *See* Compl. ¶¶ 308–32. Similarly unavailing is Shein's effort to assert the FTAIA bars the D.C. law claims (MTD at 26 n.15), for the same reasons it does not bar

the federal claims.  *See supra* § VI.A.  None of the three out-of-circuit cases Shein cites change

this result, as each merely stands for the proposition that the FTAIA can apply to state law claims.

## VIII.  Temu Sufficiently Pleaded Facts to Support Its D.C. Unfair Competition Law Claim (Count XIV)

Shein's challenge to the unfair competition claim fails for the same reasons as its

challenges to the trade dress, antitrust, and tortious interference claims.  *See supra* §§ IV, VI; *infra*

§ IX.  Shein argues (MTD at 39) that unfair competition is actionable only in "limited" instances,

yet its own case recognizes that conduct like copying trade dress (Compl. ¶¶ 186–205), effecting

an unlawful scheme to entrench monopoly power (¶¶ 130–71),[22] tortious interference with

business relations (¶¶ 15, 341–60), and abuse of judicial process constitutes unfair competition

(¶¶ 71–107, 361–65).  *See K&D, LLC*, 2018 WL 6173449, at *3; *see also Ray v. Proxmire*, 581

F.2d 998, 1002 (D.C. Cir. 1978).   And contrary to Shein's argument (MTD at 40), unfair

competition claims may apply to extraterritorial conduct that has a "substantial effect" on U.S.

commerce, as here.  *See IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 121–24 (D.D.C.

2018) (Kelly, J.), *aff'd*, 965 F.3d 871 (D.C. Cir. 2020) (unfair competition under Lanham Act);

*Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 29 (D.D.C.

2008) (common law unfair competition claims "evaluated under the same standards as [the

Lanham Act]").

## IX.  Temu Sufficiently Pleaded Facts Sufficient to Support Its Tortious Interference Claims (Counts XV–XVII)

Shein's challenge to Temu's tortious interference claims stems from the faulty premise that

they are based only on Shein's intimidation of suppliers and its improper DMCA notices.  While

---

[22]  Contrary to Shein's assertions (MTD at 40), Temu's unfair competition claim does not rest upon "a refusal to deal," but rather a multi-faceted anticompetitive scheme, the components of which constitute unfair competition in this District.  *See K&D, LLC v. Trump Old Post Off.*, 2018 WL 6173449, at *3 (D.D.C. Nov. 26, 2018), *aff'd*, 951 F.3d 503 (D.C. Cir. 2020).

those acts support the interference claim, so too does Shein's overarching scheme. *See, e.g.*, *supra* § VI.C.1 (overall scheme); § VI (antitrust claims). Courts find that a tortious interference claim "rises and falls" with plaintiff's Sherman Act and other antitrust claims. *See, e.g.*, *2301 M Cinema LLC*, 342 F. Supp. 3d at 140 (denying motion to dismiss tortious interference claim as plaintiff sufficiently alleged antitrust claims). Since Shein's arguments to dismiss the Sherman Act claims fail, so should its challenge to the tortious interference claims. And, as with the Sherman Act and other claims, Shein is wrong (MTD at 42) that the tortious interference claim fails because some of Shein's conduct occurred abroad—such conduct caused direct and substantial effects on Temu's contracts, business relations, and prospective business relationships ***within the United States*** as part of Shein's overall anticompetitive scheme. *See supra* § VI.A (trade secrets). Shein's improper DMCA notice practices are not subject to *Noerr-Pennington* and thus also independently satisfy the "improper means" requirement for tortious interference claims. *See* § VI.C.5.

Finally, Temu pleaded sufficient facts about seller contracts with which Shein interfered (Compl. ¶¶ 207, 209), pleaded its commercial relationships with those sellers (¶¶ 161, 163–64, 214), and pleaded that Shein targeted those relationships (¶¶ 153, 155, 159, 163); *see, e.g.*, *Jane Lyons Advert., Inc. v. Cook*, 1998 WL 164775, at *7–8 (D.D.C. Mar. 31, 1998) (denying motion to dismiss). Moreover, courts in this District have rejected Shein's argument (MTD at 41) that tortious interference claims fail if contracts are not pled with "specificity." *See, e.g.*, *Ulico Cas. Co. v. Pro. Indem. Agency, Inc.*, 1999 U.S. Dist. LEXIS 8591, at *11–12 (D.D.C. May 5, 1999).

## X. Shein's Arguments Concerning Temu's D.C. Abuse of Process Claim (Count XVIII) Mischaracterize the Claim and Should Be Rejected

Shein incorrectly asserts the D.C. abuse of process claim relates only to Shein's spurious copyright infringement lawsuits (MTD at 44), while ignoring that it also relates to Shein's large-scale DMCA abuse and waves of invalid copyright registrations. *See* Compl. ¶¶ 2, 9–10, 29, 52,

55, 72, 103, 220.  Temu pleaded "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge."  *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959); *see also Neumann v. Vidal*, 710 F.2d 856, 860 (D.C. Cir. 1983) ("[A]n abuse of process action can be maintained even where the earlier suit was ostensibly legitimate, so long as the reasons for the suit are found illegitimate."). First, Temu alleges Shein's ulterior motive to harm Temu's business and reputation with sellers and maintain its monopoly power. *See* Compl. ¶¶ 89–101; *supra* § VI.  For example, Shein brought five proxy copyright suits against Temu, though there was no commercial injury and Temu already had addressed the few instances of third-party infringement by removing the listings.  Compl. ¶ 100.  Second, Shein perverted the judicial process by filing scores of sham DMCA notices, defrauding the U.S. Copyright Office by knowingly filing inaccurate copyright registration forms, and seeking a TRO and preliminary injunctive relief based upon 35 copyright registrations ***all of which*** were found to contain falsities and misrepresentations.  *See id.* ¶¶ 34–101; *supra* § VI.C.5. Finally, Shein's argument (MTD at 45 n.24) that its copyright litigation is immune from  challenge under *Noerr-Pennington* likewise fails.  *See supra* § VI.C.5.

## CONCLUSION

For the forgoing reasons, Temu respectfully asks this Court to deny Shein's Motion.

Date:  April 5, 2024                              Respectfully submitted,

                                                  */s/ J. Mark Gidley*
                                                  J. Mark Gidley (D.C. Bar No. 417280)
                                                  Anna Naydonov (D.C. Bar No. 980910)
                                                  Michael J. Songer (D.C. Bar No. 453727)
                                                  WHITE & CASE LLP
                                                  701 Thirteenth Street, NW
                                                  Washington, DC 20005
                                                  Telephone: (202) 637-6197
                                                  Fax: (202) 639-9355
                                                  mgidley@whitecase.com
                                                  anna.naydonov@whitecase.com

michael.songer@whitecase.com

Jack E. Pace III (*pro hac vice*)
Michael Hamburger (*pro hac vice*)
Holly Tao (*pro hac vice*)
Rosie Norwood-Kelly (D.C. Bar No. 1780519)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8520
Fax: (212) 354-8113
jpace@whitecase.com
michael.hamburger@whitecase.com
holly.tao@whitecase.com
rosie.norwood-kelly@whitecase.com

*Counsel for Plaintiff WhaleCo Inc.*