**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WHALECO INC.,

        Plaintiff,

v.

SHEIN TECHNOLOGY LLC,
ROADGET BUSINESS PTE. LTD.,

        Defendants.

Case No. 1:23-cv-03706 (TJK)

**ORAL ARGUMENT REQUESTED**

## WHALECO INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

Page:

I.  INTRODUCTION ................................................................................................1

II. ARGUMENT ......................................................................................................6

   A.  The Proposed Limited Injunction Is Proper under Section 512(f)......................7

   B.  The Narrow Injunction Would Only Require Shein to Submit Legitimate DMCA
      Notices ................................................................................................................9

   C.  Shein's Misrepresentations Are Knowing and Affect a Large Volume of Its Notices .....13

     (1)  The Bulk of Shein's DMCA Notices Likely Include False Ownership Claims................13

     (2)  Numerous Real-Life Examples of False Notices Resulting from Shein's Actual
        Knowledge and Willful Blindness Plague Its Entire DMCA System .................16

     (3)  The UK High Court Prohibited Shein from Sending DMCA-like Notices for Supplier
        Photographs Without Proof of Copyright Chain of Title....................................19

   D.  Section 512(f), Not Counter-Notices, Provides Legal Recourse for DMCA Abuses......20

   E.  Absent an Injunction, Temu Will Continue to Suffer Irreparable Harm ..........21

   F.  The Balance of Equities and Public Interest Warrant an Injunction..................24

   G.  The Narrow Injunction Would Require Little to No Court Oversight .............25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alper Auto., Inc. v. Day to Day Imps., Inc.*,
  2022 U.S. App. LEXIS 22808 (11th Cir. Aug. 17, 2022) ........................................... 16, 24

*Alton & S. Ry. v. Bhd. of Maint. of Way Emples.*,
  899 F. Supp. 646 (D.D.C. 1995) .......................................................................................12

*Amaretto Ranch Breedables v. Ozimals, Inc.*,
  No. C 10-05696 CRB, 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010) ..........................8, 23

*Arc of Cal. v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) ..........................................................................................22

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
  280 F. Supp. 3d 59 (D.D.C. 2017),
  *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ..............................................................................22

*Beacon Assocs. v. Apprio, Inc.*,
  308 F. Supp. 3d 277 (D.D.C. 2018) ..................................................................................24

*Biosafe-One, Inc. v. Hawks*,
  524 F. Supp. 2d 452 (S.D.N.Y. 2007) ................................................................................7

*Bird v. Barr*,
  No. 1-CV-1581, 2020 WL 4219784 (D.D.C. July 23, 2020) ............................................9

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...........................................................................................................8

*Capitol Hill Baptist Church v. Bowser*,
  496 F. Supp. 3d 284 (D.D.C. 2020) ...................................................................................6

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ...........................................................................................7

*Colorado v. Idarado Mining Co.*,
  916 F.2d 1486 (10th Cir. 1990) .........................................................................................8

*Compton v. Alpha Kappa Alpha Sorority, Inc.*,
  80 F. Supp. 3d 23 (D.D.C. 2015),
  *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016) ..............................................................................8

*Cooper v. NTSB*,
  660 F.3d 476 (D.C. Cir. 2011) .........................................................................................13

*De Beers Consol. Mines v. United States,*
  325 U.S. 212 (1945) ........................................................................................... 9

*\*Design Furnishings, Inc. v. Zen Path LLC,*
  2010 WL 5418893 (E.D. Cal. Dec. 23, 2010) ................................... 7, 17, 21

*\*Design Furnishings, Inc. v. Zen Path LLC,*
  No. CIV. 2:10-02765, 2010 WL 4321568 (E.D. Cal. Oct. 21, 2010) .......... 7, 24

*\*Disney Enters. v. Hotfile Corp.,*
  No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339
  (S.D. Fla. Aug. 28, 2013) ............................................................................ 11, 17

*\*Doherty Assoc., Inc. v. Saban Entm't, Inc.,*
  60 F.3d 27 (2nd Cir. 1995) ......................................................................... 22, 23

*Eileen Grays, LLC v. Remix Lighting, Inc.,*
  No. 1:18-cv-362, 2019 WL 6609834 (N.D.N.Y. Dec. 5, 2019) ...................... 8

*English v. Trump,*
  279 F. Supp. 3d 307 (D.D.C. 2018) (Kelly, J.) ............................................... 6

*Foshan Liyan Undergarment Co., Ltd. v. Roadget Business Pte. Ltd.,*
  Case No. 3:23-cv-06557-MRA-RAO (C.D. Cal. Aug. 11, 2023) ............... 4, 18

*\*Fox Television Stations, Inc. v. FilmOn X LLC,*
  966 F. Supp. 2d 30 (D.D.C. 2013) ................................................................. 24

*\*Global-Tech Appliances, Inc. v. SEB S.A.,*
  563 U.S. 754 (2011) ......................................................................................... 13

*Grine v. County of Center,*
  138 A.3d 88 (Pa. Commw. Ct. 2016) .............................................................. 6

*Jenkins v. Holder,*
  949 F. Supp. 2d 262 (D.D.C. 2013) ............................................................... 12

*Jones v. District of Columbia,*
  177 F. Supp. 3d 542 (D.D.C. 2016) ............................................................... 25

*League of Women Voters of the United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 6

*\*Lenz v. Universal Music Corp.,*
  815 F.3d 1145 (9th Cir. 2016) .................................................................. 11, 13

*Mitchell v. Robert DeMario Jewelry, Inc.,*
  361 U.S. 288 (1960) ........................................................................................... 8

*Moore v. Hartman*,
    102 F. Supp. 3d 35 (D.D.C. 2015) ............................................................................13

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ............................................................................24

*NLRB v. Express Pub. Co.*,
    312 U.S. 426 (1941) ...................................................................................................8

*Orson, Inc. v. Miramax Film Corp.*,
    79 F.3d 1358 (3d Cir. 1996) ....................................................................................25

*Perfwaybelayouix v. Graham-Drake*,
    No. 22-1019 (CKK), 2022 U.S. Dist. LEXIS 216913 (D.D.C. Dec. 1, 2022) ...............19

*Powerwand Inc. v. Hefai Neniang Trading Co.*,
    No. 2:22-cv-01413-JHC, 2023 U.S. Dist. LEXIS 110745 (W.D. Wash. Jun. 27, 2023) ...............10

*Prunte v. Universal Music Grp., Inc.*,
    699 F. Supp. 2d 15 (D.D.C. 2010) ............................................................................18

*Religious Tech. Ctr. v. Wollersheim*,
    796 F.2d 1076 (9th Cir. 1986) ..................................................................................8

*Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*,
    415 U.S. 1 (1974) ......................................................................................................8

*Roadget Business PTE. Ltd. v. Whaleco, Inc. et al.*,
    No. 1:22-cv-07119, ECF 201 (Oct. 26, 2023) ............................................................2

*Rosen v. Hosting Servs.*,
    771 F. Supp. 2d 1219 (C.D. Cal. 2010) ....................................................................18

*Rossi v. Motion Picture Assn. of Am., Inc.*,
    391 F.3d 1000 (9th Cir. 2016) ..................................................................................20

*Sturdza v. United Arab Emirates*,
    281 F.3d 1287 (D.C. Cir. 2002) ................................................................................18

*Texas Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ............................................................................22

*United States v. Facebook Inc.*,
    No. CV 19-2184, 2023 WL 8190858 (D.D.C. Nov. 27, 2023) .....................................9

*United States v. Hsia*,
    87 F. Supp. 2d 10 (D.D.C. 2000) ..............................................................................7

*Unites States v. Macandrew,*
  No. 21-730 (CKK), 2023 U.S. Dist. LEXIS 8554 (D.D.C. Jan. 17, 2023) .....................................13

*United States v. Philip Morris USA, Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) ...........................................................................................7

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC,*
  776 F.3d 1 (D.C. Cir. 2015) ...............................................................................................7

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ............................................................................................................24

## STATUTES AND RULES

17 U.S.C. § 502 ..........................................................................................................9

17 U.S.C. § 512(c)(3) ..........................................................................................passim

17 U.S.C. § 512(g) ...................................................................................................2, 20

17 U.S.C. § 512(j) ........................................................................................................9

17 U.S.C. § 1203 ..........................................................................................................9

18 U.S.C. § 1621 ........................................................................................................11

DMCA ............................................................................................................passim

The DMCA of 1998, 105th Cong. § 2 (1998) ...........................................................9

## OTHER AUTHORITIES

Mark A. Lemley, *Rationalizing Internet Safe Harbors,*
  6 J. OF TELECOMM. AND HIGH TECH. L. 101 (2007) .........................................20

SEN. REP. NO. 105-190 (1998) .................................................................................20

U.S. COPYRIGHT OFFICE, A REPORT OF THE REGISTER OF COPYRIGHTS: SECTION
  512 OF TITLE 17 (May 2020).............................................................................10

WhaleCo Inc. submits this Reply and respectfully **requests an oral argument**.

## I.    INTRODUCTION

This case involves a sham DMCA scheme of immense proportions by a competitor to hurt a new market entrant. In its opposition, consistent with its corporate shell game, Shein goes to great lengths to disassociate itself from its Chinese identity and pretend to be a Singaporean fashion brand. In reality, it is a label reseller platform from China with a tight grip on a small pool of ultra-fast-fashion suppliers in China. Shein has been the subject of over 100 IP infringement lawsuits in the US alone. In Shein's war to eliminate Temu's competitive threat, US copyright law and the DMCA system have been debased into tools of abuse and deceit. Shein sent over 33,000 takedowns to Temu targeting competing (and cheaper) product listings largely based on claims of copyrights to photographs ***Shein did not author, does not own, and thus has no authority to enforce under the DMCA***. Similar to a large-scale bot or troll attack, Shein's ongoing assault of tens of thousands of bogus takedowns threatens to cripple Temu's ultra-fast-fashion segment, has led to a substantial erosion of market share, and tarnish its reputation. Shein makes no attempt to justify its false ownership testimony under penalty of perjury. Shein also admits through its silence that Temu's narrow request would pose no burden on Shein and still—four months after Temu filed its Complaint—fails to produce any evidence of ownership of the copyrights that are being invoked in its torrent of defective takedowns. Shein wants this Court to allow Shein's continued abuses. A limited injunction that makes Shein comply with the DMCA requirement that notices be sent by ***actual IP owners*** is warranted. Indeed, many courts have granted injunctions to stop Section 512(f) violations.

Rather than offering any evidence of its copyright ownership (the only relevant issue), Shein diverts attention by smearing Temu. The USTR Notorious Markets List ("NML") is a side show as it relates to a different platform—Pinduoduo, only operating in China (*not* Temu, a different platform operated under a US company WhaleCo). In fact, after USTR reviewed *Temu's* submission about its

IP enforcement and actual statistics on takedowns, USTR did *not* put Temu on the NML. Regarding the prior Illinois TRO, it was granted on an incomplete record of Shein's claims and quickly crumbled under scrutiny. Once the evidence came to light (e.g., that **each** Shein copyright registration asserted against Temu was flawed), the court paused the preliminary injunction proceeding for discovery, despite Shein's opposition. Then Shein dropped the case. *See Roadget Business Pte. Ltd. v. Whaleco, Inc. et al.*, No. 1:22-cv-07119, ECF 201 (Oct. 26, 2023). Moreover, the tale of Temu's "rampant" infringement is false and manufactured by Shein. Only a very small percentage of product listings on Temu is subject to takedowns. Ji Decl. ¶ 9. Its total takedown numbers pale in comparison to other platforms. Supp. Ji Decl. ¶ 61. And Shein is responsible for around **63%** of total copyright takedowns on Temu. Ji Decl. ¶ 10.

A counter-notice is no substitute for a Section 512(f) injunction. A counter-notice allows a seller (not Temu) to state that content was taken down by "mistake or misidentification," ask for reinstatement, provide their identities, and **agree to be sued by Shein** in the US. 17 U.S.C. § 512(g)(3). Shein also counts on the fact that, by statute, ISPs must wait **14 business days** before reinstating content (which is commercially unworkable for ultra-fast fashion). 17 U.S.C. § 512(g)(2)(C). A counter-notice provides **no** legal recourse for false DMCA claims, much less relief from large-scale attacks harming the platform. Given Shein's campaign of intimidation and history of suppression, merchants are afraid to utilize the counter-notice procedure and invite retaliation and a potential lawsuit against them by Shein (presuming they even understand their rights under DMCA, which is unlikely given the barriers of and unfamiliarity with the US legal system). As attested to by many merchants in ultra-fast fashion (and unrebutted by Shein), the 14-business day waiting period is like killing a product listing. Supp. Ji. Decl. ¶ 8. The risk-reward ratio thus favors Shein's abuses: it is not worth it for a small Chinese clothing factory to risk retaliation and a lawsuit from Shein over a product listing that will die because of the reinstatement timeline; but the incentive for Shein to continue false takedowns is high.

Unlike a regular IP infringement lawsuit where it would bear the burden of proving its ownership upfront (before getting relief), Shein can just continue to send bogus takedowns with false ownership claims and obtain quick takedowns of competing listings. Congress enacted Section 512(f) to stop and deter such abuses.

Nor, contrary to Shein's argument, does Temu "conflate[]" an injunction with a "discovery device." Opp. at 3. Discovery requests are toothless to stop ongoing irreparable harm; only an injunction can do that. Shein thus hopes to prolong the harm. Shein's argument is also two-faced given that Temu has been asking for Shein's proof of ownership since November, but Shein has repeatedly refused to provide it. Ji Decl. ¶ 34. Facing ongoing sham DMCA claims and false testimony under penalty of perjury, Temu has no choice but to pursue a limited preliminary injunction.

*First*, Temu is likely to succeed on the merits of its Section 512(f) claim based on Shein's false claims of ownership under penalty of perjury for the bulk of its notices. Shein does not dispute that most of its notices are not photos that Shein created, but photos provided by third-party suppliers, some of whom also list on Temu. Section 512(c)(3), relied on by Shein, governs *notification* requirements, not the underlying authority to send a notice, which Shein lacks. DMCA complainants must attest *under penalty of perjury* as to their ownership claims. 17 U.S.C. § 512(c)(3)(A)(vi) (DMCA complainant must state "under penalty of perjury, that the complaining party is authorized to act on behalf of the *owner* of an exclusive right that is allegedly infringed") (emphasis added). Shein has not shown it owns any of the asserted supplier copyrights and repeatedly glosses over false, under-oath, claims in its notices. Rather, it asks the Court to credit its continued reliance on the boilerplate terms buried in lengthy supplier agreements. But the agreements Shein has relied on do not effectively transfer IP rights to Shein; they either (1) provide Shein with a non-exclusive right to use, or (2) do not guarantee that the supplier actually owns the copyrights. Shein's in-house counsel declarant remarkably admits as much. *See* Wei Decl. ¶ 8 (many supplier agreements do not contain a transfer of

IP rights to the product photos, but merely provide Shein with the rights to *use* the photos on Shein's website). Shein thus knows from the plain language of the agreements that many contain *no* IP transfer provision. Shein also knows that many sellers do not own the copyrights; they belong to the independent photographers who took those photographs and never transferred rights to sellers. The sellers thus have no copyrights to transfer—even if some agreements purport to include IP transfers.

These are not hypothetical flaws. Multiple Temu sellers, despite their fear of retaliation from Shein, have provided sworn declarations and/or witness statements regarding Shein's false notices. In its opposition, Shein has provided no evidence of its copyright ownership of any of those supplier images. Shein was also recently sued in California by a former supplier over false copyright ownership claims in DMCA notices. *See Foshan Liyan Undergarment Co., Ltd. v. Roadget Business Pte. Ltd.*, Case No. 3:23-cv-06557-MRA-RAO (C.D. Cal. Aug. 11, 2023). Shein also knows that some images on its platform are sourced from the Internet, as it allows suppliers to upload such photos, and to which the sellers—and certainly not Shein—likely have no ownership rights. Shein has also demanded takedown of over 1000 non-infringing product listings where the asserted image did not match on its face the images on Temu. Mot. at 10-11. Far from isolated "mistakes," Shein's misrepresentations are systematic, plague over 33,000 takedowns, and were made with **actual knowledge** of, or **willful blindness** (i.e., avoiding learning facts Shein knows there is a high probability exist) as to, their falsity.

Notably, since the filing of Temu's motion for a preliminary injunction, in a parallel UK proceeding between Temu and Shein, the UK High Court of Justice held that Shein's takedown process was flawed and required Shein to provide proof of copyright ownership in future DMCA-like notices:

> On this point I have considerable sympathy with the position of [Temu]. It seems to me that it is not sufficient for [Shein] simply to rely on the warranties provided by their suppliers. It is apparent that there are suppliers that are supplying both the claimants and the defendant; the evidence on both sides is somewhat murky; and *it is striking that notwithstanding the considerable time and expenditure on this point there is still not concrete evidence that*

4

*the claimants [Shein] own or have exclusive licences to the copyright in relation to the seven examples relied upon by [Temu].*

…

[Shein] should provide the defendant with enough information regarding the chain of title to supplier photographs so as to enable the defendant to determine whether to object to the notification of those images

…

What I will order is that any notification of a supplier generated photograph should include material demonstrating the author of the image, the first owner of copyright in the image, and the chain of title from the first owner to the claimants.

Approved UK Judgment, Roadget Business PTE. Ltd. v. WhaleCo U.K. Ltd. [2024] EWHC (Ch) 132 [26], [28] (emphases added).

Tellingly, since the UK High Court issued its order on February 5, 2024, Shein has not issued a *single* UK takedown based on a supplier photograph, essentially admitting that Shein cannot prove ownership of those copyrights. Supp. Ji Decl. ¶ 24. It has only issued a much smaller number of notices based on photographs taken by its employees. Shein's 67% drop in the UK notices post the order suggests that the bulk of Shein's prior notices were based on false ownership claims. *Id.* at ¶ 25. Shein has then increased its DMCA notices by 2.5 times since the UK order as a likely workaround. *Id.* at ¶ 27.

*Second*, injunctive relief is also appropriate because Shein's sham DMCA notices are inflicting irreversible and irreparable harm to Temu during the critical stage of Temu's growth. Temu is still a relative newcomer to the US market, having launched less than a year-and-a-half ago, and it is still in the existential, make-or-break phase. Shein's actions are irreparably damaging Temu's competitive standing and ability to survive in the ultra-fast-fashion market. *Id.* at ¶¶ 3-16. Within just one year, despite its overall successful performance and growth in other segments, the share of Temu's ultra-fast-fashion segment within its overall business—the segment targeted by Shein's false DMCA campaign—has experienced a **significant decline** from 40% to under 30% share (i.e., shrunk by 25%). *Id.* at ¶ 10. Similarly, year-over-year, in the first quarter of 2024, the number of new ultra-fast-fashion sellers has dropped by nearly 30% (while other segments experienced no such decline). *Id.*

This loss is devastating given the importance of the ultra-fast-fashion segment and has a cascading (and not quantifiable) effect on other segments of the business. Over 97% of those who placed their first order for ultra-fast-fashion products continued to then buy other products on Temu, and 90% then also bought products in other categories. *Id.* at ¶ 13. In targeting the ultra-fast-fashion listings Shein eliminates shopping opportunities and impedes growth in other segments. The large-scale DMCA campaign is thus harming Temu's relationships with its sellers and customers and its reputation and goodwill. The harm will be impossible to salvage with damages.

*Third*, the balance of equities and the public interest favor an injunction. Temu is not trying to stop Shein from sending DMCA notices altogether. Shein is free to send legitimate takedown notices where it actually owns the copyrights. Nor has Shein identified *any* concrete harm from having to comply with the limited injunction. Notably, on its own IP portal, Shein demands proof of copyright ownership from DMCA complainants similar to the relief sought here, including copyright registration (if applicable), date of first publication, and original images. A narrow injunction will allow Temu to identify Shein's takedown requests with valid ownership proof, similar to how Shein has required such proof from others to evaluate DMCA notices it receives. And the public has an interest in the integrity of the DMCA and in having access to affordable competitive products.

## II.    ARGUMENT

The injunction Temu seeks is limited, narrow, and prohibitive because it does not impose any affirmative burden on Shein beyond its existing obligations under the law, which restricts the notice-takedown procedure to bona fide copyright owners (or their agents). Temu is thus not asking to "alter, rather than preserve, the status quo by commanding some positive act." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 292 (D.D.C. 2020). "Requiring compliance with a statute does not transform a preliminary injunction into a mandatory one." *Grine v. Cty. of Ctr.*, 138 A.3d 88, 93 n.5 (Pa. Commw. Ct. 2016). Moreover, it is unclear whether the District of Columbia recognizes the

mandatory versus prohibitive injunction distinction. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("reject[ing] any distinction between a mandatory and prohibitory injunction, observing that the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms"); *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018) (Kelly, J.) (declining to determine if the DC Circuit distinguishes between the "nature of the injunction sought" or requires heightened standard for an injunction "that would alter the status quo rather than merely preserve it"). Regardless, the limited relief requested here is justified under either standard because it seeks to preserve the status quo under the DMCA—limit notices to legitimate copyright owners or agents, as the statute intended.[1]

Moreover, a "preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). "[R]eliability may be inferred" where, like here, the evidence "falls within a firmly rooted hearsay exception." *U.S. v. Hsia*, 87 F. Supp. 2d 10, 13 (D.D.C. 2000).[2]

## A. The Proposed Limited Injunction Is Proper under Section 512(f)

Shein's claim that Temu seeks intermediate relief that is unavailable as final relief is incorrect. *First*, Temu's prayer for final relief in its Complaint matches the relief sought in this Motion. Compl. at Prayer for Relief ¶¶ B, C. *Second*, contrary to Shein's claim, if Temu prevails on its Section 512(f) claims, then it would be entitled to obtain final relief that is of the same character as the intermediate relief—prohibit further false notices. Shein does not dispute that many courts have allowed similar

---

[1] Shein Technology LLC ("STL") is an indirect subsidiary of Roadget providing IT and data analytic services. Pernot-Day Decl. ¶¶ 9-10. These services may be used to prepare DMCA notices including targeting "hot" listings on Temu. STL acts in privity with its subsidiaries as it is advancing their "common corporate business." *U.S. v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1136 (D.C. Cir. 2009). STL should be subject to the injunction as prior courts in this District have done in binding entities in "privity" with, represented by, or subject to the control of the enjoined party. *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 9 (D.C. Cir. 2015).

[2] The cases relied on by Shein are irrelevant as the evidence there did not fall under a hearsay exception.

injunctive relief. *See Design Furnishings, Inc. v. Zen Path LLC*, No. CIV. 2:10-02765, 2010 WL 4321568, at *5 (E.D. Cal. Oct. 21, 2010) and 2010 WL 5418893, at *3 (E.D. Cal. Dec. 23, 2010) (granting temporary restraining order and preliminary injunction on 512(f) claim; "defendant is temporarily restrained and enjoined from submitting notices of claimed infringement to eBay stating that plaintiff's auctions of wicker patio furniture violate defendant's intellectual property rights" and that "intangible injuries that are incapable of measurement, like reputation, advertising efforts, or goodwill, may constitute irreparable harm."); *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 467-69 (S.D.N.Y. 2007) (granting preliminary injunction on 512(f) claim, enjoining plaintiffs from sending additional DMCA notices); *Eileen Grays, LLC v. Remix Lighting, Inc.*, No. 1:18-cv-362 (MAD/DJS), 2019 WL 6609834, at *5 (N.D.N.Y. Dec. 5, 2019) (granting permanent injunction where defendant "knowingly submitted materially false" DMCA notices); *Amaretto Ranch Breedables v. Ozimals, Inc.*, No. C 10-05696 CRB, 2010 WL 5387774, at *1 (N.D. Cal. Dec. 21, 2010) (enjoining removal of plaintiff's products as a result of defendant's DMCA notifications).

Shein fails to cite a single case (and Temu is not aware of any) finding an injunction is not available in Section 512(f) cases. This is because federal courts possess an inherent, presumed power to grant equitable relief, including injunctive relief. *See Compton v. Alpha Kappa Alpha Sorority, Inc.*, 80 F. Supp. 3d 23, 27-28 (D.D.C. 2015), *aff'd*, 639 F. App'x 3 (D.C. Cir. 2016); *see also NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941). A statute need not enumerate all available remedies, and courts are presumed to possess the inherent authority to grant injunctive relief absent an express limitation by Congress. *See Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions"); *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960) ("Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command."). "Congress knows how to deprive courts of broad equitable powers when it chooses so

to do." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 19 (1974). Courts only find an abrogation of inherent equitable powers where Congress clearly intended to exclude it (usually because a specific government enforcement agency is vested with exclusive authority to pursue an injunction).[3] Here, Congress did not limit the Court's inherent equitable authority. The Copyright Act and the DMCA allow for injunctive relief by private litigants. *See e.g.*, 17 U.S.C. § 502; § 512(j), § 1203. And nothing in the DMCA's legislative history suggests an intention to abrogate the Court's inherent equitable powers. To the contrary, Congress enacted the private right of action in Section 512(f) "to *deter* knowingly false allegations to services providers in recognition that such misrepresentations are *detrimental* to rights holders, service providers, and Internet users." The DMCA of 1998, 105th Cong. § 2 (1998) (emphases added). A critical tool to "deter" false allegations is injunctive relief.

     *Finally*, the cases relied on by Shein are inapposite because the injunctive relief there was divorced from the asserted claims.[4] By contrast, the relief here is directly "tethered" (*see* Opp. at 15) to Shein's violations because it enjoins Shein from further violations under Section 512(f).

## B. The Narrow Injunction Would Only Require Shein to Submit Legitimate DMCA Notices

     Shein argues that it is not required to submit proof of copyright ownership with a Section 512(c)(3)'s DMCA notification. In so arguing, Shein attempts to skip the prerequisite that must happen

---

[3] *See, e.g., Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1090 (9th Cir. 1986) (RICO legislation draft history shows Congress intended to preclude injunctive relief for private plaintiffs); *Colorado v. Idarado Mining Co.*, 916 F.2d 1486, 1497-98 (10th Cir. 1990) (CERCLA expressly allows injunctive relief by the EEPA but omits it for State agencies).
[4] *Bird v. Barr*, No. 1-CV-1581, 2020 WL 4219784, at *2-3 (D.D.C. July 23, 2020) (injunction sought "FBI to refrain from generally retaliating against Plaintiffs and witnesses"; it was disconnected from specific sex discrimination claims); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (although case involved antitrust claims, preliminary injunction sought to enjoin defendants from selling any property in the US and thus "deal[t] with a matter lying wholly outside the issues in the suit" and "with property which in no circumstances can be dealt with in any final injunction"); *U.S. v. Facebook Inc.*, No. CV 19-2184, 2023 WL 8190858, at *7 (D.D.C. Nov. 27, 2023) (injunction "deal[t] with [a] matter outside the issues in the underlying suit"; court retained jurisdiction over a "single potential inconsistency with the Stipulated Order"; it "does not warrant *any* preliminary injunctive relief, let alone an injunction prohibiting the FTC from reopening its proceedings").

before a DMCA notice is sent—i.e., first, possessing a valid copyright ownership claim (or authority to act for the owner) and second, evaluation of whether the notice recipient has lawful grounds to use the accused content (e.g., a license, fair use, etc.).

Shein fails both of these prongs. As to the first prong, the DMCA requires that a party actually own the copyright (or be the owner's agent) to demand content removal. 17 U.S.C. § 512(c)(3)(B)(i). To truthfully claim under oath that the allegation is made by a copyright owner or its agent, the sender must necessarily have proof of such claim. Proof such as original photographs, a copyright registration, a work for hire agreement, or other documentation establishing chain of title are typical records that any rights holder is expected to have. *See Powerwand Inc. v. Hefai Neniang Trading Co.*, No. 2:22-cv-01413-JHC, 2023 U.S. Dist. LEXIS 110745 (W.D. Wash. Jun. 27, 2023) (producing 19 original photographs and copyright registrations as support for authority to issue DMCA notices).

And the request that Shein provide proof of ownership is nothing extraordinary. To "weed out overbroad and abusive DMCA takedown notices," a number of larger online service providers have implemented notification requirements similar to those Temu seeks here, including "[r]equiring a rightsholder to submit a registration certificate or other 'proof' of ownership before processing a takedown." US COPYRIGHT OFFICE, A REPORT OF THE REGISTER OF COPYRIGHTS: SECTION 512 OF TITLE 17, 152-57 (May 2020).[5] Indeed, Shein demands virtually identical proof from third parties submitting DMCA notices to Shein on its own IP portal, i.e.: "description of copyright"; "country of copyright creation or registration"; "copyright registration number (if applicable)"; "date of first publication"; "a link or upload a file showing your copyrighted work"; and "a link or upload a file showing your creation of the original work." Ji Decl., Ex. J. Yet, Shein dodges its own standard and

---

[5] Some of these online service providers, including Google and Facebook, have implemented takedown webforms "to ensure that the claim [rightsholders] are submitting contains the required information and is appropriate for a section 512 notice." *Id.* at 156.

submits takedowns in letter format to Temu with false ownership attestations in bulk for often hundreds of links. Shein further abuses the DMCA by camouflaging predominantly sham notices by mixing them with several potentially legitimate ones. This cripples Temu's ability to discern valid notices and forces it, to safeguard the DMCA immunity, to honor all the takedowns, even though the bulk are sham. Ji Decl. ¶ 34.

As the second prong, the sender must evaluate whether the DMCA notice recipient has any lawful purpose for displaying the content—e.g., fair use or a license. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153-54 (9th Cir. 2016) (copyright holder "concedes it must give due consideration to other uses authorized by law such as compulsory licenses," for example, it "must consider fair use before sending a takedown notification"); *Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 U.S. Dist. LEXIS 172339, at *152-53 (S.D. Fla. Aug. 28, 2013) ("copyright holder must consider not only whether the material actually belongs to it, but whether the use of the material lacks an obviously lawful purpose like fair use"). Shein has also flunked this prong as it habitually fails to consider whether the merchants retain rights; Shein knows that often the copyrights belong to the photographer (not the merchants) and that merchants have permissions to use the images.

Only after the above prerequisites are satisfied may one send a DMCA notice. Section 512(c)(3), relied on by Shein, governs *notification* requirements: not the underlying authority to send a notice. Section 512(c)(3) was designed to shield ISPs from liability based on vague, incomplete, or otherwise defective notifications (e.g., notification fails to include asserted or accused works). But this notification is nothing more than an allegation. *See* 17 U.S.C. § 512(c)(3) ("notification of *claimed* infringement") (emphasis added). This allegation, as detailed above, must be supported—under *penalty of perjury*—with proof of ownership *before a claim* is made. 17 U.S.C. § 512(c)(3)(A)(vi) (complainant must attest "under penalty of perjury, that the complaining party is authorized to act on behalf of the

11

owner of an exclusive right that is allegedly infringed"). False attestations are punishable by law.[6] Indeed, it was so important for Congress that DMCA notifications be submitted by the copyright owners (or their agents), that ownership is the only notification representation that must be made under penalty of perjury. Shein repeatedly ignores and glosses over this requirement. Opp. at 5.

The injunction would thus only require Shein to comply with the DMCA and prohibit illegitimate notices in violation of the copyright laws. Courts, including this one, have imposed similar procedures (including injunctive relief) to deter unsubstantiated complaints, abuse of legal process, or to help further the purpose of the underlying statute. *See Jenkins v. Holder*, 949 F. Supp. 2d 262 (D.D.C. 2013) (enjoining party from filing any action without seeking leave of court; requiring party to attach documentation to motion to leave and certify that such claim is being brought in good faith); *Alton & S. Ry. v. Bhd. of Maint. of Way Emples.*, 899 F. Supp. 646, 649-50 (D.D.C. 1995) ("[t]o the extent that the injunction requires affirmative action[, this action] is required to further the [statute's] purpose of preventing interruptions in interstate commerce").

*Finally*, Temu's requested relief is consistent with that already granted by the UK High Court. For asserted supplier photographs, the UK High Court ordered Shein on February 5, 2024, to include in its takedown notices (which must be limited to 100 a day) "material demonstrating the author of the image, the first owner of copyright in the image, and the chain of title from the first owner to [Shein]." Approved UK Judgment, [28]. Notably, Article 14 of the Electronic Commerce Directive—the DMCA counterpart in EEA countries—does not provide that the above documentation should be included with a takedown notice. *See* Directive 2000/31/EC. Despite this, the UK High Court adopted a practical procedure for submission of future notices similar to the narrow injunction sought here. Approved UK Judgment, [27], [28]. The UK High Court found such a procedure was necessary

---

[6] 18 U.S.C. § 1621 (person "guilty of perjury … shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both").

given the "legitimate doubts as to chain of title" for the seven representative photographs in Shein's notices to Temu. *Id.* at [27].

## C.  Shein's Misrepresentations Are Knowing and Affect a Large Volume of Its Notices

Shein argues it is not liable under Section 512(f) because its misrepresentations in the DMCA notices were not "knowing," but rather innocent mistakes. Not so. "Knowing" misrepresentations include both actual knowledge and willful blindness. *Lenz*, 815 F.3d at 1155 (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)). The Supreme Court held that for willful blindness, "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances*, 563 U.S. 769. Courts in this District have applied the *Global-Tech Appliances* standard for willful blindness. *See, e.g.*, *Cooper v. NTSB*, 660 F.3d 476, 483 (D.C. Cir. 2011) ("a defendant acted knowingly if he deliberately closed his eyes to what otherwise would have been obvious to him and did not act through ignorance, mistake, or accident"); *Moore v. Hartman*, 102 F. Supp. 3d 35 (D.D.C. 2015); *United States v. Macandrew*, No. 21-730 (CKK), 2023 U.S. Dist. LEXIS 8554, at *18 (D.D.C. Jan. 17, 2023). Shein's conduct was "knowing" in that it (1) had actual knowledge of and willful blindness to its lack of copyright ownership for likely tens of thousands of notices; (2) continued to submit notices under penalty of perjury with actual knowledge that its DMCA system was flawed and resulted in numerous false takedowns (even after being told so by the UK High Court); and (3) submitted hundreds of notices where the asserted photograph was different from the accused photograph.

### (1)  The Bulk of Shein's DMCA Notices Likely Include False Ownership Claims

Based on a recent sampling, unrebutted by Shein, the bulk of Shein's DMCA notices (tens of thousands) are likely based on photographs that were provided to Shein by *third-party* suppliers. Supp. Ji Decl. ¶ 49. Shein all but concedes it does not own the copyrights (and only has the right to *use* the works) for many of its takedowns. Opp. at 7, 22. Absent from Shein's opposition is any attempt to

defend or explain its verification process and the basis for false under penalty of perjury ownership testimony. Rather, Shein's response is as brazen as it is threatening to the very foundation of the DMCA: so long as Shein parrots the language of the DMCA in its notices and pretends it "subjectively" believes the claims to be true (forget all the evidence to the contrary staring in its face), it can continue to troll Temu with false DMCA notices and no injunction should issue to stop this.

To start, around 65% of Shein's DMCA notices (with false under penalty of perjury claims) come from its in-house counsel Ms. Gwen Zhang. Supp. Ji Decl. ¶ 51. Yet, oddly Ms. Zhang is not the declarant here. Shein relies solely on Tim Wei, who signed *only one* DMCA takedown letter among the tens of thousands of notices to Temu, to make sweeping claims on Shein's lack of knowledge of falsities. *Id.* at ¶ 52. Notably, however, Mr. Wei claims that each of the merchant declarants was subject to "a version of a supplier agreement" that merely provides that Shein "has the right to *use* the product pictures provided." Wei Decl. ¶ 18 (emphasis added). That fails to support Shein's false claim in its DMCA notices against these sellers that Shein is the "owner." As in-house counsel "familiar with the use and protection of Roadget's copyrighted images and designs" (Wei Decl. at ¶ 3), Mr. Wei surely understands the difference between the right to *use* someone's images and affirmatively asserting IP *ownership* to demand removal. Ms. Zhang, although absent in this proceeding, has continued to sign, under penalty of perjury, numerous DMCA notices claiming Shein is the owner even *after* Shein was told by the UK High Court its claims of ownership were unsupported. Supp. Ji Decl. ¶ 51.

Indeed, the agreements Shein has relied on through Mr. Wei's declaration, *see* Wei Decl. ¶¶ 6-7, 18, do not transfer IP rights to Shein; they either (1) provide Shein with *non-exclusive right to use* (an OEM Agreement ("OEM") (Wei Decl., Ex. 1), or (2) do not guarantee that the supplier actually owns the copyrights in the photos (2022 ODM Agreement ("ODM") (Compl., Ex. A). The OEM, which Mr. Wei claims each of the merchant declarants "signed a version of" (but fails to attach proof), only provides Shein with a non-exclusive right to *use* the images; it does not transfer IP title and cannot

support *ownership* claims. *Id.* at ¶ 18. This confirms Shein made false under penalty of perjury ownership claims for Merchants 7b and 10. Supp. Ji Decl. ¶ 53.[7] Although the 2022 ODM purports to contain an IP transfer clause, Mr. Wei concedes that none of the merchant-declarants are subject to the 2022 ODM. Wei Decl. ¶ 18. Further, it does not contain representations and warranties that the supplier *owns the title* to the copyrights in the photos; the supplier thus does not own and cannot transfer the title to Shein. Naydonov Decl. ¶ 10. The web of boilerplate agreements fails to support the under penalty of perjury claims that Shein is the owner (or exclusive licensee for that matter).

Further, Shein knows that the suppliers may not own the copyrights in the photographs (e.g., because the copyrights belong to the photographers who took the photos). Approved UK Judgment, [23], [25] (referencing Shein's lack of investigation of chain-of-title for photographs; it would be "excessively onerous" based on number of potential parties involved). Both parties' Chinese law experts agreed in the UK proceeding that, unless there is a formal written copyright transfer between the photographer and supplier—something Shein does not check—the copyright resides with the photographer. Naydonov Decl. ¶ 6. Accordingly, suppliers may have no copyrights to transfer to Shein. Further, when suppliers upload photographs to Shein's system, they have an option to upload third-party content, including Internet images. Ying Decl. § 11.d. Shein thus has actual knowledge that suppliers are uploading photographs owned by others, including likely infringements from the Internet. Moreover, unrebutted by Shein is Temu's sampling of Shein's DMCA notices revealing that 60% of the URLs were found on other platforms such as Amazon. Ji Decl. ¶ 24. It is unclear whether these images (i) are in the public domain, (ii) belong to others, or (iii) Shein only selectively targets Temu. *Id.* at ¶ 46.

---

[7] Similarly, a 2022 version of an OEM (asserted against Shein in another Section 512(f) case by a supplier), also does not include an IP transfer. Naydonov Decl. ¶ 8, Ex. 3. Both OEM agreements provide that any permission granted to Shein to use the photos terminates with the agreement. *Id.*

Shein may not remain willfully blind to its systematic lack of copyright ownership underlying its DMCA war against Temu. The decision in *Alper Automotive, Inc. v. Day to Day Imports, Inc.* is on point. 2022 U.S. App. LEXIS 22808 (11th Cir. Aug. 17, 2022). There, the Eleventh Circuit affirmed the district court's findings of material misrepresentation in DMCA notices and willful blindness where the notice sender relied solely on the warranty in the sender's agreement with a designer. *Id.* at *11. The defendant, like Shein, chose not to look behind the warranty and investigate despite "acute notice that there was a problem with its copyright infringement claim." *Id.* at *6. "Defendant's decision to not pursue information that would have helped confirm whether Plaintiff was infringing on a protected copyright constituted willful blindness." *Id.* As with Shein, there was an anticompetitive incentive not to investigate because filing notices was less expensive and quicker than filing a legitimate suit for infringement; it "was using the DMCA Takedown Notices to suppress a market competitor rather than to enforce a legitimate good faith claim of copyright infringement."[8] *Id.*

### (2) Numerous Real-Life Examples of False Notices Resulting from Shein's Actual Knowledge and Willful Blindness Plague Its Entire DMCA System

The above flaws are far from hypothetical scenarios. For merchants who submitted declarations, Shein failed to show it owns *any* of the images underscoring (1) the baseless foundation of its ownership claims; and (2) its deliberate decision to remain willfully blind to pervasive flaws with its ownership claims in the face of mounting concrete examples and red flags.

- **Merchant 7b**: Shein does not dispute that (1) this Merchant owns the copyright; and that (2) Shein issued a false takedown notice claiming ownership. Shein provides no grounds for its own false claim of ownership, under penalty of perjury. Although Shein claims it had obtained photos under a supplier agreement, it concedes the agreement only provides Shein with the rights to *use* the photos, not copyright ownership. Therefore, Shein lacked grounds to demand a takedown of Merchant 7b's photos.
- **Merchant 10**: Shein, again, fails to justify its false ownership testimony under penalty of perjury in its DMCA notice. Shein has not rebutted that Merchant 10 commissioned the images and thus believes Merchant 10 owns the copyrights. Shein, again, had no grounds to issue this notice.

---

[8] Shein argues that a "[c]opyright registration is not a requirement to send a DMCA takedown notice" Opp. at 30. Nowhere did Temu say it is, or that is the only available proof of ownership.

- **Merchant 3**: Shein fails to rebut that this Merchant owns the photographs. Shein claims a supplier agreement provided it with the right to use the photos. But Merchant 3 attested that it had not transacted with Shein and, therefore, could not be subject to any agreement. Tellingly, Shein does not identify which supplier it purportedly obtained the permissions from and does not attach the agreement with the alleged permission. This underscores the flaws in Shein's ownership claims.

- **Merchant 4**: Shein fails to rebut that this Merchant owns the photographs. The merchant attested under oath that it discontinued its business relationship with Shein before taking the photo. On August 10, 2023, when Merchant 4 commissioned the photos shown in its declaration, it had already stopped supplying products to Shein. ECF 55-19 at 4. As these photos were not commissioned until *after* the Merchant's business relationship with Shein ended (*see* ECF 55-28), Shein did not have the rights to use them (and there is no evidence to the contrary). This is another example of Shein's flaws in asserting rights (even the right to *use*).

- **Merchant 13**: Shein once again does not dispute the Merchant's ownership but relies on the existence of some supplier agreement to conclude summarily that it had the rights to use the photos. Shein fails to attach any proof or identify who specifically it got the permission from— another confirmation of its flawed and unsupported claims to the images.

Shein tries to poke holes in the merchants' chain of title and the documents provided to support their rights (nit-picking at sufficiency of copyright transfer and WeChat records). That is ironic as Shein fails to check chain of title altogether and relies on agreements that confer no copyright ownership to then claim ownership under oath in its DMCA notices. Given Shein's pattern of merchant suppression, these merchant declarations and additional witness statements detailed in Yi Ying's declaration are strong evidence of Shein's knowing misrepresentations and willful blindness. *See Disney Enters.*, 2013 U.S. Dist. LEXIS 172339, at *49, 156 (although plaintiff showed that out of 400,000 takedowns it sent less than 1% allegedly included misrepresentations and claimed those should be excused as mistakes, court held "there was evidence in the record to suggest that [plaintiff] intentionally targeted files it knew it had no right to remove").

Temu has made repeated good-faith requests that Shein substantiate its rights, but Shein has repeatedly refused and has continued to send more DMCA notices. Mot. at 5; Ji Decl. ¶¶ 34-41; Compl. ¶ 44. Shein's refusal to substantiate its ownership claims supports actual knowledge. *Design Furnishings*, 2010 WL 5418893, at *5-6 (failure to produce proof of IP rights despite plaintiff's requests in response to takedown notices supports finding defendant knew it did not have rights).

Shein also remained willfully blind after it was sued in a separate case in California by a supplier over multiple false DMCA notices. *See Foshan*, Case No. 3:23-cv-06557-MRA-RAO. The supplier Foshan entered into a 2022 OEM with Shein that had no IP transfer clause. Naydonov Decl., Ex. 3. Foshan commissioned photographs of undergarments and used them for listings on Shein, *see Foshan*, ECF No. 21, First Amended Complaint, ¶¶ 13 and 14. Shein and Foshan then ended the relationship, and Foshan listed the same products and pictures on Temu. *Id.* at ¶¶ 16, 19. Shein sent multiple false notices to Temu. *Id.* at ¶¶ 20-23. Ostensibly, Shein checked whether Foshan had a prior agreement with Shein but (1) the agreement provided for no IP transfer; (2) Foshan owned the pictures or retained a license to use them, and Shein had no ownership in the pictures, contrary to its false notices; and (3) Shein's right to use terminated with the agreement.

Shein has also sent hundreds of notices falsely accusing images of infringement when they were not substantially similar to (and in fact, different from) the asserted works. *See Prunte v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 22 (D.D.C. 2010) (citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002)). To wit, Shein sent 448 DMCA notices linking to hair clips, a mesh dress, and a nail kit as infringing when the "copyrighted work" was an image of a bag. Mot. at 10-11, 22; Ji. Decl. ¶¶ 21-22, 26-27, Exs. D, E, and G. The DMCA required Shein to compare, side-by-side, the "copyrighted work claimed to have been infringed" with the "material that is claimed to be infringing" in each DMCA notices. 17 U.S.C. § 512(C)(3)(A)(ii), (iii). Shein also sent 560 DMCA notices linked to various products (e.g., women's robes and men's denim shorts) based on a URL on Shein's website linking to a child's swimsuit. Ji Decl. ¶¶ 26-27. Shein thus knowingly misrepresented its copyright infringement claims by trying to remove content that did not violate any purported rights. *See, e.g., Rosen vs. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1223 (incorrect descriptions may be knowing material misrepresentation where DMCA notices showed Daisy Fuentes when subject of photos was Amy

Weber); *Perfmvaybelayouix v. Graham-Drake,* Civil Action No. 22-1019 (CKK), 2022 U.S. Dist. LEXIS 216913, at *30 (D.D.C. Dec. 1, 2022) (dismissing copyright claim for lack of substantial similarity).

### (3) The UK High Court Prohibited Shein from Sending DMCA-like Notices for Supplier Photographs Without Proof of Copyright Chain of Title

Like here, Shein argued to the UK High Court that it should be allowed, systematically, to skip investigating chain of title when sending takedowns. Approved UK Judgment, [23]. The UK High Court rejected this position and instituted a procedure similar to the injunction Temu seeks here, requiring Shein to submit, "verified by a statement of truth" for "supplier and agency photographs," "material demonstrating (i) the author of the Photograph, (ii) the first owner of copyright in the Photograph, and (iii) the chain of title between this first owner of copyright in the Photograph and the First Claimant." UK Order at 4, ¶ 6.e. Shein's attempts to distinguish the UK ruling are unavailing. The procedural posture of that case may be different, but the key fact remains: the court found Shein's takedown process was flawed and required it to provide proof of copyright ownership.

Temu relied on examples of seven noticed photographs where Shein could not show ownership of the copyrights, and the UK High Court agreed that Shein failed to offer "concrete evidence that [Shein owns or has] exclusive licenses to the copyright in relation to the seven examples." Approved UK Judgment, [24]. Out of these seven sets of photographs, five were also included in DMCA notices to Temu's US site, providing further examples of Shein's misrepresentations. Supp. Ji Decl. ¶ 23.

Shein effectively has conceded that it cannot prove ownership in its takedown notices because it stopped sending UK notices based on supplier photographs after the UK ruling. *Id.* at ¶ 24. But Shein has increased the rate at which it sends DMCA notices by 2.5 times. *Id.* at ¶ 27. Shein's conduct after the UK order also confirms that the limited injunction will work here. Shein will need to follow the law and send only legitimate notices. Shein's 67% drop in UK notices raises serious questions on whether prior ones were based on unsupported ownership claims. *Id.* at ¶ 25.

**D. Section 512(f), Not Counter-Notices, Provides Legal Recourse for DMCA Abuses**

Shein is wrong that a counter-notice is the appropriate check on DMCA abuses. Section 512(g)(3) allows for counter-notifications by the "subscriber" whose material was taken down (i.e., an accused merchant) to the service provider (Temu); it provides no legal recourse. Section 512(f) provides victims of DMCA misuse—including ISPs explicitly—with legal recourse unavailable through a counter-notice. *See Rossi v. Motion Picture Assn. of Am., Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2016) (quoting SEN. REP. NO. 105-190 at 21 (1998)). A counter-notice is not required to bring a Section 512(f) claim. Nor are counter-notices equipped to deal with large-scale abuses against a platform.

Shein is also wrong that a merchant "does not even have to interact with SHEIN in connection with the counter-notice." Opp. at 20 n.6. Counter-notices require the content poster to provide their name, address, phone number, signature, and *agreement to be sued* by Shein in the United States. *See* 17 U.S.C. § 512(g)(3)(D). For merchants terrified of having their identities revealed and facing Shein's wrath, this option is a non-starter. *See* Mark A. Lemley, *Rationalizing Internet Safe Harbors*, 6 J. OF TELECOMM. AND HIGH TECH. L. 101, 114-115 (2007) (citing Jennifer Urban and Laura Quilter, "Efficient Process or Chilling Effects? Takedown Notices Under Section 512 of the Digital Millenium Copyright Act.") ("Indeed, a recent study of DMCA takedowns found that 30% of them were legally dubious at best. While the law is even-handed and provides for a mechanism for posters to get their content put back, many posters are legally unsophisticated and don't know that they have this right or how to exercise it. Indeed, Urban and Quilter find that very few people avail themselves of this mechanism. Notice and takedown therefore rewards overzealous copyright owners who use the DMCA mechanism to rid the Web even of legitimate content, secure in the expectation that ISPs will

take everything down rather than risk their eligibility for the safe harbor.").[9]

Further, the counter-notification timeframe for restoring the content—14 business days—is far too slow to provide any meaningful relief in the ultra-fast fashion industry, where designs are more fleeting than traditional fashion. Shein's false DMCA notices have already caused massive losses for the merchants. *See* Merchant 10 Decl.; Supp. Merchant 3 Decl.; Ying Decl. § 12. The loss of time from disabled listings is compounded by the loss of the popular product listing links, positive reviews, and prominent rankings in the Temu marketplace. *Id.* Even in cases where the product is relisted, it struggles because the marketplace algorithms reset the product's popularity and ranking due to its long absence. *Id.*; *Design Furnishings,* 2010 WL 5418893 at *7, 23 (preliminary injunction under Section 512(f) granted; court not persuaded that "the plaintiff would not be irreparably harmed because eBay permits counter-notice that would restore a listing"; "Even if plaintiff files counter-notices to every notice submitted by defendant throughout the course of this action, plaintiff would likely have listings terminated, at least temporarily, and experience a decrease in policy violation ratings, temporary restrictions on selling, suspension of an account, or termination of an account.").

### E.  Absent an Injunction, Temu Will Continue to Suffer Irreparable Harm

*First,* contrary to Shein's claims, Temu did not delay. Temu initially had no reason to believe that Shein was a bad DMCA actor; a young platform just starting out, it worked on processing Shein's blizzard of notices as fast as it could. Compl., ¶ 99. Shein flooded Temu with thousands of DMCA notices and then sued Temu in December 2022 accusing Temu of infringing its copyrights and being too slow in addressing its DMCA notices. Supp. Ji. Decl. ¶ 39. In the Summer-Fall 2023, Temu

---

[9] Daphne Keller and Annemarie Bridy, *DMCA Counter-Notice: Does it Work to Correct Erroneous Takedowns?*, Stanford Law School The Center for Internet and Society (Jan. 17, 2017)(available counter-notice data shows only a tiny percentage of takedown notices are subject to a counter-notice (e.g., 0.11% of takedowns on Twitter restored through counter-notices and 0.08% on Tumblr); this is dwarfed by percent of dubious takedown notices.)

discovered the copyright registrations Shein had accused Temu of infringing contained falsities. *Id.* at ¶¶ 44-45, 49. This revelation came alongside complaints from sellers over false takedowns and mounting suspicions (both in the US and the UK) that Shein's DMCA campaign was a sham. Shein voluntarily dropped its lawsuit against Temu in October 2023, but the DMCA campaign continued. *Id.* at ¶ 47. In November 2023, Temu began asking Shein for proof of its authority to issue DMCA takedowns. *See* Mot. at 13; Supp. Ji Decl. ¶ 29. After Shein refused to provide proof, Temu had no choice but to seek relief from continued abuses. *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d, 224, 245 (D.D.C. 2014) (no delay where "the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was sleeping on its rights").[10]

*Second*, the harm from false notices is irreparable, not purely monetary, and no adequate remedy at law exists. Stopping Shein's avalanche of DMCA abuses is a matter of *survival* (or at the very least prevention of severe, irreversible injury) to the ultra-fast fashion segment of the Temu platform during the critical stage of the platform's initial growth. In just one year, despite its overall successful performance and growth, Temu's ultra-fast-fashion segment share within its overall business has experienced a significant decline from over 40% share down to under 30% (shrinking by 25%). Supp. Ji Decl. ¶ 10. Similarly, in the first quarter of 2024, the number of new ultra-fast-fashion sellers has decreased by almost 30% compared to the previous year, with no such decline in other segments. *Id.* At this pace, Shein's conduct threatens the very existence of the segment. *Id.* at ¶ 11. Monetary damages cannot rewind time and make up for lost market share. *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 104 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ("damage to [plaintiff's] reputation that will likely result from a slowdown during the upcoming busy season is irreparable"); *Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35, 38 (2nd Cir. 1995) (injunctive relief to prevent

---

[10] The cases relied on by Shein are distinguishable because plaintiffs there had clear and unequivocal notice of the harms they sought to enjoin, and yet waited months to seek injunctive relief.

loss of prospective goodwill, which is non-quantifiable, because "the tastes of children being fleeting," plaintiff would "lose an opportunity to become a major publisher of children's books" and "attract additional authors and owners of [children's] characters").

Moreover, injury to and loss of market share in the ultra-fast-fashion segment inflicts serious harms on other categories of the Temu business. About 97% of purchasers who placed their first order for ultra-fast-fashion products continued on to buy other products, and 90% bought products in other categories. Supp. Ji Decl. ¶ 13. This shows the pivotal importance of the ultra-fast-fashion segment. The loss of ultra-fast-fashion listings leads to cascading losses of customers in other product categories, as well as diminishes the platform's overall appeal. Such harms are irreparable as they are also not quantifiable. *Doherty*, 60 F.3d at 38 (loss of offering that "increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify . . .. In such cases, injunctive relief is appropriate."; "Where the loss of a product will cause . . . indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction is proper"); *Amaretto*, 2010 WL 5387774 at *2 (granting preliminary injunction; "Plaintiff has at least raised serious questions going to the merits of its section 512(f) claim"; finding irreparable harm because "this is a prime buying season, and if its product disappears (or if its marketability is dramatically affected) it will likely permanently lose prospective customers").

*Third*, a cumulative, reputational harm to Temu's business flows from Shein's continuous false attacks on its merchants, who form the fabric of Temu's critical business relationships. Most of Shein's DMCA notices affect "hot-sale" product listings (i.e., listings that are exceptionally popular) or listings with lower prices. Ji Decl. ¶ 11; *see also* Ying Decl. ¶ 10.d.iii. Shein's targeting of its DMCA notices to key sales by Temu merchants cripple merchants whose best sellers are taken down. Ji Decl. ¶ 13. This

has already resulted in serious disruption of the merchants' businesses and damaged relationships in their communities and with upstream and downstream suppliers, s*ee, e.g.*, Ying Decl. § 12; Merchant 7b Decl.; Supp. Merchant 13 Decl.; Merchant 14 Decl. Shein also targets only Temu listings, while leaving listings with identical images untouched on other third-party platforms. Ji Decl. ¶¶ 24, 46; *see also* Ying Decl. ¶ 12.e. Temu's merchants have complained to Temu, highlighting the tension Shein has intentionally sought to foster between Temu and its merchants. Ji Decl. ¶¶ 19, 45, 47. It is easy to see that merchants would choose to leave the Temu platform rather than be caught in Shein's crosshairs. *Id.* at ¶ 53. Courts routinely hold that such losses of goodwill, customer confidence, and likely future losses of business opportunities are irreparable. *See Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (plaintiff would suffer "two basic irreparable injuries in the absence of an injunction: injury to its reputation, and the consequential damages resulting from [plaintiff's] inability to compete effectively"); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001) ("plaintiff [] persuaded the court that it would likely suffer irreparable harm in the loss of its customers and by the possibly permanently damaged relationships with its customers"); *Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 54 (D.D.C. 2013) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)) (negative impact on negotiating future advertising deals not quantifiable; no need to show at preliminary injunction stage any specific lost contracts).

### F. The Balance of Equities and Public Interest Warrant an Injunction

The balance of equities strongly tips in Temu's favor. Shein argues that "Temu ignores that the public interest is served by SHEIN's protection of its own copyrights." Opp. at 28. The issue, however, is that Shein *admittedly is not enforcing "its own" copyrights*; it asserts copyrights it does not own. The injunction would not prevent it from enforcing its own IP; it will only prevent it from sending false notices. *Alper*, 2022 U.S. App. LEXIS 22808, at * 7 (defendant "was using the DMCA Takedown Notices to suppress a market competitor rather than to enforce a legitimate good faith claim of

copyright infringement"). Moreover, the public has an interest in ensuring the DMCA is not abused and having access to competing product listings sold at lower prices on Temu. *See Design Furnishings*, 2010 WL 4321568, at *8 (granting 512(f) injunction; "the public interest is in fact benefitted by granting a TRO, because absent eBay's policies, designed to avoid eBay's liability for intellectual property infringement, it would be the claimed copyright holder who would bear the burden of proving the copyright infringement"; to "withhold a TRO would allow anyone to effectively shut down a competitor's business on eBay by simply filing the notice that the seller's product allegedly infringes"). Further still, the public has an interest in stopping the irreparable harm to thousands of suppliers. *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016) ("any alleged harm to third parties is properly addressed under the public interest prong of the injunctive relief calculus").

### G. The Narrow Injunction Would Require Little to No Court Oversight

The requested relief is not a "mystery," nor will it require "an extraordinary level of micromanagement for this Court." Opp. at 30. The narrow injunction does not require Court administration or continuous review of proof. *See* Mot. at 32-33.[11] Indeed, since the UK order, the UK High Court has not had to oversee or "micromanage" its order, and Shein—presumably under the threat of court sanctions—ceased sending unsupported notices. It will allow Temu to identify takedown requests with valid ownership proof, deter further false notices from Shein, and stop the irreparable harm. The only burden, if any, on Shein is a clerical one—the *act of tendering* its proofs to Temu with its DMCA notice, proof it must have *before* sending each notice. Shein cannot articulate what harm it would suffer from the very requirements it imposes on those using its own IP portal. This is because no harm exists from complying with the law.

---

[11] Shein cites *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1363 n.4 (3d Cir. 1996), but plaintiff asked the court to compel the defendant to do business with it. The court held "it would be beyond the expertise of any court to determine whether or not defendant was complying with the injunction"; "defendant's refusal to license could be the result of sound business judgment."

Date:  April 9, 2024

Respectfully submitted,

*/s/ Anna Naydonov*
Anna Naydonov (D.C. Bar No. 980910)
J. Mark Gidley (D.C. Bar No. 417280)
Michael J. Songer (D.C. Bar No. 453727)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 637-6197
Fax: (202) 639-9355
anna.naydonov@whitecase.com
mgidley@whitecase.com
michael.songer@whitecase.com

Jack E. Pace III (*pro hac vice*)
Michael Hamburger (*pro hac vice*)
Holly Tao (*pro hac vice*)
Rosie Norwood-Kelly (D.C. Bar No. 1780519)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8520
Fax: (212) 354-8113
jpace@whitecase.com
michael.hamburger@whitecase.com
holly.tao@whitecase.com
rosie.norwood-kelly@whitecase.com

*Counsel for Plaintiff WhaleCo Inc.*

26