**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WHALECO INC., | |
|  *Plaintiff,* | |
|  v. | Civil Action No. 23-3706 (TJK) |
| SHEIN TECHNOLOGY LLC et al., | |
|  *Defendants.* | |

## <u>MEMORANDUM OPINION & ORDER</u>

The parties in this case are competing online marketplaces that offer "ultra-fast fashion" products for sale, most of which are manufactured by third-party suppliers in China. And to hear the other one tell it, each are abusing American intellectual property law as part of the way they operate their businesses. Plaintiff, which does business under the name "Temu," says that since it entered the American market almost two years ago, Defendants, whom the parties refer to collectively as "Shein," have engaged in an unlawful, multifaceted campaign to interfere with its growth and competitive posture, including by abusing the American intellectual property protection regime. Temu moves for a preliminary injunction on one sliver of its claims in this litigation: that Shein is abusing the Digital Millennium Copyright Act by submitting to Temu meritless takedown notices that allege, without the required good-faith basis, that photographs of products for sale on Temu's site are infringing copyrighted material. As a result, Temu says, it continues to lose sales and prospective customers, as well as goodwill among the sellers on its site. For the reasons explained below, however, the Court finds that Temu has not shown that preliminary injunctive relief is warranted.

## I.    Background

### A.    Legal Background

The Digital Millennium Copyright Act ("DMCA") sought to "preserve copyright enforcement on the Internet" while also providing immunity from copyright infringement liability to internet service providers for "passive" actions on its platform "without the knowledge of the service provider." *In re Verizon Internet Servs., Inc.*, 240 F. Supp. 2d 24, 36 (D.D.C. 2003) (citation omitted), *rev'd on other grounds, Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003).  As part of that balancing act, the DMCA creates a "notice and takedown" procedure through which a copyright owner or someone authorized to act on their behalf may notify a service provider of infringing activity and request its removal.  17 U.S.C. § 512(c).  Notices must include, among other things, an identification of the infringed and infringing works (and enough information to locate them) as well as statements that the complaining party has a good-faith belief that use of the material is unauthorized and, under penalty of perjury, that the information in the notice is accurate and the complaining party is authorized to act on behalf of the copyright owner.  *Id.* § 512(c)(3).  Notices do not, however, need to include the basis for that belief.  *See id.* § 512(c)(3)(A)(v).  Once notified, the service provider can take advantage of this DMCA safe harbor by "expeditiously" removing or disabling access to the material.  *Id.* § 512(c)(1)(a)(iii).

At that point, the service provider must notify whoever posted the material if the service provider wishes to fully insulate itself from liability.  17 U.S.C. § 512(g)(1), (2).  If that person believes the material was removed in error, he or she may try to restore the content by submitting a counter notice.  *Id.* § 512(g)(2)(B), (g)(3).  A counter notice must include, among other things, "[a] statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed

or disabled." *Id.* § 512(g)(3)(C). Once a counter notice is received, the purported copyright owner has 14 days to sue the alleged infringer; otherwise, the service provider must reenable the material to maintain its liability shield. *Id.* § 512(g)(2)(C).

Section 512(f) is a counterweight against misuse of § 512(c). It provides for monetary liability against a party that submits a DMCA notice that contains knowing material misrepresentations—in particular, that the material or activity is infringing. 17 U.S.C. § 512(f)(1). A bad faith counter notice is also subject to liability under the same provision. *Id.* § 512(f)(2).

### B.    Factual Background

Temu and Shein are competing e-commerce marketplaces that offer "ultra-fast fashion" products sold largely by third-party vendors. In September 2022, Temu entered the American market and, soon after, began receiving an average of 170 DMCA takedown notices a day. ECF No. 55-1 ¶ 9. Most of those notices (about 63 percent) are sent by Shein. *Id.* For a sense of scale, Temu's U.S. site hosts over three million product listings displaying more than eighty million product images, with over 100,000 new product images uploaded to Temu each day. *Id.* ¶ 7. By the end of 2023, Shein had submitted around 33,000 DMCA takedown notices to Temu. *Id.* ¶ 10. Those notices assert that listing images on Temu's site are infringing copyrights either owned by Shein or someone who has authorized Shein to act on their behalf. *Id.* ¶ 14. Temu says that whenever it receives a takedown notice, it removes the affected listing, as required for Temu to take advantage of the DMCA safe harbor provision for service providers. *See id.* ¶ 45. Its third-party sellers rarely, if ever, respond with a counter notice to Shein if they believe their content has been wrongly removed. ECF No. 56-2 ¶ 16.

Temu claims that, over time, it has grown increasingly wary of the takedown notices it receives from Shein. Many notices are sent as unsearchable PDFs with unclickable and sometimes incorrect links, and they are often sent in large batches, making it difficult to respond promptly.

ECF No. 55-1 ¶¶ 25–31; *see also* ECF No. 62-1 ¶¶ 40–41.  Some notices are even substantively defective, identifying images on Temu's site that do not match the asserted photograph (or corresponding product) Shein claims has been infringed.  ECF No. 55-1 ¶¶ 20–22, 26–27.

In summer and fall 2023, in connection with other litigation between Temu and Shein, Temu discovered inaccuracies in Shein's copyright registrations as well as—based on a sample of takedown notices it had received from Shein—that Shein employees had taken the photographs in only about 3 percent of the sampled listings.  ECF No. 55-1 ¶¶ 15–16; *see also* ECF No. 62-1 ¶¶ 44–50.  Of course, without discovery, Temu makes no representations about whether Shein otherwise owned those particular images or was acting on behalf of the copyright owner.  But in November 2023, Temu began asking Shein to provide to Temu, along with each takedown notice, its authority to submit the notice, as well as the relevant copyright registrations for each of the asserted works or documentation of Shein's authority to act on behalf of the rights holder.  ECF No. 55-1 ¶¶ 34–35.  Shein declined to do so, saying it has "fully complied with the requirements of the [DMCA]" and is not required to provide copyright registrations or any of the other requested materials.  ECF No. 55-12 at 2; *see also* ECF No. 55-1 ¶ 36.

### C.    Procedural History

Temu sues Shein, accusing Shein of violating U.S. intellectual property and antitrust laws (and their District of Columbia counterparts) in a multi-faceted scheme to maintain dominance of the American ultra-fast-fashion market.  ECF No. 1 ¶¶ 225–365.  As relevant to this motion, Temu alleges that Shein's DMCA notifications sent under § 512 knowingly and materially misrepresent that Temu, directly or by and through its sellers, infringed Shein's copyrights.  *Id.* ¶ 227.  Specifically, Temu alleges that the notifications misrepresent the ownership of the copyrighted images asserted, Shein's status as an owner or licensee, and Shein's authorization to act on behalf of the

copyright owner. *Id.* ¶ 228. Temu seeks its attorneys' fees and damages under 17 U.S.C. § 512(f). *Id.* ¶ 231.

Not long after, Temu moved for a preliminary injunction to enjoin Shein from continuing what Temu says are its deliberate abuses of DMCA takedown procedures. ECF Nos. 28–29. Temu's proposed preliminary injunction would require that Shein provide proof that it owns the copyrighted material or is acting on behalf of the copyright's owner along with each takedown notice it submits to Temu while this suit is pending. ECF No. 55 at 37–38. Such proof is not normally required by the DMCA. *See* 17 U.S.C. § 512(c)(3). It also asks that Shein submit notices for no more than 100 images a day and that all notices include clickable, verified links. ECF No. 55 at 38.

Along with its motion for a preliminary injunction, Temu moved to seal certain materials accompanying that motion and to designate those materials as "outside attorneys' eyes only," thereby restricting Shein's outside counsel from sharing them with anyone at Shein. ECF No. 28. Those materials are declarations executed by five of Temu's third-party sellers in China who claim to own the rights to photographs that appeared on Shein's website without their permission and who requested that their specific information and identity not be disclosed to Shein, out of concern that Shein might retaliate against them. In two such cases, the sellers assert that photographs accompanying their products for sale on Temu's website were the subject of meritless DMCA takedown notices that caused the removal of those products from the site. ECF Nos. 55-20, 55-21. Temu also sought the same "outside attorneys' eyes only" designation for a declaration of an attorney it hired to interview these five third-party suppliers, as well as eight other suppliers in China who were unwilling to execute declarations, purportedly because they fear retaliation from Shein.

At the parties' request, the Court stayed briefing on Temu's motion for a preliminary injunction so that it could consider the sealing and designation issue. The Court denied without prejudice Temu's motion to seal and to designate materials "outside attorneys' eyes only," finding that Temu had not shown that "substantial and serious" harm would befall the sellers should the material at issue be disclosed to Shein. ECF No. 40 at 4–6. The Court also found that Shein's ability to respond to the preliminary injunction motion would be prejudiced if the Court granted Temu's request, which sought to designate "outside attorneys' eyes only" not only the names of suppliers but also any specifics of the allegations put forth by Temu—including the products and photographs at issue. *Id.* at 6–9.

But that was not the end of the matter. Temu renewed its motion to seal and to designate certain material as "outside attorney's eyes only," and pushed briefing on its preliminary injunction motion once again. ECF No. 47. Along with its renewed motion, Temu submitted six supplemental declarations from its merchant suppliers documenting in somewhat more specific and concrete terms the potential harm to them should their identities be disclosed to Shein and the public. It also proposed narrowed redactions that would allow Shein's outside counsel to share with their clients the specific photographs and links from Shein's website at issue, as well as the substance of the declarations, allowing Shein a reasonable opportunity to rebut the allegations that they did not own the copyrighted material (or were not acting on behalf of the owner) on those occasions. The Court ultimately granted Temu's motion.

The parties then completed briefing on Temu's motion for a preliminary injunction. Temu first waived any hearing but ultimately requested one as part of its reply briefing, and the Court heard oral argument. Defendants also moved to dismiss, and those motions to dismiss remain pending while the Court considers Temu's request for preliminary relief. ECF. Nos. 52–53.

6

## II.    Legal Standard

A preliminary injunction is an "extraordinary remedy" and is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. This Circuit's precedent suggests that these factors may be evaluated on a "sliding scale," and that "an unusually strong showing on one of the factors" may compensate for a subpar showing on another. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (cleaned up). But after *Winter*, the Circuit has suggested without deciding that a movant must independently establish both likelihood of success on the merits and irreparable harm. *See, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). Either way, "it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). And to make that showing, at the preliminary injunction stage, a plaintiff "may rely on evidence that is less complete than in a trial" but "bears the burden of producing credible evidence sufficient to demonstrate his entitlement to injunctive relief." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 166–67 (D.D.C. 2018) (cleaned up).[1]

---

[1] Along with its opposition to Temu's motion for a preliminary injunction, Shein filed evidentiary objections to the declarations of the third-party sellers and the attorney Temu had hired to interview them. ECF No. 57. Temu, in turn, filed its own evidentiary objections to declarations relied on by Shein. ECF No. 63. Throughout, the Court "accord[s] weight to evidence depending on the manner in which it was presented, whether a foundation for it was laid, and whether the

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). When a plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (*i.e.*, a mandatory injunction), some district courts in this Circuit have applied an even higher standard.[2] More recently, the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction, observing that the mandatory injunction has not yet been devised that could not be stated in prohibitory terms." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *but see Pantoja v. Martinez*, No. 21-cv-7118, 2022 WL 893017, at *1 (D.C. Cir. 2022) (per curiam) (characterizing injunction that would reinstate the plaintiff in his prior leadership roles as a "mandatory preliminary injunction . . . requir[ing] a higher standard than an ordinary preliminary injunction"). At any rate, the Court need not resolve whether that heightened standard applies here, because under either standard, Temu has not shown that preliminary injunctive relief is warranted.

## III. Analysis

Temu seeks a preliminary injunction requiring, among other things, that Shein provide proof it owns the copyrighted material or is acting on behalf of the copyright owner along with each takedown notice it submits to Temu while this suit is pending. ECF No. 29-1. The requested injunction is relatively narrow in scope. But even so, Temu must show that it will suffer irreparable harm absent that relief. And "[t]he standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). An injury

---

circumstances suggested its relevance and reliability." *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 313 n.29 (D.D.C. 2020).

[2] *See, e.g.*, *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases).

is irreparable if it cannot later be remedied by "compensatory or other corrective relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quotation omitted). A qualifying irreparable injury is "both certain and great," "actual and not theoretical," and has "such imminence that there is a clear and present need for equitable relief." *Id.* (quotations and emphasis omitted). Temu does not make the required showing.

Temu alleges a slate of irreparable harms arising out of the same scenario which, it says, happens time after time: Shein sends Temu a DMCA takedown notice, and Temu then removes the (purportedly) offending product image and listing. The most obvious potential effect is lost sales, which Temu, for good reason, does not rely on. It is "'well-settled that economic loss does not, in and of itself, constitute irreparable harm' because it is merely economic in character and not sufficiently grave enough to warrant emergency injunctive relief." *GEO Specialty Chems., Inc. v. Husisian*, 923 F. Supp. 2d 143, 148 (D.D.C. 2013) (quoting *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Rather, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674.[3] Temu does not try to make such a showing here.

Instead, Temu tries to shoehorn its economic loss into what it characterizes as at least potentially irreparable harms: to reputation and goodwill, seller and customer relations, ability to compete, and market share. See ECF No. 55 at 30–35. But however characterized, Temu comes up short.

---

[3] For the same reason, Temu's complaint that it devotes thousands of hours to responding to Shein's DMCA takedown notices does not constitute irreparable harm. ECF No. 55 at 18; *see Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." (quotation omitted)).

The Court begins with Temu's alleged reputational harm and damage to goodwill. "Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103–04 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) (concluding that harm caused by shipping slowdown to the plaintiff's reputation among customers expecting express delivery was irreparable). Because "[i]njury to reputation or goodwill is not easily measurable in monetary terms," it is typically "viewed as irreparable." *Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). Still, to satisfy this standard, "the plaintiff must make a showing that is concrete and corroborated, not merely speculative." *Atlas Air, Inc.*, 280 F. Supp. 3d at 104 (internal quotation marks and citation omitted).

Any reputational harm to Temu is speculative on this record. Temu says that when it removes images from its platform based on notices submitted by Shein it has received complaints from affected sellers. ECF No. 55 at 31; *see also* ECF No. 55-1 ¶¶ 19, 45. As evidence of this, it points to the seller declarations, two of which say images owned by the merchant itself were removed in response to meritless DMCA takedown notices from Shein. ECF Nos. 55-20, 55-21; *see also* ECF No. 55-26 § 10(c). One says it "found Shein's behavior really incredulous. Not only did it use our picture, but it also used our own picture to complain about our store. Its intent was to attack our Temu store and prevent us from doing business." ECF No. 55-21 at 1. And the other declarant is "very angry about such behaviors" because "[n]ot only did Shein use our images, but they also used them to file complaints against our store, resulting in substantial financial losses and disruption to our regular business operations." ECF No. 55-20 at 1. Other sellers on Temu's site have also received takedown notices from Shein, but there is no indication those sellers owned the copyright in those images. *See* ECF Nos. 55-27, 55-28. They too blame Shein for "harass[ing]" them with complaints. ECF No. 55-28 at 1. Absent, however, is any evidence that sellers

blame Temu, or would stop using Temu to sell their products as a result.  To the contrary, their ire appears directed at Shein.  Without anything from Temu suggesting that is the case, or that it is a problem more widespread than two of its many suppliers, the Court cannot say the harm is "certain and great" and "actual and not theoretical."[4]

The case law on which Temu relies does not bridge the gap.  In those cases, the courts found that the plaintiff's public image was likely to suffer a direct and substantial blow without injunctive relief—for example, by being branded as selling "imitation ham," *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (capitalization altered), or labeled a "Communist Chinese military company," which meant no one from the United States could purchase or

---

[4] Of course, any of the 33,000 takedown notices Temu has received from Shein could be false or defective.  Temu urges the Court to assume that some number greater than two of Shein's takedown notices are meritless.  But the Court declines that invitation to speculate as to whether Temu has shown irreparable harm.  True, one seller has sued Shein over false DMCA notices, but as of now those are only allegations.  *Foshan Liyan Undergarment Co., Ltd. v. Roadget Business Pte. Ltd.*, No. 23-cv-6557 (MRA/RAO) (C.D. Cal.).  Otherwise, Temu says that it is "[t]elling[]" that, after a court in the United Kingdom restricted Shein's ability to send infringement notices, Shein pivoted to sending DMCA notices in the United States rather than go through the process overseas.  ECF No. 62 at 10–11; *see also* ECF No. 62-1 ¶¶ 24–27.  But all that tells the Court is that Shein chose the simpler process here or that it reached the cap on notices it could send in the U.K. each day, not necessarily that it would be unable to satisfy the U.K. court's requirements.  And, apparently, five of the photographs that are the subject of that litigation were also included in DMCA takedown notices.  ECF No. 62-1 ¶ 23.  Finally, the Court notes that although the D.C. Circuit has suggested that courts should "assume" a likelihood of success on the merits in the irreparable harm analysis, it is "not at all clear" that this is so outside "the Establishment Clause context."  *See English v. Trump*, 279 F. Supp. 3d 307, 333 (D.D.C. 2018) (discussing *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303); *see also Republican Nat'l Comm. v. Pelosi*, No. 22-cv-659 (TJK), 2022 WL 1604670, at *4 n.4 (D.D.C. May 20, 2022).  And "[g]iven that the bar for irreparable injury is 'very high' and that Plaintiff bears the burden for establishing such injury with actual proof, the court will not make the assumption Plaintiff urges."  *See Nat'l Parks Consv. Ass'n v. U.S. Forest Serv.*, No. 15-cv-1582 (APM), 2016 WL 420470, at *10 (D.D.C. Jan. 22, 2016) (holding that plaintiffs had not established irreparable harm given that none of their proffered affidavits "establishes that the affiant will imminently experience the adverse environmental effects stemming from the [complained-of] mining operations"); *Biovail Corp. v. FDA*, 519 F. Supp. 2d 39, 48–49 (D.D.C. 2009) (denying preliminary injunction because, "absent evidence that the generic drug pending approval will actually cause harmful health effects, these allegations fail to meet the requisite standard").

otherwise possess its publicly traded securities, *Xiaomi Corp. v. U.S. Dep't of Def.*, No. 21-cv-280 (RC), 2021 WL 950144, at *1 (D.D.C. Mar. 12, 2021).[5]  In those cases, then, the defendant's conduct "could not fail to damage [plaintiff's] good name."  *Armour & Co.*, 304 F.2d at 406.  On the record here, similar harm to Temu is far from certain, given that there is no evidence that its public image is affected by Shein's takedown notices.  Even its reputation among the merchants on its website is not clearly impacted, because it is Shein, not Temu, requesting the images be removed.  And in any event, Temu has not shown that the overall effect of Shein's takedown notices on Temu's reputation with its merchants is anything like the reputational damage plaintiffs were poised to suffer in those cases.

This theory of irreparable harm—loss of goodwill and reputational harm—is a close cousin to Temu's other theories: that by interfering with its seller and customer relationships, Shein threatens to disrupt Temu's ability to compete in the marketplace and puts Temu's existing market share at risk.  ECF No. 55 at 32–34.  Here, though, Temu adds a twist.  It argues that Shein "wants suppliers to lose confidence in working with Temu just as Temu is experiencing critical growth and building brand recognition," threatening Temu's ability to compete in the ultra-fast-fashion market.  *Id.* at 33–34.  The Court addresses these other theories of irreparable harm below.

---

[5] *See also Patriot, Inc. v. U.S. Dept. of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("Plaintiffs' reputation will be damaged by HUD's characterization of them in the March 17 letter as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate planning.'").  Otherwise, Temu relies on case law suggesting that loss of customer trust can constitute irreparable harm.  *See Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77–78 (D.D.C. 2001) (reasoning that "[i]f clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill").  Again, however, nothing in the record suggests that Temu's customers or merchants fail to trust it because of Shein's takedown notices or that Temu's reputation has suffered in any way because of them.

Loss of competitive standing—*i.e.*, customers—or lost ability to compete in the market is usually not irreparable because it is an economic harm.  *See Clevinger v. Advocacy Holdings, Inc.*, No. 23-cv-1159 (JMC), No. 23-cv-1176 (JMC), 2023 WL 4560839, at *5 (D.D.C. July 15, 2023), *reconsidered in part by* 2023 WL 5220570 (D.D.C. Aug. 15, 2023).  Such economic loss may be irreparable if it is also unrecoverable, for example, "if the party seeking injunctive relief can establish that the economic loss cannot be calculated."  *Id.*  Otherwise, again, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."  *Wis. Gas Co.*, 758 F.2d at 674.  For that reason, courts more typically find lost "ability to compete" to be irreparable when the movant might miss out on competing for a particular contract or professional opportunity—something more than an economic or hard to quantify injury.  *See, e.g.*, *Giri v. Nat'l Bd. of Med. Exam'rs*, 718 F. Supp. 3d 30, 43–45(D.D.C. 2024) (finding irreparable harm because movant could not compete in medical residency "match" program).

Temu does not contend that its feared loss would be incalculable or that it would threaten the very existence of its overall business.  *See* ECF No. 55 at 32–33.  Instead, Temu seems to treat lost ability to compete in the marketplace as an irreparable harm akin to where there is some lost chance to compete for a specific opportunity.  Still, even assuming that this purported harm could be irreparable (if certain, great, and actual) because of Temu's representations that the ultra-fast-fashion supply chain in China relies on a narrow pool of qualified suppliers who are difficult to replace, such that the very existence of Temu's ultra-fast-fashion segment could be in jeopardy, Temu has not carried its burden to show such harm rises to the level necessary to support an injunction.  *See* ECF No. 55-1 ¶ 3; ECF No. 62-1 ¶ 9.  Any harm to Temu's relationship with its sellers is unsupported for the same reasons already noted.  And there is no evidence that sellers are

leaving Temu or even threatening to do so such that Temu's ability to compete may be so impacted that the existence of this segment of its business is in jeopardy.

The few statistics that Temu *does* rely on are telling, mostly in what they omit. At most, Temu relies on the *rate* new ultra-fast-fashion sellers are joining the platform which, it says, dropped 30% recently. ECF No. 62-1 ¶ 10. But a reduction in the rate that Temu adds new ultra-fast-fashion sellers to its platform might be expected over time given its representation that it "relies on a very narrow pool of qualified suppliers"—and Temu says nothing about the rate of sellers *leaving* the site. *Id.* ¶ 9. In fact, Temu's representations on this point are consistent with sellers continuing to join the site, although at a slower rate. *Id.* ¶ 10. This is not the stuff of irreparable harm. In addition, Temu's attempt to attribute that reduction to false DMCA takedown notices— let alone those received from Shein in particular—is speculative at best. Temu's U.S. site alone hosts over three million product listings displaying more than eighty million product images, with about 100,000 new product images uploaded to Temu each day. ECF No. 55-1 ¶ 7. Even if a significant percentage of the 170 takedown notices Temu receives each day from Shein are meritless, the vast majority of a seller's listings and photographs are unaffected.

Otherwise, Temu warns that "merchants would choose to leave the Temu platform rather than be caught in Shein's crosshairs," but provides no actual support for its premonition beyond that "[i]t is easy to see." ECF No. 62 at 30. Its attorney's declarations similarly suggest that sellers whose listings are affected by takedown notices may be "more likely" than others to leave Temu or reduce their presence on its site. ECF No. 62-1 ¶ 9; *see also* ECF No. 55-1 ¶ 47. But Temu's self-serving speculation does not make such harm "certain and great" and "actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quotation omitted). Some merchants suggest that Shein has made it difficult to work with Temu through what Temu characterizes as

underhanded business practices by Shein, such as "blacklist[ing]" or "intimidat[ing]" sellers who work with Temu or "organiz[ing] online trolls to attack [Temu] store[s] with negative reviews." *E.g.*, ECF No. 55-28 at 1; ECF No. 55-29 at 1.  But absent is any suggestion that sellers are less likely to work with Temu because of false DMCA takedown notices, the only conduct at issue in this motion.  And that absence is particularly glaring given the other evidence Temu has put before the Court about how sellers feel about Shein and Temu—eleven declarations from six merchants as well as another declaration from one of Temu's attorneys summarizing interviews with those and eight other sellers.  To the contrary, the seller declarations Temu has proffered show that, if anything, they have "g[iven] up on supplying products to Shein," not Temu.  *See, e.g.*, ECF No. 55-28 at 1 (capitalization altered).

    At bottom, then, Temu has not shown that so many of its sellers would leave the platform—or other sellers would be dissuaded from advertising their products there in the first place—so as to meaningfully threaten Temu's ability to compete in the ultra-fast-fashion market such that the existence of that segment of its business is threatened.[6]

    In support of its irreparable harm argument, Temu identifies several cases in which courts enjoined parties from submitting DMCA takedown notices.[7]  In all those cases, however, the movant was the party falsely accused of infringing the defendant's copyright, not the provider hosting

---

    [6] To the extent certain individual sellers choose to list their products on competitors' websites and skip Temu's platform altogether, Temu's lost revenue is compensable, and it does not argue otherwise.

    [7] *Design Furnishings, Inc. v. Zen Path, LLC*, No. 10-cv-2765 (WBS), 2010 WL 5418893 (E.D. Cal. Dec. 23, 2010); *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452 (S.D.N.Y. 2007); *Eileen Grays, LLC v. Remix Lighting, Inc.*, No. 18-cv-362 (MAD), 2019 WL 6609834, at *5 (N.D.N.Y. Dec. 5, 2019).  Temu also identifies a case in which the court temporarily enjoined a service provider from removing the plaintiff's products when it received DMCA takedown notices from the defendant.  *Amaretto Ranch Breedables v. Ozimals, Inc.*, No. 10-cv-5696 (CRB), 2010 WL 5387774 (N.D. Cal. Dec. 21, 2010).

the content.[8]  In *Design Furnishings*, for example, the plaintiff would lose 95 percent of its cus-

tomers and revenue if the defendant continued to submit takedown notices to eBay (the service

provider) for its product listings.  *Design Furnishings, Inc. v. Zen Path, LLC*, No. 10-cv-2765

(WBS), 2010 WL 5418893, at *6–7 (E.D. Cal. Dec. 23, 2010).  But there was no suggestion that

eBay, like Temu, would be irreparably harmed by the loss of a seller on its platform.  And Temu

cannot buoy its showing of irreparable harm based on harm to its third-party merchant suppliers.

*See Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to

third parties are not a basis to find irreparable harm.").[9]

What is left is Temu's theory that with fewer listings on its website, prospective *customers*

are less likely to choose to shop on Temu, endangering Temu's ability to compete in the ultra-fast-

fashion market at a critical time of growth in the American market.  Sometimes, "[t]he threatened

loss of prospective customers also constitutes irreparable harm."  *Design Furnishings*, 2010 WL

5418893, at *6–7.  The loss of customers, just as with loss of business, is still economic harm.

*Clevinger*, 2023 WL 4560839, at *5.  But "when it results from injury to a company's reputation,

ability to compete, or market share, [loss of customers] can, in theory, be an irreparable harm if

the party seeking injunctive relief can establish that the economic loss cannot be calculated or

---

[8] *Eileen Grays* is particularly inapt because there was no discussion of irreparable harm.  It was not a preliminary injunction, but a permanent one.  The defendant had defaulted, and the court was making a final determination on the merits of the complaint.  2019 WL 6609834, at *2, 5.

[9] The Court does not doubt that those sellers caught in the crossfire between Shein and Temu are the worse for it.  Sellers must "either do nothing about a wrongful takedown notice and swallow the losses, or, if it can, expend the money to retake the photos and relist its products as quickly as possible."  ECF No. 55-26 ¶ 12(f).  They could submit counter notices, but the original Temu product link would expire during the required 14-day waiting period.  *Id.*  And sales suffer for relisted products while they reaccumulate popularity and regain visibility on the platform.  *Id.* ¶ 12(g).  Some sellers are stuck, then, with excess inventory and may need to swallow hefty storage costs on top of lost sales.  *Id.* ¶ 12(h), (i).  But again, any harm to Temu itself is speculative.

threatens its ability to stay in business." *Id.* Even so, "[s]uch a claim cannot be conclusory—the moving party must provide factual support for its argument to obtain a preliminary injunction." *Id.*

No doubt, Temu may lose some prospective customers looking for a particular item no longer available on its website when it removes listings in response to Shein's takedown notices. Many products listed on Temu are available on other platforms, and customers may choose to shop with Temu's competitors, instead, and may be less likely to shop with Temu in the future. *See* ECF No. 62-1 ¶ 13. But Temu has not shown such harm cannot be compensated with an award of monetary damages should it ultimately prevail on its § 512(f) claim.

Temu argues that Shein's DMCA takedown notices threaten its place in the market.[10] But Temu has not shown that this threat is so severe that its ability to stay in the ultra-fast-fashion

---

[10] Temu does not argue that this loss of revenue would be incalculable. *See* ECF No. 55 at 30–35; ECF No. 62 at 27–30. To the contrary, "courts in this district have routinely recognized that the value associated with loss of customers can be distilled to monetary damages." *Clevinger*, 2023 WL 4560839, at *5 (collecting cases). And lost sales for products customers choose to purchase elsewhere are quantifiable. Unlike a company where a "customer list is the lifeblood of its business," *see Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001), Temu's "[c]lients, though not fungible in the traditional sense, are, nonetheless, the currency of commercial enterprise," and its interest in "preventing [defendant] from siphoning its future profits" is "eminently compensable"). Temu appears to possess significant data about its customers and the marketplace, which does not suggest that any lost customers or lost sales would be incalculable. In fact, it presents data about the percent of purchasers who place their first order for ultra-fast-fashion products on Temu that continue to buy other products from the same platform. ECF No. 62-1 ¶ 13. Finally, even to the extent some number of lost customers cannot be quantified, "the fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm, for the harm must also be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (internal quotation marks and citations omitted); *see also Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) ("The wiser formula

market is in jeopardy.[11]  When it filed its motion, Temu had been receiving takedown notices from

Shein for well over a year.  *See* ECF No. 55-1 ¶ 9.  And yet, it remains operating, with no evidence

of particular hardship, as discussed below.  Temu is an operating company incorporated under

WhaleCo Inc., which is a subsidiary of PDD Holdings, a multinational commerce company with

total revenue last year of almost $35 billion.[12]  *See Holiday CVS, LLC v. Holder*, 839 F. Supp. 2d

145, 169 (D.D.C. 2012) ("[C]ourts in this Circuit and elsewhere have found the economic status

of a plaintiff's parent corporation to be highly relevant when a plaintiff seeks to show irreparable

economic harm.") (collecting cases), *vacated and remanded on other grounds*, 493 F. App'x 108

(D.C. Cir. 2012).

Temu points out that over a recent period, there has been about a ten-percentage-point

reduction in the relative amount of product listings in its ultra-fast-fashion segment compared to

the rest of its business.  ECF No. 62-1 ¶ 10.  But again, what that statistic does not say is telling.

Perhaps Temu decided to scale back the millions of ultra-fast-fashion listings on its site, or some

other part of its business boomed, making the ultra-fast-fashion segment smaller by comparison.

---

requires that the economic harm be significant, even where it is irretrievable because a defendant
has sovereign immunity.").  As explained, Temu has not made that showing.

[11] Temu argues that injunctive relief is appropriate because, it says, Shein's DMCA
takedown notices threaten Temu's competitive standing and market position.  ECF No. 55 at 34.
But it bears emphasis: those are not, in and of themselves, irreparable harms.  *See ConverDyn v.
Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014) ("[L]oss of market share is simply economic harm by
another name, and thus a litigant must still demonstrate the considerable magnitude of loss required
in this Circuit to warrant preliminary injunctive relief." (internal quotation marks and citation omit-
ted)); *Air Transport Ass'n of Am.*, 840 F. Supp. 2d at 335 ("The loss of business opportunities,
market share, and customer goodwill are typically considered to be economic harms." (collecting
cases)); *Clevinger*, 2023 WL 4560839, at *5 ("Loss of business (or customers) is an economic
harm.").  Instead, Temu must establish that the economic loss cannot be calculated or threatens its
ability to stay in business, which it has not done.

[12] PDD Holdings Inc. Form 6-K, Exhibit 99.1 (Mar. 2024), *available at*
https://perma.cc/HNV2-DTK8.

Like its proffered metric on the rate at which new sellers continue to join its site, this figure does not rule out the possibility that the number of its product listings in the ultra-fast-fashion segment *increased* in absolute terms. In any event, attributing the trend it describes in its ultra-fast-fashion product listings to Shein's takedown notices is largely speculative, especially given that Temu has identified only a few examples of photographs subject to defective takedown notices. And to repeat, there is no evidence that Temu's market presence is so fragile that the potential financial impact from Shein's DMCA takedown notices could irreparably harm its overall business. *See Mylan Labs Ltd. v. U.S. Food & Drug Admin.*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (loss of $44.55 million was "not so severe as to cause extreme hardship to [Mylan's] business or threaten its very existence" given forecasted annual revenue of $7 billion (internal quotation marks and citation omitted)).

Temu's proffered case law does not advance its cause. In those cases, the court relied on something else beyond the pure economic harm of loss of customers to enter a preliminary injunction. For example, in *Design Furnishings*, as noted above, the movant faced the loss of virtually all its business. 2010 WL 5418893, at *6–7. Or in *Atlas Air*, the court found that the movant, an airline operating cargo and passenger flights for commercial customers, was likely to suffer irreparable injury in the absence of a preliminary injunction should there be a slowdown for express shipping during the busiest portion of the year. 280 F. Supp. 3d at 104. It reasoned, in part, that "because of the high cost of the initial integration of a transportation provider into a customer's supply chain, once a switch has been made, the customer is unlikely to return its business to Atlas, even if Atlas's reliability problems are resolved." *Id.* The situation here is quite different, because there is no evidence that customers who make purchases on Shein or any other competitor face similar barriers to shop with Temu.

19

For all the above reasons, Temu has not shown that any harm it may suffer is certain, great, actual and not theoretical, and cannot be later remediated with money damages, for which the DMCA expressly provides: "Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages" incurred "as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing."  17 U.S.C. § 512(f).  And "[t]he general rule is that injunctive relief will not issue when an adequate remedy at law exists."  *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 n.6 (D.C. Cir. 2006); *see Del., Dep't of Health and Soc. Servs., Div. of Medicaid & Med. Assistance v. U.S. Dep't of Health & Hum. Servs.*, 272 F. Supp. 3d 103, 114 (D.D.C. 2017) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.")).  So too here.[13]

---

[13] Temu also tries to carve out an exception to that general rule to enjoin the abuse of the legal process "[w]here a litigant acts in bad faith, or with a harassive purpose."  *Robertson v. Cartinhour*, No. 9-cv-1642 (ESH), 2010 WL 11541592, at *2–3 (D.D.C. Dec. 30, 2010) (citation omitted); *see* ECF No. 55 at 34–35.  Of course, "a court may employ injunctive remedies to protect the integrity of the courts and the orderly and expeditious administration of justice."  *Urban v. United Nations*, 768 F.2d 1497, 1500 (D.C. Cir. 1985).  But even then, an anti-suit injunction "should be imposed in only the most egregious cases."  *Robertson*, 2010 WL 11541592, at *2 (citation omitted).  But this is not a case of a litigant abusing the process before this Court, even if Temu alleges that Shein is exploiting the DMCA.

**IV.      Conclusion and Order**

For all the above reasons, it is hereby **ORDERED** that Temu's Motion for a Preliminary Injunction, ECF No. 29, is **DENIED**.  The Court intends to promptly address the pending motions to dismiss.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 9, 2025