## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WHALECO INC.,

    *Plaintiff*,

  v.

SHEIN TECHNOLOGY LLC et al.,

    *Defendants*.

Civil Action No. 23-3706 (TJK)

### <u>MEMORANDUM OPINION</u>

The parties in this case are online marketplaces that offer "ultra-fast fashion" products for sale. Temu, a newcomer to the market, accuses Shein of engaging in an intricate scheme to disrupt its business and slow its growth in the United States. Shein has mainly done so, Temu claims, by abusing American intellectual property law and foreclosing Temu's access to a limited pool of specialized Chinese suppliers necessary to compete in the market. Temu also says Shein stole valuable commercial and financial information and has begun mimicking aspects of Temu's platform that contribute to its popularity. To stop all that, Temu sued Shein and its subsidiary, Shein Technology LLC, for various claims under federal and District of Columbia law. Both Defendants move to dismiss, and Temu opposes. For the reason explained, the Court will dismiss Temu's claims for trade secret misappropriation, antitrust violations, tortious interference, and abuse of process, but it will permit its claims for violating the Digital Millenium Copyright Act, copyright and trade dress infringement, fraud on the U.S. Copyright Office, and unfair competition to proceed. The Court will, however, dismiss Shein's subsidiary as a defendant because Temu has attributed no conduct specifically to it.

## I.    Background

### A.    Factual Background

Temu and Shein are rival e-commerce marketplaces offering "ultra-fast fashion" products mostly sold by third-party suppliers based in China.[1]  Whereas fast-fashion companies like H&M and Zara offer new styles roughly every 100 days, Temu and Shein do so "effectively on a daily basis"—thus "ultra-fast" or "on-demand" fashion.  ECF No. 1 ("Compl.") ¶¶ 133–34, 137.  This nascent direct-to-consumer model offers highly expedited design-to-production times, ideal for those seeking a budget-friendly "quick refresh" of their wardrobe.  *Id.* ¶¶ 134, 137.  Temu and Shein both rely "on a highly tech-enabled supply chain" with "a limited pool of" about 10,000 "independent clothing makers that can create and deliver products on demand," *id.* ¶¶ 28, 135, and both permit suppliers to market and sell that day's apparel trend through their websites and mobile apps.  *See id.* ¶¶ 109, 139, 141, 219.

Temu alleges it entered the U.S. market in 2022, when Shein was by far the largest player with more than 75% of U.S. market share.  Compl. ¶¶ 24, 139.  Its entry, according to Temu, shook up the status quo.  After a little over a year, it had served about thirty million daily users and had "become a household name in American retail."  ¶¶ 137, 187–88.  Much of that quick customer growth Temu attributes to its playful shopping experience and unique marketing strategy.  *Id.* ¶¶ 173, 188.  Its "rewards-based customer acquisition" strategy invites users to play interactive

---

[1] The complaint lumps together Roadget Business Pte. Ltd. and Shein Technology LLC as "Shein" and directs its allegations at "Shein" or "Defendants."  ECF No. 1 ("Compl.") p.5.  Roadget is a private company organized under the laws of Singapore that owns and operates the website https://us.shein.com and the corresponding mobile application; it also owns Shein's trademarks and other assets.  *Id.* ¶¶ 26, 121.  Most of its employees and the bulk of its operations are in China.  *Id.* ¶ 123.  Shein Technology LLC is one of Roadget's indirect, wholly owned subsidiaries.  *Id.* ¶ 25.  The Court will refer to Roadget as "Shein" and to Shein Technology LLC as "Shein Technology."  In addition, the parties refer to Plaintiff WhaleCo Inc. as "Temu," so the Court will do so too.  *See* ECF No. 53-1 at 14; ECF No. 52-1 at 5; ECF No. 1 at 5.

games, which Temu has copyrighted, to accumulate rewards and discounts. *Id.* ¶¶ 178, 188. Its gamified website and mobile app, which feature "an alluring combination of Temu's signature orange color palette and graphic design elements . . . that evoke the whimsy of arcade games," keep customers engaged while they peruse the millions of product images displayed there. *Id.* ¶¶ 137, 178, 193. Indeed, "tens of millions of people" allegedly now use Temu's website and app "each day," and its sales have "skyrocket[ed]." *Id.* ¶¶ 199–200.

Threatened by Temu's rise, Shein allegedly "hatched a desperate plan" to disrupt Temu's operations and slow its growth in the United States. *Id.* ¶¶ 3, 5. That scheme, Temu says, runs the gamut from abusing the Digital Millenium Copyright Act ("DMCA"), copying Temu's intellectual property, stealing its confidential information, and tying up Chinese suppliers through exclusive-dealing agreements and intimidation, to filing dubious infringement lawsuits and defrauding the U.S. Copyright Office. *Id.* ¶ 5.

Soon after Temu entered the U.S. market, Shein allegedly began inundating it with thousands of DMCA takedown notices asserting that product images on Temu's site are infringing copyrights owned by Shein or someone who authorized Shein to act on its behalf. *Id.* ¶¶ 35, 37. Temu's U.S. site hosts over three million products, displays more than eighty million product images, and adds about 100,000 new images each day. *Id.* ¶ 37. Judged against that volume, Temu states, the number of takedown requests it receives each day—170 on average—is relatively small. *Id.* But most of them—63%—allegedly come from Shein. *Id.* To shield itself from liability, Temu must investigate and remove the affected listings, meaning Temu's sellers—who allegedly don't submit counter-notices in part because they fear Shein's retaliation—lose profits. *Id.* ¶¶ 35, 88, 95–96.

Yet according to Temu, Shein's DMCA campaign is a sham on many fronts. To begin,

Shein allegedly sends thousands of DMCA notices falsely claiming that it is the copyright owner or licensee of the images. Compl. ¶¶ 74–75. Shein also purports to act on behalf of its suppliers, even though it allegedly "knows that many of the[m] . . . do not own the copyrights in the images." *Id.* ¶ 76. In one instance, Temu recounts, Shein sent a DMCA notice to a Temu seller on behalf of a Shein supplier even though the Temu seller owned the copyright to the image, and Shein did not investigate whether it had the rights it asserted until *after* the seller sued Shein. *Id.* ¶ 78. That is no isolated instance, says Temu; many of its merchants have complained about such false notices. *Id.*

Shein allegedly also sends takedown notices for product images unrelated to the asserted copyrighted images. Compl. ¶ 80. For instance, Shein sent two DMCA notices accusing 700 product listings of infringing Shein's copyrighted images, 448 of which linked to an image of a shoulder bag posted by a Temu seller. *Id.* ¶ 81. But the links to Shein's website, purportedly showing the copyrighted works that the image infringed on, included everything from hairclips and jumpsuits to dresses and nail kits—just no shoulder bag. *See id.* On top of that, Temu alleges, Shein "then disabled many of the 448 links to unrelated products, destroying evidence and frustrating Temu's ability to confront Shein for its baseless accusations." *Id.* ¶ 82. Deploying a closely related tactic, Shein allegedly also sends troves of notices claiming copyright infringement where the only similarity between Temu's and Shein's listing is the underlying product—which is not copyrighted—while the images are entirely different. *Id.* ¶¶ 84, 86.

Worse still, according to Temu, Shein's notices often contain "broken and unusable Internet links" or non-searchable PDFs, making it difficult to review and process the requests. Compl. ¶¶ 90, 95. In spring 2023, Temu alleges, Shein sent takedown notices for nearly 20,000 product listings in an unclickable format, such that Temu employees had to manually type out each

character of each URL. *Id.* ¶ 95. And, Temu continues, Shein strategically sends many DMCA notices at once to delay Temu's response times and disrupt its business. *Id.* ¶¶ 96–97. Later, Shein took Temu to court for "infringing its copyrights and being too slow in addressing its DMCA notices." *Id.* ¶¶ 98–99. But when discovery revealed that "all thirty-five copyright registrations Shein asserted contained falsities and misrepresentations to the U.S. Copyright Office," Shein eventually dropped the suit. *Id.* ¶ 99 (emphasis removed). Still, according to the complaint, Shein is also behind five "proxy copyright litigations" that are allegedly designed to damage Temu's reputation and harm its relationships with sellers and copyright owners. *Id.* ¶¶ 100–01.

Temu says Shein did not stop there. Separate from its DMCA campaign, Shein is allegedly also taking—or, rather, copying—a page from Temu's customer acquisition playbook by replicating Temu's popular promotional games that "simultaneously serve to advertise [its] services, sales, or other offers." Compl. ¶ 175–76. Temu has registered at least four such games with the U.S. Copyright Office: "Lucky Flip," "Credit Giveaway," "Free Gift," and "Cash Rewards." *Id.* ¶ 176. Shein's platforms allegedly show promotional games "that are substantially similar if not identical to Temu's" and infringe Temu's copyrights "by copying [the] artistic elements, graphic stylization, color schemes, language, and other artistic expressions for the same types of promotions." *Id.* Temu alleges that Shein "regularly monitors Temu's platform" and "had access to [its] protected works," as these games "have been widely disseminated across the United States" via its shopping app and website. *Id.* ¶ 180. Shein also allegedly "hire[d] away" several of Temu's key marketing employees to "take advantage of their knowledge of Temu's successful marketing strategies"— including the "promotional activities" Temu found play well with its customers—and to "use that knowledge for [its] benefit." *Id.* ¶¶ 181, 183.

Shein allegedly took yet another "shortcut" by copying Temu's "arcade-style" "shopping

experience trade dress" that it uses across its website, mobile app, and advertising. Compl. ¶¶ 174, 186–87. Temu says the unique design of its customer experience—specifically, the "combination of 'gamified' aesthetic elements and prominent and consistent use of the color orange"—has become "integral" to its branding and has made its platform "instantly recognizable." *Id.* ¶¶ 187, 193, 197; *see also id.* ¶ 201. Temu has allegedly spent "hundreds of millions of dollars" on "aggressive[ly]" advertising and promoting its "playful," "social shopping experience," which is "highly effective in user engagement" and makes Temu "stand[] out" from other sellers. *Id.* ¶¶ 188–91; *see also id.* ¶ 197. In 2023, Temu also ran a "smash hit" Super Bowl advertisement that reached between 113-200 million viewers and was "replete with Temu's energetic orange coloring and game-like flashing graphics," reportedly causing Americans to flock to the app store and jump on Temu's marketplace. *Id.* ¶ 192. But following Temu's "meteoric rise," Shein allegedly "create[d] a copycat look and feel" shopping experience by using the same combination of features to "trade off of Temu's rapid success." *Id.* ¶ 203–04; *see* p. 70, T10.

There is still more, says Temu. Shein's allegedly unlawful conduct is also international in scope. Temu alleges that Shein devised an "anticompetitive scheme to block Temu's access" to the specialized suppliers it says are necessary to compete in the market. Compl. ¶ 130. In the past, Shein's supplier agreements allegedly permitted suppliers to "offer[] their styles to third parties." *Id.* ¶ 142. Yet Shein "gradually revised" those contracts. *Id.* ¶ 143. First, Temu states, Shein added an "IP clause" requiring "suppliers to grant free, twelve-month exclusive licenses to Shein for all product styles, images, and videos provided by the supplier," though that license became non-exclusive after twelve months. *Id.* ¶ 143. Then it "expanded the exclusivity requirements" even further. *Id.* ¶ 144. Suppliers are now "force[d]" to grant a "worldwide, irrevocable, and *exclusive* license allowing Shein to 'publish, display, reproduce, improve, or otherwise use'" the

suppliers' products and related styles and to transfer to Shein any IP rights in the images, photos, or videos of their products. *Id.* (emphasis in complaint). The contracts allegedly also prohibit suppliers from "using or displaying" the styles they provide to Shein on any third-party platform. *Id.* So, Temu alleges, suppliers effectively "lost all of their IP rights in the styles of products they provide to Shein," and many signed these exclusive-dealing agreements not knowing they were relinquishing their IP rights. *Id.* ¶¶ 145, 147. On top of that, the contracts allegedly impose harsh penalties and "unreasonable enforcement provisions" in case suppliers try "to escape Shein's exclusionary tactics" and do business with Temu. *Id.* ¶¶ 149–150, 156. Together, Temu says, these terms make it "uneconomical and, as a practical matter, impossible" for suppliers to sell their apparel on Temu. *Id.* ¶ 151.

Shein allegedly reinforces this control by demanding that suppliers sign "Loyalty Attestations" which "scare [them] away from partnering with Temu." Compl. ¶¶ 152–53. Among other things, they must affirm that they have "never cooperated with Temu on the production and sales of the infringing products"—a term that allegedly covers "any product sold on Temu that is the same or 'highly similar' to products" sold on Shein—and that they will not provide those "products or their images" to Temu. *Id.* ¶¶ 153–54. Sellers allegedly also promise that they "will inform on" others and "help Shein police" its exclusive-dealing agreements. *Id.* ¶ 153. Further still, Shein's contracts with suppliers allegedly feature "an anticompetitive 'Price Commitment' restriction." *Id.* ¶ 169. So should a supplier "somehow offer[] the same product" on Shein's platform and Temu's (despite the exclusivity agreement), the supplier owes Shein a penalty—double the overpaid purchase fee—unless the supplier adjusts the price and swiftly notifies Shein that the product is offered at a lower price elsewhere. *Id.* ¶¶ 169–170. That pricing-floor term further prevents suppliers from doing business with Temu and keeps them from "from offering more

competitive prices to Temu." *Id.* ¶¶ 169, 171.

Temu alleges that, more recently, Shein's "coercive conduct" became even "more severe" and unlawful. Compl. ¶ 162. It "summon[ed] Temu's suppliers on false pretenses" to Shein's offices in Guangzhou, China, "detain[ed]" them "for up to ten hours," "seiz[ed]" their phones and searched them "for Temu sales, commercial, and other financial information," and "demand[ed]" the sellers' chat histories and log-in credentials for their Temu account. *Id.* ¶¶ 132, 162, 208. Sellers were allegedly also forced to export certain "transaction records related to Temu." *Id.* ¶ 163. Temu says that "[s]eizing this information from suppliers" gave Shein access to "a treasure trove of" "commercial and financial trade secrets" housed in Temu's seller portal protected by user identification, password credentials, and confidentiality agreements. *Id.* ¶¶ 163, 206–08. In Temu's view, Shein's conduct sends a "clear" message: "if you choose to deal with Temu, then you are subject to intimidation, unauthorized access to your personal devices, and other threats." *Id.* ¶ 166.

Temu alleges that Shein's "scheme to foreclose Temu from supply" through exclusive-dealing agreements, loyalty attestations, and "mafia-style" intimidation tactics is working. Compl. ¶ 152; p. 42. Many suppliers have systematically removed all their products from Temu and no longer "offer new products" there. *Id.* ¶ 151. "[S]everal manufacturers" allegedly stopped working with any third-party platform—and kept their "products exclusive to Shein"—after Shein made clear that it would enforce "its coercive agreements." *Id.* ¶ 155. Some who did not were then publicly shamed by Shein for violating these agreements. *Id.* ¶¶ 157–61. Still other suppliers allegedly stopped doing business with Temu because of Shein's "intimidation tactics." *Id.* ¶ 168. Temu says that suppliers—many of whom are small businesses with limited resources—"bear the brunt of Shein's conduct." *Id.* ¶¶ 217–18. Not only are they left with no choice but to sell

exclusively through Shein and give up revenue, but "Shein's permanent seizure of [their] IP rights" also limits their ability to develop any new products. *Id.* ¶¶ 215–17.

Shein's treatment of suppliers has ramifications for Temu. All told, Shein's exclusive agreements and "coercive conduct" have allegedly foreclosed Temu from access to about "70–80% of ultra-fast fashion suppliers." Compl. ¶ 213. Unable to contract with these suppliers, Temu says, it faces lower sales volume and higher costs, which in turn limits its ability to "achieve the economies of scale needed to grow and compete." *Id.* ¶ 214. Indeed, but for those lost business opportunities, Temu allegedly "could sell as much as three to four times the daily volume of ultra-fast fashion merchandise" it offers now. *Id.* And U.S. consumers, for their part, face higher prices, limited selection, and reduced quality because Shein nixes "competition before it even starts." *Id.* ¶ 216; *see id.* ¶¶ 146, 168.

### B.    Procedural Background

Temu sued Shein and Shein Technology in December 2023, alleging that Shein's "multi-faceted scheme" to stymie Temu's growth in the United States violates a laundry list of federal and District of Columbia laws. Compl. ¶¶ 5, 225–365. Under federal law, Temu alleges false DMCA takedown notices under 17 U.S.C. § 512(f) (Count 1); copyright infringement under 17 U.S.C. § 101 *et seq.* (Count 2); inaccurate copyright registrations under 17 U.S.C. § 411 (Count 3); trade dress infringement under 15 U.S.C. § 1125(a) (Count 4); misappropriation of trade secrets under 18 U.S.C. § 1831 *et seq.* (Count 5); restraints-of-trade, monopolization, and attempted monopolization under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Counts 7–9); and exclusive dealing under Section 3 of the Clayton Act, 15 U.S.C. § 14 (Count 10). And under D.C. law, Temu alleges misappropriation of trade secrets under D.C. Code § 36-401 *et seq.* (Count 6); restraints-of-trade, monopolization, and attempted monopolization under D.C. Code §§ 28-4502

and 28-4503 (Counts 11–13); unfair competition under D.C. common law (Count 14); tortious interference with contract, business relations, and prospective business under D.C. common law (Counts 15–17); and abuse of process under D.C. common law (Count 18). *Id.* ¶¶ 225–365. Temu seeks various forms of declaratory, injunctive, and monetary relief. *Id.* p. 94–99.[2]

Soon after filing its complaint, Temu moved for a preliminary injunction seeking to enjoin Shein from continuing its alleged abuse of DMCA takedown procedures. ECF No. 29. The Court denied the motion after a hearing. *See* ECF No. 81. In the meantime, Shein Technology and Shein separately moved to dismiss. *See* ECF Nos. 52, 53. Shein Technology moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), arguing Temu fails to allege facts connecting it to any of the conduct and claims asserted in the complaint, so the case against it must be dismissed. Shein, for its part, moves to dismiss all counts against it for failure to state a claim or for certain jurisdictional shortcomings. Also before the Court is Temu's motion to take judicial notice of certain documents attached to its briefs in opposition to these motions. ECF No. 61.[3]

## II.    Legal Standards

A plaintiff must establish subject-matter jurisdiction to overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation modified). The plaintiff gets "the benefit of all inferences that can be derived from the facts

---

[2] Not long after, Shein countersued Temu, accusing it of some of the same unlawful conduct, including trade secret misappropriation, copyright infringement, and unfair competition. *See Roadget Bus. Pte. Ltd. v. PDD Holdings Inc. et al.*, 24-cv-2402, ECF No. 1 (Aug. 19, 2024).

[3] Shein also requested that the Court judicially notice certain documents in support of its motion to dismiss. ECF No. 54. The Court granted the motion as to all but one exhibit. *See* Min. Order of Mar. 31, 2025.

alleged," and based on those facts, the court decides "jurisdictional questions." *Id.* (citation modified).  Without subject-matter jurisdiction over a claim, the Court must dismiss it.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Though "a court must accept as true all of the allegations contained in a complaint," "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Rather, a claim is "plausible when it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citation modified).  And the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.   Analysis

### A.   Shein Technology's Motion to Dismiss

Although Shein Technology moves under both Rule 12(b)(1) and (b)(6), the arguments for dismissal are, at their core, the same.  The complaint mentions Shein Technology just four times and contains no allegations about any acts that it—as opposed to its parent company—took that give rise to Temu's claims.  ECF No. 52-1 at 5.  That requires dismissal under Rule 12(b)(1), says Shein Technology, because Temu has not shown how it "caused" Temu's injury for standing purposes.  *Id.* at 6–9.  A different flavor of the same argument, Shein Technology contends the case must be dismissed because, by failing to explain how it is part of the case, Temu has also failed to state a plausible claim for relief under Rule 12(b)(6).  *Id.* 9–11.  The Court agrees with the gist of

Shein Technology's argument.  But as other courts confronted with similar complaints have ruled, these deficiencies implicate Rule 8, not Rule 12(b)(1) or 12(b)(6).

Under Rule 8, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief" and allegations that are "simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2), (d)(1).  That "minimum standard for the sufficiency of complaints" is meant "to give fair notice of the claims being asserted and the grounds upon which they rest" so that "the adverse party" can "file a responsive answer" and "prepare an adequate defense."  *Est. of Mickens v. U.S. Bank Nat'l Ass'n*, No. 18-cv-928 (KBJ), 2021 WL 3418955, at *3 (D.D.C. Aug. 5, 2021) (citation modified).  A plaintiff flouts that rule, however, "by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct."  *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (citation modified).  Courts in this District have thus granted motions to dismiss when the plaintiff's "factual allegations refer[red] to 'Defendants' collectively without specifying which of" the individual defendants "allegedly took each action described in the complaint."  *Est. of Mickens*, 2021 WL 3418955, at *4; *see, e.g.*, *United States ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*, No. 20-cv-2312 (BAH), 2023 WL 7536185, at *8 (D.D.C. Nov. 13, 2023), *aff'd*, 2024 WL 4864480 (D.C. Cir. Nov. 22, 2024) (explaining that plaintiff cannot "rely on its definition of 'Defendants' to argue that the . . . complaint contains specific, particularized allegations as to each defendant's involvement" to meet Rule 8); *Perfvwaybelayouix v. Graham-Drake*, No. 22-cv-1019 (CKK), 2022 WL 17357231, at *9 (D.D.C. Dec. 1, 2022), *aff'd*, 2023 WL 4991334 (D.C. Cir. Aug. 4, 2023) (granting motion to dismiss where plaintiff "ma[de] little, if any, distinction in terms of each parties' role in the alleged copyright infringement" and "allege[d] no facts regarding individual Defendants' actions").

With respect to Shein Technology, Temu's complaint falls short of Rule 8. It mentions Shein Technology individually only four times: first, in the case caption alongside defendant Roadget; second, in the opening paragraph, stating that Temu "requests a Jury Trial against Defendants Shein Technology LLC and Roadget Business Pte. Ltd. (together, 'Shein' or 'Defendants')"; third, in paragraph 18, alleging that "Defendant Shein Technology LLC has an office and employees located at 250 Massachusetts Avenue, NW, Washington, D.C., 20001"; and finally, in paragraph 25, alleging that "Defendant Shein Technology LLC is an indirect, wholly-owned subsidiary of Roadget Business Pte. Ltd. and is located" in Washington, D.C. ECF No. 52-1 at 5–6. Otherwise, the complaint refers collectively to "Defendants" or, to a greater extent, to "Shein" in describing the conduct giving rise to Temu's claims. Not once does Temu explain what role Shein Technology played in the alleged scheme or attempt to "break[] out the individual Defendants where appropriate" to "specify the conduct each is accused of committing." *Yueh-Lan Wang by & through Winston Wen-Young Wong v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 31 (D.D.C. 2017); *see also ACQIS LLC v. Lenovo Grp. Ltd.*, No. 20-cv-967, 2022 WL 2705269, *3–4 (W.D. Tex. July 12, 2022) (rejecting argument that the plaintiff impermissibly referred collectively to "Defendants" in describing the allegedly infringing conduct because the complaint elsewhere "explained . . . what role each Defendant played in the alleged infringement").

The complaint does, however, include specific allegations about co-defendant Shein (*i.e.*, Roadget). Indeed, right off the bat, the complaint sets out to "detail" "*[t]he history of Roadget acting as Shein*" and then levels all factual allegations against the "Shein" entity. Compl. ¶ 26 (emphasis added). It also alleges that "Roadget owns" the Shein website and "corresponding mobile application," "gained ownership of Shein's trademarks and other assets," and is the claimant for Shein's 300 copyright registrations (or purports to be, anyway). *Id.* ¶¶ 26, 56, 59, 121. In at

least one instance, the complaint would be internally inconsistent if the term "Defendants" covered both Roadget and Shein Technology.  Temu refers to "Defendants' copyright applications and registrations," even though, as noted, it elsewhere specifies that Roadget purports to own them. *Compare id.* ¶ 21, *with id.* ¶ 56.  On top of that, it is implausible that the detailed allegations about Shein's allegedly unlawful conduct abroad—including "in *Shein's offices in Guangzhou, China*"—could refer to Shein Technology, an entity not alleged to have any offices there.  *Id.* ¶ 162.  Taken together, the allegations against Roadget (however few there are) and the internal inconsistencies that would result from accepting a contrary reading suggest that the complaint's references to Shein describe the conduct of one entity: Roadget, which "act[s] as Shein." *Id.* ¶ 26. And the parent company, for its part, does not dispute that it is the proper defendant, nor does it argue the Court lacks jurisdiction over it (in which case the Court would hesitate to dismiss the U.S.-based subsidiary outright).

Two cases drive home the Court's conclusion that Shein Technology should be dismissed. *See Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022); *Bonilla-Santiago v. BLB Privatized Hous., LLC*, No. 20-cv-2524 (TSC), 2022 WL 990681, at *3 (D.D.C. Mar. 31, 2022).  In *American President Lines*, the plaintiff sued a trio of shipping services companies under the Sherman Act: Matson, Inc., the parent holding company; Matson Navigation Company, Inc., a direct subsidiary providing ocean shipping services; and Matson Logistics, Inc., a second-level subsidiary providing logistical support to Matson Navigation.  633 F. Supp. 3d at 216, 234. The complaint, however, did "not attribute specific conduct to the three defendants," instead "simply lump[ing] them all together as 'Matson.'"  *Id.*  So two entities sought dismissal.  As for Matson, Inc., that court agreed, explaining that the complaint did not, as it must, "say enough to give the defendant fair notice of what the plaintiff's claim is"—a "principle," the court emphasized,

that "applies to each named defendant." *Id.* (cleaned up). But "[t]he complaint fail[ed] to allege facts indicating that any of the alleged anti-competitive conduct was undertaken by, or can be traced to, Matson, Inc. specifically." *Id.* Yet the court saw things differently with respect to Matson Logistics, Inc. because the complaint did "allege[] a number of . . . acts implicating the ground-support portion of Matson's shipping business" such that it could "reasonably infer[] from the context of the complaint that these acts were allegedly undertaken by, or at least involved, Matson Logistics." *Id.* at 234–35. Here, by contrast, the Court can make no such inferences, as the complaint does not allege what Shein Technology does.[4]

---

[4] In opposition to Shein Technology's motion, Temu points the Court to that defendant's LinkedIn page, which specifies that Shein Technology LLC is a "technology company which supports SHEIN Distribution Corporation," an entity that in turn "distributes SHEIN's products in the U.S." ECF Nos. 59 at 7 and 61-7. Temu also gestures at documents submitted in unrelated cases that purportedly explain Shein Technology's role, including that it "provides certain technology and data processing services to [Shein Distribution Corporation] and Roadget, including security infrastructure, risk management, and data privacy functions, in addition to communications, public affairs, and ESG-related functions." ECF Nos. 59 at 13, 61-8, 61-11. The Court may judicially notice these records, so it will grant Temu's request for judicial notice as to these documents. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023) ("The 'contents of webpages available through the Wayback Machine' constitute 'facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (citation omitted); *Lewis v. DEA*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011) ("The court may take judicial notice of public records from other court proceedings."). But nothing in these records ties Shein Technology to the alleged scheme or even supports an inference that this subsidiary undertook or participated in any of the alleged conduct. Further still, Temu's attempt to remedy the complaint's shortcomings now only underscores the issue: neither "the [C]ourt [n]or" Shein Technology can "understand whether" Temu has "a valid claim" against that entity because the complaint offers not one fact plausibly implicating it in the alleged conduct. *Est. of Mickens*, 2021 WL 3418955, at *3 (citation omitted). And Temu "may not refer to" these records "to save [the] complaint's deficiencies any more than [it] may try to amend [its] complaint through [its] opposition to the motion to dismiss." *Yoder v. Architect of the Capitol*, No. 23-cv-2214 (TJK), 2025 WL 915611, at *6 (D.D.C. Mar. 26, 2025) (citations omitted).

The Court also declines to judicially notice the other exhibits Temu offers in opposing Shein Technology's motion. Exhibits A, E, and F are screenshots of different versions of sheingroup.com's website listing "offices" or "key offices" held by "SHEIN" around the world, including in Washington, D.C. *See* ECF Nos. 61-5, 61-9, 61-10. Although these webpages could be subject to judicial notice, *see Meta Platforms, Inc.*, 66 F.4th at 303, the Court may not notice

The plaintiffs in *Bonilla-Santiago* met a similar fate.  In that landlord-tenant dispute, a family sued Hunt Companies, Inc., and four of its subsidiaries for negligence, breach of contract, and other claims.  2022 WL 990681, at *1.  At first, the complaint defined "Defendants" to include all five companies and then asserted all allegations and causes of action against that collection of parties.  *See* No. 20-cv-2524, ECF No. 1.  When Defendants moved to dismiss the complaint in part for impermissibly lumping them together and thus failing to meet Rule 8's notice requirement, the plaintiffs amended their complaint, changing every reference to "Defendants" to the names of all five companies.  *See, e.g.*, ECF No. 23 ¶¶ 96–97.  Defendants renewed their request for dismissal, which the court granted as to one of them because it was "unable to identify any factual allegations . . . connecting" that defendant "to Plaintiffs or their claims." 2022 WL 990681, at *3.  And "that this company is allegedly a subsidiary of Hunt Companies, Inc.," the Court added, "is not, without more, a sufficient nexus." *Id.*  But it stopped short of granting the motion as to the remaining companies because the complaint contained enough facts to show "some interconnectedness" between them, including that their names or insignias appeared on the lease and that residents communicate with an email address associated with one of the companies.  *Id.*

The throughline of these cases is that a plaintiff cannot escape its pleading burden by grouping different entities under "Defendants" or some other umbrella term without alleging some facts

---

"matters" that are not "relevant," *Masek v. United States*, No. 22-cv-3574 (RC), 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024) (quoting *Whiting v. AARP*, 637 F.3d 355, 364 (D.C. Cir. 2011)).  And the proposed exhibits are irrelevant.  At most, the websites suggest that Shein Technology has an office here (although none even mentions Shein Technology).  But that fact is already in the complaint, *see* Compl. ¶¶ 18, 25, and neither party has contested it or challenged the Court's personal jurisdiction over Shein Technology.  For the same reason, the Court will not judicially notice Exhibit B, a record of Shein Technology's registered agent, because, again, all it says is that Shein Technology has an office in Washington, D.C.  *See* ECF No. 61-6.  And Exhibit H, a letter from Shein's Executive Vice Chairman about a "de minimis" tariff exemption, is irrelevant to the adequacy of Temu's allegations against Shein Technology—or any claim against either entity for that matter.  *See* ECF No. 61-12.

about the role each played in the challenged conduct or, at the very least, something about the nature of their business that might implicate them, even if the complaint does not attribute the conduct to each entity specifically. *See Arias v. Universal Music Grp.*, 640 F. Supp. 3d 84, 93 (D.D.C. 2022) (collective reference to "Defendants" coupled with "a brief description of the general business of each Defendant but no reference to any individual Defendant's alleged conduct" was "insufficient to maintain a direct infringement claim"). Temu's complaint falls short of that standard and, unlike the plaintiffs in *American President Lines* and *Bonilla-Silva*, Temu can point to nothing in the complaint that would save it from dismissal against Shein Technology.

Temu's contrary arguments do not move the needle. The Court takes Temu's point that it cannot "pars[e]" Defendants' "confidential organization structures" or "ascertain the subsidiary's role in the conduct alleged" before discovery. ECF No. 59 at 7, 17. That may be true. But the problem for Temu is that, to the extent the facts necessary to fill the void in its complaint "are peculiarly within the possession and control of the defendants," it could have pled them on "information and belief." *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 325 (D.D.C. 2017) (citation omitted). Temu did not do that. And its attempt to supply some information about Shein Technology's business and relationship to its corporate parent in its opposition brief not only suggests that it could have pled more specific facts in the complaint but also runs headlong into the "axiomatic" rule that "a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000); *e.g.*, ECF No. 59 at 23–24.

Temu also claims that "the acts of Shein Technology as the subsidiary, and Roadget as the parent, can be considered one enterprise for purposes of antitrust violations." ECF No. 59 at 24 (citing *In re Vitamins Antitrust Litig.*, No. 99-cv-197 (TFH), 2001 WL 755852, at *3 (D.D.C. June

7, 2001) and *GTE New Media Servs. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 32 n.2 (D.D.C. 1998)). But Temu does not explain why the single-enterprise theory is at all relevant here. It is antitrust-law jargon for the notion that a parent and its wholly owned subsidiary cannot conspire under § 1 of the Sherman Act because "the coordinated activity" of those entities "must be viewed as that of a single enterprise." *See Copperweld Corporation v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984). As Defendants note, "this doctrine has nothing to do with Temu's" pleading burden. ECF No. 65 at 20. And neither case Temu cites resolved a challenge like Shein Technology's.[5] Nor does either suggest that the doctrine somehow relieves the plaintiff from alleging enough facts about the role each defendant played in the challenged conduct.

For all these reasons, the Court will grant Shein Technology LLC's motion to dismiss. That said, of course, Temu may seek to amend the complaint later on, especially if discovery reveals "evidence of a relevant connection" between Shein Technology and the challenged conduct. *Bonilla-Silva*, 2022 WL 990681, at *3; *see* Fed. R. Civ. P. 15(a)(2).

---

[5] The defendants in *GTE New Media Services*—an antitrust case brought by an Internet Yellow Pages provider against five competing providers—moved to dismiss for lack of personal jurisdiction, improper venue, and failure to plead antitrust violations, among other things. 21 F. Supp. 2d at 32. That court cited the *Copperweld* doctrine (in a footnote) in the introduction, explaining that the defendants were "comprised of one or more subsidiaries" who would be considered "as a single enterprise" with their parents "for the purpose of th[e] decision." *Id.* n.2. It said nothing about the requirement that a complaint must contain enough allegations about each defendant's involvement in the alleged misconduct. And the court in *In re Vitamins* resolved, in relevant part, a standing challenge. The defendants argued that the plaintiffs lacked standing to assert antitrust "claims based on harms" they suffered "as a result of injuries to their affiliates." 2001 WL 755852, at *3. The court rejected the defendants' challenge, explaining that "the plaintiffs and their subsidiaries . . . appear[ed] to have acted as single enterprises" and thus could avail themselves of an "exception" to the general rule that "indirect purchasers lack standing to assert" § 1 antitrust claims. *Id.* (citing *Copperweld*, 467 U.S. at 77, and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 76 n.16 (1977)). Neither case turned on (or had anything to do with) the kind of pleading deficiencies Shein Technology identified. And Temu does not explain how either case fits here.

### B.      Shein's Motion to Dismiss

Shein moves to dismiss all claims against it, whether brought under federal or D.C. law. The parties appear to agree that many of the latter depend on the Court's resolution of the former, so the Court will address them together where appropriate.  For the reasons explained below, the Court will grant the motion and dismiss Counts 5–13 and 15–18 but will deny it with respect to Counts 1–4 and 14.

### 1.      Temu States a Claim under § 512(f) of the DMCA (Count 1)

First up is Temu's claim that Shein violated § 512(f) of the DMCA by knowingly and materially misrepresenting that the content on Temu's website infringed on Shein's copyrights or the copyrights of others who had authorized Shein to file takedown notices.  Shein mainly quibbles that Temu failed to plead that it acted "knowingly," and that the complaint does not meet Rule 9(b)'s heightened pleading requirement, which it says applies here.  Temu is wrong on both counts, so this claim will proceed.

The DMCA creates a "notice and takedown" procedure through which a copyright owner or someone authorized to act on its behalf may notify a service provider of suspected infringing activity and request its removal.  17 U.S.C. § 512(c), cmt. 3.  Among other things, a notice must "identif[y]" both "the copyrighted work claimed to have been infringed" and the "material that is claimed to be infringing" and should be removed, along with enough information to locate the infringing works.  *Id.* § 512(c)(3)(A).  The complaining party must also state that it "has a good faith belief" that use of the material is unauthorized, under penalty of perjury, that the information in the notice is accurate, and that it is authorized to act on behalf of the copyright owner.  *Id.*  To benefit from the DMCA's safe-harbor provision and escape liability for damages for infringing activity on its platform, the service provider must, once notified, "expeditiously" remove or disable access to the infringing material.  *Id.* § 512(c)(1)(A)(iii).

The DMCA also imposes liability for misrepresenting that copyright infringement happened. *See* 17 U.S.C. § 512(f). To state a relevant claim, a plaintiff must allege facts to show that (1) the defendant knowingly and materially misrepresented that copyright infringement occurred; (2) a service provider relied on that misrepresentation; and (3) the plaintiff was injured as a result. *Id.*; *Digit. Mktg. Advisors v. McCandless Grp.*, LLC, 2022 WL 18216003, at *2 (C.D. Cal. Mar. 28, 2022). Although no court in this District appears to have interpreted § 512(f)'s knowledge requirement, other courts have said that the plaintiff must plead enough facts to show that the defendant "subjectively had actual knowledge of the misrepresentation." *Digital Marketing*, 2022 WL 18216003, at *3 (citing *Rossi v. Mot. Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004)); *see also e.g.*, *MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d 740, 751 (N.D. Ill. 2024); *Source Cap. Funding Inc. v. Barrett Fin. Grp.*, LLC, No. 23-cv-02113, 2023 WL 7552330, at *5 (D. Ariz. Nov. 14, 2023). Allegations that add up to nothing more than the defendant making "an unknowing mistake"—"even if the copyright owner acted unreasonably in making th[at] mistake"—will not do. *Rossi*, 391 F.3d at 1005. A plaintiff can also satisfy the knowledge requirement by alleging that the defendant was "willfully blind," meaning the defendant chose "not to confirm a high probability that material [wa]s not infringing." *MFB Fertility*, 730 F. Supp. 3d at 751–52 (citation omitted); *see Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2015).

Shein does not argue that Temu failed to plead the second and third elements of § 512(f)'s test—reliance and injury. It challenges only the knowledge prong. But Temu has done enough to plead knowledge. According to the complaint, Shein has "inundate[d] Temu with tens of thousands" of DMCA claims in which it "falsely" represents its rights to "many of the asserted works" and claims that Temu's "listings are infringing," even though it "knows" that is not so. Compl. ¶¶

34, 46 (emphasis removed). It also regularly sends such notices on behalf of suppliers even though it "knows" many do not own any copyrights in the images. *Id.* ¶ 76. Indeed, Temu alleges that sometimes Shein "attempt[s] to investigate" whether it had any grounds to assert copyright infringement only *after* Temu's merchants—who own the copyrights at issue—sue Shein. *Id.* ¶¶ 73–76, 78. And when Temu requests some proof that Shein owns rights in the infringed material or is authorized by those who do, Shein does not respond. *Id.* ¶ 79; *see ISE Ent. Corp. v. Longarzo*, 2018 WL 1569803, at *7 (C.D. Cal. Feb. 2, 2018) (denying motion to dismiss where defendant allegedly refused to withdraw takedown notice after plaintiff's attorney notified DMCA submitter of plaintiff's rights in the work); *Disney Enter., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) (denying summary judgment where plaintiff provided evidence that defendant "intentionally targeted files it knew it had no right to remove").

The complaint also states that Shein "intentionally" sends these takedown notices "in large batches" and "in spikes over a small period, making it difficult for Temu to quickly address them," which Temu alleges shows its "true intention is not" to enforce valid copyrights "but to cause disruption." Compl. ¶¶ 52, 96. Indeed, when the images subject to Shein's takedown notices appear on other platforms like Amazon—which is often the case—Shein allegedly does not object. *Id.* ¶ 89. More, Shein allegedly "intentionally . . . demand[s] removal of product listings unrelated to the asserted copyrights." *Id.* ¶ 52. For example, Shein unleashed "an avalanche" of infringement claims related to an image of a shoulder bag "but provided hundreds of links" to noticeably different images of products such that "Temu had to spend countless hours combing through" those links to address the notice. *Id.* ¶¶ 52, 81. Temu says Shein did so "to overwhelm Temu and try to manufacture a scenario" where Temu delays or fails to promptly process the takedown requests. *Id.* ¶ 82. Indeed, after sending that "flawed" notice, Shein then "disabled many of the . . . links to

the unrelated products, destroying evidence and frustrating Temu's ability to confront Shein for its baseless accusations." *Id.* Shein's notices are allegedly also "replete" with examples where it asserts copyright infringement of *products* that "look similar" to those listed on Shein's platform, but the *image* of the product—*i.e.*, the work that could be infringed under copyright law—is "utterly" different. *Id.* ¶ 84. *Cf. MFB Fertility, Inc. v. Action Care Mobile Veterinary Clinic, LLC*, 730 F. Supp. 3d 740, 751–52 (N.D. Ill. 2024) (explaining that "[f]ailure" to "proactively consider the potential that similarities in materials are unprotectable" can "form the basis of a finding of willful blindness" under § 512(f)).

Further still, Temu alleges that Shein repeatedly and "deliberately fail[s] to provide clickable links" or "submit[s] incorrect links" and "mismatched images and links" to make "DMCA compliance difficult, if not impossible." *Id.* ¶¶ 52, 90. For instance, it "recycled" the same URL (linking to a children's swimsuit) to support takedown notices for "over 560" unrelated listings on Temu's website, *id.* ¶¶ 92–93, and for several months sent takedown notices affecting nearly 20,000 product listings in "unclickable PDF format," meaning Temu employees had to "manually type out each character of each URL" to address the requests, *id.* ¶¶ 94–95. Taken together and considering the nature and sheer volume of allegedly frivolous takedown notices, Temu has plausibly alleged that Shein acted with the requisite knowledge—whether considered through the lens of "actual knowledge" or "willful blindness."

None of Shein's responses stick. It contends that Temu must—but does not—meet Rule 9(b)'s heightened pleading standard because the DMCA claim "sounds in fraud." ECF No. 53-1 at 18–19. That is doubly wrong. Courts across the board apply the typical plausibility standard to § 512(f) claims. *See ENTTech Media Grp. LLC v. Okularity, Inc*., No. 20-CV-06298, 2021 WL 916307, at *6 (C.D. Cal. Mar. 10, 2021) ("[N]o authority holds that claims under § 512(f) must be

pleaded with particularity."). And while allegations of fraud in connection with a DMCA claim may indeed trigger Rule 9(b)'s particularity standard, *see Digital* Marketing, 2022 WL 18216003, at *3, a fair reading of the complaint shows that Temu's DMCA claim does not turn on such allegations; it describes a bad-faith campaign to cripple Temu. Moreover, even if Temu's references to "fraudulent notices" or "fraudulent DMCA and copyright scheme" were enough to trigger Rule 9(b), *e.g.*, Compl. ¶¶ 18, 22, 36, it gets Shein nowhere. Under that standard, Temu need only plead "with particularity the circumstances constituting fraud"—and Shein does not argue it has failed on that score—while "knowledge" can still "be alleged generally." Fed. R. Civ. P. 9(b); *see Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) ("Rule 9(b) is largely designed to give each opponent notice of his purported role in the alleged fraud."). And the Court has already explained that the complaint passes muster in that regard.

Shein disagrees, contending that Temu alleges nothing more than "mistakes." ECF No. 53-1 at 19; ECF No. 66 at 13. That argument might fare well if all Temu alleged was that Shein sent "some" takedown notices even though it "had no rights" in the infringed materials and "did not engage in any analysis" before filing such notices, as was true in the case Shein cites. *Digital Marketing*, 2022 WL 18216003, at *3; ECF No. 53-1 at 20. But Temu alleges that Shein has buried it with "hundreds of notices" linking to unrelated products, "hundreds or even thousands" of "unusable" takedown demands, and "scores" of notices where it falsely claims to own copyrights in the asserted works. Compl. ¶¶ 73, 82, 94. To say the least, a "mistake" repeated hundreds or thousands of times is quite plausibly not a mistake. Shein also cherry-picks a few paragraphs in the complaint to argue why those allegations are not enough to plead knowledge. *See* ECF No. 53-1 at 19–20. But Shein misses the forest for the trees—and some trees as well. Take the allegation that Shein "destroy[ed] evidence" of an allegedly baseless DMCA notice so that Temu

could not confront it.  Compl. ¶ 82.  That is a clear-cut allegation of "some knowledge of misrepresentation."  *Rossi*, 391 F.3d at 1005.  In any event, though, the totality of Temu's allegations plausibly suggests that Shein knew it misrepresented that Temu was infringing Shein's or its sellers' copyrights.  And while discovery may or may not bear that out, Temu has cleared the pleading hurdle.  *See MFB Fertility, Inc*, 730 F. Supp. 3d at 752 ("[W]hether a copyright owner formed a subjective good faith belief is, in most instances, a factual issue that is not appropriate for resolution on a motion to dismiss."); *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008) (similar).

### 2.    Temu States a Claim for Copyright Infringement (Count 2)

Next is Temu's claim that Shein is infringing its copyrights over four promotional games displayed on its website and mobile app.  To state a copyright-infringement claim, Temu must allege facts that, if true, would prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 38 (D.D.C. 2007) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  The complaint alleges, and Shein does not dispute, that Temu owns the copyrights for the promotional games at issue.  Compl. ¶ 175.  Shein instead focuses on the second element, but its challenge does not succeed.

The second prong typically breaks down into two sub-parts: the complaint must allege "(1) that [the defendant] had access to the copyrighted work, and (2) the substantial similarity between the protectible material in plaintiff's and [the defendant's] works."  *Prunte*, 484 F. Supp. 2d 32 at 40–41.  The substantial-similarity inquiry, which often gets complicated, "concerns whether actual copying is legally actionable."  *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002).  That is, the plaintiff must eventually "identify[] which aspects" of the work are protectable

by copyright, for "copyright is limited to those aspects of the work . . . that display the stamp of the author's originality." *Id.* (quoting *Feist Publ'ns*, 499 U.S. at 350). "[F]acts or ideas" are not that. *Id.* But "a compilation of non-copyrightable factual matter may itself be copyrightable" if the author "select[s], coordinate[s], or arrange[s]" the material in a "sufficiently creative" way. *Roe v. Bernabei & Wachtel PLLC*, 85 F. Supp. 3d 89, 98 (D.D.C. 2015). And then the question is whether "the accused work" is "so similar" to those protectable expressions that "an ordinary reasonable person would conclude that the defendant unlawfully appropriated" them "by taking material of substance and value." *Sturdza*, 281 F.3d at 1296. Here, it is the "overall look and feel" of the works that counts. *Id.*

Temu alleges that Shein infringed its copyrights by copying the "artistic elements, graphic stylization, color schemes, language, and other artistic expressions" in its Lucky Flip, Credit Giveaway, Free Gift, and Cash Rewards games. Compl. ¶¶ 175–76; *see id.* p. 57–62. For example, Temu's customers playing the Free Gift game see these images:

   

And the game Shein developed appears like this:

   

Compl. p. 57, T3.  Temu alleges that Sheim's game, like the others, is "substantially similar if not identical to Temu's."  *Id.* ¶ 176.  The substantial-similarity question, however, is a highly fact-intensive one and typically left for a jury.  *See Prunte*, 484 F. Supp. 2d at 41; *see Nichols v. Club for Growth* Action, 235 F. Supp. 3d 289, 293 (D.D.C. 2017).  Even "summary judgment" on this issue "has traditionally been frowned upon."  *Sturdza*, 281 F.3d at 1296 (quotations omitted).  That is fatal to Shein's challenge, which is lodged against precisely that part of the copyright-claim inquiry.  ECF No. 53-1 at 20–23.

Shein contends that Temu seeks "copyright to the *idea* of arcade-style games on a retail website."  ECF No. 53-1 at 20.  But the "arcade-style elements of the Games"—including "common catch-phrases" like "Congrats!" and "depictions of cards [and] squares"—are not copyright-able in its view, as "their features and elements are inseparable from the ideas of the Games themselves."  *Id.* at 21–22.  And because these features are not protectable, says Shein, Temu must show "identical copying," not merely "substantial similarity," and the images in the complaint show that standard is not met.  *Id.* at 22.  These arguments are premature.  Right now, "the Court must accept the allegations of creativity as true" because "assessing whether a work is copyright-able" is a "subtle" inquiry, often "impossible" at the pleading stage.  *Roe v. Benabei & Wachtel PLLC*, 85 F. Supp. 3d 89, 97–98 (D.D.C. 2015).  Perhaps Shein is right that the arrangement and

selection of the games' features lack a creative spark, but that is for another day. All Temu had to do was "claim ownership over the copyrighted work[s]" and allege that Roadget "cop[ied]" them. *Id.* at 99. It did both. And courts in this District, unlike some others, do not require a plaintiff at the pleading stage to "distinguish protectable from unprotectable material" and to "specify why material was copied," as "there is no requirement that copyright claims must be pled with particularity." *ICC Eval. Serv, LLC v. Int'l Assoc. of Plumbing & Mech. Offs., Inc.*, No. 16-cv-54 (EGS), 2016 WL 11769565, at *3 (D.D.C. Sept. 19, 2016); *see Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 37 (D.D.C. 2024) (rejecting defendant's "categorical argument that [plaintiff's] videos lack copyrightable authorship," noting defendant "may raise those arguments at summary judgment"); *Prunte*, 484 F. Supp. 2d at 41 (declining to conduct substantial-similarity analysis at motion-to-dismiss stage where plaintiff alleged that defendants infringed on plaintiff's lyrics).

### 3.    Temu's Claim for Inaccurate Copyright Registrations May Proceed Because Temu Seeks Declaratory Relief (Count 3)

In Count 3, Temu challenges dozens of Shein's copyright registrations, arguing they stem from fraud on the U.S. Copyright Office. *See* Compl. ¶¶ 70, 239–43; *see id.* p. 95–96. It alleges that those registrations are based on "knowing misrepresentations" about "key facts," "backdated assignment agreements," "works where Shein does not own the copyrights," and "coercive, invalid IP transfers." *Id.* ¶¶ 57–58; *see id.* ¶¶ 59–70. In Temu's view, this claim is tied to its DMCA claim, as Shein allegedly "relies" on these copyright registrations to issue its "bad-faith DMCA notices to Temu." *Id.* ¶ 33; *see id.* ¶ 55. Temu seeks two forms of relief: an order declaring that "Shein's conduct constitutes fraud and/or knowingly false representations to the U.S. Copyright Office" and an order "cancelling [those] copyright registrations." *Id.* p. 95–96.

Under the Copyright Act, a certificate of registration is valid "regardless of whether" it

"contains any inaccurate information," unless "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate," and the Register of Copyrights would have refused registration had it known of that inaccuracy.  17 U.S.C. § 411(b)(1).  A claim of "fraud on the Copyright Office is typically brought in an infringement action as an affirmative defense to the enforcement of a registered copyright certificate."  *Wozniak v. Warner Bros. Ent. Inc.*, 726 F. Supp. 3d 213, 234 (S.D.N.Y. 2024) (citation modified).  But it can also "be pursued as a separate cause of action."  *Id.*  To state a claim, a plaintiff must allege facts that will establish that (1) "the application for copyright registration is factually inaccurate," (2) "the inaccuracies were willful or deliberate," and (3) "the Copyright Office relied on those misrepresentations."  *Id.*; *see Laatz v. Zazzle, Inc.*, No. 22-cv-04844, 2024 WL 1023849, at *5 (N.D. Cal. Mar. 7, 2024) (quoting *Unicolors, Inc. v. H&M Hennes & Mauritz*, 52 F.4th 1054, 1067 (9th Cir. 2022)).

Shein does not argue Temu failed to allege any of these elements.  Instead, it challenges the remedy Temu seeks, arguing the Court lacks authority to cancel copyright registrations.  ECF No. 53-1 at 23–24.  True enough.  Although caselaw on this issue is scarce, courts appear to agree they cannot "invalidate or cancel [a] Defendant's copyright registration."  *App. Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 331 (D.D.C. 2015); *see also Brownstein v. Lindsay*, 742 F.3d 55, 75 (3d Cir. 2014) (district court erred in ordering cancellation "because there is no statutory indication whatsoever that courts have such authority").  Only the Copyright Office can do that.  *App. Dynamic*, 87 F. Supp. 3d at 331.  But Shein's is a strawman argument.  As noted, cancellation is not the only form of relief Temu requests.  And that is what makes this case different from those Shein cites; they speak only to courts' ability to grant "relief in the form of cancellation of the registration."  *Vaad L'Hafotzas Sichos, Inc. v. Krinsky*, 133 F. Supp. 3d 527, 537 (E.D.N.Y. 2015);

*see Pastime LLC v. Schreiber*, 705 F. Supp. 3d 95, 100–01 (S.D.N.Y. 2017) ("[Plaintiff] asks the Court to grant 'Cancellation and Nullification'" of defendant's copyright registration).[6]

So while the Court cannot order Shein's copyright registration cancelled, it can consider the claim if it seeks declaratory relief.  Other courts have done so, and Shein offers no persuasive reason why this Court should depart.  *See, e.g.*, *Wozniak*, 726 F. Supp. 3d at 234; *Canadian Standards Ass'n v. P.S. Knight Co.*, 649 F. Supp. 3d 334, 354 (W.D. Tex. 2023) (finding copyright registration was fraudulently obtained and thus invalid); *Friedheim v. Hoeber*, No. 20-cv-335, 2020 WL 10893185, at *6 (N.D. Tex. Dec. 16, 2020) (considering claim where plaintiff alleged fraud on the Copyright Office not as a defense to enforcement of a copyright but as a cause of action seeking declaratory relief); *New Mission Glob., LLC v. Xu*, No. 20-cv-250, 2020 WL 14010794, at *2 (N.D. Tex. Nov. 24, 2020) (same); *Shirokov v. Dunlap, Grubb & Weaver, PLLC*, No. 10-cv-12043, 2012 WL 1065578, at *31 (D. Mass. Mar. 27, 2012) ("[Plaintiff] may seek a declaration that [Defendant's] copyright is invalid based on fraud on the Copyright Office.").

### 4.    Temu States a Claim for Trade Dress Infringement (Count 4)

Shein also challenges Temu's claim that Shein is infringing its "Arcade Trade Dress," *i.e.*, "the design of Temu's customer experience" on its website and mobile app.  Compl. ¶¶ 186, 193. The Court, however, sides with Temu on this count as well.

Section 43(a) of the Lanham Act provides a right of action against any person who "uses

---

[6] The court in *Pastime* found that the plaintiff waived any claim for fraud on the copyright office and so declined to "opine . . . on the existence of a cause of action" for that claim.  705 F. Supp. 3d at 101.  It nonetheless "note[d]" in dicta that "the absence of [such] a cause of action" would "comport[] with the absence of a cause of action for cancellation of a copyright registration."  *Id.*  For support, the court relied on another case, which in turn pointed to the lack of "precedent" for a cause of action for fraud on the Copyright Office.  *See Vaad L'Hafotzas Sichos*, 133 F. Supp. 3d at 537.  Yet since then, another court from that District has affirmatively stated such a cause of action exists.  *See Wozniak v. Warner Bros. Ent. Inc.*, 726 F. Supp. 3d 213, 234 (S.D.N.Y. 2024).

in commerce any word, term, name, symbol, or device, or any combination thereof," in a way that "is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods."  15 U.S.C. § 1125(a)(1).  That section also creates a cause of action for trade dress infringement.  The term refers to the overall look or "total image of a product," and "may include features such as size, shape, color or color combinations, texture, [and] graphics."  *Reader's Dig. Ass'n, Inc. v. Conservative Dig., Inc.*, 821 F.2d 800, 803 (D.C. Cir. 1987), *abrogated by, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) (citations omitted).

A trade dress plaintiff must "articulate with precision the specific components of its claimed trade dress in the complaint."  *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 122 (2d Cir. 2025).  In addition, the plaintiff must plead three elements.  First, that the trade dress is "not functional."  *Id.* at 121.  A trade dress is functional and thus unprotectable if it "is essential to the use or purpose of the article," "affects [its] cost or quality," or "would, if denied to others, put competitors at a significant non-reputation-related disadvantage."  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 23–24 (2001).  Second, the plaintiff must plead that its trade dress is either "inherently distinctive"—that is, it "serves to identify a particular source," such as "Tide" in Tide laundry detergent—or has "acquired secondary meaning."  *Cardinal Motors*, 128 F.4th at 121 (citation omitted); *Fernandez v. Jones*, 653 F. Supp. 2d 22, 29 (D.D.C. 2009).  Secondary meaning "occurs when, in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (citation modified).  Third, the plaintiff must show that consumers are likely to confuse the source of the plaintiff's product with the defendant's.  *Fernandez*, 653 F. Supp. 2d at 29.  "[E]ach prong of the analysis . . . involves an inherently factual review."  *Stat. Ltd. v. Beard Head, Inc.*, 60 F. Supp. 3d 634, 638 (E.D. Va. 2014).

That is why trade dress infringement cases are "rarely resolved at the motion to dismiss stage," *id.*, where "the court has little more than the plaintiff's allegations and the defendant's summary denial of them." *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014). This case is no exception.

Temu describes its "arcade-style trade dress" as "a combination of 'gamified' aesthetic elements and prominent and consistent use of the color orange across Temu's website, mobile app, and advertising." Compl. ¶ 187. It elsewhere articulates three elements and provides representative images of the claimed trade dress's "look and feel":

- "vibrant orange coloring that creates an energetic, almost 'electrified' aesthetic";

- "graphics resembling arcade games, including Temu's well-known 'wheel of fortune' that greets many customers as they open the Temu website or app"; and

- "shimmering white or gold signage and typeface against a contrasting background to create a glowing effect and glowing accents on graphics."

    

*Id.* p. 66–68. "[T]ogether," Temu alleges, these elements "create a playful customer experience reminiscent of an arcade," which "has become an integral part of Temu's branding." *Id.* ¶ 193. Temu also alleges that it "has garnered widespread customer recognition for the distinctive 'look

and feel' of [its] website and mobile app," *id.*, which it attributes to the "millions of dollars" it has

spent on "promot[ing]" it "across different media." *Id.* ¶ 196. It "has attracted significant attention

and has made Temu's website, app, and promotions instantly recognizable, distinguishing Temu

from other online marketplaces by creating a community-focused gaming wonderland." *Id.* ¶ 197.

Temu also alleges that Shein "began prominently using the same combination of elements" on its

platform, which "is likely to cause confusion . . . as to the source or origin of Shein's products and

platform" and "falsely suggest a sponsorship, connection, or association" between the two. *Id.*

¶ 203–04; *see id.* p. 70.

   

These allegations are enough to state a claim for trade dress infringement, and Shein's

contrary arguments miss the mark—at least at this stage. Shein does not challenge Temu's artic-

ulation of its trade dress. But it does object that the complaint fails to plead all three elements

required to state a claim—non-functionality, secondary meaning, and likelihood of confusion. Not

so.

First, Shein contends it is off the hook for this claim because Temu has "not allege[d] any

facts establishing how its alleged trade dress is non-functional." ECF No. 53-1 at 25. That Temu

does not use the term "non-functional" is no reason to dismiss the claim, however, as the complaint

"otherwise includes factual allegations" and visual representations "sufficient to infer non-func-

tionality." *Sunjoy Indus. Grp., Ltd. v. Permasteel, Inc.*, No. 22-cv-1896, 2023 WL 406211, at *3

(S.D. Ohio Jan. 25, 2023); *see Good L Corp. v. Fasteners for Retail, Inc.*, No. 18-cv-489, 2019

WL 1429252, at *3 (M.D. Tenn. Mar. 28, 2019) ("[T]he plain appearance of the product from the photos in the Amended Complaint shows the trade dress is at least arguably non-functional."). It lists elements claimed as protected along with visual representations, and nothing about an "orange color palette," "graphic design elements," and "shimmering white or gold signage and typeface against a contrasting background" appear "essential to the use or purpose" of the website or shopping experience or "affect[]" their "cost or quality." *TrafFix*, 532 U.S. at 33; *see Bambi Baby.com Corp. v. Madonna Ventures, Inc.*, No. 18-cv-12669, 2019 WL 2337447, at *5 (D.N.J. June 3, 2019) ("distinctive palette of colors and image/video filters featuring a clean, modern, and straightforward user interface highlighted by bright, vibrant colors set" was plausibly non-functional). It is also plausible that granting Temu exclusive use over its claimed trade dress will not "put competitors at a significant . . . non-reputation related disadvantage," *TrafFix*, 532 U.S. at 32, given the "nearly infinite variations" of "placement, color, font, and size of such features," *Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 3d 124, 148 (D. Mass. 2019); *Conference Archives, Inc. v. Sound Images, Inc.*, No. 6-cv-76, 2010 WL 1626072, at *17 (W.D. Pa. Mar. 31, 2010) ("As long as there are alternate ways to design a website . . . the site's interface should not be considered functional.").

Shein recycles its argument that "the design of the Games is inseparable from the idea of arcade-style games" and thus is not protectible. ECF No. 53-1 at 25. But that is not the test. Nor is Temu's trade dress limited to the games alone. And when a plaintiff claims trade dress in the combination of elements, as Temu does, it does not matter that individual features are functional so long as the "appearance" of the trade dress, "when viewed as a whole, is non-functional." *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 638–39 (S.D.N.Y. 2001); *see Eliya, Inc. v. Kohl's Dep't Stores*, No. 6-cv-195, 2006 WL 2645196, at *4 (S.D.N.Y. Sept. 13, 2006)

(plaintiff "sufficiently allege[d] that the overall image of [its shoe] design" was non-functional even though individual elements were functional).

Switching gears, Shein asserts that Temu has not plausibly alleged that its trade dress has acquired secondary meaning. ECF No. 53-1 at 25–27. Again, not so. Temu makes "classic allegations" of secondary meaning, and Shein is wrong to suggest that Temu must meet "vigorous evidentiary requirements" this early in the litigation. *Id.* at 25. Secondary meaning is a highly "factual determination." *Globalaw Ltd v. Carmon & Carmon Law Off.*, 452 F. Supp. 2d 1, 41 (D.D.C. 2006). Of course, Temu must eventually muster direct evidence like consumer surveys and testimony or circumstantial evidence about the length of use, the extent of advertising, and other efforts to promote its trade dress. *See id.* And Shein is right that evidence of overall advertising will not carry the day if that advertising does not highlight the trade dress, nor will the volume of sales serve as proof of secondary meaning if those sales were not generated by the trade dress itself (rather than non-source-identifying features). ECF No. 53-1 at 26; *see Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001). But a motion to dismiss is not the proper vehicle to make those arguments.[7]

---

[7] The parties also disagree whether Temu must provide evidence of secondary meaning at all, or whether it may instead show that its trade dress is inherently distinctive. ECF No. 58 at 29. That dispute harkens back to *Wal-Mart Stores*, where the Supreme Court held that trade dress in product design is "distinctive, and therefore protectable, only upon a showing of secondary meaning." 529 U.S. at 216. But it differentiated trade dress that appears on product packaging from, for example, the design of a restaurant, which may be "inherently distinctive." *Id.* at 214–15; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 776 (1992) (holding that décor of Mexican restaurant, including layout, color scheme, and decorations, could be protected without a showing of secondary meaning). Unlike Shein, however, the Court is not convinced at this point that Temu's "shopping experience," *i.e.*, the appearance of its website or mobile app, counts as product design such that Temu must prove secondary meaning. Few courts have spoken on this issue, but those who have appear to agree that a "website" can be "entitled to trade dress protection if it is inherently distinctive *or* has acquired secondary meaning." *Smartling, Inc*, 358 F. Supp. 3d at 148 (emphasis added); *see Conf. Archives, Inc.*, 2010 WL 1626072, at *17 (same).

Shein makes a final push by arguing that Temu failed to plead a likelihood of confusion. ECF No. 53-1 at 27. The allegations in the complaint are indeed thin. But like the other elements, this one too "is a question of fact that is not generally amenable to a motion to dismiss." *Mosaic Brands, Inc. v. Ridge Wallet LLC*, No. 20-cv-4556, 2021 WL 922074, at *5 (C.D. Cal. Jan. 7, 2021). And combined with the side-by-side comparison of Temu's claimed trade dress and Temu's allegedly infringing website, the allegations in the complaint withstand Temu's motion. *See Monster Energy Co. v. Beast Cookie Co., LLC*, No. 23-cv-568, 2023 WL 4681632, at *5 (C.D. Cal. June 15, 2023) ("Plaintiff has pled sufficient facts . . . by including photographs of the arguably similar trade dresses and an explanation of the prominent color schemes on the product packaging and marketing materials of both parties."); *Mosaic Brands, Inc.*, 2021 WL 922074, at *5 (plaintiff provided "side-by-side photos" and alleged that defendant's product "is likely to cause confusion"); *Bambi Baby.com Corp.*, 2019 WL 237447, at *7 (similar). Although it might be difficult for Temu to show that consumers are likely to be confused given that the name of each company is readily visible and displayed prominently across the websites and games, that argument is properly considered at summary judgment.

### 5. Temu Has Failed to State a Claim for Trade Secret Misappropriation (Counts 5 and 6)

Shein seeks dismissal of Temu's claims for trade secret misappropriation because they are impermissibly extraterritorial. On this score, the Court sides with Shein.

The Defense Trade Secrets Act ("DTSA") creates a private cause of action for trade secret misappropriation, meaning "acquisition," "disclosure," and "use" of certain information. 18 U.S.C. §§ 1836(b)(1), 1839(5)(A)–(B); *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 113 (D.D.C. 2019). But the statute contains an extraterritoriality provision limiting its application to foreign conduct: a plaintiff cannot sue for trade secret misappropriation occurring outside the United States

unless (1) the defendant is a citizen of the United States or an entity organized under its laws, or (2) "an act in furtherance of the offense was committed in the United States."  18 U.S.C. § 1837. The DTSA does not define "act in furtherance," but courts have borrowed from federal conspiracy law to hold that "an act in furtherance" of misappropriation "must manifest that the offense is at work and is not simply a project in the minds of the offenders or a fully completed operation." *Luminati Networks Ltd. v. BIScience Inc.*, No. 18-cv-483, 2019 WL 2084426, at *10 (E.D. Tex. May 13, 2019) (cleaned up) (citing *Yates v. United States*, 354 U.S. 298 (1957)); *see ProV Int'l Inc. v. Lucca*, No. 19-cv-978, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019); *MedImpact Healthcare Sys., Inc. v. IQVIA Inc.*, No. 19-cv-1865, 2020 WL 5064253, at *14 (S.D. Cal. Aug. 27, 2020).  "Causing harm" to the plaintiff via lost sales is not "an act in furtherance," as "damages caused as a result of misappropriation" are not "part of the offense itself." *Luminati Networks Ltd.*, 2019 WL 2084426, at *11.  They are relevant only "to a plaintiff's remedy." *Id.* (citations omitted).

Temu alleges that Shein misappropriated its trade secrets when it summoned Temu's sup-pliers to Shein's offices in China, seized their phones, and forced them to provide log-in credentials to Temu's seller portal, which in turn gave Shein access to "a variety" of Temu's "commercial and financial information."  Compl. ¶¶ 132, 162–63, 206–07.  These allegations bring the DTSA's bar on extraterritorial application into play.  Temu does not meet the statute's first exception, as Shein is not an American corporation, and Temu does not argue otherwise. *See* ECF No. 58 at 32–33. Nor can Temu seek refuge in the second exception, as the complaint contains no factual allegations to plausibly establish that any "act in furtherance" of the alleged misappropriation took place in the United States.  All the alleged conduct took place in China. *See* Compl. ¶¶ 206–11.

None of Temu's contrary arguments carries the day.  First, Temu argues that "Shein is

using the commercial and financial data it accessed to understand Temu's economic positions and gain an advantage in the U.S. market." ECF No. 58 at 33. But its complaint does not say that. Temu cites nine paragraphs to argue that an act in furtherance of the misappropriation occurred here. *Id.* (citing Compl. ¶¶ 214, 224, 208, 251-52, 255, 265-66, 269). Of those, only one even mentions the United States. *See* Compl. ¶ 214. But that "Temu has made significant investments, and incurred substantial costs, to enter the U.S. ultra-fast fashion market" and that Shein "entrench[es] its monopoly position" through its "anticompetitive conduct and unreasonable agreements," *id.*, has nothing to do with the alleged trade secret misappropriation. The Court cannot, as Temu requests, "infer[]" from that attenuated allegation that Shein is "using" its claimed trade secrets in the United States. ECF No. 58 at 32. And to the extent that Temu says that the alleged misappropriation "compromise[d] the value of" its claimed trade secrets and thereby caused harm in the United States, that is, as explained, beside the point. *Id.* Temu likewise pleads no factual support for its bald assertion that Shein is "offering and selling goods incorporating the trade secrets within the District of Columbia." *Id.* at 33; *see Zaccari*, 390 F. Supp. 3d at 114 ("naked assertions" cannot "survive a motion to dismiss"). It also makes no sense. How could any of the apparel Shein sells "incorporate" the financial or commercial information that Temu alleges was misappropriated? Even construing the complaint in Temu's favor, it has alleged no facts plausibly suggesting that any act in furtherance of the alleged misappropriation occurred in the United States. So its claim under the DTSA is barred.

The parties agree that Shein's claim under the D.C. Uniform Trade Secrets Act ("DCUTSA") rises or falls with the DTSA claim. *See* ECF No. 53-1 at 28–29; ECF No. 58 at 33. Unlike the federal statute, the DCUTSA is silent about its geographic reach. *See* D.C. Code Ann. §§ 36-401–36-410. But with "nothing in the [DCUTSA] to indicate that the District of Columbia

intended the statute to operate extraterritorially, much less in countries overseas," the Court has no trouble concluding that Temu's claim cannot proceed under the DCUTSA either. Other courts have held that their state analogues do not apply to foreign conduct. ECF No. 66 at 20 n.7; *see, e.g.*, *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 436 F. Supp. 3d 1150, 1168 (N.D. Ill. 2020); *vPersonalize Inc. v. Magnetize Consultants Ltd.*, 437 F. Supp. 3d 860, 879 (W.D. Wash. 2020). And Temu, for its part, cites no contrary authority.

### 6.    The Court Lacks Subject-Matter Jurisdiction Over Shein's Claims under the Sherman Act and Its D.C. Counterpart (Counts 7–9 and 11–13)

Temu brings three claims for antitrust violations under the Sherman Act. But before reaching the merits, the Court must ensure that it has subject-matter jurisdiction over those claims. It does not, so the Court will dismiss them.

American antitrust laws "strive to maintain competition in our domestic markets." *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 305 (3d Cir. 2002). Because these laws protect "*American* consumers and *American* exporters, not foreign consumers or producers," *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 986 (9th Cir. 2008), Congress has expressly limited their geographic reach. *See* 15 U.S.C. § 6a. Specifically, the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") excludes from the scope of the Sherman Act "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." *Id.*; *see F. Hoffmann–La Roche Ltd. v. Empagran S.A. ("Empagran I")*, 542 U.S. 155, 162 (2004). But it "brings such conduct back within the Sherman Act's reach" if two conditions are met: (1) the alleged conduct must have a "direct, substantial[,] and reasonably foreseeable effect" on U.S. domestic commerce, and (2) that domestic effect "gives rise" to the plaintiff's antitrust injury. *Id.* (quoting 15 U.S.C. § 6a(1), (2)). Put another way, the Sherman Act reaches "two types of foreign commerce": one, conduct involving import trade or import

commerce (called the "import exception"); and two, conduct that—though not import trade or commerce—still has a direct, substantial, and foreseeable effect on U.S. commerce, and the Sherman Act claim arises from it (called the "domestic effects exception"). *Biocad JSC v. F. Hoffman-La-Roche, Ltd. ("Biocad I")*, No. 16-cv-4226, 2017 WL 4402564, at *7 (S.D.N.Y. Sept. 30, 2017), *aff'd sub nom. Biocad JSC v. F. Hoffmann-La Roche ("Biocad II")*, 942 F.3d 88 (2d Cir. 2019) (citation omitted). The FTAIA's limitation is jurisdictional. *See Empagran S.A. v. F. Hoffmann–La Roche, Ltd. ("Empagran II")*, 417 F.3d 1267, 1269 (D.C. Cir. 2005).

Shein argues that the FTAIA bars Temu's Sherman Act claims because the alleged anti-competitive conduct (1) does not involve "import commerce," and (2) whatever the domestic effect—Shein says it is not "substantial"—that effect does not "give rise to" Temu's injuries. ECF No. 53-1 at 35–38. The Court agrees.

In assessing whether a defendant's alleged foreign anticompetitive conduct involves "import commerce," the Second Circuit persuasively explained in *Biocad II* that the test is whether the defendant's conduct at issue is either the importation of goods and services itself or whether that conduct has "a direct or immediate effect" on—or "directly interferes with"—the "act of importing goods or services" into the United States. *Biocad II*, 942 F.3d at 96, 100. Moreover, whether foreign conduct meets this test "is not determined by reference to a defendant's subjective intent to affect import commerce." *Id*. at 100.

Under that test, Shein's alleged anticompetitive conduct does not involve import trade or commerce. The complaint alleges that Shein blocks Temu's access to specialized suppliers in China by entering into exclusive-dealing agreements (with "Roadget" as the Chinese buyer), seizing the suppliers' IP rights, using "mafia-style" intimidation tactics to scare them away from Temu, and setting anti-competitive pricing floor requirements. Compl. ¶¶ 5, 30-31, 48, 130–171; *see*

ECF No. 1-1 at 2.

    None of this conduct is itself the importation of goods into the United States.  Indeed, Temu

appears to concede that Shein "do[es] not act as" an "importer" of any goods into the United States.

ECF No. 58 at 37.  And Temu does not plausibly allege that Shein's alleged conduct in China has

a "direct or immediate effect" on the "act of importing goods" into the United States.  While the

alleged conduct impacts the market in which Temu and Shein compete for Chinese suppliers to

use their platforms, it does not *directly* or *immediately* interfere with the act of importing goods

into the United States.  In other words, none of the alleged conduct places any direct or immediate

restriction on any party's ability to import a good into the United States, let alone "preclude[]" a

party from "exporting goods into the United States." *Maricultura Del Norte v. World Business

Capital, Inc.*, 159 F. Supp. 3d 368, 383 (S.D.N.Y. 2015), *aff'd*, 769 F. App'x 44 (2d Cir. 2019).

Moreover, whatever the indirect consequences of Shein's alleged conduct, because both parties

operate "global[]" e-commerce marketplaces, Compl. ¶ 180, in which they serve customers all

over the world, Shein's alleged conduct in China is not plausibly "directed at an import market *in

the United States*." *Maricultura*, 159 F. Supp. 3d at 383 (emphasis added).

    Contrast the allegations here with those in *Maricultura*.  The plaintiffs there—tuna fish-

ers—alleged they "want[ed] to export Bluefin Tuna *into the United States*" but were "prevented

from doing so" by the defendants who "seized" their "vessels" and effectively ensured they could

not regain "access" to them.  159 F. Supp. 3d at 375, 383 (emphasis added).  Without the vessels,

the plaintiffs "ceased to compete meaningfully in the U.S. market"—they could no longer "cap-

ture, farm, and export" tuna here—and the defendant-competitor, for its part, came "to dominate"

the tuna "import market." *Id.* at 375, 384.  Those allegations plausibly stated the defendant's

conduct involved import commerce: that conduct had "substantially impaired *Plaintiff's exports

*of Bluefin Tuna into the United States* thereby impacting United States import trade and commerce." *Id.* at 384 (emphasis in original). Or take *In re Vitamin C Antitrust Litigation*, where the plaintiffs—purchasers of vitamin C supplements from Chinese manufacturers—alleged that Chinese manufacturers agreed to fix prices and suppress how much product they would export. 904 F. Supp. 2d 310 (E.D.N.Y. 2012). That alleged conduct was an agreement with an obvious direct and immediate effect on the defendants' importation of goods. And that conduct was "directed at the U.S. import market" because the manufacturers allegedly conspired to set the "price, volume of sales and exports to the United States," as evidenced by "sale[s] contracts" showing "that defendants *specifically contracted* for the delivery of vitamin C to *locations within the U.S.*" *Id.* at 317 (emphases added). Temu's allegations are nothing of the sort.

Temu responds by arguing that Shein's conduct "involves" import commerce because its "scheme is *intended* to preserve . . . [its] monopoly by preventing Temu and others from offering more ultra-fast fashion products to U.S. consumers." ECF No. 58 at 36–37 (emphasis added). But as explained above, the import-commerce exception is not about "intent." *Biocad II*, 942 F.3d at 97. Thus, "foreign conduct" allegedly "intended to influence or affect domestic markets" is irrelevant to determining if that conduct involves "import commerce." *Id.* at 96. In fact, even if the "sole purpose" of a defendant's alleged "actions" is to "delay" or impair "entry into the United States market," to allege "import commerce," a plaintiff must still plausibly contend that the defendant "engaged in . . . conduct that otherwise immediately or directly affected" the importation of goods into this country. *Id.* at 100. Not so here.

That does not mean, however, that Shein is off the hook just yet. As previewed, the FTAIA does not bar antitrust claims if the challenged non-import conduct nonetheless falls within the domestic effect exception. It does so only if it "*both* (1) sufficiently affects American commerce,

*i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'give rise to a Sherman Act claim.'" *Empagran I*, 542 U.S. at 162 (citation modified) (quoting 15 U.S.C. §§ 6a(1), (2)). Shein challenges the first prong by arguing that the domestic effect of its allegedly anti-competitive conduct is not "substantial" and the second by contending that this effect does not give rise to Temu's antitrust injury. ECF No. 53-1 at 36–38. Because Temu is right on the second point, the Court skips the first.

Relevant here, the statutory language "gives rise to" requires "a direct causal relationship, that is, proximate causation." *Empagran II*, 417 F.3d at 1271. So for the domestic effect exception to apply, it is not enough that the "defendant's conduct causes plaintiff's injury." *Biocad I*, 2017 WL 4402564, at *10. Instead, "the domestic effects of a defendant's anticompetitive foreign conduct [must] cause[] [the] plaintiff's injury." *Id.*

The Second Circuit's decision in *Lotes Company v. Hon Hai Precision Industries Company* illustrates this point. 753 F.3d 395, 398 (2d Cir. 2014). The plaintiff, a Taiwanese electronics manufacturer with facilities in China, alleged that five competitors tried to gain monopoly power over the entire USB connector industry by refusing to offer licenses to adopters of their technology. *Id.* at 399–401. "Given the central role Chinese manufacturing plays in the global electronics supply chain," the plaintiff alleged, "curbing competition in China" would have the eventual effect of driving up prices of consumer electronics incorporating these connectors worldwide, including in the United States. *Id.* at 402, 414. The Second Circuit concluded that the exception did not apply there because "those higher prices did not cause [the plaintiff's] injury of being excluded from the market for USB 3.0 connectors." *Id.* at 414. "[T]hat injury" instead "flowed directly from the defendant's exclusionary foreign conduct." *Id.* If anything, the Court added, "the

direction of causation" ran the opposite way: "the defendants' patent hold-up has excluded [the plaintiff] from the market, which reduces competition and raises prices, which are then passed on to U.S. consumers." *Id.* So the plaintiff's "injury *precede[d]* any domestic effect in the causal chain." *Id.* (emphasis in original).

So too here. Temu alleges that Shein's anticompetitive conduct in China "block[ed] Temu's access to" about "70–80%" of specialized Chinese "suppliers necessary to compete in the market," Compl. ¶¶ 130, 162, 213, which had "[t]he effect" of "depriv[ing] American consumers of lower-priced products through competition," *id.* ¶¶ 146, 168. Temu's injury of "being excluded from the market for" fast-fashion suppliers thus "flow[s] directly from" Temu's anticompetitive actions in China and "precedes" the domestic effect—higher prices for U.S. consumers. *Lotes*, 753 F.3d at 414; *see Prevent DEV GmbH v. Adient PLC*, No. 20-cv-13137, 2021 WL 5585917, at *17 (E.D. Mich. Nov. 30, 2021) (domestic effect exception not met where plaintiff "alleged Defendants collaborated to exclude it from the global automotive seat cover market and this exclusion 'raised the price and reduced the output of seat covers' which 'affected vehicles sold in the United States'"); *Biocad I*, 2017 WL 4402564, at *10 (S.D.N.Y. Sept. 30, 2017) (same where plaintiff "allege[d] that Defendants' conduct in Russia harmed Plaintiff in Russia, which in turn prevented Plaintiff from entering the U.S. market, which in turn will have the eventual domestic effect of" increasing prices in the United States).

Temu responds by saying Shein "misrepresent[s]" its alleged harm as only "reduced access to suppliers" that occurred before any downstream effect on U.S. consumers. ECF No. 58 at 39. "Rather, Shein's conduct injured consumers and Temu in the United States *at the same time*." *Id.* (emphasis added). In its view, "consumers were forced to pay Shein higher prices," "third-party sellers on Temu's U.S. marketplace lost sales, and Temu lost revenue it would have earned on

those U.S. sales." *Id.* at 39–40.  But even if that were the case, Temu cites no authority—and the Court has found none—for the idea that the domestic effect exception is met when anticompetitive conduct causes a domestic effect "at the same time" as it causes a plaintiff's injury.  And the statutory language "gives rise to," which, as explained, courts have interpreted to require causation, forecloses that reading.  After all, for the domestic effect of a defendant's conduct to *cause* a plaintiff's injury, it must *precede* it.[8]

In any event, Temu does not even allege that it was injured by the domestic effect of Shein's anticompetitive conduct—higher prices in the United States—at all, rather than directly by Shein's conduct.  The complaint alleges that "Shein's conduct is unfairly limiting Temu's sales volume and artificially raising its costs," thereby "reducing Temu's ability to achieve the economies of scale needed to grow."  Compl. ¶ 214. And "*[b]ut for Shein's anticompetitive conduct and unrea-sonable agreements, Temu could sell as much as three to four times [its current] daily volume*" of merchandise.  *Id.* (emphasis added).  Nowhere does Temu allege that higher prices in the United States "caused" it to lose sales or revenue.  Nor would that make any sense.  Consumers pay more when and if Temu—who allegedly "regularly beats Shein on price for identical products"—makes fewer sales.  *Id.* ¶ 216.  Thus, while Temu is correct that *Lotes* is distinguishable in one respect if Temu's injury is lost sales or lost revenue (because that injury, unlike the plaintiff's in *Lotes*, was not suffered only in a foreign market) that distinction is irrelevant.  What trips up Temu's Sherman Act claim is that the complaint alleges that foreign anticompetitive conduct, not the domestic effect of that conduct, gives rise to Temu's injuries—no matter how characterized.  Thus, the FTAIA's

---

[8] In addition, any injury suffered by third-party sellers is irrelevant because the effect of Shein's conduct must have "caused *Plaintiff's* injuries."  *Biocad I*, 2017 WL 4402564, at *10 (emphasis in original).

bar applies here.[9]

Moreover, because the FTAIA precludes Temu's Sherman Act claims, it likewise bars the attendant claims under D.C. antitrust law.  On its face, the FTAIA limits only the reach of the Sherman Act.  *See* 15 U.S.C. § 6a.  But the Court agrees with other district courts to have considered the issue that "state law antitrust claims are 'limited by the FTAIA to the same extent as any federal law claims.'"  *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-2918, 2023 WL 3483242, at *3 (N.D. Cal. May 15, 2023) (collecting cases); *see Prevent DEV GmbH*, 2021 WL 5585917, at *17.  As one of those courts has explained, "[f]oreign commerce is pre-eminently a matter of national concern," and interpreting D.C. antitrust laws "to reach conduct which the federal law could not" would "subvert[]" "Congress's intent."  *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 457 (D. Del. 2007) (citation omitted).  Temu offers no contrary authority.[10]

---

[9] Although the allegations undergirding Temu's Sherman Act claims focus on Shein's interference with Chinese suppliers—meaning the FTAIA applies—Temu cursorily argues that Shein's alleged DMCA campaign itself violates antitrust laws.  *See* ECF No. 58 at 39 ("Temu would not have been forced to remove successful products due to Shein's sham DMCA notices.").  That attempt to shoehorn the DMCA notices into a Sherman Act claim and use that conduct as a jurisdictional hook fails.  For starters, the Court is unaware of any case supporting the idea that false DMCA notices can support such a claim, and Temu cites none.  In any event, that repackaged claim cannot succeed because the complaint does not allege that Shein's DMCA notices had any effect at all on competition or Shein's market power.  *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977) (explaining that antitrust laws "were enacted for 'the protection of *competition* not *competitors*'" (emphases added)); *Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987) ("[O]nly harm stemming from a reduction in competition qualifies as injury cognizable under the antitrust laws.").  Temu states only that it has received complaints from affected sellers, Compl. ¶ 78, but it does not allege that any of them have left Temu's platform or will stop using Temu to sell their products as a result.  And "frustrat[ing] Temu's business" by "forc[ing] [it] to expend substantial time and resources reviewing and processing the takedown requests" is no harm the antitrust laws recognize either.  *Id.* ¶ 90.  Thus, without any cognizable antitrust injury, any Sherman Act claim based on Shein's DMCA campaign fails.

[10] Because the Court does not reach the merits, it will not judicially notice Exhibits 1–3 attached to Temu's opposition, which go to the parties' dispute over whether Temu has pled a

### 7. Temu Has Failed to State a Claim Under the Clayton Act, Because Shein Is Not the Seller in the Contracts at Issue (Count 10)

Temu also alleges that Shein's exclusive-dealing agreements and loyalty attestations "constitute anticompetitive exclusive dealing" under § 3 of the Clayton Act. Compl. ¶ 302. But Temu cannot avail itself of this antitrust law either.

Section 3 of the Clayton Act makes it unlawful "for any person engaged in commerce" to "make a sale or contract for sale of goods . . . on the condition, agreement or understanding that the . . . purchaser thereof shall not use or deal in the goods," where "the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce. 15 U.S.C. § 14. But the statute's "plain language" makes clear that it "does not impose liability on purchasers for exclusive dealing contracts." *Genetic Sys. Corp. v. Abbott Lab'ys*, 691 F. Supp. 407, 414 (D.D.C. 1988). Section 3 applies only to sellers. *See id.* at 415; *Truck-Lite Co., LLC v. Grote Indus., Inc.*, 18-cv-599, 2021 WL 8322467, at *15 (W.D.N.Y. Sept. 17, 2021) ("[T]he Clayton Act has not been applied to situations . . . where a buyer . . . is alleged to have required a seller . . . to refrain from selling to other buyers."); *Marion Healthcare, LLC v. S. Illinois Healthcare*, No. 12-cv-871, 2015 WL 3466585, at *4 (S.D. Ill. May 29, 2015) (similar). That dooms Temu's claim because Shein is not a seller in the alleged exclusive-dealing contracts at issue. *See, e.g.*, Compl. ¶ 30 ("Shein enters into Exclusive-Dealing Agreements with ultra-fast fashion suppliers . . . .").

Temu contends that Shein is indeed a seller to which the Clayton Act applies because it "contracts with suppliers to identify trends and 'resells products' to U.S. consumers." ECF No. 58 at 55. Temu misses the point. For purposes of this inquiry, it is irrelevant that Shein might

---

relevant antitrust market. *See* ECF Nos. 61-2, 61-3, 61-4. The claims falter on jurisdictional grounds, so the proposed exhibits "are irrelevant." *Masek v. United States*, No. 22-cv-03574 (RC), 2024 WL 1240093, at *8 (D.D.C. Mar. 22, 2024).

otherwise function as a seller.  What matters is its role "in the transactions at issue."  *Cnty. of Stanislaus v. Pac. Gas & Elec. Co.*, 93-cv-5866, 1994 WL 706711, at *32 (E.D. Cal. Aug. 25, 1994).  And the complaint identifies no exclusive-dealing contracts other than those between Shein and its suppliers where Shein is the seller.  Temu's "attempt to fit [Shein's] square conduct . . . into the round hole of Section 3 cannot succeed."  *Genetic Sys.*, 691 F. Supp. at 415.

### 8.  Temu States a Claim for Unfair Competition Under D.C. Common Law (Count 14)

The remaining claims arise under D.C. law.  First up is Temu's claim for unfair competition, which is based on Shein's "engag[ing] in unfair methods of competition through its infringement of the Arcade Trade Dress" and through its "anticompetitive and exclusionary [s]cheme" of "disparaging Temu's business, intimidating suppliers, [and] threatening groundless legal action."  Compl. ¶¶ 333–340.

"Unfair competition is not defined in terms of specific elements, but by various acts that would constitute the tort if they resulted in damages."  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 153 (D.D.C. 2011) (citing *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 57 (D.D.C.2001)).  The District of Columbia Court of Appeals has provided a non-exhaustive list of such acts, ranging from "defamation, disparagement of a competitor's goods or business methods, intimidation of customers or employees, interference with access to the business, [and] threats of groundless suits" to "false advertising or deceptive packaging."  *K&D, LLC v. Trump Old Post Off.*, 951 F.3d 503, 509 (D.C. Cir. 2020) (*quoting B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982)).

Temu has pled enough allegations to "satisfy the fluid requirements of the tort for unfair competition," including, at minimum, that Shein infringed its claimed trade dress.  *Hanley-Wood LLC*, 783 F. Supp. 2d at 153; *see Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*,

589 F. Supp. 2d 25, 29 (D.D.C. 2008) (evaluating claims for trademark infringement and common law unfair competition together for purposes of liability). Shein appears to concede as much by arguing that "[t]o the extent Temu's unfair competition claim is based on its trade dress infringe-ment claim," it fails because that claim fails too. ECF No. 53-1 at 53. The Court, as explained above, disagrees. Thus, the Court need not address Shein's separate arguments for dismissal—for example, that the unfair competition claim also cannot turn on acts that occurred in China or Temu's abuse of process claim—because so long as Temu's trade-dress claims survives, so does its unfair competition claim.

### 9.    Temu Fails to State a Claim for Tortious Interference with Contracts, Business Relations, or Prospective Business (Counts 15–17)

Shein also challenges Temu's tortious interference claims. To state a claim for intentional interference with contract or business under D.C. law, a plaintiff must allege (1) the existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference inducing or causing a breach or termination; and (4) re-sulting damages. *In re McWade Properties, LLC*, No. 12-cv-634, 2012 WL 5897184, at *3 (Bankr. D.D.C. Nov. 7, 2012) (citations omitted); *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012). If the relationship "is prospective in nature, the plaintiff must allege business expectancies, not grounded in present contractual relationships, but which are commercially reasonable to expect." *In re McWade Properties*, 2012 WL 5897184, at *3 (citation omitted).

Temu's interference-with-contract claim fails because it identifies no contract at all with which Shein interfered. ECF No. 53-1 at 54. While allegations about *Shein's* contracts with its own suppliers abound, the complaint only vaguely alleges that "Temu has existing contracts with ultra-fast fashion manufacturers." Compl. ¶ 342. That is not enough. *See Gov't Rels. Inc. v. Howe*, No. 5-cv-1081 (CKK), 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007) (dismissing claim

because "Plaintiff never pleads any details regarding the nature of any 'contract,'" including "the terms of said agreement"); *cf. Samuel v. Wells Fargo & Co.*, No. 17-cv-2539 (CKK), 2018 WL 4705807, at *3 (D.D.C. Oct. 1, 2018) ("vague allegation" that plaintiff had valid business relationship or expectancy "insufficient" to state claim for tortious interference); *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 229 (D.D.C. 2016) ("[T]he Complaint fails to identify the specific business relationships with which defendants are alleged to have interfered . . . .").

Unable to point to anything more in the complaint, Temu instead argues that it need not "ple[a]d" the contract "with 'specificity.'" ECF No. 58 at 57 (citing *Ulico Cas.Co. v. Pro. Indem. Agency, Inc.*, No. 98-cv-1018 (TFH), 1999 U.S. Dist. LEXIS 8591, at *11–12 (D.D.C. May 5, 1999)). But the sole case it cites does not say that. Indeed, the court in *Ulico dismissed* the tortious-interference-with-contract claim because the plaintiff "fail[ed] to allege the breach of any contract." 1999 U.S. Dist. LEXIS 8591, at *8. And that court's statement elsewhere in the opinion that a plaintiff need "not allege with specificity every element of a cause of action," *id.* at *12, has little bearing on the degree of specificity with which Temu must allege a valid contract. Nor does it provide any persuasive counterweight to the cases suggesting that vague allegations will not do.

All Temu's tortious interference claims must be dismissed for another reason: the complaint alleges no conduct—at least no actionable conduct—to establish Shein's intentional interference with any contract, business relationship, or expectancy. Temu's claims appear predicated on Shein's alleged anticompetitive conduct in China. In fact, its leading argument against dismissal is that "a tortious interference claim 'rises and falls' with plaintiff's Sherman Act and other antitrust claims." ECF No. 58 at 57 (quoting *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 140 (D.D.C. 2018)). In this case, it falls. As explained, neither federal nor D.C. law can reach that conduct here.

Nor can Temu rely on Shein's "improper DMCA notice[s]" to "support" its interference claims. ECF No. 58 at 56–57. Several courts have persuasively reasoned that the DMCA preempts "state law claims," including for tortious interference, "arising out of the submission of infringement notices." *Stardock Sys., Inc. v. Reiche*, No. 17-cv-7025, 2019 WL 8333514, at *4 (N.D. Cal. May 14, 2019) (citing cases); *see Stevens v. Vodka & Milk, LLC*, No. 17-cv-8603, 2018 WL 11222927, at *1–2 (S.D.N.Y. Mar. 15, 2018). State law is preempted where, among other things, "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Nw. Central Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). Through DMCA § 512(c)'s safe-harbor provision for internet service providers, § 512(g)'s notice-and-takedown procedure, and § 512(f)'s remedy for abuses of that system, Congress has created "a complex and comprehensive statutory regime" intended to "appropriately balance[] the interests of" copyright holders, internet service providers, and the public. *Stevens*, 2018 WL 11222927, at *2 (citation omitted).

Thus, to the extent that Temu's tortious interference claims are based on Shein's alleged misuse of the DMCA, Congress has "provide[d] an express remedy" for that: § 512(f). *Online Pol'y Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1206 (N.D. Cal. 2004). Put differently, "[t]he pervasive nature of" that statute, "including an express remedy for the very wrong that [Temu] here allege[s], 'make[s] reasonable the inference that Congress left no room for the States to supplement' the remedies outlined in the DMCA." *Stevens*, 2018 WL 11222927, at *2 (citation omitted); *see Quill Ink Books, Ltd. v. Soto*, No. 19-cv-476, 2019 WL 13251351, at *2 (E.D. Va. Aug. 15, 2019) ("Plaintiff's state law claims – tortious interference with business expectancy, defamation, and statutory conspiracy, are all tied directly to the allegedly fraudulent DMCA takedown notices and her remedies lie in that statutory scheme, not in state law."). And Temu fails to respond

to—and thereby concedes—Shein's argument that the tortious interference claims are preempted to the extent that they arise from the DMCA notices. *See Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51, 68 (D.D.C. 2013).[11]

### 10.    Temu Fails to State a Claim for Abuse of Process (Count 18)

The crux of Temu's abuse-of-process claim is that Shein has misused "the legal process" by "filing copyright infringement litigations against Temu" for the purpose "maintaining [its] monopoly power" and "interfer[ing] with Temu's business." Compl. ¶¶ 361–65. That claim never gets out of the starting gate.

Because abuse-of-process claims have the "potential to limit unfettered access to the courts and to cause a chilling and inhibitory effect on would-be litigants of justiciable issues," courts approach them with caution. *Rockwell Cap. Partners, Inc. v. CD Int'l Enterprises, Inc.*, 311 F. Supp. 3d 52, 55 (D.D.C. 2018) (citation modified). In the District of Columbia, a plaintiff must allege (1) "the existence of an ulterior motive" and (2) "an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Swanson v. Howard Univ.*, 249 F. Supp. 3d 255, 258 (D.D.C. 2017) (citation omitted). The latter requires "a perversion of the judicial process and achievement of some end not [otherwise] contemplated." *Spiller v. D.C.*, 362 F. Supp. 3d 1, 6 (D.D.C. 2019) (citation omitted).

Temu's complaint, however, falls far short of that standard. Simply filing a lawsuit—"no matter what ulterior motive may have prompted it"—is not actionable because "the gist of" this cause of action "lies in the improper use" of the judicial process *after* the suit is filed. *US Dominion, Inc. v. MyPillow, Inc.*, No. 21-cv-0445 (CJN), 2022 WL 1597420, at *3 (D.D.C. May 19,

---

[11] Temu also hints at its trade secrets claims as providing a basis for its tortious interference claims. ECF No. 58 at 57. But as the Court has already explained, neither federal nor D.C. law reaches the exclusively foreign conduct underlying those counts.

2022).  Yet that is all Temu alleges.  Compl. ¶¶ 362–64.  And the complaint does not identify any act that Shein "has taken other than filing and pursuing its lawsuit[s]."  *Id.*; *see Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 330–31 (D.D.C. 2012).  In response, Temu tries to repackage its abuse-of-process claim by arguing that it "relates to Shein's large-scale DMCA abuse and waves of invalid copyright registrations."  ECF No. 58–57.  But neither involves an abuse "of the *judicial process*."  *Swanson v. Howard Univ.*, 249 F. Supp. at 258 (emphasis added).  Indeed, Temu elsewhere argues that DMCA takedown notices are not even "pre-litigation activity."  ECF No. 58 at 52.

## IV.    Conclusion

For all these reasons, the Court will grant Shein Technology LLC's Motion to Dismiss and dismiss it from the case.  The Court will also grant Shein's Motion to Dismiss as to Counts 5–13 and 15–18 and deny it as to Counts 1–4 and 14.  Finally, as explained throughout, the Court will grant in part and deny in part Temu's Motion to Take Judicial Notice.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 30, 2025